Anne Chapman (#025965)
Lee Stein (#012368)
Kathleen E. Brody (#026331)
anne@mscclaw.com
lee@mscclaw.com
kathy@mscclaw.com
MITCHELL | STEIN | CAREY | CHAPMAN, PC
2600 North Central Avenue, Suite 1000
Phoenix, AZ 85004
Telephone: (602) 358-0290
Facsimile: (602) 358-0291

George J. Terwilliger III*
P.O. Box 74
Delaplane VA 20144
George@gjt3law.com
*Pro Hac Vice

*Attorneys for Mark Meadows*

IN THE UNITED STATED DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona,<br><br>    Plaintiff,<br><br>v.<br><br>Mark Meadows,<br><br>    Defendant. | No. _____<br><br>**NOTICE OF REMOVAL OF CRIMINAL PROSECUTION PURSUANT TO 28 U.S.C. §§1442 & 1455 AND REQUEST FOR LEAVE TO FILE NOTICE BASED ON GOOD CAUSE** |

Defendant Mark R. Meadows, former Chief of Staff to the President of the United States, removes this proceeding from the Maricopa County Superior Court[1] (Case No. CR2024-006850-018, indictment dated April 23, 2024), insofar as it charges

---

[1] A true and correct copy of this pleading is being filed with Maricopa County Superior Court in Case No. CR2024-006850-018 concurrently with the filing of this Notice.

Mr. Meadows in each count of the 9-count indictment, to the United States District Court for the District of Arizona under 28 U.S.C. §§ 1442 & 1455 and hereby requests leave to file this Notice based on recent new Supreme Court authority clarifying the scope of immunity and other good cause articulated below.

Mr. Meadows has the right to remove this matter because he has a federal defense of Supremacy Clause immunity to the State charge and Congress has provided that federal courts are the appropriate forum to adjudicate such issues. The conduct giving rise to the charges in the indictment all occurred during his tenure and as part of his service as White House Chief of Staff. In these circumstances, federal law provides for removal of a "criminal prosecution . . . commenced in a State court . . . against or directed to" a federal official, "in an official or individual capacity, for or relating to any act under color of [his] office." 28 U.S.C. § 1442(a)(1). This Federal Officer Removal Statute "protect[s] the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting within the scope of their authority." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007) (cleaned up).

The Maricopa County indictment squarely relates to Mr. Meadows's conduct as Chief of Staff to the President. Nothing Mr. Meadows is alleged in the indictment to have done is criminal *per se*. Rather, it consists of allegations that he received (and occasionally responded to) messages from people who were trying to get ideas in front of President Trump or seeking to inform Mr. Meadows about the strategy and status of various legal efforts by the President's campaign. Serving as the filter for the President's time and attention is well within the Chief of Staff's role. Indeed, it would be unusual if people did *not* reach out to the Chief of Staff on these matters or that a Chief of Staff would *not* be aware of these significant matters demanding the attention of the President.

In any event, these communications have far less to do with the interests of state law than, for example, murder charges that have been successfully removed. *E.g.*, *In Re Neagle*, 135 U.S. 1, 71 (1890); *Tennessee v. Davis*, 100 U.S. 257, 260–62 (1879). This is precisely the kind of state interference in a federal official's duties that the Supremacy Clause of the U.S. Constitution prohibits, and that the removal statute shields from adjudication in a state court. *See Neagle*, 135 U.S. at 76 (holding that a federal official carrying out his duties "is not liable to answer in the courts of [a State]").

Mr. Meadows intends to file a motion to dismiss the indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure as soon as is feasible. Mr. Meadows respectfully requests that the Court "order an evidentiary hearing to be held promptly" and "dispos[e] of the prosecution as justice shall require." 28 U.S.C. § 1455(b)(5). Here, justice requires the prompt dismissal of the charges against Mr. Meadows. At a minimum, in the meantime, federal law requires granting removal, which will halt the state-court proceedings against Mr. Meadows, *see* 28 U.S.C. § 1455(b)(5), while the motion to dismiss is resolved.

## I.     This Court Has Jurisdiction, and Removal Is Warranted.

Removal under § 1442(a)(1) is proper when a defendant shows (1) he is an officer within the meaning of the statute, (2) there is a "causal nexus" between the alleged conduct and his official duties, (3) and he can "assert a colorable federal defense." *DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th Cir. 2023) (quotation omitted). The "causal nexus" test is "quite low," *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017), and derives from the statute's requirement that the charged conduct be "for or relating to any act under color of . . . office." 28 U.S.C. § 1442(a)(1). To meet this test, a defendant must show only that the charged conduct is "connected or associated with" his official duties. *DeFiore*, 85 F.4th at 557 n.6. The requirement of showing a colorable federal defense is also quite low. The Supreme Court has "rejected a 'narrow, grudging interpretation' of the

statute" when "construing the colorable federal defense requirement." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). Thus, "an asserted federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020) (en banc) (quotations omitted).

This matter—insofar as it relates to charges against Defendant Mark R. Meadows—arises directly from his service as Chief of Staff to the President. Mr. Meadows served in that role from March 31, 2020, until January 20, 2021. He was thus an "officer" within the meaning of § 1442(a)(1) when the conduct alleged in the indictment occurred.[2]

The allegations giving rise to the indictment as it concerns Mr. Meadows occurred during Mr. Meadows's tenure as White House Chief of Staff and are "for or relating to" that role. The indictment sets forth the following factual allegations (and only the following factual allegations) as they relate to Mr. Meadows[3]:

- While **Unindicted Coconspirator 1** himself was unwilling to accept that he lost the election, **MEADOWS (018)** had confided in a White House staff member in early November 2020 that **Unindicted Coconspirator 1** had lost the election. Nevertheless, **Unindicted Coconspirator 1** wanted to keep fighting the election results, and **MEADOWS (018)** wanted to "pull this off" for **Unindicted Coconspirator 1.**

- The Trump Campaign next filed a suit on November 8, 2020, in *Trump v. Hobbs,* Maricopa County Superior Court No. CV2020-014248. The claims relating to the Presidential election were dismissed five days later because

---

[2] In another case arising from Mr. Meadows's service as Chief of Staff to the President, the U.S. Court of Appeals for the Eleventh Circuit was the first and only court in 150 years to hold that the Federal Officer Removal Statute does not allow removal by *former* officers. *See State v. Meadows*, 88 F.4th 1331 (11th Cir. 2023). That novel ruling—which, of course, is not binding precedent in this Court—is flatly wrong and the subject of a forthcoming petition for writ of certiorari to the U.S. Supreme Court.
[3] *See* Attachment 2 (indictment).

the lawsuit would not have changed the outcome of the election. That prompted **KELLI WARD (001)** to text **MEADOWS (018),** "WTH," and ask **MEADOWS (018)** "[a]re our lawyers in AZ afraid of being blackballed by the left," and conclude "[i]t sounds like that's a total cop out."

- **GIULIANI (012),** unindicted coconspirators, and others also tried to contact the Republican Supervisors. For example, an Arizona Congressional Representative sent a text message to **MEADOWS (018)** on November 8, 2020, that he had "placed some calls to the board of supervisors without connecting so far," later writing, "I can give you some idea what's going on with the county supervisors." **KELLI WARD (001)** sent **MEADOWS (018)** a text message on November 13, 2020, "Just talked to POTUS. He may call the Chairman of the Maricopa Board of Supervisors," who was then Clint Hickman. Hickman later received a call from the White House Switchboard on New Year's Eve, but he did not answer.

- As an example, the then-United States Secretary of Energy texted **MEADOWS (018)** on November 4, 2020, "HERE"s an AGRESSIVE STRATEGY: Why can't the states of GA NC PENN and other R controlled state houses declare this is BS (where conflicts and election not called that night) and just send their own electors to vote and have it go to the SCOTUS."

- Similarly, **MEADOWS (018)** received a text on November 5, 2020, that **Unindicted Coconspirator 1** should "urge GOP officials in close states to expose shenanigans and, if necessary, to refuse to seat Biden electors in the event of a fake count." That same day, **Unindicted Coconspirator 1's** son texted **MEADOWS (018)** a more developed plan revolving around the electors: "It's very simple If through our lawsuits and recounts the Secretary of States on each state cannot 'certify' that states vote the State Assemblies can step in and vote to put forward the electoral slate Republicans control Pennsylvania, Wisconsin, Michigan, North Carolina etc. we get Trump electors."

- An Arizona Congressional Representative similarly texted **MEADOWS (018)** on November 6, 2020: "I'm sure you have heard of this proposal. It is to encourage the state legislatures to appoint a look doors [sic] in the various states where there's been shenanigans. If I understand right most of those states have Republican Legislature's [sic]. It seems to be comport with glorified [sic] Bush as well as the Constitution. And, well highly controversial, it can't be much more controversial than the lunacy that were sitting out there now. And It would be pretty difficult because he would take governors and legislators with collective will and backbone to do that. Is anybody on the team researching and considering lobbying for that?"

**MEADOWS (018)** responded, "I love it."

- The memo eventually made its way to members of the Trump Campaign, some who questioned Unindicted Coconspirator 4's plan to have the Republican electors vote in all six listed states. With the exception of Wisconsin and possibly Georgia, they concluded that there were no pending lawsuits that could change the outcome of the election in the remaining six states. Trump Campaign officials also had general concerns about **GIULIANI's (012)** efforts. For example, Advisor Jason Miller wrote **MEADOWS (018)** on December 6, 2020, "[a]ll guidance appreciated, as the legal turf war thing is new to me!"

The charged conduct comprises acts taken by Mr. Meadows, whether in an individual or official capacity, under color of his role as Chief of Staff to the President of the United States. *See* 28 U.S.C. § 1442(a)(1).

As is apparent on the face of the indictment, Mr. Meadows received messages from a number of individuals as part of his official duties as Chief of Staff given his proximity to the President. The indictment, as it relates to Mr. Meadows, consists almost entirely of allegations that he received and occasionally responded to messages from people who were trying to get those ideas in front of President Trump or seeking to inform Mr. Meadows about the strategy and status of various campaign efforts.

Indeed, it is readily apparent that the text messages Mr. Meadows received were sent to him *because* he was the Chief of Staff to the President. The senders were seeking to get their message to the President through Mr. Meadows, to persuade the President's closest senior advisor, or simply to keep Mr. Meadows apprised of what was happening. When those messages hit Mr. Meadows's phone, none of them forced him out of his role as Chief of Staff to the President. To the contrary, fielding that sort of incoming from people who want the President's attention or to influence his decision-making is squarely within the Chief of Staff's responsibilities. Even assuming that the proposals being suggested to Mr. Meadows were illegal under state law, that is all the *more* reason why it would be appropriate for the Chief of Staff to be aware of them. Only by being aware of such proposals could the Chief of Staff ensure that the President is getting sound advice to combat any unsound advice he may be receiving.

Finally, Mr. Meadows has colorable defenses to the charges in this Arizona indictment that arise under federal law, including a federal immunity defense under the Supremacy Clause of the Federal Constitution. *See* U.S. Const., Art. VI, cl. 2; *In Re Neagle*, 135 U.S. 1, 57 (1890); *Idaho v. Horiuchi*, 253 F.3d 359, 365 (9th Cir. 2001), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *Clifton v. Cox*, 549 F.2d 722, 726 (9th Cir. 1977).

For purposes of removal under 28 U.S.C. § 1442(a)(1), it is enough that the defendant has a "plausible" federal defense to the charges against him. *Latiolais*, 951 F.3d at 297. Here, the charges against Mr. Meadows far exceed that low threshold. Indeed, as explained below, it is clear from the face of the indictment that the charges against Mr. Meadows should be dismissed under the Supremacy Clause. But for purposes of removal, the Court need not make that determination. Mr. Meadows is entitled to remove this action to federal court because the charges against him plausibly give rise to a federal defense based on his role at all relevant times as the White House Chief of Staff to the President of the United States.

**II.      This Notice Satisfies the Procedural Requirements of 28 U.S.C. § 1455.**

Mr. Meadows seeks to remove this proceeding at an early stage, well "before trial," and while he did not immediately remove within 30 days of arraignment, there is "good cause" for the Court to grant leave to remove it now. 28 U.S.C. § 1455(b)(1). Mr. Meadows, through counsel, pursued an effort to convince the State that it should not pursue the charges against Mr. Meadows. While those efforts have not been successful to date, they reflect an effort to resolve the matter promptly without the need to resort to removal.

Moreover, Mr. Meadows and counsel awaited the Supreme Court's recent decision in *Trump v. United States*, 144 S. Ct. 2312 (2024), as it could, and now does bear on the immunity issue in this matter. The Court's ruling strongly articulates the importance of robust immunity for the President of the United States. While that decision addresses a former President's immunity from *federal* prosecution, its reasoning further bolsters the case for immunity from *state* prosecution for the President and his seniormost advisors. It also underscores the importance of the Federal Officer Removal Statute, which Congress enacted to vindicate those same Supremacy Clause interests.

Mr. Meadows also readily meets the remaining procedural requirements for removal. The grounds for removal are set forth herein. *See* 28 U.S.C. § 1455(b)(2). This notice is filed in the district and division within which is prosecution is pending, it is signed by counsel pursuant to Rule 11 of the Civil Rules, and it contains a short and plain statement of the grounds for removal. *See id.* § 1455(a). This notice also includes as an attachment the publicly filed indictment, which sets forth the charges against Mr. Meadows and other defendants.

**III.     The Court Should Promptly Hold an Evidentiary Hearing, Grant Removal, and Notify the State Court**.

The filing of this notice does not automatically stay the state court proceedings against Mr. Meadows, "except that a judgment of conviction shall not be entered" while this notice remains pending. *Id.* § 1455(b)(3). Mr. Meadows respectfully asks that the

Court promptly hold an evidentiary hearing, grant removal, and notify the state court so as to halt any further state-court proceedings against him. *See id.* § 1455(b)(5). Section 1455(b)(5) provides that, if the Court "does not order the summary remand of [a removed] prosecution"—which would be wholly unjustified here—then "it shall order an evidentiary hearing to be held promptly and, after such hearing, shall make disposition of the prosecution as justice shall require." *Id*.

Mr. Meadows respectfully submits that the most just disposition is for the charges against him to be promptly dismissed pursuant to the Supremacy Clause. The basis for that conclusion is apparent from the facts of the case and the face of the indictment, and Mr. Meadows will submit a separate motion to dismiss which more fully sets forth the facts the law supporting dismissal. But as an initial step, justice requires granting removal and halting any further state-court proceedings against Mr. Meadows. That will allow for the timely consideration of Mr. Meadows's defenses, including his federal defense under the Supremacy Clause, without requiring him to defend himself in state court simultaneously.

The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." U.S. Const., Art. VI, cl. 2. The Supreme Court has long interpreted the Supremacy Clause to provide federal officials "immunity from suit" involving state charges in order to "protect[] federal operations from the chilling effect of state prosecution." *New York v. Tanella*, 374 F.3d 141, 147 (2nd Cir. 2004); *see generally In Re Neagle*, 135 U.S. 1 (1890); *Tennessee v. Davis*, 100 U.S. 257 (1879). States are thus broadly prohibited from bringing "suits under state law against federal officials carrying out their executive duties." *Kordash v. United States*, 51 F.4th 1289, 1293 (11th Cir. 2022).

A federal official is entitled to immunity if he "'was authorized to do [what he did] by the law of the United States,'" if "'it was his duty to do [it] as [an officer] of the

United States,'" and if "'in doing that act he did no more than what was necessary and proper for him to do.'" *Denson*, 574 F.3d at 1347 (quoting *Neagle*, 135 U.S. at 57) (alterations in original). Courts unanimously agree that federal authority under *Neagle* is a question of the official's general role and authority, not specific authorization for the conduct that allegedly constitutes a criminal act.[4] As the Ninth Circuit has explained:

> [T]he fact that a petitioner is not required by law or by direction of his superiors to act as he did is not controlling because "the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority."

*Clifton*, 549 F.2d at 726–27 (quoting *Barr v. Matteo*, 360 U.S. 564, 575 (1959)).

Here, it is unmistakably clear that the indictment charges Mr. Meadows with alleged state crimes based on acts he took as Chief of Staff to the President of the United States and in the course of his duties in the position. *See generally supra* Part I. Indeed, this court is in the unusual position of having Mr. Meadows's testimony under oath in a separate federal court proceeding, which explains (in detail) his role as White House Chief of Staff and why communications like those alleged in the indictment

---

[4] *See Tanella*, 374 F.3d at 147 ("No one disputes that Tanella was acting in his capacity as a federal DEA Agent when he shot Dewgard."); *Kleinert*, 855 F.3d at 317 ("With probable cause of two federal felonies, Kleinert was authorized to arrest Jackson under 21 U.S.C. § 878."); *Long*, 837 F.2d at 745 ("[E]ven though an agent exceeds his express authority, he does not necessarily act outside of the authority conferred by the laws of the United States."); *Clifton*, 549 F.2d at 728 ("[E]ven though his acts may have exceeded his express authority, this did not necessarily strip petitioner of his lawful power to act under the scope of authority given to him under the laws of the United States."); *Livingston*, 443 F.3d at 1227–28 ("The question is not whether federal law expressly authorizes violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties."); *Baucom*, 677 F.2d at 1350 ("In *Neagle*, it was held that the necessary authority could be derived from the general scope of the officer's duties.").

would naturally have been routed to Mr. Meadows in that role.[5] He is therefore entitled to immunity from suit under the Supremacy Clause.

While dismissal of the charges against Mr. Meadows is ultimately the "disposition of the prosecution [which] justice shall require," 28 U.S.C. § 1455(b)(5), the first step is for the Court to accept removal promptly in order to stay the state-court proceedings against Mr. Meadows. By statute, the Court is directed "promptly" to consider whether to accept removal, *see* 28 U.S.C. § 1455(b)(5), and whenever the court "determines that removal shall be permitted, it shall so notify the State court . . . which shall proceed no further," *id.* § 1455(c). Mr. Meadows's entitlement to removal is clear and does not turn on any disputed facts. The standard for removal, moreover, is even easier to meet than the standard for asserting a substantive federal defense. *See Latiolais*, 951 F.3d at 297 (explaining that removal under § 1442 was proper where the defendant's federal defense was "plausible").

Prompt acceptance is also important to stay the state-court proceedings. The Supremacy Clause provides "immunity from suit rather than a mere shield against liability." *Tanella*, 374 F.3d at 147. The issue should be "decided early in the proceedings so as to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the immunity issue decided." *Id.* (cleaned up). Requiring Mr. Meadows to litigate his defenses in parallel in state court would inflict the very injury that Supremacy Clause immunity protects against—both for Mr. Meadows's own sake and for the sake of other federal officials who might be chilled by the prospect of their own state-court prosecution.



//

//

---

[5] *See* Exhibit A, Attached (Transcript of Evidentiary Proceedings, ECF No. 65, *State of Georgia v. Meadows*, Case No. 1:23-cv-03621-SCJ (N.D. Ga. Aug. 28, 2023)).

1

\*      \*      \*

2      The Court should grant Mr. Meadows leave to file this Notice and promptly

3  accept removal.

4  RESPECTFULLY SUBMITTED on July 26, 2024.

5                          MITCHELL | STEIN | CAREY | CHAPMAN, PC

6

7                  By:  */s/ Anne Chapman*

8                      Anne Chapman
                       Lee Stein
9                      Kathleen E. Brody
                       George J. Terwilliger III*
10                     * *Pro Hac Vice*

11

12                     *Attorneys for Defendant Mark Meadows*

13

14

15

16                  **CERTIFICATE OF SERVICE**

17      I hereby certify that on July 26, 2024, I electronically transmitted the attached

18  Notice of Removal with the Clerk of the Court using the CM/ECF System, which will

19  send notification of filing to all registered parties.

20

21

22

23

24                  Peggy McClellan

25

26

27

28



# Exhibit A

1

1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3

4  THE STATE OF GEORGIA,              )
                                      )
5                  PLAINTIFF,         )
                                      )        DOCKET NO:
6                                     )    1:23-CV-03621-SCJ
                                      )
7          -VS-                       )
                                      )
8  MARK RANDALL MEADOWS,              )
                                      )
9                  DEFENDANT.         )
   _____

10

            TRANSCRIPT OF EVIDENTIARY PROCEEDINGS
11          BEFORE THE HONORABLE STEVE C. JONES
               UNITED STATES DISTRICT JUDGE
12                MONDAY, AUGUST 28, 2023

13  APPEARANCES:

14  ON BEHALF OF THE PLAINTIFF:

15    ADAM NEY, ESQ.
      ANNA GREEN CROSS, ESQ.
16    DAYSHA D'ANYA YOUNG, ESQ.
      FRANCIS MC DONALD WAKEFORD, IV, ESQ.
17    JOHN WOOTEN, ESQ.
      NATHAN J. WADE, ESQ.
18
    ON BEHALF OF THE DEFENDANT:
19
      GEORGE J. TERWILLIGER, III, ESQ.
20    JOHN S. MORAN, ESQ.
      JOSEPH MATTHEW ENGLERT, ESQ.
21    MICHAEL LEE FRANCISCO, ESQ.
      EMILY ERB KELLEY, ESQ.
22    FRANCIS J. AUL, ESQ.

23       VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
      OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
24              UNITED STATES DISTRICT COURT
                     ATLANTA, GEORGIA
25                     404-215-1479
              VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

1                           I N D E X

2

WITNESSES:                                      PAGE:

3

MARK RANDALL MEADOWS

4

5            DIRECT EXAMINATION........................  9
             CROSS-EXAMINATION......................... 55
             REDIRECT EXAMINATION......................147

6

7  KURT ROBERT HILBERT

8            DIRECT EXAMINATION........................161
             CROSS-EXAMINATION.........................183

9

10 BRAD RAFFENSPERGER

11           DIRECT EXAMINATION........................186
             CROSS-EXAMINATION.........................215
12           REDIRECT EXAMINATION......................222

13

14                      - - - - -

15

16

17

18

19

20

21

22

23

24

25

1          (HELD IN OPEN COURT AT 10 A.M.)

2          THE COURT:  Good morning.  You-all can be seated.

3          I hope everybody had a nice, cool weekend.  We're

4 getting ready to start today.

5          Let me say this, a couple of logistic matters.  If

6 you-all have a seat in the courtroom right now, you have a

7 seat for the entire day.  If you're with the media and if

8 you're sitting there, you have a seat there for the entire

9 day.  If you're sitting out in the audience, you have a seat

10 there for the entire day.

11          Here's why I'm saying this.  We're probably not going

12 to finish before lunch.  We're probably going to have some

13 breaks.  You don't have to sit there saying, if I leave my

14 seat, I can't get in again.  That's not a problem.

15          We're going to try to proceed as orderly and

16 cautiously as possible.  Again, if you have a seat in the

17 courtroom now, you have that seat all day long.  Okay?

18          Second matter.  It is to me vitally important that

19 the public knows what goes on in this courtroom.  The

20 courtroom belongs to the public, not to the judges, not to the

21 lawyers.  And it is very important to me that the public hear

22 what's going on and be notified what's going on and being

23 involved in what's going on.

24          However, it's also important to me that courtroom

25 decorum is adhered to and followed.  I need you-all in the

 1  public to be as quite as possible, to be as courteous as

 2  possible, and let the lawyers do their jobs.  I do not want to

 3  be put in a situation where I have to say to one of the

 4  marshals remove that person from the courtroom.  I want to

 5  concentrate on what these individuals are saying.  It is

 6  vitally important to Mr. Meadows and vitally important to the

 7  State of Georgia that I hear everything.  Now, I'm saying this

 8  because I know I'm not going to have any problem whatsoever.

 9  However, I need to say it.  Okay?

10          Now, what's going to happen in a moment, Ms. Wright

11  is going to call the case for the day.  Once the case is

12  called, the lead attorney for each side will stand up and

13  introduce themselves and then they will introduce whoever is

14  with them today.  And after that, I will give you-all further

15  instructions.

16          Ms. Wright, you can call the case for the day.

17          THE DEPUTY CLERK:  Yes, sir.  The Court calls the

18  State of Georgia v. Mark Randall Meadows, Civil Action No.

19  1:23-CV-3621-SCJ.

20          MR. TERWILLIGER:  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. TERWILLIGER:  George Terwilliger from McGuire

23  Woods for Mr. Meadows.  With me this morning are my

24  colleagues, Michael Francisco and John Moran.  And in the

25  back, from left to right, Robert Bittman, Francis Aul, Emily

5

1   Kelley, and Joseph Englert.  And, of course, this is

2   Mr. Meadows.

3          THE COURT:  Good morning to everyone.

4          MR. TERWILLIGER:  Thank you, Your Honor.

5          THE COURT:  Good to see you-all.

6          MR. WAKEFORD:  Good morning, Your Honor.  I'm Donald

7   Wakeford and along with my colleagues here, we represent the

8   State of Georgia.  I'm joined at the counsel table by Anna

9   Cross, special prosecutor, and Nathan Wade, special

10  prosecutor.  Behind me here we have Deputy District Attorney

11  Will Wooten and Deputy District Attorney Daysha Young.

12          THE COURT:  Good morning to each one of you-all.

13          Now, on August 13, 2023, a grand jury of Fulton

14  County returned a 41-count indictment against 19 individuals,

15  one of those individuals is Mr. Mark Meadows.  Mr. Meadows is

16  charged in Count One and Twenty-eight of the indictment.

17          In Count One Mr. Meadows is charged with violation of

18  Georgia's RICO Act under 16-14-4(c).  And in Count

19  Twenty-eight he is charged with solicitation and violation of

20  oath of a public officer for unlawfully soliciting or

21  requesting the Georgia Secretary of State, Brad Raffensperger,

22  a public officer, to engage in conduct constituting a federal

23  offense of violation of oath of public office.

24          Now, August 15, Mr. Meadows by and through his

25  attorneys, filed a motion with this Court to remove the case

1  from the Superior Court of Fulton County to the United States
2  District Court for the Northern District of Georgia.

3      On August the 16th of this year, this Court reviewed
4  the motion and determined that some of the reprimand was not
5  going to happen, and this Court denied summary remand and
6  decided that an evidentiary hearing would need to be held on
7  this case under
8  28 U.S.C. 1455.  The Court entered that order on August 16,
9  2023, setting up an evidentiary hearing for today, August 28,
10  2023.

11      The State of Georgia, by and through Fani Willis,
12  United States District Attorney for Fulton County, filed a
13  response on August 23, 2023, asking that the case remain in
14  the Fulton County Superior Court.  A reply brief was filed on
15  August 25 by Mr. Meadows asking that the case remain here.

16      Now, to have this case remain in the United States
17  District Court for the Northern District of Georgia,
18  Mr. Meadows, by and through his attorneys, have the burden of
19  showing this Court three matters:

20      One, he was an officer or any person acting under an
21  officer of the United States;

22      Two, he is facing criminal charges for or relating to
23  any act under color of such office;

24      And, three, that he has raised or will raise a
25  plausible federal defense.

1    Now, Mr. Meadows indicated through his briefs that he

2 meets all three requirements:  That he is a federal officer;

3 that his action as Chief of Staff for then President Donald

4 Trump was part of his duties; and there was a causal

5 connection between his jobs and what he was doing at the time.

6    And he's indicated through the supremacy clause that

7 he has three defenses:

8    One is the supremacy clause defense.  He's also

9 indicated through the 1st and 14th Amendment that he has a

10 defense.

11    The State of Georgia represented by District Attorney

12 Fani Willis disputes that, says there is no casual connection

13 between his job as Chief of Staff and what he was doing

14 through any of the 14 acts that are alleged in the indictment.

15 In particular, the act of calling Secretary of State Brad

16 Raffensperger at the time and arranging a call in which it is

17 alleged -- and the Court puts at this time, there is no

18 evidence in front of this Court of anything -- that it is

19 alleged that then President Donald Trump requested the

20 Secretary of State to remove 11,780 votes.  There's also an

21 allegation dealing with Mr. Meadows coming to Cobb County to

22 watch a vote count.

23    They also allege under the Hatch Act that

24 Mr. Meadows' job did not allow him to be involved in political

25 activity and, therefore, no casual connection, and, therefore,

1  this case should remain in the Fulton County Superior Court.
2  And that brings us here today.

3       With that stated, the Court thinks I have a pretty
4  good idea of what this case is about.  However, if either
5  party wishes to make an opening statements, I will give you
6  ten minutes for an opening statement, followed by evidence
7  from Mr. Meadows, followed by evidence from the State.  At the
8  close of all the evidence, each side will have 30 minutes for
9  closing arguments.

10      Any questions about the procedure coming from
11  Mr. Meadows?

12      MR. TERWILLIGER:  No, thank you, Your Honor.  And
13  we'll save the argument for after we present evidence.

14      THE COURT:  A wise attorney.

15      Any question about procedure coming from the State?

16      MR. WAKEFORD:  No questions, Your Honor.  And I'm
17  picking up what you're putting down, and I will stay quiet as
18  well.

19      THE COURT:  Another wise attorney.  I've always been
20  told when you pick up what the Judge is trying to tell you,
21  that tells the Judge I'm dealing with wise attorneys.

22      With that stated, you may proceed with your case.

23      MR. TERWILLIGER:  Thank you very much, Your Honor.

24      I assume you'd like us to work from the podium?

25      THE COURT:  Yes, sir.  Yes, sir.  You can talk from

1  the podium or from the ELMO system there.

2          MR. TERWILLIGER:  Thank you, Your Honor.

3          Your Honor, we call Mr. Mark Meadows to the stand.

4          THE COURT:  Mr. Meadows, you can come up.

5          Good morning, Mr. Meadows.  If you will remain

6  standing, Ms. Wright is going to administer an oath to you.

7                          ******

8                    MARK RANDALL MEADOWS,

9          having been duly sworn, testified as follows:

10                         ******

11  DIRECT EXAMINATION

12  BY MR. TERWILLIGER:

13  **Q.**   Sir, would you please state your full name and tell the

14  Court where you currently reside.

15  **A.**   Mark Randall Meadows, and I live in Sunset, South

16  Carolina.

17  **Q.**   Mr. Meadows, did there come a time in your professional

18  life when you were in public service positions?

19  **A.**   Yes, sir, there was.

20  **Q.**   Would you please briefly describe what those positions

21  were and what periods of time?

22  **A.**   In January of 2013, I was sworn in as a member of

23  Congress to represent the Eleventh District of North Carolina,

24  a position that I continued to represent for the better part

25  of four terms.  In March of 2020, I left that position,

1  resigned that position to be the Chief of Staff for President
2  Trump and remained in that position until January 20th of
3  2021.
4  **Q.**   In that position as Chief of Staff, were you a
5  commissioned officer of the United States?
6  **A.**   Yes, sir, I was.
7          MR. TERWILLIGER:  May I approach with an exhibit,
8  Your Honor?
9          THE COURT:  Yes, sir.  Have you-all seen this
10 exhibit?
11         MS. CROSS:  No, Your Honor.
12         MR. TERWILLIGER:  We'll give it to them.
13         THE COURT:  Well, let them see it before you hand it
14 to Mr. Meadows.  Let the State see it.
15         MS. CROSS:  Thank you, Your Honor.
16         THE COURT:  You may proceed, sir.
17 BY MR. TERWILLIGER:
18 **Q.**   Do you recognize that document, Mr. Meadows?
19 **A.**   Yes, sir, I do.
20 **Q.**   Could you just tell the Court briefly what it is?
21 **A.**   It looks like a photocopy of the commission that
22 appointed me as assistant to the President and Chief of Staff,
23 signed by Donald Trump.  And it looks like signed by the
24 Secretary of State Mr. Pompeo.
25 **Q.**   What size is the original commission?

1  **A.**   It's probably about that -- that big.  I mean, it's --

2  it's ceremonial, and it's framed on my wall.  But too big --

3  well, I guess not too big to bring in here, but it would have

4  been very difficult.

5         MR. TERWILLIGER:  Your Honor, we would move the

6  admission of Exhibit 1, unless there's an objection.

7         THE COURT:  Any objections?

8         MS. CROSS:  No objection, Your Honor.

9         THE COURT:  It's admitted without objection.

10         (Government's Exhibit 1 was received and marked into

11  evidence.)

12         MR. TERWILLIGER:  Thank you for that.

13  BY MR. TERWILLIGER:

14  **Q.**   Mr. Meadows, first I'd like to ask you some questions

15  about your role as Chief of Staff in general.

16         Approximately how long did you serve as Chief of Staff?

17  **A.**   I served from the end of March of 2020 until January --

18  noon, January 2021.  So about ten months or so.

19  **Q.**   And if you could, would you give the Court an idea of

20  what the atmospherics were like working in the White House as

21  Chief of Staff?  What your working hours were, you know, in

22  general, who you dealt with, what you did, and those sorts of

23  things?

24  **A.**   I don't know that I was really fully prepared.  I don't

25  know that anybody that's not done the job is ever fully

1    prepared for what would happen.  It was -- it was a 24-hour,

2    7-day-a-week kind of job.  I can tell you my -- if this would

3    be appropriate -- kind of just what my schedule was.

4    **Q.**    Please.

5    **A.**    So I would normally try to get to the office between 7

6    and 7:30 in the morning.  And as I got there, I would get my

7    -- my security daily presidential briefing with CIA and others

8    about threats to the United States.  I would try to get caught

9    up on as many to-dos that I could get done prior to the

10   President coming down from the residence.

11        Once the President would come down from the residence, I

12   was on call and oftentimes would be called in the oval on a

13   minute's notice.

14        Beyond that, you know, meeting with cabinet members,

15   meeting with elected officials, meeting with state officials,

16   meeting with business leaders, meeting with staff, trying to

17   manage the staff.  It was a very broad responsibility.  I

18   would work trying to set -- set up all of the meetings making

19   sure that everything flowed.

20        Candidly, trying to catch-up on what things that the

21   President might be addressing that was not part of our to-do

22   for that day.  And in addition to that, would stay generally

23   until the President would go up to the residence between 7 and

24   8 or 9 o'clock.

25        From there, would drive to the apartment, making phone

1  calls, returning phone calls, and trying to finish up on

2  things that I didn't have the time to do.

3      Those were challenging times, bluntly.  COVID had just

4  hit, and what would normally be your schedule got -- really

5  set a different priority because people's lives were at risk.

6  **Q.**   You mentioned and your commission indicates you're the

7  Chief of Staff.  Did you formally have another title?

8  **A.**   Well, most of the time they called me chief, but Chief of

9  Staff.  But it was actually assistant to the President and

10 Chief of Staff would be the official commission.  And so,

11 broadly, my function was to oversee all the federal operations

12 -- not just in the West Wing, but more broadly than that.

13 **Q.**   You mentioned in your description the staff, quote,

14 unquote.  Could you explain to the Court what constitutes the

15 Executive Office of the President?

16 **A.**   Well, the Executive Office of the President is not just

17 the West Wing.  I know a lot of people just see it as the --

18 the West Wing from TV and things like that, but it would not

19 be just that, that group of people.

20     The executive, they called it EOP.  You would have either

21 an EOP e-mail address -- so we had the Eisenhower Building

22 that was opposite of west -- west of that as well.  And so you

23 had a very broad staff that was -- in addition to just the

24 core people that were there in the West Wing, you would have

25 people in the Eisenhower Building.  And then you had a variety

1  of -- of cabinet members that were dispersed throughout the

2  country.

3  **Q.**   And other than the President, who is the senior official

4  in charge of the Executive Office of the President?

5  **A.**   That would have been me, sir.

6  **Q.**   You mentioned the President and coming down.  How often

7  in a given day, if you can quantify it this way, might you see

8  the President over the course of a day or a week or a month,

9  for that matter?

10 **A.**   Well, perhaps, it's best just on a daily basis.  I mean,

11 multiple times during the day.  So it was less so on weekends,

12 even though I would be in the office the majority of the

13 weekends.  Less so on weekends.  But certainly during the day,

14 by multiple -- you know, it could be a dozen to 20 or 30, I

15 mean, and that's on a daily basis.  But hundreds if not

16 thousands of times over a monthly basis.

17 **Q.**   And did you have formal working hours in your role as

18 Chief of Staff?

19 **A.**   24/7.  You know, not -- I don't -- you mean clock in,

20 like, at 7 or out at 11?  No, sir, I didn't.

21 **Q.**   And as Chief of Staff, were you ever given leave?  Did

22 you have a vacation schedule that you were entitled to or

23 anything of that sort?

24 **A.**   When -- when I took the job, I told the President that I

25 had one particular prepaid vacation of sorts, that ended up

1  not being much of a vacation, but that my kids had given me

2  for our 40th wedding anniversary.  And that I had to be away

3  on one weekend for my daughter's wedding.

4  **Q.**   I guess what I was trying to get at is, as civil servants

5  who have allocated leave in a given year, keep a time sheet

6  and are entitled to take a certain number of hours or days,

7  did you have that?

8  **A.**   No, sir.  If I did, I was not aware of it.

9  **Q.**   Did your job ever take you outside of the White House

10  complex and the West Wing?

11  **A.**   Yes, often.  I mean, I would travel -- I would travel

12  with the President.  I would travel to meet with members in

13  Congress up on Capitol Hill.  I mentioned COVID earlier, there

14  were a number of trips up to Capitol Hill when we were

15  negotiating relief, but yes.

16  **Q.**   Without getting into anything that might be classified,

17  was there any requirement with your position that you had to

18  fulfill in connection with presidential travel?

19  **A.**   Yes.  I mean, to not get into anything classified, I

20  think it's pretty well-known that -- that the Chief of Staff

21  or his designee has to travel with -- with the President

22  whenever he travels along with the military aid.  And

23  obviously we don't know -- there's threats daily to the

24  American citizens in this great country, and you never know

25  when those threats are going to come in.  And so you have to

1    travel.

2    **Q.**   You mentioned a couple of times in your description of

3    the job in general, Mr. Meadows, meetings.  Could you be more

4    specific and talk about what kinds of meetings you would

5    attend, where they would be, with whom they might be, and why

6    you -- you might be there?

7    **A.**   So -- a variety of meetings, but -- but to try to be

8    specific for the Court, for Your Honor, I would be invited to

9    almost every meeting that the President was having, whether it

10   was as a principal or whether it was as an observer.  Part of

11   my job was to not only be aware of everything that was going

12   on or try to be aware of everything, which ended up being a

13   much more difficult task than I could ever, ever imagine, but

14   trying to be aware of everything that was going on even if I

15   was not a principal in that particular meeting.

16        So, you know, the types of meetings, many times the

17   President would have meetings with cabinet members, certainly

18   as it dealt with military operations, national security

19   issues, policy issues, policy discussions.  Some on executive

20   orders -- less so on executive orders.

21        I would actually be meeting oftentimes with -- with

22   people that were trying to get in -- in to see the President.

23   So instead of actually seeing the President, they would --

24   they would see me as the next best thing -- which, you know,

25   seeing the President is here (indicating), and, you know, Mark

1  Meadows is way down here.  But they felt like if they couldn't

2  get to the President, they could get to me and that was

3  getting his ear.

4       You know, one thing that comes to mind, if you don't mind

5  me sharing, sir -- excuse me, Your Honor.

6       THE COURT:  I answer to everything.  Sometimes it's

7  even worse at home.

8       THE WITNESS:  Me, too.

9       I can remember one, the Secretary of Agriculture

10 called me because I had a previous relationship from North

11 Carolina.  He was the Secretary of Agriculture from North

12 Carolina.  He said, Mark, we're about to have a crisis of no

13 protein, no chicken, no pork, no beef because of COVID,

14 everything that's happening.  You know, you need to make sure

15 that the President understands that this is -- you know,

16 people will starve.

17      And I trusted this individual even though I, you

18 know, only knew him on a professional basis.  And then we

19 ended up very quickly putting together a group of people that

20 worked on both poultry, swine, and beef, in terms of trying to

21 make sure that -- that all of that came together.

22      So setting that -- that call up was, basically --

23 started with an informal -- one of those informal

24 conversations between the Secretary of Agriculture, Mr.

25 Troxler, and me, that ended up with industry leaders where we

1  were actually trying to make sure that we address it and did

2  address it.

3          It's one of the things that honestly didn't get

4  reported on that much.  You know, it fortunately was one of

5  the crises that we averted.  During a COVID meeting with

6  airline executives, because they were concerned that they were

7  all going bankrupt because nobody was flying, obviously, and

8  so we would bring them in.  They actually -- I met with most

9  of those in the Roosevelt Room -- talking about everything

10 from prescription drug policies, bringing in doctors, and

11 industry leaders there.  So a variety of -- maybe I've gone on

12 way too much, but just trying to give some specifics.

13 BY MR. TERWILLIGER:

14 **Q.**   So just sticking with meetings for a minute.  You said

15 sometimes -- I believe you said, the record will reflect,

16 sometimes you were a participant, sometimes you were more an

17 observer.  Could you sharpen that distinction a little bit?

18 And at whose discretion would you either be -- so I'm asking

19 you two questions -- would you either be at a meeting or not?

20 So tell us a little bit about what you mean by the distinction

21 between participant or principal and observer, and then why

22 would you -- what would control whether or not you went to a

23 given meeting or not?

24 **A.**   Well, the first part of that is a principal versus just

25 an observer.  Oftentimes as a principal you would come in, you

1   might have a particular position, whether it was three or four

2   cabinet members, you were talking about a particular issue.

3   So what -- a lot of times I would come in and say, all right,

4   well, we've got the Secretary of Agriculture who thinks that

5   we need to do this, the Secretary of Energy thinks we need to

6   do this.  Set the plate, try to show the pros and cons of both

7   of their arguments so that some resolution could be made.  So

8   that would be more as a principal.

9        If the President was having meetings, again, I was copied

10  on certainly setting up the schedule.  The scheduler was right

11  outside of my complex.  So the West Wing has the Oval Office

12  kind of over here, there's a long hallway, the Chief of Staff

13  is on the other corner.  And so outside of my office is the

14  scheduler, executive assistants, Deputy Chief of Staff.  So

15  the scheduler is there working that.

16       So I would be aware of the President's schedule.  There's

17  always a demand on the President's schedule.  Part of me being

18  there as an observer is -- was to try to move meetings along.

19  The President would have -- would spend more time talking to

20  people than was ever on the schedule.  And so trying to, you

21  know, do the wrap-up and -- and bring things to a close where

22  there was an action item there.

23       The other is to be generally aware of what's going on.

24  So a lot of times the meetings asked for were getting so I

25  could give the President advice, either in private or in the

1  meeting.  Most often, Your Honor, that advice would be more

2  one-on-one after the meeting; you know, if I was an observer

3  and not a principal, where, you know, here's some concerns as

4  I dealt with that.  But really it was about me trying to be

5  aware.  You know, you play offense and defense, and I found

6  myself on defense a whole lot with things coming at me that

7  came from a million different directions.

8       And so the President had a style that was such that, you

9  know, he would ask you about any given topic.  You know, the

10 topic could be on withdrawal from Afghanistan, which is one of

11 the things that was there while we were there.  But he might

12 ask about three or four different other topics in that

13 particular meeting.  So it's trying to understand what was

14 going on and be aware of that.

15 **Q.**   The second part of my question -- which I thank you for

16 that -- I'll repeat.  Was did somebody set a schedule, the

17 President or otherwise, for what meetings you would attend or

18 not or was that up to you?

19 **A.**   Oftentimes, that was -- was up to me.  I was certainly

20 welcome at all kinds of meetings.  If I was a principal,

21 certainly I had to be there, but on a lot of the others, I

22 would make a very quick pop in, see if things were going --

23 and, bluntly, see if there was someone there who could, you

24 know, wrap-up a meeting, basically bring the meeting to a

25 close.

1    There were times when, bluntly, I would get a call from

2  the Outer Oval.  And, Your Honor, again, you had the Oval and

3  then in the Outer Oval, right outside of there was two

4  executive assistants, a Deputy Chief of Staff, and that was

5  between that and the cabinet room.

6    And so that Outer Oval, you know, they could hear a lot

7  more that was going on.  And so sometimes it was a meeting

8  that I wasn't planning to attend, and then all of a sudden I'd

9  get a call and they'd say, you know, you may want to get down

10  here.  You know, there are some issues that will have to be

11  addressed.

12  **Q.**  Before we leave meetings, just to make sure we're being

13  clear and complete, you've mentioned meeting with members of

14  Congress, other executive branch officials.  You alluded to

15  some outside parties such as airline executives.  Did you ever

16  meet with state or local government officials from outside of

17  the federal establishment?

18  **A.**  Yes, certainly.  Oftentimes, we would met with state

19  officials on a variety of topics, and would do that pretty

20  regularly.  You know, some of the highest profile state

21  officials that I can recall would be the Governor of New York,

22  the Governor of New Jersey, the Governor of Texas, and meeting

23  with some of their -- their cabinet officials or elected

24  officials as well.  Yes, sir.

25  **Q.**  Turning to communications, what part of your job involved

1 communications that you were involved in?  And could you,

2 again, like you did with meetings, kind of give the Court an

3 overview of what kind of communications came with your role as

4 Chief of Staff?

5 **A.**    So communications, like --

6 **Q.**    All forms.

7 **A.**    All forms, okay.

8 So we had, obviously, a press secretary and

9 communications director.  We had a deputy communications

10 director, one of which would sit close to my office.

11 But in terms of all of the communication that was going

12 out, there were daily presidential briefings.  When I got

13 there as Chief of Staff, they hadn't done briefings like --

14 you know, like President Biden is having briefings at the

15 White House.  Those had not been done in a while.  We started

16 those back up.

17 Similar to, Your Honor, what you said, the people had the

18 right to know.  And so in -- in doing that, you know, I was

19 intimately involved in a number of those, setting those

20 functions in place.

21 Communications in terms of going out personally and

22 getting updates in terms of -- at the White House, they have

23 what we commonly refer to -- if this is too much detail, I'm

24 sorry.

25 THE COURT:  No, I have a question.

1        THE WITNESS:  Yes.  Yes, sir.

2        THE COURT:  When the person went out and got

3   information, how did you do it?  If you got something -- you

4   said you personally went out.  Tell me more about that.

5        THE WITNESS:  So oftentimes what would happen is

6   there would be a question where we would actually have a

7   particular issue.  So let me pick COVID, because COVID seemed

8   to dominate at that particular point.

9        I would actually reach out to the FDA in terms of

10  some of the progress they were making.  I would reach out to

11  HHS in terms of some of the progress they were making there.

12  And so communicating that.  There was a big interaction with

13  state officials and certainly with the American people because

14  of the relief packages that had been approved by Congress.

15       THE COURT:  Excuse me for interrupting.

16       THE WITNESS:  No, no.

17       THE COURT:  What kind of communications did you make

18  with state officials?

19       THE WITNESS:  I beg your pardon?

20       THE COURT:  What type of communications did you make

21  with state official, governors?

22       THE WITNESS:  So all types.  So governors, state

23  legislators, secretaries of -- of ag, like I mentioned with

24  Mr. Troxler.  We would deal with a number of them on FEMA

25  issues as well.  So as you probably recall, you know,

1  everybody was looking for federal aid because of -- and so my

2  interaction with state officials got probably a lot more.

3         And one of the nuances is FEMA approval, it actually

4  goes through the National Security Advisor.  Makes no sense to

5  me, but it made sense to somebody at some point.  And so the

6  National Security Advisor actually had the other corner office

7  just down from mine.  And so we would actually interact with

8  them as well.

9         And so it could be a variety -- again, a lot of those

10  state officials were just looking for access to the President.

11  There were times when I felt like my phone number was

12  plastered all over every bathroom wall in America.  I mean, it

13  just -- phone calls kept coming.

14         But to that point, having that communication, we

15  would try to go out and make sure the American people knew

16  what was coming.  One of the big ones was when we had

17  approved, you know, billions of dollars for relief.  We would

18  start getting calls from, well, the relief is not getting to

19  this hospital or it's not getting to that hospital.

20         My communication with members of Congress elevated

21  because they were all looking at their own constituency, and

22  rightfully so, both Republican and Democrat.  And there was an

23  area out on -- in front of the White House, we refer to it as

24  Pebble Beach, only because there are a lot of pebbles, but if

25  you see a picture of the White House where, you know,

1  reporters are there, that's commonly referred to Pebble Beach.

2       So from time to time, I would go out there and

3  actually talk to reporters.  There's always a pool of

4  reporters at the White House to make sure we got the message

5  out.

6       THE COURT:  Thank you.  And I'm sorry.

7       THE WITNESS:  No, no, very insightful question.

8       THE COURT:  I'm sorry to interrupt your line of

9  questioning.

10       MR. TERWILLIGER:  Not at all, Your Honor.  Please,

11  any time.  We want you to know what you believe you need to

12  know.  Thank you for that.

13  BY MR. TERWILLIGER:

14  **Q.**   In talking about communications, you mentioned telephone

15  calls.  I assume you also communicated by other means?

16  **A.**   Yes.  I mean, I think everybody knows text messages, but

17  not -- you know, in-person meetings.  We would have telephone

18  text message and, certainly, individual meetings.

19  **Q.**   So in terms of text messages, I think it probably is

20  true, as you say, everybody knows that you had a lot of text

21  messages that, for example, wound up with the January 6th

22  committee in the House of Representatives.

23       Tell the Court a little bit about your receiving text

24  messages, particularly, frankly, in the post-election period

25  and how they got to you, what they were about, and what was

1 your protocol, if any, for handling them.

2 **A.**    Well, there were more than I could handle.  I mean, I had

3 all kinds of incoming from everywhere.  What I tried to do is,

4 you know, give a courteous response, regardless of the merits

5 of what was being asked or not.  Give a courteous response.

6 Some of those I would just leave as not doing anything with.

7 **Q.**    Can you think of an example of that?

8 **A.**    There were so many.  Yeah.  Yeah.  You know, I think

9 there's -- there was a couple recommendations of what the --

10 are we talking pre or post --

11 **Q.**    Either way.  I'm trying to give the Court a flavor of

12 what the incoming was and what you did with it.

13 **A.**    Yeah.  So there would be a lot of recommendations in

14 terms of, you know, what we should do on a particular policy;

15 engaging in withdrawal from Afghanistan was one of those.

16 There were a number of people that believed that we ought to

17 increase our troop levels in Afghanistan.  The President had

18 already made a pretty clear decision on that.

19      And so, you know, I don't know that I got text messages

20 on that, but certainly phone calls on that subject.  And would

21 not follow up on that mainly because the President had already

22 made a decision on which -- which way to go there.

23      You know, that being said, you know, if the question came

24 up, you know, are people with us 100 percent on this, we would

25 say, no, we're still hearing from individuals that believe

1    that we need to ramp up our support -- some of which were on

2    Capitol Hill.

3    **Q.**    You also communicated by e-mail, I presume.  Did you have

4    an e-mail address?

5    **A.**    Yes.  Both -- both personal e-mail and a White House

6    e-mail.

7    **Q.**    Obviously, 2020 was an election year when you came into

8    the job.  Did you -- what -- what aspects of your job as Chief

9    of Staff intersected with political matters?  And it might be

10   useful -- well, let me just ask that first.

11   **A.**    So a lot of them.  I mean, everything from the policies

12   that you're considering, executive orders at your decision.

13   There's, you know, certainly a political component to all of

14   that.

15        You know, in an election year there's always a demand for

16   the President's time.  I think the campaign team, they would

17   like 100 percent of his time.  You know, for me, trying to

18   make sure that not only we were addressing the official duties

19   of -- of the country, but trying to allocate that time.  So

20   there was a large intersection where you would intersect with

21   those individuals as well.

22        Politically, the things that you're doing, what are the

23   priorities?  Do you send -- one, you know, do you send a

24   direct check to the American people?  Is that going to be

25   viewed positively or negatively?  And largely, positively, you

1  know, people -- people were hurting.  I mean, people were

2  really hurting.  And so -- so there was a political component

3  to -- to certainly everything that we did.

4  **Q.**   Let me direct your attention specifically to the period

5  after the November Election Day and the Inauguration in

6  January.

7      Was -- what things -- leaving the election matters aside

8  for a moment, what other things, if any, occupied your

9  attention and/or matters?  I think you just said priority for

10  the administration.  What was going on?

11  **A.**   Well, in those last, you know, 60 days or so, you know,

12  bluntly, I know we are here today on an issue that seems like

13  that that was the, you know, the top paramount issue.  But for

14  me, it was not.  There was all kinds of things that we were

15  having to get done.

16  **Q.**   Could you give some examples?

17  **A.**   Yeah.  I mean, so I mentioned Afghanistan withdrawal.

18  That was one of those we were still working on.  There was

19  national security threats.  We continued to have threats that

20  were real.  There was trying to not only get the -- the last

21  package of COVID relief out the door, you know, I think that

22  didn't come to a screeching halt because of the political

23  implications, both would it be seen as positive or -- not from

24  our standpoint, we were pushing, but I think Capitol Hill

25  didn't want that to get done.  So those ramped up.  So we were

1   actually working on trying to get the final relief there.

2       There was the National Defense Authorization Act that was

3   coming up that had to get done as well.  And Mr. Mnuchin and I

4   -- excuse me -- Secretary Mnuchin and I were intimately

5   involved in trying to make sure that we got at-home tests for

6   COVID.

7       One of the things that we felt like was, is that it would

8   give confidence to people being able to get back to work.  And

9   so, you know, we originally told -- you know, having, you

10  know, an at home -- and what I refer to as kind of like a

11  pregnancy test, where you can take it at home.  And, you know,

12  the same we wanted for COVID.  And so he and I were in ways

13  myopically focused on that, trying to get that done.

14      There was pardons and -- and executive orders that the

15  President wanted to get done.  It actually had a vetting

16  process.  So when you do an executive order, it actually goes

17  through a number of different processes before it ever gets

18  seen by the President.  It may start with an idea, but it goes

19  through a process where you have principals that weigh in.

20  And ultimately the staff secretary is the one that drafts it

21  up before it -- so all of that was there, in addition to a

22  peaceful transfer of power, there was a transition that --

23  that, you know, we had to start and address.

24      You know, getting a secure place from -- where at that

25  point President Elect Biden could actually review some of the

1  national security threats that we were getting and making sure

2  that he was getting his briefings and still working with

3  Mr. Klain who was ultimately his Chief of Staff at the time.

4  **Q.**   Again, without going into classified -- any classified

5  information, did there come a time where you were having a

6  daily telephone call or regular telephone call with Secretary

7  Pompeo and General Milley, the Chief of Staff?

8  **A.**   Yes.  That was actually in the last 15 days or so, after

9  January 6.  We would have normal -- normal national security

10  briefings where you would do that, but trying to make sure

11  that --

12  **Q.**   How did that phone call come about, setting that up?

13  **A.**   There was -- it was raised as an issue that some of our

14  adversaries may see us as weaker after January 6, after what

15  happened at the Capitol.  So I set up a morning call between

16  myself, Secretary Pompeo and General Milley, the Chairman of

17  the Joint Chiefs, so that we could in realtime -- and most of

18  those were not long conversations -- but just identify, you

19  know, are any of our adversaries coming after us.  That was on

20  a secure line that I set up and recommended that we do after

21  January 6.

22  **Q.**   So if I could go back over a couple of things.  You've

23  mentioned a number of national security issues:  Withdrawal

24  from Afghanistan, the reauthorization of the National Defense

25  Authorization Act, COVID relief, some other programs and

whatnot.  What -- what involvement was required in your job

with those things in terms of dealing directly with political

figures, whether in the federal government or elsewhere?

**A.**    Certainly my direct involvement was -- was there and

required at a 100 percent, primarily, because it had to be

expedited.  I mean, there was only 60 days left.  And so as --

I was acting as a principal, and so I'd have a number of

conversations with those individuals.

**Q.**    But what individuals?

**A.**    Well, so in terms of the principals, in terms of those

particular -- that was responsible.  So if it was -- I can

remember Senator Schumer was real concerned about money

getting to some of the hospitals in New York.  And so I had

the deputy secretary for HHS, along with a number of his

people saying, all right, where are we on the money, why is

not getting here, how much is actually going, so that we could

actually have a conversation with Senator Schumer and update

him on that.  That's one -- one example that comes to mind.

**Q.**    In the -- in the campaign period, explain your role, if

any, in relation to the President's reelection campaign and

what, if any, interactions you would have with people in

charge of or running the campaign?

**A.**    You mean was I -- was I --

**Q.**    Yes.

**A.**    I'm not -- I was never paid by the campaign, never

1 | supervised the campaign, and they had their own structure.

2 |     Certainly I would interact with them.

3 | **Q.**   Why would you interact with them?

4 | **A.**   Well, the President oftentimes, even if it's just simple

5 | schedulings -- that's the simplest thing.  But we'd interact

6 | with them on a regular basis.  They would come in and, you

7 | know, be giving a briefing prior to the election, prior to

8 | November 30 -- November 3rd, they would actually come in and

9 | meet with the President oftentimes.  And so something as

10 | mundane as just setting up those meetings to -- to actually

11 | following up with a number of those at the President's

12 | direction.

13 | **Q.**   When you mentioned travel before and going with the

14 | President, did you travel to any, for lack of a better term,

15 | I'll call it campaign rallies that the President was the

16 | principal?

17 | **A.**   Yes, sir, a number of them.

18 | **Q.**   And why would you travel to those?

19 | **A.**   Well, in my official capacity, again, we had to be -- I

20 | want to just try to make sure I'm not violating any --

21 |     THE COURT:  Yes.

22 |     THE WITNESS:  I'm in enough trouble as it is.

23 |     THE COURT:  Just take your time, think about it, you

24 | know.

25 |     THE WITNESS:  Yeah.  So, thank you, sir.  Your Honor.

1          So in traveling with the President, both from the

2     standpoint of the -- the way that you staff the President, so

3     those logistics concerns, you're there, you're working in your

4     official capacity to make sure that if anything happens while

5     he is out at a rally, that you would be there.

6          In addition to that, there were still demands on his

7     time for official actions that had to take place.  I can

8     remember one specifically where we were trying to get a

9     hostage out of a country in Northern Africa, and so we were

10    dealing with that in realtime while we were actually traveling

11    with the President on Air Force One.  And so running the

12    country continued to go on.

13    BY MR. TERWILLIGER:

14    **Q.**    Going specifically to political matters, you've mentioned

15    a couple of times needing to know what's going on --

16    **A.**    Yes.

17    **Q.**    -- as a reason you would go to a meeting or about taking

18    some other discretionary action on your part.  Why did you

19    need to know what was going on, including politically?

20    **A.**    One, to give advice to the President of the United

21    States.  To help prioritize his time.  But the other is, is

22    trying to skate to where the public is.  There were no rhyme

23    or reason where questions might come up, whether they were

24    political in nature, whether they were policy in nature,

25    whether they were national security in nature, those would

 1  come up.

 2      And so having -- having a broad understanding of what was

 3  going on was -- was critically important as a senior advisor

 4  to the President so that I could anticipate what logistics

 5  were needed and what we needed to do.

 6  **Q.**  You've no doubt heard the expression "policy is

 7  politics"?

 8  **A.**  Yes.

 9  **Q.**  What does that mean to you?

10  **A.**  Well, it just means that everything that you do from a

11  policy standpoint has a political implication.

12  **Q.**  And was it part of your job to be aware of those

13  political implications?

14  **A.**  Sure.  I mean, understanding whether it was something

15  that -- that would be viewed to help the American people,

16  knowing the pushback we would get both from the American

17  people but from Congress.  I mean, you know, it would be

18  different if it were just the President of the United States

19  signing things into law.  But it's, you know, we've got three

20  equal branches of government, and one of those had to

21  understand the politics of those policies and how they'd be

22  viewed on Capitol Hill as well.

23  **Q.**  Directing your attention specifically to the

24  post-election period, did you maintain, or not, a general

25  awareness of what was going on with the challenges to election

1  results by the President and/or his campaign?

2  **A.**   Certainly a general awareness and tried to have a deeper

3  understanding -- are there things that even recently I've

4  become aware of that I wasn't aware of?  Yes.  But having an

5  understanding of what was going on and who was in the

6  President's ear.  The President, Your Honor, would have a

7  number of people that would have direct access to him.  And so

8  trying to understand that even though one of my jobs is trying

9  to be a gatekeeper, that was a lot more challenging with

10  President Trump.

11  **Q.**   Did you, in fact, try to limit or eliminate the access of

12  anyone to the President in the post-election period?

13  **A.**   Yeah, there were times where I -- I did try to limit some

14  of the access.

15  **Q.**   Because why?

16  **A.**   Well, it just -- it created a number -- a number of

17  challenges for me, because it would raise issues, whether they

18  were allegations or things to deal with that I felt like it

19  was -- you know, having the team -- and by the team what I'm

20  talking about is his legal team addressing those issues

21  directly, trying to limit that would -- I thought would allow

22  him more time to do the things that were part of the official

23  duties.

24  **Q.**   Did people from either the inside or the outside, whether

25  it's the campaign, the legal team supporting the President, or

1  just other people on the outside, did you receive any

2  communications from those people concerning the potential for

3  challenging the election or the election results?

4  **A.**   Yes.  I mean, I would get text messages, phone calls,

5  some were one-on-one meetings.  But certainly would get -- a

6  number of allegations were made.

7  **Q.**   And what was the volume of those, say, in the period of

8  November and December?

9  **A.**   More than -- than you could deal with.  There were times

10 where, you know, it reminded me of, like, an Andy Griffith,

11 you know, where all this incoming is coming -- like an

12 operator, you know, that you might get something and plug it

13 into this hole and, you know, try to route it on the -- on

14 some of the legitimate stuff, but, you know, hitting all of

15 these cross wires trying to get it here or there, but more

16 than you could handle.

17 **Q.**   I'm not sure that it's clear what you mean by that.  You

18 mentioned the concept of routing it and you also mention the

19 concept of legitimate.  Did you do any separating of the wheat

20 from the chaff, as those things came up?

21 **A.**   Yeah, certainly.  There were some that just didn't get

22 dealt with.  There were others that, you know, if I got

23 something and felt like that, okay, regardless of the merits

24 of this, you know, that's something that DOJ should look at,

25 this is something the campaign can follow up on.  You know, I

1  was -- I was oftentimes seen as the one that if -- you know,

2  if they just got to me, they would be able to have the

3  President's ear.  And so some of those that you would just

4  leave by the wayside, the others you try to -- that's what I

5  was talking about with the operator, try to get them to

6  somebody to take care of the issue and without opining on the

7  merits of those.

8  **Q.**   It's been publicly reported that you were in attendance

9  at a meeting where then Attorney General Barr met with the

10 President in the Oval Office in the post-election period.

11 What was that meeting -- do you recall that meeting?

12 **A.**   Yes.

13 **Q.**   What was that meeting?

14 **A.**   I believe.  I mean, I was in several meetings

15 post-election with General Barr.

16 **Q.**   But was there a meeting where General Barr said he was

17 going to resign?

18 **A.**   Yes, sir, there was.

19 **Q.**   As to that meeting, what do you recall about it, where it

20 was and what occurred?

21 **A.**   When he mentioned that he was going to resign?

22 **Q.**   Yes.

23 **A.**   We were actually -- again, the Oval Office is here, Outer

24 Oval here, there's a dining room that's part of the Oval

25 complex.  It was actually in the dining room area there.  And

38

1  I was actually in that meeting.  We were --

2  **Q.**    What was that meeting about?  What was --

3  **A.**    Well, we talked about the election -- some of the

4  allegations that had been made, and the election --

5  **Q.**    Allegations concerning what?  Be as specific as you can

6  on the subject matter.

7  **A.**    Okay.  So some of the allegations of fraud and election

8  irregularities and a number of those issues that were making

9  headlines at that particular point, and that the President

10 would continue to -- to bring up.  But we were discussing

11 those issues.

12 **Q.**    Do you recall the date of that meeting?

13 **A.**    I don't, sir.

14 **Q.**    Do you know about when it was?

15 **A.**    It would have been -- I believe, as best I can recall,

16 sometime in December, early December, I believe.

17 **Q.**    And to your recollection, did General Barr take a

18 position with the President about election irregularities?

19 **A.**    Yes, sir, he did.

20 **Q.**    And what did he say?

21 **A.**    I think -- well, he just said a lot of it had no merits

22 and that some of it, I think, to use his term, was bullshit.

23 **Q.**    Why were you at that meeting?

24 **A.**    Well, again, as part of -- of being -- advising the

25 President of the United States.  I was -- any meeting that the

1  President would -- would have, generally speaking, I would be

2  there.  We were discussing something that the President had

3  brought up on a regular basis.  I didn't know that Attorney

4  General Barr was -- was going to offer his resignation, but I

5  think he had made some public comments that prompted that

6  meeting as well.

7  **Q.**   You're aware of a federal statute or a series of

8  statutes, actually, that are generally known as the Hatch Act?

9  **A.**   Yes, sir, I am.

10 **Q.**   You're not a lawyer, are you?

11 **A.**   No.

12 **Q.**   In your understanding, and particularly in regard to the

13 execution of your role in -- as Chief of Staff, tell the Court

14 your understanding of what the Hatch Act required and allowed,

15 for that matter.

16 **A.**   Well, my understanding is you can't advocate for a

17 particular candidate in your official -- and by advocating,

18 you know, be out there and saying, you know, please vote for

19 President Trump or President Biden, you know.  I think it's

20 come up recently with the press secretary and, you know, under

21 President Biden, that you can't campaign actively for -- in

22 your official title is my understanding.

23      And broadly, you know, other activities that I was

24 involved with, you know, from my standpoint were certainly

25 allowed.

1  **Q.**   Did there come a time where you were actually dinged for

2  an alleged Hatch Act violation?

3  **A.**   Yes, sir, there was.

4  **Q.**   Tell the Court what the circumstances of that was.

5  **A.**   I was actually doing an interview out on Pebble Beach and

6  on a totally unrelated topic, and -- and kind of, I think, at

7  the end of that interview -- as I recall it.  I mean, you

8  know, it's three years ago.  But as I recall it, at the

9  interview they asked me about a candidate that was going to

10  replace my old congressional seat.  And I think I made the

11  comment, I think, you know, he'll make a fine member of

12  Congress.

13      And very shortly after that was a -- you know, there was

14  a group that said that I had violated the Hatch Act and made

15  the allegation.  And I know from there it had two effects:

16  One, I went to our ethics attorneys and said, you know, what

17  am I supposed to do?  You know, I'm having an interview about

18  other subjects and then all of a sudden, you know, they ask

19  this question.  Am I supposed to say no comment?

20      And, you know, he -- he basically said, well, you know,

21  maybe not have on the chyron that you're the Chief of Staff

22  and -- but I was talking about other -- other...

23      So it made me extremely cautious from there, because, you

24  know, any time that, you know, somebody would start to ask a

25  political question -- but really what it had, the chilling

 1  effect is, is that I did a whole lot less interviews at that
 2  point.
 3          THE COURT:  Was this as a result of a report from the
 4  special counsel, this event?
 5          THE WITNESS:  No, sir, I think that came later, Your
 6  Honor.  But early on, I mean, almost immediately, one of the
 7  groups said, Well, you know, Meadows has violated.  I found
 8  out about it reading a headline, honestly.
 9          THE COURT:  Okay.
10          THE WITNESS:  Yeah.
11  BY MR. TERWILLIGER:
12  **Q.**   Do you know whether or not the office of the White House
13  counsel took a position as to whether or not you violated the
14  Hatch Act in that interview?
15  **A.**   Yes, sir.
16          MS. CROSS:  I object, Your Honor, to any hearsay that
17  the witness is being called for.  I think as phrased, it was
18  "are you familiar with," and I have no objection to the
19  witness answering that question.
20          MR. TERWILLIGER:  I think he can say whether or not
21  he knows --
22          THE COURT:  Hold on, hold on.  She's talking.
23          MR. TERWILLIGER:  Sorry.
24          MS. CROSS:  I think it's the content of any advice or
25  any response from another White House counsel or anybody else

 1 | that would be hearsay, and we object.

 2 |         THE COURT:  I will allow Mr. Meadows to testify to

 3 | anything what we deem resulted, but not what the special

 4 | counsel said specifically.

 5 |         MS. CROSS:  Thank you, Your Honor.

 6 |         MR. TERWILLIGER:  So you're allowing --

 7 |         THE COURT:  What happened?  Did anything happened to

 8 | you?  What was the result?  Don't tell me what the special

 9 | counsel said.  What was the result after the end of the

10 | conversation?

11 |         THE WITNESS:  My understanding from the White House

12 | counsel's office is that they said that I had not violated the

13 | Hatch Act.  Did I mess up?

14 |         THE COURT:  No, you did fine.

15 |         Move on.

16 |         THE WITNESS:  All right.  Sorry, Your Honor.

17 |         MR. TERWILLIGER:  Your Honor, may I approach?

18 |         THE COURT:  Yes.

19 |         MR. TERWILLIGER:  Thank you.  I'm going to show

20 | Mr. Meadows what has been marked as Defense Exhibit 2, which

21 | is the indictment in this case, which I assume our opponents

22 | are familiar with.

23 |         THE COURT:  You may approach, sir.  Yes, sir.

24 |         MR. TERWILLIGER:  Your indulgence for a second, Your

25 | Honor.

1            THE COURT:  Yes.

2    BY MR. TERWILLIGER:

3    **Q.**   I'm going to direct your attention, Mr. Meadows, to page

4    21 -- well, maybe I should have you identify the exhibit first

5    for the record.

6    **A.**   This says defense -- or Exhibit Defense 2, and it appears

7    to be an indictment filed on August 14, 2023, from --

8    Ché Alexander, Clerk of Court, Fulton County Superior Court.

9    **Q.**   Thank you.  I direct your attention to page 21.

10            THE COURT:  Are you moving for it to being admitted?

11            MR. TERWILLIGER:  Pardon me, Your Honor?

12            THE COURT:  Are you moving to have it admitted?  Are

13   you going to have him testify from it?

14            MR. TERWILLIGER:  Well, I assume --

15            THE COURT:  Let's just have it admitted for the

16   record.

17            MR. TERWILLIGER:  Okay.

18            MS. CROSS:  I have no objection.

19            THE COURT:  It's admitted without objection.

20            (Defense Exhibit 2 was received and marked into

21   evidence.)

22            MR. TERWILLIGER:  Thank you, Your Honor.

23   BY MR. TERWILLIGER:

24   **Q.**   Directing your attention to what's denominated as Act No.

25   5 in that indictment, to the extent that you engaged in the

1  conduct described therein, if any, can you tell the Court

2  whether or not you undertook that activity in connection with

3  or related to your role as Chief of Staff?

4  **A.**   Act No. 5?

5  **Q.**   Yes, sir.

6  **A.**   So certainly.  That was -- it would be in my capacity as

7  Chief of Staff, that particular meeting as I recall happened

8  late in the evening.  As I mentioned earlier, it's very -- it

9  was very common to meet with -- I was not a principal, but --

10  but to be in meetings in the Oval Office, particularly when

11  there was no one else there to -- to kind of do the wrap-up

12  and try to get, you know, to bring a meeting to a close.  But

13  it would have been in my official capacity as Chief of Staff.

14  **Q.**   Is there anything about that meeting that you

15  particularly recall as occurring that you were involved in?

16  **A.**   As I recall, most of the state legislators were -- were,

17  you know, in a "U" right in front of the President's desk in

18  the Oval.  Again, would not have been as much as a

19  participant.  The President would have been leading that

20  meeting.  And as we wrapped that up, I think most of that had

21  to do with allegations of potential fraud in Michigan, and

22  what, you know, they may or may not do as a legislature.

23  **Q.**   And why would you need to be aware of what was happening

24  in that meeting as Chief of Staff?

25  **A.**   Well, certainly as Chief of Staff, again, giving advice

to the President, but, also, making sure that White House

counsel is informed, others being able to give advice to the

President.  And certainly as a gatekeeper trying to round

things -- you know, wind things up.

But, again, in that broader scope of trying just to be

aware of what is consuming the President's time or taking his

attention.

**Q.**   Did you give political advice to the President?

**A.**   Certainly.

**Q.**   Did the President ask you for political advice?

**A.**   Yes, sir.

**Q.**   While we're on that, is there one or more offices in the

Executive Office of the President under the Chief of Staff

that are involved in political affairs?

**A.**   Two that I know of.  We would actually have a couple of

different federal roles within -- and, actually, most of those

were housed, as I talked about earlier, in the -- they're part

of the EOP, part of the Executive Office of the President, but

would be either housed in -- not in the West Wing, but

certainly in either the Eisenhower Building or other parts of

the White House.

**Q.**   When you were a member of Congress --

**A.**   Yes.

**Q.**   -- part of that time was during the Obama administration?

**A.**   Yes, sir.

1   **Q.**   Did you ever deal with any political officers of that
2   administration while you were a member of Congress?
3   **A.**   I don't know that I -- political in nature in that there
4   was a -- what they would call a congressional liaison.  So I
5   dealt with their congressional liaison who was reaching out to
6   me as an elected official.  Because if you'll recall, during
7   parts of that the Republicans had a majority in the house, I
8   believe, not in the Senate.  And I can't remember when I had
9   that contact.  But certainly had contact with those
10  individuals in the Obama administration.
11  **Q.**   Did you meet with other people on the White House staff
12  in that time when you were in Congress?
13  **A.**   Not as much, just -- I don't know that President Obama
14  was seeking my advice on -- but -- but not as much.  I was a
15  newer member of -- of Congress, and so most of our
16  interactions had to do with, early on, just some of the
17  legislation that we were dealing with.
18  **Q.**   Directing your attention again on page 21 of the
19  indictment to Act No. 6, as it's denominated there, can you
20  tell us if any -- to the extent you engaged in the conduct
21  described there, if any, to any degree, can you tell us
22  whether or not you undertook that activity in connection with
23  your role as Chief of Staff?
24  **A.**   Yes.  And, certainly, as -- in my role as Chief of Staff
25  to get additional phone numbers for the President on a variety

1  of individuals.

2      Most of the time, Your Honor, the White House switchboard

3  had, you know, a pretty wide Rolodex.  It was -- but from time

4  to time, the President or the White House switchboard or

5  Ms. Michael -- Ms. Michael was his executive assistant that

6  sat in the Outer Oval -- would ask me for, you know, do you

7  have contact for this particular person.  Sometimes not even,

8  you know, with the context of why they wanted it.  Just the

9  President wanted the phone number.  So I was asked on a pretty

10 regular occasion for numbers.

11     And if -- if it helps the Court to give a little color, I

12 mean, to this, the President typically would see someone in a

13 particular state as being all knowing in terms of everything

14 in that particular state.  I know when I was a member of North

15 Carolina, he would call me for just about anything that was

16 happening in North Carolina and expect me to know.  And I

17 assume a similar kind of thing here with Mr. Perry, because he

18 was a member of Congress from Pennsylvania, asking for those

19 numbers.

20 **Q.**   Directing your attention to Act No. 9 on page 22 of the

21 indictment, Mr. Meadows, to the extent that you engaged, if

22 any, in the conduct described therein, did you undertake those

23 activities in connection with your role as Chief of Staff?

24 **A.**   Well, as I previously stated, it was not uncommon for me

25 to, as Chief of Staff of --

1  **Q.**   Can you answer that first question yes or no?

2  **A.**   Can you ask it again?  I'm sorry.

3  **Q.**   Yeah.

4        To the extent that you engaged in any of the activity, if

5  you did, described in Act No. 9, did you undertake that

6  activity in connection with your role as Chief of Staff?

7  **A.**   Yes.

8  **Q.**   And is there something in particular you wanted to say

9  about this?

10  **A.**   Yeah.  On this particular meeting, Your Honor, I -- to

11  the best of my recollection, I was not actually in this

12  meeting.  Again, a lot of this may be fuzzy, but what I seem

13  to recall about the Pennsylvania meeting was -- actually, I

14  was in my office, in my Chief of Staff office down the hall

15  when this delegation came in.  They actually came into, I

16  mentioned earlier, the cabinet rooms, not into the Oval

17  Office.

18        And I had somebody come to me in my Chief of Staff office

19  and said that three people had positive for COVID.  At that

20  particular point, we were testing everybody for COVID that

21  came in to meet with the President.  And they came into my

22  office and said that there's three people that have COVID.

23        I recall going down to -- to the cabinet room where they

24  were assembling at that particular point, introduced myself as

25  the Chief of Staff, and then tried to let the individuals know

1  that there was three of them that wouldn't be able to meet

2  with the President because they had -- had, you know, come

3  down with a positive COVID test.

4    And then trying to make sure that -- that -- if the

5  meeting was to go on, that it would actually keep the

6  President safe and keep him a proper distance away from --

7  from individuals.  And so I don't recall being in -- in the

8  rest of that meeting, but if I had been, certainly it would

9  have been like other meetings being the Chief of Staff.

10 **Q.** Let me direct your attention to page 24 of the indictment

11 and Act 19, please.

12 **A.** Act 19 you said?

13 **Q.** Yes.

14   To the extent you engaged in the activity described

15 therein, if any, would you have undertaken that -- did you

16 undertake that activity in your role as Chief of Staff?

17 **A.** Yes.  Any -- any action on -- it was common for the Chief

18 of Staff, in his role of Chief of Staff, to ask individuals

19 for memos on a variety of topics, and -- and I often did so.

20 **Q.** Who is Mr. McEntee and what was his role, if any, in the

21 Executive Office of the President?

22 **A.** Mr. McEntee was head of personnel policy, and would deal

23 with setting up resumes, people to consider for vacancies and

24 the like in the administration.  He had been the President's

25 body man at one time as well.  He had a very close

1  relationship with the former President.  And -- but at that

2  particular point, he would have been the head of personnel

3  policy.

4  **Q.**  Do you believe you asked Mr. McEntee for a memorandum for

5  a strategy for disrupting and delaying the joint session of

6  Congress on January 6?

7  **A.**  No, sir, I don't.  I -- when this came out in the

8  indictment, this was the biggest surprise for me because I had

9  zero recollection.

10        THE COURT:  You don't remember asking or you did not

11  ask?

12        THE WITNESS:  I did not ask and -- well, certainly I

13  don't remember asking.  But I'm saying I did not ask and

14  here -- can I -- can I --

15        THE COURT:  Stop, think about it.  There is a big

16  difference between not asking and not remembering asking.

17  Which one is it?

18        THE WITNESS:  And so I would say I did not ask.  And

19  here is the -- and that's not to infringe on anybody's

20  credibility.  I want to make sure the Court knows that.

21  Here's -- here's the reason.  One, it was a surprise to me.

22        Two, the second part of that is, is that Mr. McEntee

23  was over personnel.  I remember asking him for recommendations

24  in terms of personnel things, but I don't believe he's an

25  attorney.  Most -- if I were to ask for this kind of memo,

1  Your Honor, it would have been with Pat Cipollone or Eric

2  Cushman or one of the lawyers in the White House counsel's

3  office.  I oftentimes spent more time in their office than I

4  did in mine.

5       And that's why, you know, I'm always -- want to be

6  cautious to make sure I'm truthful and honest with the Court.

7  But I can tell you that me asking Johnny McEntee for this kind

8  of a memo, just -- just didn't happen.

9       THE COURT:  Okay.

10      MR. TERWILLIGER:  Do you have further questions on

11 that, Your Honor?

12      THE COURT:  No, sir, you can proceed.

13      MR. TERWILLIGER:  Thank you.

14 BY MR. TERWILLIGER:

15 **Q.**   Directing your attention to page 44 of the indictment, if

16 I could, please.  Just take a moment and look at that.

17 **A.**   Which act?  I'm sorry.

18 **Q.**   92.  I'm sorry.

19 **A.**   Yes, sir.

20 **Q.**   To the extent, if any, you engaged in the activity

21 described in Act 92 of the indictment, was that in connection

22 or related to your role as Chief of Staff or not?

23 **A.**   It certainly was in my role as Chief of Staff.

24 **Q.**   Would you just briefly explain to the Court the

25 circumstances of you being there and why you went, in

1  particular, assuming you did?

2  **A.**   I did go.  Your Honor, actually, I was in the Atlanta

3  area visiting my children for Christmas.  Both of my children

4  live here in the Atlanta -- greater Atlanta area, and I was

5  here.  There was -- not just with Cobb County, but with Fulton

6  County as well -- concern over the signature verification.

7  I'm not sure who made an allegation, but there were concerns

8  about that process and how it would actually be meted out, and

9  I felt like that anticipating where the President would not

10 only ask, but bring it up, that interrupting my Christmas with

11 my children for a trip over to Cobb County to see the actual

12 count in process would keep me well-informed so that I could

13 advise the President of what I observed in person instead of

14 reading about it or hearing speculation from other people.

15 **Q.**   And what did you observe?  Could you characterize that?

16 **A.**   I -- I observed a very professional operation that was

17 being done, in my opinion, in all the proper ways that it

18 should be.  And -- and as I was able to see a number of

19 investigators, I was able to see the GBI, Georgia Bureau of

20 Investigation, working hand in glove.  You know, there were

21 stacks of ballots up, but -- now, I didn't actually seeing

22 them doing the counting process. I actually looked into the

23 room.  They stopped the counting while I did that.  And -- and

24 I felt like they had done a very professional job.

25 **Q.**   Did any kind of confrontation or other unpleasantness

1  take place while you were there?

2  **A.**   No.  I've read some of the reports that would indicate

3  otherwise, but I've -- I believe that I acted like a gentleman

4  the whole time and was very deferential and truly just in a

5  fact-finding mode to observe what they were doing and felt

6  like the Secretary of State's office was doing a good job on

7  that.

8  **Q.**   And without telling us about any particular

9  communications, did you relay your -- your observations, as

10  you've recounted them here, to the President?

11  **A.**   I did.

12  **Q.**   Directing your attention to Act 93 of the indictment,

13  also on page 44, if you would take a look at that.

14  **A.**   Act 93?

15  **Q.**   Yes.

16  **A.**   Yes, sir.

17  **Q.**   To the extent you engaged, if any, in the activity

18  described therein, did you undertake that activity in

19  connection with your role as the Chief of Staff?

20  **A.**   Yes.  In my role as Chief of Staff, I recommended that

21  the President reach out to Ms. Watson.

22  **Q.**   Directing your attention to the next page, page 45, at

23  96.

24  **A.**   Yes, sir.

25  **Q.**   To the extent, if any, that you engaged in the activity

1  described in Act 96, did you undertake that activity in your

2  role as the Chief of Staff or not, as the case may be?

3  **A.**   Certainly any outreach to the Secretary of State's office

4  that I made was in my role as Chief of Staff.

5  **Q.**   And directing your attention further --

6  **A.**   Can I clarify one thing, though?

7  **Q.**   Yeah, absolutely.

8  **A.**   I don't -- I don't know -- I see what this says in terms

9  of me reaching out to Chief Investigator Frances Watson.  I

10 don't recall reaching out to Ms. Watson.  You know, they've

11 got a quote there, and I don't think that quote actually was

12 to Ms. Watson.

13 **Q.**   Okay.  Thank you for that.

14     Let me direct your attention further to page 50, what is

15 Act 112.

16 **A.**   Page 50?

17 **Q.**   Yes, sir.

18 **A.**   Yes, sir.

19 **Q.**   To the extent, if any, that you engaged in the activity

20 described in Act 112, did you undertake that activity in

21 connection with or related to your role as Chief of Staff or

22 not, as the case may be?

23 **A.**   Yes.  In my role as Chief of Staff, it was not uncommon

24 for me to set up phone calls with the President and state

25 officials, other individuals, everybody, from the King of

Saudi Arabia to others.  And so it was not uncommon for me to

help set those up -- whether I personally did it or worked

with our switchboard or national security team.

            MR. TERWILLIGER:  May I have a moment, Your Honor?

            THE COURT:  Yes, sir.

            MR. TERWILLIGER:  Thank you, Your Honor.

            No further questions.

            THE COURT:  Your witness.

            MS. CROSS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. CROSS:

**Q.**    Good morning, Mr. Meadows.

**A.**    Good morning.

**Q.**    We met briefly this morning but, otherwise, we haven't

met; correct?

**A.**    To the best of my recollection.

**Q.**    I think that's right.

      I want to ask you a few questions.  And we've been going

for a minute, so with the Court's permission, if you'll just

let me know if you need to take a few minutes break.

            THE COURT:  Do you need to take a break?  I think

this cross-examination is not going to be short.  But if you

need to take a break, we can stop and take a break now.

            THE WITNESS:  I'm fine, Your Honor.

            THE COURT:  Are you fine?

1        MS. CROSS:  I'm fine, sir.

2        MR. TERWILLIGER:  Yes, Your Honor.

3        THE COURT:  Okay.

4        MS. CROSS:  Thank you.

5   BY MS. CROSS:

6   **Q.**   So your attorney, Mr. Meadows, asked you a series of

7   questions about the specific acts in the indictment.  And

8   you've still got the indictment there in front of you, don't

9   you?

10  **A.**   Yes, ma'am.

11  **Q.**   All right.  And he asked them in a lawyerly kind of way:

12  To the extent you participated in this alleged activity, was

13  it within the scope of your employment.

14       Do you recall those series of questions?

15  **A.**   Yes, ma'am.

16  **Q.**   Okay.  I'm going to ask you a slightly different version

17  of that question.  If you would turn for me, please, to page

18  21 of the indictment, Act 5.  And I'm going to ask you,

19  Mr. Meadows, did you, in fact, on November 20, 2020, meet with

20  then President Trump and members of the Michigan State

21  legislation in the Oval Office regarding the Trump campaign's

22  allegations of fraud in the election?

23  **A.**   I met with --

24       MR. TERWILLIGER:  Object to the form of the question,

25  Your Honor.  There are multiple questions there:  Did he met

1  with him; what the subject matter was.  I ask that he be asked

2  one question at a time.

3            THE COURT:  Let's do one question at a time.

4            Did you met with him?

5            MS. CROSS:  Absolutely.  Thank you.

6  BY MS. CROSS:

7  **Q.**  Mr. Meadows, did you meet on November 20, 2020, with then

8  President Trump and members of the Michigan State legislature

9  in the Oval Office?

10 **A.**  I don't have my calendar here in front of me, but I do

11 recall meeting with the Michigan State legislative group

12 sometime I believe, in November.  So if -- the 20th sounds

13 about the right date.

14 **Q.**  Okay.  Without committing to the date, on or about

15 November 20, 2020, do you recall a meeting that's described in

16 this way?

17 **A.**  Yes, ma'am.

18 **Q.**  And, in fact, was Mr. Giuliani, Mr. Rudy Giuliani, did he

19 attend by phone?

20 **A.**  I believe he did, yes.

21 **Q.**  Okay.  Now, the Trump campaign at that time had an

22 election challenge pending in Michigan; is that correct?

23 **A.**  I don't know.

24 **Q.**  You don't know that?

25 **A.**  I don't.

1  **Q.**  Do you know if the federal government had any litigation
2  ongoing in Michigan at that time related to the presidential
3  election?
4  **A.**  I don't.
5  **Q.**  All right.
6  **A.**  I don't know.
7  **Q.**  What was the official role of you as a Chief of Staff in
8  that meeting?
9  **A.**  Well, as I said earlier, when they actually came in to
10  meet with the President, you do normal introductions.  Part of
11  that is you're trying to be aware of what -- any do-outs that
12  may be required, so you would listen to that.
13  **Q.**  Let's make sure -- I'm going to stop you there for just a
14  minute.
15  **A.**  Yes, ma'am.
16  **Q.**  I just want to make sure for our court reporter that the
17  record is clear.  When you say "do-outs," is that a kind of a
18  colloquial term for action items or to-do items that might
19  come out of that meeting?
20  **A.**  Where the President might request at a later date
21  something that would happen.  Now, sometimes that happens
22  whether I was in a meeting or not.
23      This particular one, as I recall, was later in the
24  evening, and Mr. Giuliani was not there in person.  So I don't
25  know that there was anybody that could wrap-up the meeting.

1 And so part of me being there in my official capacity would
2 have been to try to assist with time management and wrap-up
3 the meeting as well.
4 **Q.** What was the federal policy, if any, that was advanced by
5 you being present in that meeting?
6 **A.** Well, certainly -- you know, speaking to any federal
7 policy, certainly making sure you have an accurate and fair
8 election would be the only policy that I would know of.
9 But --
10 **Q.** I'm sorry, can I finish my question.
11          THE COURT:  Hold on, hold on.
12          MR. TERWILLIGER:  Your Honor, let him finish his
13 answer, please.
14          THE COURT:  Let him finish.
15          THE WITNESS:  You know, if you're looking at
16 policies, I think all of us as Americans want to make sure
17 there are vote counts and that there are -- that it is a free
18 and fair election.  And so certainly from a standpoint of
19 trying to make sure that elections are -- are accurate, you
20 know, does that have a federal nexus, I would assume it would
21 have a federal nexus.  I mean, we have operations within the
22 federal government that tries to make sure our elections are
23 accurate, whether it's the Department of Homeland Security,
24 DOJ or others.
25          THE COURT:  Let me say this.  The witness has the

1  right to give an answer, but it has to be responsive to the

2  question.

3          MS. CROSS:  That's where I was going.

4          THE COURT:  And you can't go beyond the scope of the

5  question.  I want you to give your answer for that.

6          THE WITNESS:  I'm sorry.

7          THE COURT:  Again, sir, if it goes beyond the scope

8  of the question, I will allow you to be cut off.

9          THE WITNESS:  Yes, sir.  Yes, sir.

10          THE COURT:  You're not a lawyer.  That's their jobs.

11          THE WITNESS:  Okay.

12          MS. CROSS:  Thank you, Your Honor.

13  BY MS. CROSS:

14  **Q.**  All right.  So let me ask my question again, Mr. Meadows,

15  and see if we can keep it a little more targeted.  Okay?  Yes?

16  **A.**  Yes.  Yeah.  I'm sorry.

17  **Q.**  So the -- you talked about a general, as Americans, the

18  interest that we all have in secure and safe elections;

19  correct?

20  **A.**  Sure.

21  **Q.**  All right.  So what I'm wondering, though, is the federal

22  policy, outside one that would apply to everyone, every

23  American, I'm wondering what federal policy was that -- your

24  participation in that meeting -- was advanced by you being

25  there?

**A.**   You mean is there a law that's come to be since I've been in that meeting?

**Q.**   No.  I want to know what you --

**A.**   I'm not following you.  And I'm trying to follow you. I'm not following you.

THE COURT:  How would you being in that meeting affect the federal operations for America?

THE WITNESS:  Well, certainly from a standpoint of -- of the President, it is trying to make sure that I manage his time and make sure that he continues to focus on other federal policies that -- that require his time.  So if nothing more than a time manager on that would be part of it.  But, you know, I would have to speculate on -- on any other federal role.

BY MS. CROSS:

**Q.**   I don't want you to speculate.  But I'm hearing you say that the management of the President's time, that was the federal interest -- please wait until --

**A.**   Yeah.

**Q.**   -- I finish my questions.

**A.**   My apologies.

**Q.**   The court reporter is going to -- it's going to make it a lot easier for her --

**A.**   Okay.

THE COURT:  Hold on, hold on, hold on.  One talking

1  at a time.  You ask the question, you give an answer, and the

2  court reporter can write it down.  Okay?

3  BY MS. CROSS:

4  **Q.**   Other than the time management of the President's

5  schedule that you told us about, is that the only federal

6  interest or policy that you rely on to -- for your testimony

7  on direct that your presence in that meeting was necessary and

8  proper to your role as Chief of Staff?

9  **A.**   No, that would not be the only option.  In addition to

10  that, the President of the United States often makes

11  recommendations on legislation that could come up, makes

12  recommendations on how to make sure elections are safer and

13  securer.  There is potential for executive orders that would

14  come up, to make sure that all of that happens.  So all of

15  those things would be part of why you would have to be in a

16  meeting like that.

17  **Q.**   I understand your testimony that all of those things

18  could potentially be federal interests involved.  And I'm

19  wondering what was the federal interest involved in your

20  participation in this meeting?

21        MR. TERWILLIGER:  Your Honor, I have to object.  That

22  is asked and answered, and this is bordering on badgering.

23        THE COURT:  I disagree.

24        Overruled.  Go ahead.

25        MS. CROSS:  Thank you.

1  BY MS. CROSS:

2  **Q.**   Did you understand my question?

3  **A.**   I think I do.  And so in doing that, again, trying to

4  make sure that elections are safe and secure, and that as

5  issues come up, being able to advise the President on future

6  legislation that may or may not happen, is -- is part of the

7  Chief of Staff's role.  And there are meetings you're in where

8  it actually helps with -- with that particular cause.  There

9  are meetings that are a bust as well.  But that would be why I

10 would have been there in my role as Chief of Staff.

11 **Q.**   Okay.  I think you bring up an interesting point.

12 President Trump certainly had -- then President Trump had a

13 personal interest in the outcome of the election in Michigan;

14 is that correct?  Would you agree with me on that?

15 **A.**   Yes.

16 **Q.**   He was running for reelection; correct?

17 **A.**   At this point the election had already happened, but

18 prior to November 3 he was running for reelection, yes.

19 **Q.**   Correct.

20       And then President Trump was contesting the election

21 results in Michigan; correct?

22 **A.**   You said that earlier.  I was not -- I mean, he was

23 concerned about the election results, but in terms of a

24 lawsuit, I'm not aware of it.

25 **Q.**   And I'm not asking in particular about any litigation

1   that was ongoing at that time.  I understand your response

2   that you don't have that information.  But the subject of this

3   meeting, if I understand your testimony, the subject matter of

4   this meeting was -- were allegations of potential fraud in

5   Michigan that then President Trump was relaying and discussing

6   with the legislators from Michigan; is that correct?

7   **A.**   That is my understanding, yes.

8   **Q.**   All right.  And then President Trump had a personal

9   interest in potentially seeing the election in Michigan, which

10  he had lost, reversed in some way; correct?  He was interested

11  in that?  That was his personal interest?

12  **A.**   I think it would be fair to say that that was his

13  personal interest, yes.

14  **Q.**   Okay.  The federal government, of course, has no role in

15  overseeing the certification of elections in Michigan;

16  correct?

17  **A.**   No role?  I don't know that I would agree with that.  I

18  mean, the Department of Justice would certainly be concerned

19  if something were fraudulent.

20  **Q.**   Outside of an area of fraud, the general administration

21  of the presidential election certification in Michigan, that's

22  not something that the federal government has a role in;

23  correct?

24  **A.**   My understanding is, is that's a -- to certify is a

25  state-by-state role.

1    **Q.**    State-by-state role, not a federal one?

2    **A.**    Well, to say that there are no federal connections, I

3    don't know that that's accurate, if that's what you're saying.

4    **Q.**    I'm wondering if you know what -- if there is a federal

5    connection?  What is the federal connection or nexus that you

6    are relying on?

7    **A.**    Well, certainly having an accurate election that is free

8    from fraud and nefarious activities.

9    **Q.**    I understand.

10       All right.  Do you still have the indictment there in

11   front of you, Mr. Meadows?

12   **A.**    Yes, ma'am.

13   **Q.**    On that same page, page 21, Act 6.

14       Do you see that?

15   **A.**    Yes.

16   **Q.**    And your testimony on direct addressed whether you

17   acknowledge or admit the conduct that is charged there.

18       Do you acknowledge that on or about November 21, 2020,

19   you sent a text to United States Representative Scott Perry

20   from Pennsylvania and stated:  "Can you send me the number for

21   the speaker and the leader of the PA, Pennsylvania,

22   Legislature?  POTUS wants to chat with them?"

23       Did you send that text?

24   **A.**    I believe I did, yes.

25   **Q.**    No reason to dispute that?

1        You're shaking your head no?

2   **A.**   Oh, I'm sorry.  No, no.

3   **Q.**   That's all right.  I understand.  It's easy to do.

4        There was -- the Trump campaign had an election

5   challenge -- or at least understanding that you're not

6   familiar with all the litigation pieces that were ongoing at

7   that time.  You know, though, of course, that the Trump

8   campaign raised allegations of fraud in the Pennsylvania

9   presidential election; correct?  You're aware of that?

10  **A.**   That's my understanding, yes.

11  **Q.**   What was the official role of you as a Chief of Staff in

12  arranging for a meeting between -- or obtaining the contact

13  information as described in that text?

14  **A.**   It was a request that came to me.  And getting a phone

15  number for the President of the United States was -- was

16  something that I did regularly.  And so as Chief of Staff,

17  getting numbers that was not readily available for the White

18  House switchboard, I did on a pretty regular basis.

19  **Q.**   What is your understanding or what was your understanding

20  at or around the time that you sent this text for why then

21  President Trump wanted to chat with the speaker and the leader

22  of the Pennsylvania Legislature?

23  **A.**   I don't know that I had a full understanding of what he

24  wanted to talk to them about at that particular point.

25  **Q.**   And what -- what was your understanding, whether it was

1 full and robust or not?

2 **A.**   I don't know that I had an understanding of what he

3 wanted to talk to him about.

4 **Q.**   As you sit here now, is it your testimony that you did

5 not know what then President Trump --

6 **A.**   I don't recall.  Excuse me.  Go ahead, I'm sorry.

7 **Q.**   It's easier for the court reporter.

8 **A.**   No.  It's polite, too.  Sorry.

9 **Q.**   I understand.

10      Is it your testimony that you did not know why then

11 President Trump wanted to chat with individuals identified

12 there from the Pennsylvania Legislature or that you don't

13 recall whether you knew or you didn't know?

14 **A.**   At this particular date, on the 21st of November, I don't

15 believe I knew why he wanted it.  But I can't say with

16 certainty to the Court that I didn't know.  I actually came

17 down with COVID on November 4th or 5th, and so I was just

18 getting back, you know -- I actually worked from home during

19 that time, but would certainly have been back at that

20 particular time.

21      But knowing all the things that -- you know, all of the

22 reasoning behind it, might not necessarily know that.  You

23 know, certainly, it appears -- but you asked me not to

24 speculate.  So I don't want to speculate.

25 **Q.**   I don't want you -- no, I don't -- I'm asking now what

1  you recall as you sit here of what you were aware of at the
2  time.
3  **A.**   I didn't even recall that I did it, you know, just to be
4  blunt.  It's not unusual, but I didn't recall that I did it.
5  **Q.**   And your testimony here this morning was that this
6  communication, though, you don't recall it specifically, you
7  don't dispute it, this communication was necessary and proper
8  to your role as a Chief of Staff to further what federal
9  interest?
10 **A.**   Well, serving the President of the United States
11 certainly, you know, whether it's phone numbers for state
12 legislators or others.  You know, I was asked oftentimes for
13 phone numbers.
14 **Q.**   All right.  With the indictment there in front of you,
15 Defense 2, can you take a look at page 22 for me, please.  I'm
16 going to direct your attention to Act 9.
17 **A.**   Yes, ma'am.
18 **Q.**   Do you acknowledge, Mr. Meadows, that you did on November
19 25, 2020, have a group of Pennsylvania legislators and others
20 meet with you at the White House?
21 **A.**   There was, on or about that date -- and, again, as long
22 as we're not specific to that date, but -- and I'm not
23 contesting it, I just don't know.  There were a group of state
24 legislature -- legislators from Pennsylvania that came, along
25 with others, with Mr. Giuliani.  And as I previously

1  testified, my recollection of my involvement in that was in

2  the -- the cabinet room.  I don't recall being in any further

3  meeting from that.

4  **Q.**    And I'm not -- I'm going to ask you to be as specific as

5  you can.  And I'm not picking on you, I just want to make sure

6  I understood your direct -- your testimony on direct.

7        Your recollection now, as you sit here, was that you

8  participated in the meeting insofar as you relayed the COVID

9  results for part of the delegation; is that correct?

10  **A.**    Yes.  I introduced myself when I came in.  I think I said

11  that earlier.  But as I recall, and trying to be visual, you

12  know, I came in the side door of the cabinet room.  I think,

13  it's not mentioned here, but I think Bernie Kerik was there,

14  as I recall.

15  **Q.**    I'm sorry, who is Mr. Kerik?

16  **A.**    I just know ex-New York police guy.  He worked along with

17  Mr. Giuliani.  But I think he was there.

18  **Q.**    Mr. Kerik had no federal employment at that time;

19  correct?  He was associated with the campaign?

20  **A.**    Not to my knowledge.  He didn't work for me.  Yeah, so...

21  **Q.**    I believe at one time he received a pardon from President

22  Trump towards the end of the administration; is that correct?

23  **A.**    I do believe so.  I don't recall with specificity, but I

24  know his name came up.

25  **Q.**    I understand.  And Mr. Giuliani was someone who was,

1 again, associated with the campaign; correct?  Or Mr. Trump's

2 personal attorney?

3 **A.**   I think he was an attorney.  His relationship with the

4 campaign, you'd have to speak to the campaign people about

5 that.  I don't -- I don't know what their structure is.

6 **Q.**   Well, he certainly wasn't a federal employee; correct?

7 **A.**   Mr. Giuliani?

8 **Q.**   Correct.

9 **A.**   No, he was not.

10 **Q.**   He was not somebody who worked under your supervision;

11 correct?

12 **A.**   No, he did not.

13 **Q.**   Did he take direction from you?

14 **A.**   No, he did not.

15 **Q.**   Did he give you direction?

16 **A.**   No, he did not.

17 **Q.**   All right.  And what about Ms. Ellis, was Ms. Ellis

18 someone who was --

19 **A.**   You mean by giving -- excuse me.

20         THE COURT:  Yes, go ahead.

21         THE WITNESS:  I want to make sure, by giving me

22 direction -- I mean -- you mean did I report to him or did he

23 at times tell me he wanted something done?  Because I want to

24 make sure I'm clear.  I mean, there's lots of times where

25 Mr. Giuliani might say he wanted something done, but I didn't

1    work for him, if that's what you were asking.

2    BY MS. CROSS:

3    **Q.**    Let's phrase it carefully for both of us.

4         Did you accept direction from Mr. Giuliani?

5    **A.**    As a supervisor of me?  No.

6    **Q.**    Um-hum.

7    **A.**    No.

8    **Q.**    That was no?

9    **A.**    That was a no.  I'm sorry.

10   **Q.**    All right.  And Ms. Ellis was someone, again, who was not

11   under your supervision as a federal employee; correct?

12   **A.**    That is correct.

13   **Q.**    All right.  And in whatever capacity she worked for Mr.

14   Trump, whether it was for the campaign or personally, it was

15   not something that was associated with the federal government;

16   correct?

17   **A.**    That is correct.

18   **Q.**    That was in President Trump's personal capacity, if any?

19   **A.**    Well, I can't speak to that, because they were his

20   attorneys, and so I don't -- you would be asking me to

21   speculate on that.

22   **Q.**    I don't want you to speculate.  Thank you for making it

23   clear.

24   **A.**    They were not federal employees.

25   **Q.**    All right.  So when you talk about what your specific

1  recollection now is, you recall being at that early portion of

2  the meeting with this delegation; correct?

3  **A.**    I do recall that, yes.

4  **Q.**    Do you specifically recall then not being part of any

5  further discussion among this group?

6  **A.**    As -- as I mentioned earlier, I don't recall being part

7  of any further discussions with them.  I'm more of a visual

8  individual, and I don't -- with the Michigan meeting, I can

9  remember, you know, people sitting, you know, and where I was.

10  In this particular one, it doesn't conjure that up.  Again, I

11  want to be careful that I'm not saying anything that's not

12  accurate, but I don't recall being in any other meeting that

13  went on in terms of the Oval Office or anything.

14  **Q.**    Okay.  I think I understand.

15      You don't have a recollection, but would you say it is

16  possible that you did participate further beyond the portion

17  of the meeting that you do recall?

18          MR. TERWILLIGER:  Objection to the form of the

19  question.  Anything's possible.

20          THE COURT:  Rephrase your question.  Make it a little

21  more specific.

22          MS. CROSS:  Sure.

23  BY MS. CROSS:

24  **Q.**    Do you dispute that you were present during any other

25  portion of this meeting?

1  **A.**    Well, based on my recollection, I would dispute it.  I

2  mean, because I don't believe I was there.  But at the same

3  time, if -- if, you know, if there is something that would jog

4  my memory where I could see it, but I just don't -- I don't

5  recall seeing it.

6  **Q.**    Okay.  And, again, I'm just trying to discern how certain

7  you are of your testimony.  Are you certain that you weren't

8  present for any remainder of that meeting?

9  **A.**    What I am certain of is that I went down and informed

10  those individuals of the COVID -- what I believe I did was

11  help escort them out so that they weren't there, is what I

12  believe that I did.  You know, we're asking for three years

13  back.  That's what I think I did, but my wife will tell you

14  sometimes I forget to take out the trash.  So I mean, it's

15  just -- it's just --

16  **Q.**    And I'm on trash patrol, too.  I understand how that can

17  be.

18       So -- but I'm hearing you say that -- are you certain or

19  are you not certain that you participated in the remainder of

20  the meeting?

21  **A.**    To the best of my recollection, I did not participate in

22  the rest of the meeting.  That's my testimony.

23  **Q.**    Okay.  All right.  And your involvement in this meeting,

24  such as it was, what was the federal interest that you were

25  advancing by your participation?

**A.**   So you're assuming that I was in the meeting that I don't recall, is what you're saying?

**Q.**   No, sir.

**A.**   Okay.

**Q.**   The part --

**A.**   So the federal role, obviously, was protecting the President of the United States when I went down to make sure that he was not getting COVID.  So security of our Commander in Chief, that was a federal role in me being there, and trying to make sure that we followed protocols, White House protocols, protocols that I put in place.  So those certainly were being advanced when I was there.

**Q.**   Any other federal role outside the COVID protocol that was in place at that time to protect the President and other White House employees?

**A.**   Well, since I don't remember being in any part of a meeting, for me to opine on what federal role that I may have been there part of, is me trying to speculate on what may or may not have been said, because I don't recall it.

**Q.**   Mr. Meadows, and, you know, just quickly.  If there -- I'm fine with an answer of "I don't know" or "I don't recall."

**A.**   Yeah, I'm just trying to -- and if it's coming across that I'm not being courteous, I don't mean it that way.

**Q.**   I didn't take it that way at all.

**A.**   Okay.  All right.

1    **Q.**    All right.  Can you turn your attention, please, to page

2    24 of the indictment that's in front of you and Act 19.

3         Do you recall being asked questions about -- first of

4    all, I think you -- I understood your testimony on direct

5    examination that you would not have asked Mr. McEntee -- am I

6    pronouncing it correctly?

7    **A.**    McEntee.

8    **Q.**    McEntee.

9         You don't believe that you would have asked Mr. McEntee

10   for a memo that -- as it's described there.  Do you recall if

11   then President Trump did?

12   **A.**    I don't recall.

13   **Q.**    Okay.  You don't recall this interaction at all?

14   **A.**    I don't recall.  Like I say, when I read the indictment,

15   it was a surprise to me.

16   **Q.**    Okay.  Okay.  And are you affirmatively stating that you

17   know it didn't happen or are you saying as you sit here now

18   you don't recall and it doesn't sound familiar to you?

19   **A.**    Well, I think His Honor asked me to -- I said that based

20   on what I believe today, that it didn't happen.  Because he

21   asked me to clarify, I believe.

22   **Q.**    He did?  Okay.

23              THE COURT:  That's how I've got it.

24              MS. CROSS:  Uh-huh.

25   BY MS. CROSS:

**Q.**   All right.  And being asked questions about it doesn't jog your memory at all?

**A.**   No, ma'am.

**Q.**   Okay.  All right.  Can I direct your attention, then, to page 44 of the indictment in front of you, Act 92.

**A.**   Page 44, ma'am?

**Q.**   Yes, sir.  Have you got it there in front of you?

**A.**   Yes, ma'am.

**Q.**   Okay.  All right.  And I understood your testimony to be that, yes, you were in the Atlanta area anyway for personal reasons, it was around the holiday, you were visiting your children; correct?

**A.**   That is correct.

**Q.**   Okay.  And you acknowledge that you did, on December 22, 2020, travel to the Cobb County Civic Center for the purposes of observing the signature audit that was going on at that time; correct?

**A.**   Signature audit process, yes, ma'am.

**Q.**   The process, correct.

**A.**   Yes, ma'am.

**Q.**   And were you invited to that event?

**A.**   No, I was not.

**Q.**   How was it that you arrived there, then?

**A.**   I called to say that I was going to come over and take a look at what was going on.  I actually read in the paper where

it was happening in -- because I think it was at the Cobb

County Civic Center, as the indictment would indicate.  My

Secret Service detail actually arranged for me to arrive there

in a secure manner.  We came in the back where I met with

Ms. Fuchs and Ms. Watson and members of the GBI.

**Q.**   Why was it that you took the initiative to attempt to

observe a portion of the signature audit that was ongoing at

that time?

**A.**   There had been allegations of fraud in both Cobb and

Fulton County that the President had received from others, and

-- and my concern was that -- that if there was an audit

procedure being done, to reiterate with the President the

veracity of that audit procedure, that any results from that

would be accepted and looked at as -- as good government work.

**Q.**   Were you directed by then President Trump or anyone else

to take the action to observe part of the signature audit that

was ongoing?

**A.**   I was not directed by him to do that.  Again, that was

trying to be aware of questions, anticipate questions that

would come up.  And in doing so, indeed, that question came

up.  I can't remember if it came from President Trump or

others, but that question did come up and I was able to talk

about how I felt like Ms. Watson and the GBI had done an

outstanding job in Cobb County.  I had no reason to believe

that if -- if there was fraud, I believe they would find it.

1  If there was no fraud, I believe that they would report that

2  accurately as well.

3  **Q.**   Mr. Meadows, was this activity on or about December 22,

4  2020, was that before or after the meeting with then Attorney

5  General Barr and then President Trump that your attorney asked

6  you about on direct examination?

7  **A.**   Based on the timeline, this would be after that.

8  **Q.**   And I don't think you said, did you agree with General

9  Barr's assessment that the allegations of widespread fraud in

10  the presidential -- 2020 presidential election, did you agree

11  with his assessment of those allegations?

12  **A.**   Yeah.  For me, at that particular point, it was more in

13  trying to make sure that any allegation that was made was

14  dealt with and disposed of and being able to be handled and

15  vetted by the proper groups.

16          THE COURT:  Mr. Meadows --

17          THE WITNESS:  Yeah.

18          THE COURT:  -- that's not responsive to her question.

19          THE WITNESS:  Okay.  All right.

20          THE COURT:  Repeat your question again.  Repeat your

21  question.

22  BY MS. CROSS:

23  **Q.**   Did you agree with then General Barr's assessment, I

24  think you used a colorful term and I will not, but quoting

25  him, so I guess it might be okay, we'll say BS.

1    Would you agree or did you agree at the time you had the

2  meeting with then Attorney General Barr and then President

3  Trump, that the allegations of widespread fraud were unfounded

4  and, in fact, were bullshit?

5  **A.**   It was my opinion at that particular point that there had

6  been a number of allegations that had been made that needed to

7  be -- have further investigation.   That was my personal --

8  **Q.**   Is that to say that you had no opinion?   You agreed with

9  Attorney General Barr?   Or you disagreed with Attorney General

10  Barr?

11  **A.**   My personal opinion at that point was, is that additional

12  investigation into allegations of fraud needed to continue.

13  He was making an opinion on what he had found to date.   Those

14  investigations were ongoing and would continue to go on after

15  that meeting where Mr. Barr -- it was -- I had no reason to

16  doubt Mr. Barr's word and -- and still don't to this day.

17    You know, he said based on what he had seen to the date,

18  during that meeting, that he had found no widespread fraud,

19  but the investigations were continuing.

20  **Q.**   From the time of that meeting with then Attorney General

21  Barr and then President Trump until the time that you arrived

22  at the Cobb County Civic Center to observe a portion of the

23  signature audit on or about December 22, 2020, had you learned

24  new information that provided you sufficient evidence to reach

25  a conclusion?

1  **A.**    To reach a conclusion on what?

2  **Q.**    To reach a conclusion about the allegations of widespread

3  fraud in the presidential election.

4  **A.**    As I stated earlier, there were continuing -- there would

5  continue to be allegations of fraud that were being

6  investigated by DOJ and others at that particular point, and

7  so I don't know that they had reached a conclusion, and

8  because of that I hadn't reached a conclusion.

9  **Q.**    Okay.  And that was kind of where I was going.

10      So you went to the Civic Center in Cobb County to observe

11  what was then the ongoing signature audit in that county;

12  correct?

13  **A.**    That's correct.

14  **Q.**    That audit was being conducted by the Secretary of

15  State's office in Georgia; correct?

16  **A.**    Yes.

17  **Q.**    Among other entities?

18  **A.**    And the GBI.

19  **Q.**    Among other entities.

20      At that time, did you have an opinion about whether the

21  allegations about widespread fraud in Georgia, in particular,

22  were valid or invalid?

23  **A.**    I didn't have enough information to make a determination

24  one way or another.

25  **Q.**    All right.  Do you recall as you sit here now that the

1  Trump campaign had ongoing litigation in Georgia on December

2  22, 2020?

3  **A.**   I don't know about that specific date.  I do know that

4  they had litigation with Georgia, et al., I guess is the best

5  way for me to put it, at some point in December.

6  **Q.**   And what was the federal policy or interests that you

7  were advancing in observing the Cobb County Civic Center

8  signature audit that was ongoing?

9  **A.**   So, again, trying to make sure that I kept the President

10  well informed.  The President -- be able to inform him of any

11  potential for executive orders, future legislation.  Broadly

12  looking at his time and trying to make sure that, with all of

13  the other things that were going on, checking off a box to say

14  this has been checked, that's a question that's been asked and

15  answered.

16      But, again, it was working with the President to try to

17  make sure that he was -- had proper advice and -- and -- and

18  understood what was going on.

19  **Q.**   No federal interests outside the management of the

20  President's time and the general interests that you've

21  described for us?

22  **A.**   Well, I think I mentioned in my testimony just now that

23  the potential federal interest, the potential for future

24  legislation, for executive orders, the potential for other

25  federal agencies to be aware.  You know, it's not just the

1  President.  It would be -- in terms of elections, it's the

2  Department of Homeland Security, it's DOJ, it's others that

3  all are concerned about a free and fair election.  And so

4  being able to advise him of that was -- was critical.  That's

5  part of -- part of my role.

6  **Q.**   That's interesting.

7       Did you advise anybody else about your observations or

8  conclusions after your visit to the Cobb County signature

9  audit?

10 **A.**   Have I advised anybody else?

11 **Q.**   You let us know that you reported back to then President

12 Trump and described the findings as you testified here earlier

13 that the GBI was going a great a job, that the Secretary of

14 State's office was doing a great job.  Is that the sum and

15 substance of your testimony that you reported to President

16 Trump?

17 **A.**   I think it's -- yes.  So I did -- but there would have

18 been other attorneys that I would have shared that with as

19 well.

20 **Q.**   Who are those other attorneys?

21 **A.**   So as I mentioned earlier, most of my interactions would

22 have been with the White House general counsel's office.  So

23 Mr. Herschmann on many of these matters, Mr. Cipollone.

24 That's not to the exclusion of other attorneys in the White

25 House counsel's office, but those would be the two -- my two

1  primary contacts.

2  **Q.**   Okay.  All right.  But much like the Michigan procedure,

3  you know of no federal agency that's involved in the

4  administration of or certification of election results in

5  Georgia, do you?

6  **A.**   So when you say "certification," that's one thing.  If

7  you're talking about is there a federal role in terms of

8  working with secretaries of state, is there a federal role of

9  working with board of elections in terms of a federal role,

10 without a doubt.  There's been hearings on Capitol Hill.  I

11 actually was part of those hearings on Capitol Hill when I was

12 a member of Congress.  And so there is a federal

13 interconnection there.  If that's -- if you're suggesting that

14 there's not --

15 **Q.**   Well, I'm not suggesting.  I'm just asking questions,

16 Mr. Meadows, and perhaps you could answer the questions that I

17 ask you.

18        THE COURT:  Hold on, hold on, hold on.

19        MR. WAKEFORD:  I don't know how to get her attention

20 from way over there.  Myapologies, Your Honor.

21        MS. CROSS:  Okay.

22 BY MS. CROSS:

23 **Q.**   The question I asked you was a little different, though.

24 Let me rephrase, see if we can narrow it even more.

25        What is the federal role in the administration of

1   presidential elections in Georgia?

2   **A.**   The federal role in presidential elections would be

3   working with state and local officials.  The federal role

4   would be included with our Department of Homeland Security and

5   other areas in terms of that interaction, in terms of giving

6   advice for cyber threats, how to keep votes -- so there's a

7   federal role there.

8        THE COURT:  Let me ask this question.  Is there a

9   role under Article II of the Constitution for the President in

10  state elections or any elections?

11       THE WITNESS:  In Article II of the Constitution, I

12  don't -- I don't know that I'm well-versed enough in Article

13  II to go through it.

14       THE COURT:  Article II deals with --

15       THE WITNESS:  No, no.  I --

16       THE COURT:  Is there a role --

17       THE WITNESS:  There's Article I, Article II,

18  Article III, yeah.

19       THE COURT:  Is there a role in Article II for the

20  President in state elections, or any elections, Electoral

21  College or any of those aspects?

22       THE WITNESS:  I don't know enough to --

23       THE COURT:  That's fair.

24       THE WITNESS:  -- to opine on that, sir.

25       THE COURT:  That's fair.

1          MS. CROSS:   And that's -- thank you, Your Honor.

2    BY MS. CROSS:

3    **Q.**   So you weren't acting -- at the time you went to observe

4    the signature audit in Cobb County, you weren't acting out of

5    the belief that you were there in furtherance of a specific

6    article of power that the President had?

7    **A.**   I believed I was there supporting the President, as I've

8    mentioned earlier, in my federal role as Chief of Staff,

9    which, bluntly, is to keep him well-informed and well-advised

10   on a variety of issues.  This particular issue was a good

11   report on what was happening here, and -- and having him

12   advised of that, I did then and still today think that that

13   was the role that I was expected to do as Chief of Staff.

14   **Q.**   I asked you earlier about the administration of

15   elections.

16        Do you know of any or are you aware of any federal role

17   by anybody, any agency, in the certification of elections in

18   Georgia?

19   **A.**   I am not.

20   **Q.**   When you were describing, Mr. Meadows, this period of

21   time post-election -- you were Chief of Staff for

22   approximately ten months --

23   **A.**   Yes, ma'am.

24   **Q.**   -- correct?  Okay.

25        From approximately March 2020 until the January 20, 2021;

1  is that correct?

2  **A.**   That's correct, yes, ma'am.

3  **Q.**   Okay.  All right.  And when your lawyer was asking you

4  questions on direct examination about all of the things that

5  were going on in the post election period, do you recall those

6  questions?

7  **A.**   Most of them, yes, ma'am.

8  **Q.**   Recall the general topic?

9  **A.**   Yes.  Yes, ma'am.

10  **Q.**   Fair enough.

11       And COVID was something that you mentioned, correct?

12  **A.**   Yes, ma'am.

13  **Q.**   The federal response to the COVID pandemic; correct?

14  **A.**   Yes, ma'am.

15  **Q.**   I wrote down that you referred to Afghanistan, the

16  potential withdrawal from Afghanistan, that was something that

17  was occupying a lot of your time; correct?

18  **A.**   Well, it was one of the things, yes.

19  **Q.**   One of the things.

20  **A.**   And --

21  **Q.**   Go ahead.

22  **A.**   I'm sorry.  Go ahead.  I'll let you ask the question.

23       THE COURT:  You can finish your answer.

24       THE WITNESS:  Yes, sir.

25       You know, the withdrawal of Afghanistan actually

1  brought in a whole lot of other, you know, other

2  considerations, and -- you know, I don't want to indicate that

3  that was myopic, I mean, but it was an important issue.  I was

4  just trying to give specifics under the questions for His

5  Honor.

6  BY MS. CROSS:

7  **Q.**   I understand.  Of course, in fact, I think you used the

8  word "myopic."  I think you used that before, you had a new

9  myopic focus on making the COVID tests more accessible and

10  more practical for use; is that correct?

11  **A.**   Yes, ma'am.

12  **Q.**   Okay.  But even amid all of the other duties and

13  responsibilities that you had, you made time on December 22 to

14  go to Cobb County?

15  **A.**   Yes, ma'am.

16  **Q.**   Okay.  To your knowledge, Mr. Meadows, did Mr. Trump's

17  campaign reimburse your travel?

18  **A.**   No.

19  **Q.**   You don't know or they did not?

20  **A.**   I'm not aware of them reimbursing it, no, I don't -- I

21  mean, if --

22  **Q.**   Okay.  All right.

23  **A.**   I would be surprised -- I didn't put in for

24  reimbursement, no.  So I would be surprised.

25  **Q.**   If the Chief of Staff accompanies the President on

1  campaign travel, as you described for us earlier, is that

2  something that is reimbursed by the campaign?

3  **A.**   I don't believe so.

4  **Q.**   Do you know for sure that it is not?

5  **A.**   I've asked that question.  And my understanding is, is

6  that because so much of my work requires me to be there as

7  Chief of Staff and to be there, that there was a certain group

8  of people that were required to be there in the Chief of Staff

9  role, and that was one of those.  And so that didn't get

10  reimbursed.  That was my understanding from discussing it with

11  an attorney, in-house attorney.

12         THE COURT:  I don't want to get into attorney/client

13  discussion.  That's good enough, what he said.

14         MS. CROSS:  Yeah, I'm happy to move on from that.

15  That's fine.

16  BY MS. CROSS:

17  **Q.**   Do you recognize, Mr. Meadows, of course, that then

18  President Trump had a personal interest in that election

19  outcome in Georgia; correct?

20  **A.**   Sure.

21  **Q.**   And, in fact, he was pretty personally invested in the

22  Georgia election outcome; correct?

23  **A.**   I think to say the President was interested in all of the

24  election outcomes would be accurate as they affected him, yes.

25  **Q.**   All right.  I think you acknowledged in your direct

1  testimony -- we're still there on page 44, Mr. Meadows,

2  Act 93, if you could take a look at that for me, please.

3  **A.**   Which act?  I'm sorry.

4  **Q.**   93.

5  **A.**   Yes, ma'am.

6  **Q.**   Okay.  Do you acknowledge, sir, that you did, on December

7  23, 2020, arrange a telephone call between Ms. Watson and then

8  President Trump?

9  **A.**   Yes, ma'am.

10  **Q.**   Were you on that call?

11  **A.**   I was not.

12  **Q.**   Are you aware of anyone other than then President Trump

13  and Ms. Watson on that call?

14  **A.**   I am not.

15  **Q.**   And you used the contact information for Ms. Watson that

16  she had provided to you the day before at the Cobb County

17  energy center -- Civic Center?

18  **A.**   Either -- either that contact or Ms. Fuchs, one or --

19  Ms. Fuchs was my primary contact, Ms. Jordan Fuchs, I'm sorry.

20  But I seem to have a vague recollection that, yes, it was a

21  phone number that I gave him.

22  **Q.**   Okay.  And Fuchs, for the court reporter, is spelled

23  F-U-C-H-S.  Is that your understanding?

24  **A.**   Yes, ma'am.

25  **Q.**   Okay.  All right.  If you turn to the next page, Act 96,

1  can you take a look at that for us, please, on page 45.  You

2  let us know that there -- the allegation is that a text

3  message was sent to Ms. Watson, but actually your recollection

4  is that text message was sent to Ms. Fuchs; correct?

5  **A.**   I don't know that I said that for the Court, but that is

6  my recollection, yes.

7  **Q.**   Okay.  All right.  So you do acknowledge that on or about

8  the 27th of December, 2020, you sent a text message -- we

9  believe to be to -- do you have a specific recollection that

10  it was to Ms. Fuchs?

11  **A.**   The phone number I believe is Ms. Fuchs'.  And so

12  Ms. Watson, I don't -- I don't know that I communicated with

13  Ms. Watson after visiting Cobb County.  I can't say with

14  certainty.  But I don't recall any conversation with her.  But

15  my belief is, is this particular one was not Ms. Watson.  It

16  would have been Ms. Jordan Fuchs.

17  **Q.**   All right.  Is the content of that text consistent with

18  your recollection?

19  **A.**   I think there were several text messages, as I was going

20  back and forth with Ms. Fuchs on that.  And I believe we

21  provided those to the January 6th committee.

22  **Q.**   You were subpoenaed for your phone records and your

23  texts.  What were you subpoenaed?  What was the scope of the

24  subpoena that you received from the January 6th commission?

25  **A.**   I -- I don't -- I -- broad, I'm sure.  But --

1   **Q.**   I'm sure that's true.

2   **A.**   -- I don't remember.

3   **Q.**   All right.  Let's ask it a little differently, then.

4        Did you provide your phone records and whatever content

5   of text messages you had in your possession at that time in

6   response to the subpoena?

7   **A.**   We -- we provided some text messages.  I'd have to have

8   my attorneys weigh in.  They did all that.  And I'm sure there

9   were some questions of privilege and other questions that may

10  have kept some of -- some of the things from being shared.

11  **Q.**   Okay.  Certainly.  For our purposes today, all I need to

12  know, Mr. Meadows, is that you did indeed send, on or about

13  December 27, 2020, you sent a text, among others, to Ms. Fuchs

14  that read in part, "Is there a way to speed up Fulton County's

15  signature verification in order to have results before Jan 6

16  if the Trump campaign assists financially?"

17  **A.**   That seems to be consistent with a message I sent to

18  Ms. Fuchs, yes.

19  **Q.**   That's accurate, to the best of your knowledge?

20  **A.**   To the best of my knowledge, yes, without looking at it.

21  **Q.**   Why are you as the Chief of Staff making a financial

22  offer to the Georgia Secretary of State's office on behalf of

23  the Trump campaign?

24  **A.**   To be clear, the way you're phrasing, I didn't make a

25  financial offer to them.  This particular question was asking

1  a question about whether it was -- we were able to speed

2  things up.  And I can tell you the reason why I asked that

3  question.

4  **Q.**    Sure.

5           THE COURT:  Go ahead.

6           THE WITNESS:  I was in a meeting prior to that in --

7  earlier that -- in that time period.  I don't know exactly

8  when, Your Honor.  But where in Wisconsin, there was a

9  recount.  And they indicated that they would do a recount in

10 that particular particular state if -- if the campaign was

11 willing to pay for it.

12          My -- my question was more if this was an overtime

13 financial drain on a particular government entity, as we all

14 in the government have financial constraints, wanted to be

15 able to speak to that particular question.  But that's why it

16 came up, was really from a financial assistance that the

17 campaign made in the Wisconsin case.

18 BY MS. CROSS:

19 **Q.**    Did anyone direct you to inquire as to whether campaign

20 funds could be available for assistance in the Secretary of

21 State's procedure?

22 **A.**    In terms of campaign funds, I think the question was

23 posed by me, just seeing if the resources -- I didn't speak

24 for the campaign, didn't work for the campaign, but certainly

25 being able to advise the President of the United States.  You

1    know, he was looking at ways to make sure that we could get a
2    definitive yes or no quickly.
3         And so it's just in keeping of me trying to ask a person
4    who should know whether it's a financial resource issue, you
5    know, manpower issue or whatever.  So I wasn't speaking on
6    behalf of the campaign.
7    **Q.**   You had no authority or ability to offer federal funds
8    for that purpose, did you?
9    **A.**   No.
10   **Q.**   There was no federal funds available for a campaign
11   request of a Secretary of State's office in Georgia; correct?
12   **A.**   There should be no federal.
13   **Q.**   Why is that?
14   **A.**   You mean in terms of American taxpayer dollars?
15   **Q.**   Yes.
16   **A.**   You know, having American taxpayer dollars paying for
17   campaign-related issues is, you know, it gets back -- speaks
18   to the question about me traveling with the President and why
19   some of the people that travel with the President, they get
20   reimbursed for their -- their time.  Mine was unique in that,
21   as the Chief of Staff, I had to travel with the President.
22   But having campaigns pay for those kinds of activities is what
23   I deem inappropriate.
24   **Q.**   All right.  Mr. Meadows, you mentioned on direct
25   examination that you had a personal e-mail and an official

1    e-mail.

2        Do you recall that testimony?

3    **A.**    Yes.

4    **Q.**    How did you distinguish how you used those two separate

5    e-mail accounts?

6    **A.**    If -- oftentimes what I would do is -- on my personal

7    e-mail is -- would copy it and send it to the archives in

8    terms of a federal record.  Many times it was incoming that

9    came to me personally, whether it's on my White House e-mail

10   or my e-mail that was a Gmail account at that point.

11   **Q.**    The responsive documents that you produced in -- after

12   you received a subpoena from the January 6th committee, did

13   those include -- I don't want to know anything you talked

14   about with your attorneys.  So if you can answer without

15   telling me about anything you talked about with your

16   attorneys.

17       Were responsive documents produced from both of those

18   accounts?

19   **A.**    It's my understanding they were.

20   **Q.**    Thank you.

21   **A.**    I don't know that for a fact, though.  But, I mean --

22   **Q.**    To the best of your knowledge?

23   **A.**    Yeah.  To the best of my knowledge, I would assume that

24   it came from both accounts.

25   **Q.**    Okay.

1    A.    I don't know -- so I haven't -- can I be clear?

2              THE COURT:  Yes, sir, go ahead.

3              THE WITNESS:  So my White House e-mail I didn't have

4    access to, you know.  So if you're saying that I got a

5    subpoena -- I assume that they got my White House e-mails, but

6    they didn't get them from me, because I didn't have them.  And

7    so I -- so, again, trying not to speculate.  I would find it

8    surprising if they didn't have my White House e-mails, but I

9    didn't have access to them.

10   BY MS. CROSS:

11   Q.    Understood.  Thank you.

12        All right.  Can I direct your attention, then,

13   Mr. Meadows, to --

14              MR. WAKEFORD:  I'm sorry, Ms. Cross.

15              One second, Your Honor.

16              THE COURT:  We need to move on.

17              MS. CROSS:  Yes, sir.

18   BY MS. CROSS:

19   Q.    When -- Mr. Meadows, when you were answering my questions

20   about the texts you sent to Ms. Fuchs about the campaign

21   potentially paying for expedited signature review, do you

22   recall that?

23   A.    Yeah.  Based on the quote, you mean, from -- I guess that

24   would be from Act 96?

25   Q.    Correct, yes.  And you said that, well, we were just

1  looking for an answer quickly or we wanted an answer --

2  **A.**   If I used the word -- I'm sorry.  Go ahead.

3         THE COURT:  Let her finish the question.

4  BY MS. CROSS:

5  **Q.**   Yeah.  You see where I'm going.

6         I was wondering who you referred to in the "we?"

7  **A.**   Yeah.  "We" is -- is a term that I default to a lot,

8  trying not to give -- take undue credit myself when I was in

9  Congress.  And so using the term "we" is probably not the

10  accurate word there in terms of "we."

11        In terms of expedited verifications, certainly that would

12  have been the campaign or the President himself.

13  **Q.**   So then why was it you who sent the text instead of

14  someone on the campaign reaching out to the Secretary of

15  State's office?

16  **A.**   Again, I had had conversations with Ms. Fuchs.  What I

17  had observed in Cobb County was impressive.  I felt like that

18  her goal and the Secretary's goal was to make sure that the

19  signature verification was accurate, and there in -- certainly

20  in Cobb County.  And being able to take this particular

21  question of signature verifications, whether it's in Cobb

22  County or Fulton County or any other county in the State of

23  Georgia off the table, would allow for one area to be closed.

24  Be able to work towards, you know, a peaceful transition of

25  power, continue to work on the other issues that we've already

1  talked about.  But, for me, it was being able to take an open

2  question off the table.

3  **Q.**   Did you report to anyone in the campaign the response you

4  got to that text?

5  **A.**   Not that I recall, no.

6  **Q.**   Was there any transfer, to your knowledge, of campaign

7  funds to the Secretary of State's office in Georgia to

8  facilitate or expedite any sort of review?

9  **A.**   Not to my knowledge.  I think Ms. Fuchs didn't indicate

10  that it was much of a financial as it was a time constraint.

11  **Q.**   Okay.  All right then.  If you're on page 50?

12  **A.**   Which page?

13  **Q.**   50.

14  **A.**   50?  Okay.

15  **Q.**   I want to direct your attention -- you acknowledge -- I

16  believe I understood your testimony to be that you were on the

17  January 2, 2021, call between then President Trump and

18  Secretary of State Raffensperger?

19  **A.**   Yes, ma'am.

20  **Q.**   Okay.  Can you tell me who initiated that call?

21  **A.**   Who set the call up?

22  **Q.**   How the call came to be?  What is your understanding of

23  the purpose of the call, who set it up, and why it was placed?

24  **A.**   My understanding of the call was to try to find -- I

25  think judges -- I mean, attorneys call it a compromise and

1  settle.  My understanding was, is that it was to try to find

2  some common ground in terms of signature verifications between

3  the attorneys and -- and the Secretary of State's office, and

4  to handle the issue in a less litigious manner.

5  **Q.**    Is it your testimony that the initiation of the call came

6  from campaign lawyers?

7  **A.**    I don't know exactly who it came from.  I know that

8  certainly the President of the United States wanted to have --

9  have this issue resolved, and my understanding was, is to put

10  everybody together.  Again, this flows out of a -- what I

11  would consider a good meeting that I had observed prior to

12  Christmas with the Secretary of State's office.

13  **Q.**    Let me ask it a slightly different way.

14      How did you learn that -- did you take the suggestion of

15  a call between then President Trump and Secretary of State

16  Raffensperger, did you take that to the President and suggest

17  it?

18  **A.**    Not to my knowledge, no.

19  **Q.**    Do you recall the then President suggesting to you that

20  he wanted to speak with Secretary of State Raffensperger?

21  **A.**    Yes.

22  **Q.**    That idea initiated with him; correct?  And by "him," I

23  mean then President Trump?

24  **A.**    I believe so, yes.  I don't know whether it came from his

25  attorneys to him, but I was asked to reach -- reach out.

**Q.**    First you heard of any potential call between then President Trump and Secretary of State Raffensperger was from then President Trump; correct?

**A.**    Yes.

**Q.**    Do you recall the content of that conversation?

**A.**    You mean the phone call?

**Q.**    No.  I mean, you first learning that then President Trump wished to contact Secretary of State Raffensperger.

**A.**    I don't recall, I mean...

**Q.**    What, then, did you do to facilitate the call, if anything?

**A.**    This phone call here?

**Q.**    Yes, sir.

**A.**    I'm sure I dealt with Ms. Fuchs to set the call up.  It certainly would have been set up through our White House switchboard in getting both attorneys and the President on the phone with Mr. Raffensperger.  And I believe Mr. Germany was on the phone as well.

**Q.**    Who did you reach out to -- once the President came to you, initiated the idea of a conversation with Secretary of State Raffensperger, who then did you reach out to to arrange the participation of the litigation attorneys?

**A.**    So who did I reach out to -- I missed the last part of that.  Litigation attorneys, what is that?

**Q.**    You, I believe, referenced that some attorneys for then

1  President Trump personally and the Trump campaign that was --

2  had ongoing litigation at that time.  Is that your

3  understanding?

4  **A.**   I think there were three attorneys that were -- were

5  involved in the phone call.  I'm not sure in what capacity,

6  whether they worked for the campaign or whether they worked

7  for Mr. -- for President Trump directly.  I can't speak to

8  that.

9  **Q.**   How did they learn about the call?

10  **A.**   I don't know.

11  **Q.**   You didn't reach out to them?  Who did you reach out to,

12  if anyone, do you recall?

13  **A.**   I don't recall.  I've tried to recall a number of times

14  exactly.  I know I was asked to reach out to the secretary

15  previous to this phone call and to his Chief of Staff

16  previously, but I don't recall how that -- that came about.

17  **Q.**   Did you make previous attempts to reach President -- I'm

18  sorry -- to reach Secretary of State Raffensperger or his

19  Chief of Staff?

20  **A.**   I did.

21  **Q.**   What were those attempts?

22  **A.**   What were those -- I mean, call -- I called and left a

23  message saying that the President wanted to speak with the

24  secretary.

25  **Q.**   So January 2, 2021, that wasn't the first time the

1  President had informed you that he wished to speak to

2  Secretary of State Raffensperger?

3  **A.**    That is correct.

4  **Q.**    How many times did then President Trump indicate to you

5  that he wished to speak with Secretary of State Raffensperger?

6  **A.**    I don't recall.  I know that, you know, I've read reports

7  and all that, but I -- a lot of those reports are not

8  accurate.

9  **Q.**    That's why I'm interested in what you remember,

10  Mr. Meadows.

11  **A.**    Yeah, so...

12  **Q.**    And what you know from your experience.

13  **A.**    I don't know.

14  **Q.**    Do you know how many times?

15  **A.**    The only thing I do recall is -- is at least twice.

16  **Q.**    At least twice?

17  **A.**    Yeah.

18  **Q.**    Over a period of what time?

19  **A.**    You know, a week or two.  You know...

20  **Q.**    Understanding we can't be precise, but --

21  **A.**    Yeah.

22  **Q.**    -- that's the best of your recollection?

23  **A.**    Yeah.

24  **Q.**    All right.  So over a period of a week or two before this

25  January 2, 2020, call, the President indicated to you that he

1  wished to speak to Secretary of State Raffensperger; correct?

2  **A.**   That's correct.

3  **Q.**   And you made attempts to make that happen; correct?

4  **A.**   That is correct.

5  **Q.**   And your attempts to make that happen, as I understand

6  your testimony today, was to reach out and leave messages for

7  both, the secretary personally; correct?

8  **A.**   I believe one time for the secretary personally, yes.

9  **Q.**   And then another attempted phone connection with a staff

10  member?

11  **A.**   As I recall, yes.

12  **Q.**   Were either of those calls returned?

13  **A.**   No.

14  **Q.**   When you attempted to arrange those --

15  **A.**   I say -- excuse me.  I say they're not returned.  I

16  didn't talk to them.  So, I mean, if they returned them, I

17  didn't --

18  **Q.**   Thank you.

19  **A.**   They may have returned them, but I didn't talk to them,

20  no.

21  **Q.**   Okay.  When you attempted to arrange those previous phone

22  conversations at the direction -- was it at the direction of

23  President Trump?

24  **A.**   Yes.

25  **Q.**   When you attempted to arrange those previous connections

1   with Secretary of State Raffensperger at the direction of then

2   President Trump, who else was involved in that procedure?

3   **A.**   Who else tried to reach out?

4   **Q.**   No.  Who else did you involve in the attempt to reach

5   out?

6   **A.**   I don't recall.

7   **Q.**   Okay.  And here's why I'm kind of asking, so maybe you'd

8   have a better recollection if I asked it a different way.

9        You said that you believed the purpose of the call on

10  January 2, 2021, was for purposes of settlement, correct, of

11  the pending litigation?  That was your testimony?

12  **A.**   Well, they -- the purpose was trying to get signature

13  verification in Fulton County.

14  **Q.**   Whose purpose was that?

15  **A.**   The President wanted to -- wanted to have signature

16  verification.  He felt like a signature verification in Fulton

17  County was appropriate.

18  **Q.**   He relayed that information to you?

19  **A.**   He did.

20  **Q.**   And that was a goal of his campaign; correct?

21  **A.**   I don't know.

22  **Q.**   You don't know that?

23  **A.**   I don't speak for the campaign.

24  **Q.**   I'm not asking you to speak for the campaign.

25       To your knowledge, was that also a goal of the Trump

1  presidential campaign, to have further signature audits in

2  Georgia?

3  **A.**    I do not know.

4  **Q.**    You do not know.

5      You believe, however, President Trump -- please explain

6  to me as best you can recollect his request or direction to

7  you to arrange this call with Secretary of State

8  Raffensperger.

9  **A.**    I'm sorry, I missed you there.  So can you rephrase or

10 repeat the question?

11 **Q.**    Sure.

12     I'm wondering, as best you can recall, what were the

13 words he used?  What did he tell you he wanted to talk to

14 Secretary of State Raffensperger for?  And, again, I'm asking

15 you for the best as you can recollect then President Trump's

16 words.

17 **A.**    Yeah.  I don't know that he gave me a whole lot of

18 specifics on why he wanted to do that.  I don't recall any

19 specifics.

20 **Q.**    Okay.  All right.  In your previous attempts, did you try

21 to loop in anyone from the campaign on that call?

22 **A.**    I don't recall looping in anybody on the campaign.

23 **Q.**    Did you attempt to loop in or have input from anyone

24 else?

25 **A.**    In trying to set up the calls?

1  **Q.**   Yes, sir.

2  **A.**   Maybe the White House switchboard.  Yeah, I think they

3  made several attempts.

4  **Q.**   Okay.

5  **A.**   I don't know that I asked them to do -- the President may

6  have asked them.  I just know that -- I just know that -- I

7  know that -- well, I've come to know that the White House

8  reached out to the Secretary as well.

9  **Q.**   Okay.

10  **A.**   White House switchboard.

11  **Q.**   The White House switchboard.  All right.

12      Do you recall on January 2nd -- prior to the call, do you

13  recall having any conversation with Cleta Mitchell?

14  **A.**   Certainly I had conversations with Cleta Mitchell.

15  **Q.**   What were those conversations about?

16  **A.**   A variety of aspects as it relates to Georgia and -- in

17  terms of any details of election fraud, what she was doing.  I

18  had conversations with her.

19  **Q.**   Who is Ms. Mitchell?

20  **A.**   Cleta Mitchell is an attorney that represented the

21  President I think in a pro bono manner.  Again, I don't know

22  the exact arrangements, but Cleta Mitchell -- I know Cleta

23  Mitchell well.

24  **Q.**   She was involved in the campaign litigation?

25  **A.**   It's my understanding, yes.

**Q.**   Okay.  Without defining her role, that might be outside
the scope of your knowledge, but she was involved in some way
and you had conversations -- she was involved in some way in
the campaign litigation for then President Trump?

**A.**   Again, you used the word "campaign litigation."  I'm not
sure if it was litigation on the President's half or the
campaign, but certainly involved in some way with litigation
is my understanding.

**Q.**   She wasn't a federal employee, Ms. Mitchell?

**A.**   She was not a federal employee.

**Q.**   She didn't work at DOJ?

**A.**   She did not.

**Q.**   She had no role in -- she was not a federal employee in
any respect that you're aware of in December 2000 -- January
2021, correct?

**A.**   That's correct.

**Q.**   So what conversation, if any, did you have with
Ms. Mitchell about the phone call that was, again, requested
by then President Trump with Secretary of State Raffensperger?

**A.**   I don't recall any specific conversation with
Ms. Mitchell.  I'm sure I had a conversation with
Ms. Mitchell.  But I don't recall any specific conversation.
You know, as I've gone back over this -- this phone call
that's been widely reported about for many, many months trying
to -- trying to remember everything around it and all of that.

1  I don't remember anything specific as it relates to

2  Ms. Mitchell.

3      You know, as I've said, my understanding and my belief

4  then and certainly my belief today was, is that this was more

5  about Fulton County signature verifications.  It was

6  particularly a concern for the President of the United States

7  and -- and this phone call was hoping to find a way to have a

8  less litigious way of resolving that.

9  **Q.**   What was going to be a less litigious way of resolving?

10 **A.**   I beg your pardon?

11 **Q.**   What would be a less litigious way to resolve the

12 concerns that then President Trump was expressing to you?

13 **A.**   My understanding was, is that the attorneys desired to

14 work with Secretary of State's office for some of the records.

15 **Q.**   Whose attorneys?  What attorneys?

16 **A.**   I think it was three attorneys, Ms. Mitchell, Alex, I

17 think it's Kaufman, and Kirk -- it starts with an H.  I'm not

18 sure.

19 **Q.**   Does Hilbert sound --

20 **A.**   It sounds correct.

21 **Q.**   -- correct?

22     So those were campaign attorneys?

23 **A.**   I don't know.  Again, you keep coming back to say they're

24 campaign attorneys.  I don't know how they were compensated or

25 if they were compensated or who they worked for, if they

1   worked for the President directly or some other group.

2   **Q.**   I'm wondering, then, if you weren't clear about the scope

3   of their representation to the extent you didn't know who they

4   represented, why did you want them on this call?

5   **A.**   My -- my understanding, again --

6   **Q.**   Go ahead.

7   **A.**   Okay.  My understanding was -- is that there was -- that

8   the President wanted signature verifications in Fulton County.

9   He believed that there was fraud there.  And that if signature

10   verifications took place there, they would show justification

11   for allegations -- for some of the allegations of fraud that

12   had been made.

13        Whether there was fraud or not, I had no knowledge --

14   still don't to this day.  And -- and so in this meeting, this

15   phone call, setting it up with the attorneys where they could

16   find some kind of compromise -- again, I think you-all call it

17   compromise and settle.

18   **Q.**   I don't call it that.

19   **A.**   Okay.  So...

20   **Q.**   Were you clear about the roles of the individual

21   attorneys that you mentioned, Mr. Hilbert, Mr. Kaufman, and

22   Ms. Mitchell, at the time you placed the call?

23   **A.**   Was I clear on their roles?  I think, as I just

24   testified, other than them being attorneys that were involved,

25   that was the extent of my understanding of their role, that

1  they were involved in a lawsuit.

2  **Q.**   If, for example, you introduced them on the call as

3  Mr. Kirk Hilbert and Alex Kaufman as attorneys that represent

4  the President, does that suggest to you -- assume for the

5  purpose of my question that you did, in fact, introduce Mr.

6  Hilbert and Mr. Kaufman on the call as attorneys that

7  represent the President, if that's true, do you believe at the

8  time you had a better understanding of their roles?

9  **A.**   No.  As I say -- and if I've said anything that would

10 indicate a contradiction of that, I believe that I did

11 introduce them as attorneys.  But whether they work for the

12 President directly or the campaign -- because I think your

13 question said they represented the campaign.  I don't know

14 that.  All I know is they were attorneys involved in a

15 lawsuit.  Whether it was for him personally or for the

16 campaign, I don't know.  I do know that they were attorneys

17 and I believe at the beginning of the call, I identified

18 myself as the Chief of Staff, and that we had kind of place

19 set the call saying we've got these other people on the call

20 -- as setting up the call.

21 **Q.**   Mr. Meadows, at the time you placed the call, what

22 Article II, authority was advanced -- did you believe was

23 advanced by this phone conversation?

24 **A.**   Again, getting back to His Honor's question of Article II

25 and specifically there, I don't know that I'm learned enough

to be able to talk about the Article II aspects of -- of the

call.  I mean, certainly in a broaden sense, trying to make

sure that we had accurate, fair elections, and advancing that

and that principal, whether that's an Article II

responsibility or an Article II -- or an Article I, II, and

III responsibility, we all want an accurate election.

**Q.**    Is settlement of private litigation, does that have any

federal purpose?

**A.**    When that federal -- when that legislation -- when that

litigation involves elections, I saw it as part of my role as

the Chief of Staff to try to deal with that.  The President

gave clear direction on wanting to deal with it.  Did I get

involved in other litigation matters, generally not.  I left

attorneys to, hopefully, work out the attorneys -- work it out

with other attorneys.

Me setting up a phone call for the President of the

United States at his direction was certainly something that I

believe was in my duty as Chief of Staff to help facilitate.

**Q.**    Your testimony is that you believed it was necessary and

proper for your role as Chief of Staff to participate and

arrange a settlement conference of the President's private

litigation?

**A.**    That is my testimony -- you added the settlement part of

that.  Serving the President of the United States and -- and I

want to be clear with His Honor, you know, it takes on all

1  kinds of forms.

2      I mean, listen, I dealt with the President's personal

3  physician on a number of things that, you know, you wouldn't

4  normally as a Chief of Staff think that, okay, you're going to

5  be talking to his doctor and other people, but you do that.

6      And, you know, in Article II of the Constitution, does it

7  say the Chief of Staff is supposed to talk to the attorney to

8  make sure the President is feeling well?  Well, it doesn't say

9  that, but it's still part of my job to make sure that the

10 President is safe and secure and able to perform his job.  And

11 that's what I was doing.

12 **Q.**   Under that interpretation, Mr. Meadows, is there

13 anything, anything that you did at the direction of then

14 President Trump that is outside the scope of your

15 responsibilities as Chief of Staff?

16 **A.**   Would there be anything?

17 **Q.**   My question was, was there?

18 **A.**   I don't know that I did anything that was outside of my

19 scope as Chief of Staff that we've discussed today.

20 **Q.**   Every direction the then President gave you, you consider

21 to be necessary and proper in your role as Chief of Staff?

22 **A.**   No, ma'am.

23 **Q.**   Were there some times that the President gave you

24 direction that you thought to be outside the scope of your

25 Chief of Staff duties and responsibilities?

**A.**    Potentially.

**Q.**    Can you give me an example?

**A.**    I'm trying to think of one.  But I'm sure there are times where he would have asked me to do something and I didn't do it, but that would have been a give and take, back and forth between the President and me.

**Q.**    That's a little different.

I'm asking you whether you did it or didn't do it.  My question was, is there any direction that the then President gave you that you consider to be outside the scope of your role as Chief of Staff?

**A.**    I can't come up with an example.  I mean, you're asking me to speculate on -- if you're asking me for an example that comes to mind, I don't have an example that comes to mind.

**Q.**    Can you think of a circumstance -- even if it wasn't your experience -- can you think of a circumstance where the President would have given you direction and you thought it was outside the scope of your duties and responsibilities as Chief of Staff?

**A.**    If he were to ask me to get up on a stage and campaign for him, that would have been outside of my -- that would have been clearly me advocating for him in terms of President of the United States.

**Q.**    You advocating for him would have been outside the scope of your role as Chief of Staff?

1  **A.**   Campaigning for him.

2  **Q.**   You acting on behalf of his campaign would be outside

3  your role as Chief of Staff?

4  **A.**   Interacting with, but working for the campaign, if I were

5  working for the campaign, that would not be my role as Chief

6  of Staff.

7  **Q.**   It wouldn't, would it?

8       There's a pretty clear differentiation between campaign

9  functions and the role of a federal employee; correct?

10 **A.**   There is -- there is a line that certainly campaign

11 individuals are not federal employees.  As we've discussed all

12 morning, both with your questions and with questions from

13 Mr. Terwilliger.

14      Me talking with and communicating with campaign officials

15 and interacting with campaign officials, is certainly part of

16 my role.  It's been part of -- I would -- it should be part of

17 the role of every Chief of Staff.  To suggest that there's not

18 a political component of it would be disingenuous.

19 **Q.**   Do you agree with me, Mr. Meadows, that solely advancing

20 the interest of a campaign would be outside your role as Chief

21 of Staff?

22 **A.**   Solely advancing a campaign related -- well, a --

23 **Q.**   Or interest.

24 **A.**   -- campaign-related goal?  Well, give me an example of

25 that.  And I think if you give me an example, I can -- I can

 1  -- I can speak to it.

 2        THE COURT:  Hold on, hold on, hold on.

 3  BY MS. CROSS:

 4  **Q.**   I'm going to ask you to please answer the questions that

 5  I ask you.

 6        MR. TERWILLIGER:  Your Honor, I'm going to object to

 7  the questions she's asking, because it's a hypothetical and

 8  it's asking him for an opinion.  He's not an expert.

 9  BY MS. CROSS:

10  **Q.**   If you can't think of anything --

11        THE COURT:  Hold on one second.  Let me rule on the

12  objection.  I think he can answer it.  If he can't answer, he

13  can say, "I can't answer."  So ask the question again.

14        MS. CROSS:  Okay.

15        THE COURT:  If you can answer it, answer it.  If you

16  can't, tell the truth.

17  BY MS. CROSS:

18  **Q.**   Would you agree with me, Mr. Meadows, that acting to

19  advance -- solely acting to advance a campaign goal or

20  interest would be outside the scope of the Chief of Staff's

21  responsibilities?

22  **A.**   I would not agree with that.

23  **Q.**   You would not agree with that?

24  **A.**   No.  The way -- so -- can you read back exactly the way

25  that you asked that?

1          THE COURT:  She can't.

2          THE WITNESS:  Oh, she can't do that?  Okay.

3          So you said advancing a campaign goal.  A campaign

4  goal is lowering prescription drug prices.  Is that -- do I

5  have a federal nexus there?  Without a doubt I've got a

6  federal nexus.  And so there's lots of things that are said on

7  the campaign trail that, quite frankly, my job as Chief of

8  Staff is to make sure that it's not just campaign rhetoric.

9  That's part of the problem with America is they campaign one

10 way and they legislate another.

11 BY MS. CROSS:

12 **Q.**  Sir --

13          MS. CROSS:  I'm going to object to the responsiveness

14 of the answer.

15          THE COURT:  Let's go to the next question.

16 BY MS. CROSS:

17 **Q.**  My question, though, was solely a campaign goal or

18 interest.  Is advancing a campaign goal or interest something

19 that you consider to be within the scope of the Chief of

20 Staff's role?

21          MR. TERWILLIGER:  Objection, Your Honor.  Asked and

22 answered.

23          MS. CROSS:  I don't believe I've gotten an answer.

24          THE COURT:  I don't think he's answered the question

25 yet.  So I'm going to overrule the objection.

1 BY MS. CROSS:

2 **Q.** Did you understand my question?

3 **A.** Yes. So my response would be, campaign goals and

4 objectives, there is a role for the Chief of Staff to make

5 sure that those campaign roles and objectives get implemented

6 at the federal level, and it's part of my job as Chief of

7 Staff.

8 **Q.** Thank you for your candor.

9 THE COURT: Thank you.

10 THE WITNESS: Thank you, sir.

11 BY MS. CROSS:

12 **Q.** Let's go back, Mr. Meadows, although we are --

13 THE COURT: How much more do you have on cross?

14 MS. CROSS: I've got a minute. Probably about 35, 40

15 minutes.

16 THE COURT: All right. Let's stop right here for a

17 lunch break.

18 Mr. Meadows -- everybody sit down.

19 Mr. Meadows, you can't discuss your testimony with

20 anyone while at the break. Okay? You can talk to your

21 lawyers, but you can't discuss your testimony.

22 Any questions?

23 THE WITNESS: Even with them?

24 THE COURT: You can talk to them, but you can't

25 discuss your testimony. They know the rules. They're

1  experienced lawyers.

2          Okay.  We'll start back at 2 o'clock.  Thank you-all.

           (A lunch break was taken from 12:50 p.m. to 2 p.m.)

4          (Court Reporter Penny Coudriet, RPR, RMR, CRR,

5  commenced reporting the proceedings.)

6          THE COURT:  I hope everybody had a good lunch.  You

7  ready?  It looks like you had a good lunch, you're ready to

8  go.

9          MS. CROSS:  Thank you, Your Honor.  I am ready to go.

10         THE COURT:  Mr. Meadows, I'll remind you you're still

11 under oath, sir.

12         THE WITNESS:  Yes, sir.

13 BY MS. CROSS (CONT'D):

14 **Q.**   Mr. Meadows, prior to us breaking for lunch you had the

15 indictment in front of you that was an exhibit.  Do you still

16 have that in front of you?

17 **A.**   No, ma'am, I don't.  I think --

18 **Q.**   If you don't mind, I'm going to --

19         MS. CROSS:  Your Honor, may I approach the witness?

20         THE COURT:  Yes, ma'am.

21 BY MS. CROSS:

22 **Q.**   All right.  I'm just going to put that in front of you in

23 case you need to refer to it for any reason.

24 **A.**   Thank you.

25 **Q.**   Thank you.

1      All right.  Mr. Meadows, you spoke to us this morning

2  about your role as Chief of Staff.  And at times it was

3  appropriate for you to reach out to various state officials on

4  different reasons; correct?

5  **A.**    Yes.

6  **Q.**    And one of the states you mentioned I think was New York;

7  correct?

8  **A.**    Yes.  In terms of state officials that I met with, yes.

9  **Q.**    Correct.  Absolutely.

10     And I think another one of the states you referenced was

11  Texas; correct?

12  **A.**    Yes.

13  **Q.**    And when you were given examples, I think in response to

14  Judge Jones' questions about why it was necessary for you to

15  have these interactions with state officials, I think you

16  referenced FEMA, federal aid for disaster relief.  That was a

17  typical subject matter of your outreach to state officials; is

18  that right?

19  **A.**    That's one of them, yes.

20  **Q.**    COVID, I think you told us, was another one; correct?

21  **A.**    Yes.  Just trying to give examples, sure.

22  **Q.**    Absolutely.  Yeah.  And those come to mind.

23     The federal government was coordinating the response to

24  the COVID pandemic, correct, during your time as Chief of

25  Staff?

1    A.    Yes.

2    Q.    So that was a centralized federal role that you were

3    facilitating state cooperation with; correct?

4    A.    Yes.

5    Q.    Okay.  Same thing with FEMA.  I think you referenced

6    FEMA.  The federal government has a role in dispersing federal

7    emergency funds, correct, in the result -- in response to a

8    disaster?

9    A.    Yes.

10   Q.    That's typically what FEMA does?

11   A.    Yes.

12   Q.    And so when you described for us using an example of your

13   outreach to various state officials as being potentially part

14   of a FEMA response and coordination, that's what you were

15   referring to?

16   A.    On that particular example, yes.

17   Q.    Yes.  Okay.  All right.

18         Well, let's, then, direct our attention to the

19   January 2nd, 2021, call between the then President Trump and

20   Secretary of State Raffensperger.  That's kind of where we

21   ended the questioning before lunch; do you recall?

22   A.    Yes, ma'am.

23   Q.    Okay.  All right.  As I recall your testimony, the then

24   President came to you and wanted you to initiate a call with

25   Secretary of State Raffensperger; correct?

1    **A.**    Make contact with the secretary so he could talk to him.

2    **Q.**    He wanted to talk to him?

3    **A.**    That's correct.

4    **Q.**    And he asked you, make that happen?

5    **A.**    That's correct.

6    **Q.**    All right.  And this was the at least third such attempt

7    in the week or two prior to the January 2nd call; correct?

8    **A.**    The January 2nd would have been the third, yes.

9    **Q.**    Okay.  All right.  And you're aware, of course, that by

10   January 2nd, 2021, that the election result in Georgia had

11   been certified; correct?

12   **A.**    I believe it was certified in December.

13   **Q.**    Yes.  Sometime prior to your January 2nd, 2021, call;

14   correct?

15   **A.**    That's correct.

16   **Q.**    Okay.  All right.  Do you recall having a conversation

17   with anyone -- in between the time then President Trump wanted

18   you -- told you to get Secretary of State Raffensperger on the

19   phone, did you have a phone conversation with any of -- anyone

20   that you recall in between that time and the time you actually

21   got on the phone?

22   **A.**    I probably did, but I don't recall anything specifically.

23   **Q.**    Do you recall being on the phone with any of the

24   attorneys who were involved in President Trump's campaign

25   litigation?

1  **A.**   Okay.  You keep saying attorneys, campaign.  Are you

2  talking about Alex and Kurt?

3  **Q.**   I am.

4  **A.**   Okay.  All right.

5  **Q.**   So Mr. Hilbert, Mr. Kaufman, the people who ended up on

6  the call, I'm wondering if you had any conversation with them

7  in between the time then President Trump told you to initiate

8  this call and the time you actually got on the call?

9  **A.**   I may have, but I don't recall if I did.

10  **Q.**   Okay.  And as I understood your answers earlier, you may

11  have had a conversation with Ms. Mitchell, but you don't

12  recall specifically?

13  **A.**   Right.  It's highly probable.  I talked to Ms. Mitchell

14  more than I did those other two attorneys.

15  **Q.**   Did you have a prior relationship with -- professional

16  relationship with Ms. Mitchell before the election

17  litigation -- I'm sorry -- the post-election phase, let's call

18  it that, the post-2020 election, did you know Ms. Mitchell

19  prior to?

20  **A.**   I did.

21  **Q.**   How long is your association with Ms. Mitchell?

22  **A.**   Many years.  I don't know specifically, but I've known

23  Ms. Mitchell for many years.

24  **Q.**   Are you personal friends?

25  **A.**   We've never been to dinner together that I know of, if

1  that's what you're meaning.  But we had a professional

2  relationship.  She was an attorney that represented me when I

3  was a member of Congress.

4  **Q.**  What was the subject matter of her representation of you?

5  We don't need a lot of details but just --

6  **A.**  Right.  FEC.

7  **Q.**  FEC litigation or matters?

8  **A.**  Matters.

9  **Q.**  Matters.  Okay.

10     All right.  Did you have any role in bringing

11 Ms. Mitchell, then, to advise the President on any

12 campaign-related issue?

13 **A.**  Actually, I asked Ms. Mitchell to come down and

14 volunteer -- early on to Georgia to volunteer when it looked

15 like the election results were going to be close.

16 **Q.**  Why did you do that?

17 **A.**  Because I felt like we needed a number of attorneys on

18 both sides because it was going to be close.

19 **Q.**  Did you make that outreach on behalf of the campaign?

20 **A.**  No.  Again, I've got -- from my standpoint I have no

21 campaign role.

22 **Q.**  No campaign role.  I'm going to write that.  No campaign

23 role.

24     MR. TERWILLIGER:  Can he finish his answer?

25     THE COURT:  Hold on.  Hold on.

1      MR. TERWILLIGER:  I'm sorry.  Just if you could

2  admonish counsel to let him finish his answer before

3  commentary on it.

4      THE COURT:  Let him finish his full answer and then

5  ask your next question.

6      MS. CROSS:  Yes, sir.

7  BY MS. CROSS:

8  **Q.**   Are you finished with your answer, Mr. Meadows?

9  **A.**   I beg your pardon?

10 **Q.**   Are you finished with your answer?

11 **A.**   So in terms of interacting with campaign, certainly I did

12 in my role as Chief of Staff, reaching out to make sure that

13 we had attorneys in areas.  It was something that served the

14 President.

15     And certainly reaching out to Ms. Mitchell, because of my

16 prior relationship, she had been in Montana, I believe,

17 working on election issues -- election campaigns there, and so

18 I had asked her to come down.

19 **Q.**   Did you request Ms. Mitchell's presence on the phone

20 call, the January 2nd phone call?

21 **A.**   Again, I'm not sure how all of that actually transpired.

22 It's my understanding that Ms. Mitchell and others had

23 conversations with the President directly that I was not

24 involved with, but I don't know that for certain.

25 **Q.**   Understood.

1      By whatever means, Ms. Mitchell ended up on the call;
2  correct?
3  **A.**   Yes.
4  **Q.**   We talked about Mr. Hilbert ending up on the call;
5  correct?
6  **A.**   Yes.
7  **Q.**   Mr. Kaufman ended up on the call; correct?
8  **A.**   Yes.
9  **Q.**   You were on the call for the entirety of the phone call?
10 **A.**   Yes.
11 **Q.**   Then President Trump was on the phone call for the
12 entirety -- entire duration?
13 **A.**   With the secretary and Mr. Germany, yes.
14 **Q.**   Okay.  Who else from your side of the phone call was on
15 the line?
16 **A.**   That's all that I know of.  I was actually in my Chief of
17 Staff's office by myself.  So, I mean, I didn't introduce
18 anybody else.  Those were the only people on that I was aware
19 of.
20 **Q.**   Are you aware of anyone from the White House Counsel's
21 Office who was on the call?
22 **A.**   I am not.
23 **Q.**   Are you aware of anyone from the Department of Justice
24 who was on the call?
25 **A.**   I am not.

1   **Q.**   Did you reach out to anyone in the Department of Justice

2   to participate in the phone call?

3   **A.**   I did not.

4   **Q.**   Did you reach out to anyone from the Office of White

5   House Counsel to participate in the phone call?

6   **A.**   Not to my knowledge.  That would be a question for

7   Mr. Herschmann probably.  He would be the only one.  But not

8   to my knowledge.

9   **Q.**   You don't have any recollection?

10  **A.**   I have no recollection of that.

11  **Q.**   Okay.  Do you have any recollection of reaching out to

12  anyone for participation in this phone call that for whatever

13  reason wasn't on the call?

14  **A.**   Not to my knowledge, no.

15  **Q.**   Okay.  All right.  And the phone call that we're talking

16  about, Mr. Meadows, it didn't have anything to do with COVID;

17  correct?

18  **A.**   No, ma'am.

19  **Q.**   It didn't have anything to do with the federal response

20  to the COVID pandemic; correct?

21  **A.**   Do you mean to FEMA?  No, it did not.

22  **Q.**   It didn't have anything to do with FEMA or other funds

23  that were being requested or released; correct?

24  **A.**   That's correct.

25  **Q.**   Okay.  You spoke on the call?

1  **A.**   I did.

2  **Q.**   If you could, please summarize for us the substance of

3  the call to the best of your recollection.

4  **A.**   Obviously it was the President -- the former President

5  talking mostly about a number of the allegations of fraud that

6  he believed occurred in Georgia.  I set up the meeting,

7  introduced myself as Chief of Staff, introduced Ms. Mitchell.

8  I believe I introduced the other two by just their first

9  names.

10       And then the vast majority of the phone call was the

11  President talking about the allegations of fraud and how much

12  fraud was there in different aspects, whether it was

13  fraudulent voters, whether it was the -- it was a fairly

14  lengthy call.

15  **Q.**   It was?

16       To the best of your recollection, it was slightly over an

17  hour?

18  **A.**   To my recollection, I think that's correct, yes.

19  **Q.**   Perhaps even longer?

20            THE COURT:  What did you say?  I didn't hear you.

21            MS. CROSS:  I'll withdraw that, Your Honor.

22  BY MS. CROSS:

23  **Q.**   You had let us know, Mr. Meadows --

24            THE COURT:  I asked you a question --

25            THE WITNESS:  She said "perhaps longer."

1        THE COURT:  Okay.

2        MS. CROSS:  I wasn't going to make him answer that.

3   BY MS. CROSS:

4   **Q.**   You let us know, Mr. Meadows, a little earlier in our

5   questioning about that meeting you had with then Attorney

6   General Barr, that he expressed his satisfaction that there

7   had been no widespread fraud proven in the presidential

8   election.

9        Do you recall those questions?

10  **A.**   Yes.

11  **Q.**   Okay.  And when I asked you about your trip to the Cobb

12  County Civic Center to observe a portion of the signature

13  verification audit that was going on conducted by the

14  Secretary of State's office, among other agencies, at that

15  time you had not come to a conclusion about whether you agreed

16  with Attorney General Barr's assessment or not; correct?

17  **A.**   Yeah.  I think what I said, there were other allegations.

18  The investigation was ongoing, and so no conclusion in terms

19  of what was there or not there.

20  **Q.**   Right.  You didn't feel that you had enough information

21  to make a --

22  **A.**   Well, I knew the investigation was ongoing.

23       You know, for me it was all about trying to make sure

24  that a number of these allegations that were out there --

25  there were probably more allegations that the President heard

1  than I ever heard directly.

2      You know, my job was to land the plane, is to try to deal

3  with all of those issues, make sure that we've got those

4  issues dealt with.  And in dealing with all of those issues,

5  be able to finish up the things that we had in 60 days, have a

6  peaceful transfer of power, make sure that we got all of that

7  done.

8      And so certainly with these issues, being able to speak

9  with some kind of direction and authority on allegations that

10 were being made.  And if I knew that they were not true, it

11 was much easier for me to speak with authority with the

12 President.

13 **Q.**  By the time of this phone conversation on January 2nd,

14 2021, were there allegations that had been made that you

15 believed were unfounded?

16 **A.**  Certainly there were allegations -- to answer your

17 question specifically, there were certain allegations that

18 were unfounded at that point that I knew -- what I believed

19 were unfounded, sure.

20 **Q.**  Okay.  And at the time of the January 2nd, 2021, call,

21 did you feel as though at that point you had sufficient

22 information to either agree or disagree with then Attorney

23 General Barr's assessment?

24 **A.**  I think, as I said earlier, and I would reiterate, is

25 there was still ongoing investigations.  Even at January 2nd

1  there were still ongoing, at least meting out, trying to

2  figure out whether the veracity of some claims were there.

3       The outstanding issue from the President's perspective

4  was Fulton County signature authorizations.  There had been a

5  number of allegations as it related to that that were still

6  outstanding.  And even though Cobb County had been going

7  through their verification, Fulton County, to my knowledge,

8  had not started or been done.

9  **Q.**   So when you say "still outstanding," an allegation was

10  "still outstanding," I'm wondering from whose perspective are

11  you drawing that conclusion?  Are you trying to tell me that

12  from then President Trump's perspective those allegations were

13  still outstanding, or is it your testimony you mean that the

14  official recount and certification process in Georgia had not

15  been resolved to your knowledge?

16  **A.**   What I'm saying is I kept getting asked about it in my

17  official duties as Chief of Staff of the President of the

18  United States.  I kept asking -- getting asked about Fulton

19  County and was there going to be a signature verification.

20  And a number of allegations had been made, and so I continued

21  to get asked about that.

22  **Q.**   Okay.  That's a little different than my question,

23  though.

24  **A.**   Okay.  I'm sorry.

25  **Q.**   That's okay.  That's all right.

1        Who kept asking you?  Who kept bringing it up to you?

2   **A.**   The President had asked me about it.

3   **Q.**   Okay.  Were you aware at that time that the Secretary of

4   State of Georgia for that office had any open investigation

5   into any of the allegations that President Trump was

6   repeatedly raising with you?

7   **A.**   That the Secretary of State for the State of Georgia had

8   an open investigation, I believed they did.

9   **Q.**   You believe that they did?

10  **A.**   I believed that they --

11  **Q.**   After -- okay.

12       And after the certification of the vote, you believe that

13  that was still an outstanding issue?

14  **A.**   When did the certification happen?

15  **Q.**   I can't answer your question.

16  **A.**   Oh, you can't answer.  So --

17  **Q.**   If I orient you a little bit to early December -- yeah.

18  If I orient you a little bit to early December --

19  **A.**   Your Honor, without me having a calendar -- in the spirit

20  of trying to be totally transparent, I thought certification

21  happened sometime the middle part of December, and yet there

22  was still -- the Secretary of State's office was looking at

23  signature verifications in Cobb County.  I witnessed that

24  personally.

25       I think Ms. Watson indicated that not only would she

1  verify those signatures, but that she would go further to

2  verify other counties within the state to make sure.  And so I

3  assumed from that that there was an ongoing investigation.

4  **Q.**   Okay.  The allegations that were raised by then President

5  Trump on the call were varied; would you agree with that?

6  There were several allegations that he raised?

7  **A.**   Yes.  In rereading the transcript, yes.

8  **Q.**   Did you reread the transcript prior to your testimony

9  today in preparation?

10  **A.**   I went back over it, yes, ma'am.

11  **Q.**   Okay.  All right.  And I don't want to know anything you

12  did with your attorneys.

13  **A.**   No.

14  **Q.**   But you've reviewed it since January 2nd, 2021?

15  **A.**   Well, to be clear, I reviewed an AP report of what was

16  there, so...

17  **Q.**   No.  I appreciate that.

18  **A.**   I mean, to the point that that was accurate, that's what

19  I read.

20  **Q.**   Okay.

21          THE COURT:  The AP people love that answer.

22          THE WITNESS:  Yeah, I bet they do.

23  BY MS. CROSS:

24  **Q.**   Okay.  So as you were approaching the conversation with

25  Secretary of State Raffensperger, did you share then President

1  Trump's concerns about the specific allegations that he raised

2  during the call?

3  **A.**   The only allegation that had been consistent that I felt

4  like there needed further investigation would have been the

5  signature verification for Fulton County.  Other things were

6  raised in there.  And in rereading it, some of the other

7  allegations, I'm not sure exactly where they came from.

8       I can tell you that as his Chief of Staff the thing that

9  I heard about the most was Fulton County's signature

10  authorizations.

11  **Q.**   But to the best of your recollection at the time this

12  call was initiated, you had insufficient information to

13  determine whether that allegation about the signature matching

14  had merit; is that a fair --

15  **A.**   I think even on the phone call I said, you know, can we

16  get together?  I saw an opening.  At the end of the phone call

17  where -- is it Mr. Hilbrin (phonetic), is that --

18  **Q.**   Hilbert.  H-I-L-B-E-R-T, I believe it is.

19  **A.**   Mr. Hilbert.  Okay.

20       Mr. Hilbert made a suggestion, and I saw an opening.  I

21  took that opening to say, all right, great.  You know, at

22  least we've got something here that hopefully we can agree

23  upon, bring -- you know, land the plane.  Let's get this

24  particular issue off the table.  Hopefully get the attorneys

25  together where they can talk about it.  And at that particular

1   point used that as an opportunity to close out the call.

2   Q.    Okay.  You were comfortable that the other allegations

3   that then President Trump made during the course of that phone

4   call didn't require further investigation by the Secretary of

5   State?

6   A.    I don't know if they did or didn't, just -- there were a

7   number of allegations that were made.  I can tell you what I

8   know from my time as Chief of Staff, that the one that I

9   heard about most frequently was the signature verification.

10  Beyond -- should the others have been looked at?  I can't

11  speak to the veracity of that.

12  Q.    Okay.  And you make no representations here about the

13  veracity of the allegations that were raised?

14  A.    So your question is I've made no allegations here as --

15  Q.    I could ask that a little better.  Let me ask a better

16  question.

17  A.    Okay.  Okay.

18  Q.    President Trump on the call to your recollection -- or do

19  you recall then President Trump during the discussion with

20  Secretary of State Raffensperger being very convinced that he

21  had, in fact, won the presidential election in Georgia?

22  A.    Yes.

23  Q.    That was something that he appeared confident in?

24  A.    He believed that.

25  Q.    Did you believe that?

1  **A.**    I believe that there was additional things that needed to

2  be investigated at that particular point.

3  **Q.**    Okay.  That really wasn't my question, though.

4      Did you believe that President Trump had won the State of

5  Georgia in the 2020 presidential election?

6  **A.**    Again, I felt like that what had to be -- had to happen

7  is, is some of these allegations of fraud needed to be looked

8  at in a real way, like with anything else that you would do.

9  **Q.**    Okay.  You thought the Secretary of State's office had

10  been doing a wonderful job with the signature audit; correct?

11  **A.**    I did.

12  **Q.**    And I'm not trying to trip you up.  Maybe your answer is,

13  I didn't have enough information on January 2nd, 2021, when

14  this phone call was going on to reach an opinion.  Is that

15  what you're trying to tell me?  Or are you telling me that you

16  did believe that he had -- that then President Trump had won

17  Georgia, or you didn't believe that he had won Georgia?

18  **A.**    What I'm saying was is there were a number of allegations

19  that were made.  And the allegation as it relates to the

20  Fulton County signatures seemed to have more credibility than

21  some of the others in my opinion, and that those needed to be

22  further investigated in order to be able to fully ascertain

23  whether President Trump or President Biden had won the State

24  of Georgia.

25  **Q.**    Okay.  And until you resolved those questions, you didn't

1  feel able to make a determination?

2  **A.**   If you're talking about me personally, yeah.

3  **Q.**   I am.

4  **A.**   In my mind that was an open question, yes.

5  **Q.**   Okay.  Okay.  All right.  Mr. Meadows, I'm almost done.

6       You talked with us a little bit earlier today about the

7  Hatch Act.  Do you recall those questions?

8  **A.**   Yes, ma'am.

9  **Q.**   Being asked those questions?

10 **A.**   By Mr. Terwilliger, yes.

11 **Q.**   Yes.  Okay.

12      And you seemed to concede that, as the Chief of Staff,

13 the Hatch Act prohibition applied to you; correct?

14           MR. TERWILLIGER:  Objection to "seemed to concede,"

15 Your Honor.  It's not consistent with the record.

16           THE COURT:  I don't think he conceded.  He gave his

17 definition of the Hatch Act, but I don't think he conceded

18 that it did.

19           MS. CROSS:  Fair enough.  I'll rephrase it.

20 BY MS. CROSS:

21 **Q.**   Mr. Meadows, did you believe at the time you served as

22 the Chief of Staff that the Hatch Act applied to you?

23 **A.**   I believe the Hatch Act is a statute that applies to all

24 federal employees in some degree or another.

25 **Q.**   And you were a federal employee during the time that

1 we're talking about; correct?

2 **A.**   Yes, I was.

3 **Q.**   So the Hatch Act as a federal employee would apply to

4 you; correct?

5 **A.**   Yes, ma'am.

6 **Q.**   Okay.  And, in fact, you told us that when there was an

7 allegation raised about a potential violation on your behalf,

8 that you got kind of dinged a little bit about that

9 previously; correct?

10 **A.**   I got what about it?

11 **Q.**   I said "dinged."

12 **A.**   Yeah.

13 **Q.**   I thought that's what you had said but --

14 **A.**   Well, that's accurate.  I got dinged, yes.

15 **Q.**   Okay.  Okay.  And when that happened -- and that happens.

16      When that happened, you went to, I think, seek some

17 advice from an ethics counsel or ethics personnel?  Who was it

18 that you referenced speaking to about that and how to avoid

19 any future violations?

20 **A.**   Yes.  Someone with the White House Counsel's Office.

21 Mainly because it was extremely awkward figuring out how to do

22 TV.  And reporters will ask a number of questions that are not

23 necessarily on the topic that you're asked to be commenting

24 about.

25 **Q.**   Reporters perhaps not so aware of the distinction between

1  what is prohibited by the Hatch Act and what is permitted;

2  correct?

3  **A.**   Well, I think reporters just trying to get your opinion

4  on things, I don't...

5  **Q.**   Sure.

6       Is that resource that you used in the White House

7  Counsel's Office, was that something that was a resource that

8  you could have used at any time during your tenure as the

9  Chief of Staff?

10 **A.**   Certainly.  I mean, the White House Counsel's Office was

11 available to me.  They worked for me.

12 **Q.**   Sure.

13      So any time you had a question or concern about potential

14 violations of the Hatch Act, then you had someone you could

15 call to run that by?

16 **A.**   Yes.

17 **Q.**   At any time?

18 **A.**   Yeah.  I mean, not in the middle of the night generally.

19 But, I mean, I could wake somebody up and ask them.

20 **Q.**   I suspect they would answer your call.

21      If you had a Hatch Act emergency and you called someone

22 from the White House Counsel's Office in the middle of the

23 night, I suspect they'd take your call.  Would you suspect

24 they'd take your call?

25 **A.**   Most of the time they would take a call from the Chief of

1  Staff.

2  **Q.**   And that was you?

3  **A.**   That was me, yeah.

4  **Q.**   All right.  Okay.  All right.

5       So we can agree that the role of Chief of Staff is

6  governed in part by the prohibitions of the Hatch Act;

7  correct?

8  **A.**   The role of Chief of Staff is governed -- I don't know

9  that I would say it's governed.  I mean, does the Hatch Act

10  apply to a Chief of Staff?  Yes.

11      Is the Hatch Act something that is sitting there as your

12  guiding light necessarily?  No.

13  **Q.**   I understand that distinction.

14      I think the first part is what I was looking for.

15  Whether you're in the role of Chief of Staff or anybody else

16  is in the role of Chief of Staff, the Hatch Act is something

17  that applies to that role; correct?

18  **A.**   It applies to the Chief of Staff, even though there are

19  some differences of opinion, just to be frank, on how it

20  should apply.  But it applies to all federal employees.  So,

21  yes.  I'm a federal employee, it would apply to me.

22  **Q.**   All right.  You let us know, Mr. Meadows, that you had no

23  campaign role.  Is that what you testified to a little

24  earlier?

25  **A.**   That is correct.

1    **Q.**    You had no campaign role?

2    **A.**    No official campaign role.

3    **Q.**    All right.  Did you have an unofficial campaign role?

4    **A.**    No, I did -- I did not.

5    **Q.**    You did not?  Okay.

6         And it sounds like the Chief of Staff role is a robust

7    one.  You had enough on your plate without an additional

8    responsibility of the campaign; is that correct?

9    **A.**    Yeah.  I hadn't wanted to work for the campaign.  I would

10   love for the campaign to do everything that they could do on

11   their own.

12        You know, bluntly, if -- I had more than I could say

13   grace over in terms of everything that I was doing.  Now, did

14   that mean that I could completely ignore them?  Absolutely

15   not.  I mean, you know, it -- it consumed part of the

16   President's time and schedule.  And certainly I had to be

17   aware of everything that was going on.

18   **Q.**    Were you aware of the Hatch Act and the restrictions on

19   your ability as a federal employee to participate in the

20   campaign during the post-election period?

21   **A.**    So your question is to participate in the campaign.

22   What -- are you meaning working for the campaign?

23   **Q.**    No.  I mean, for example, participating in the

24   January 2nd, 2021, call about -- with attorneys who

25   represented then President Trump in his personal campaign

1  capacity.

2  **A.**   Yeah.  So my understanding of the Hatch Act is that my

3  interaction with campaign-related people and campaign

4  personnel is a permitted use for the Chief of Staff in the

5  role that he has as Chief of Staff.  So I didn't see that as a

6  violation of the Hatch Act.

7  **Q.**   Okay.  You acknowledged that it applied.  And whether it

8  was a violation or not, that's something that maybe someone

9  else will resolve down the line.  But you were aware of the

10 Hatch Act at the time, December and January -- December 2020

11 and January 2021, and that it did apply to your role as Chief

12 of Staff; correct?

13 **A.**   That's correct.

14 **Q.**   Okay.  And you had no role in the campaign; correct?  And

15 by "the campaign" I'm talking about then President Trump's

16 reelection campaign.  You had no role in that campaign;

17 correct?

18 **A.**   That is correct.

19 **Q.**   Did you have any role, Mr. Meadows, in coordinating the

20 various electors in the contested states for the Trump

21 campaign?

22 **A.**   No, I did not.

23 **Q.**   No role at all?

24 **A.**   The only time that I know of from the electors's point

25 was when somebody raised the issue with me and I referred it

1  on to the campaign.

2  **Q.**   So you had no role for the campaign or as Chief of Staff

3  in coordinating those efforts across contested states?

4  **A.**   As Chief of Staff, no, I did not coordinate those

5  efforts.

6  **Q.**   Okay.

7       MS. CROSS:  May I approach the witness, Your Honor?

8       THE COURT:  Yes.

9       MS. CROSS:  We've marked this as State's Exhibit

10  Number 1.

11  BY MS. CROSS:

12  **Q.**   I'm going to show you, Mr. Meadows, State's Exhibit

13  Number 1 and ask you to take a look at it for me and see if

14  you recognize State's Exhibit Number 1?

15  **A.**   Yes, I do.

16  **Q.**   How do you recognize it?

17  **A.**   It was an e-mail from me to Mr. Miller.

18  **Q.**   It's complete and accurate to the best of your

19  recollection?

20  **A.**   I have no reason to doubt its veracity.  I mean...

21  **Q.**   I appreciate that.

22       MS. CROSS:  Your Honor, at this time we'd move

23  State's Exhibit Number 1 into evidence.

24       THE COURT:  Any objections?

25       MR. TERWILLIGER:  One moment, Your Honor.

1    I guess, no, Your Honor.

2    THE COURT:  State's 1 is admitted without objection.

3 You may proceed.

4    MS. CROSS:  Thank you.

5 BY MS. CROSS:

6 Q.   If you take a look at that, that's a two-page document.

7 Is that State's Number 1 in front of you?

8 A.   Yes.  It is two pages.

9 Q.   And it looks to be an e-mail exchange between you and

10 Jason Miller; is that correct?

11 A.   Yes, ma'am, it is.

12 Q.   All right.  And all of those e-mails seem to be sent and

13 received between 4:11 p.m. on December 6th, 2020, and then

14 the final one, then, from you at the top is the same date,

15 December 6th, 2020, at 4:39 p.m.; is that correct?

16 A.   I'm not seeing -- oh, yes.  Yes.  That is correct.

17 Q.   Okay.  So it looks to be a series of e-mails between you

18 and Mr. Miller over a period of maybe 30 minutes or so;

19 correct?

20 A.   That's correct.

21 Q.   Okay.  And who is Mr. Miller, Jason Miller?

22 A.   Jason Miller worked for the Trump reelect committee and

23 was part of their campaign.

24 Q.   Okay.  In December 2020 did Mr. Miller have any federal

25 employment that you're aware of?

1  A.    He did not, not that I'm aware of.

2  Q.    Okay.  And your e-mail is redacted from this exhibit but

3  Mr. Miller is not.  And I apologize to Mr. Miller.  But

4  the domain name on Mr. Miller's e-mail is, in fact,

5  donaldtrump.com; correct?

6  A.    Yes, that's what it says.

7  Q.    Okay.  And that is a domain name that was associated with

8  the Trump campaign during this time period; correct?

9  A.    I believe so, yes, ma'am.

10  Q.    Okay.  All right.

11        MS. CROSS:  On the second page, Your Honor, since

12  it's been admitted, may I have permission to publish it?

13        THE COURT:  Yes.

14        MS. CROSS:  Thank you.

15  BY MS. CROSS:

16  Q.    The second page, I'm going to start there, Mr. Meadows,

17  because this appears to be an attachment that was on the first

18  e-mail, first-in-time --

19  A.    Right.

20  Q.    -- e-mail that was sent.

21        Does that appear the same to you?

22  A.    It does appear the same to me, yes, ma'am.

23  Q.    And this is looking to me like -- please look at that.

24  What's the attachment on that exhibit, can you tell?

25  A.    It says "Chesebro memo on real deadline."

1  Q.   Is there a date on the memo?

2  A.   11/20/2020.

3  Q.   And, of course, we don't know the date of any particular

4  memo or what was the substance of the attachment, that's not

5  in this State's Exhibit Number 1, but that's what the

6  attachment purports to be?

7  A.   Right.

8  Q.   Okay.  And if we then look at the first page of that

9  State's Exhibit Number 1, the very bottom of the page that

10 that attachment appears to be connected to or associated with,

11 that's an e-mail from you to Mr. Miller it appears.  "Let's

12 have a discussion about this tomorrow," correct?

13 A.   Yes.  So I'm not sure if that's me writing him or him

14 writing me, but, yes, that's what it says.

15 Q.   We can check.

16      The next one up is a response that is clearly from

17 Mr. Miller about seven minutes later at 4:18 p.m. on

18 December 6th, 2020.

19      Is that what that appears to be?

20 A.   Yes, ma'am.

21 Q.   And the response -- I'll read it and you can just follow

22 along and you tell me if I'm reading it correctly, okay, so

23 that it's clear in the record.

24      Mr. Miller responds to you that, "You bet.  So you know,

25 Justin and I did on background calls this very subject with

1  Maria, Leven, Chuck Todd, and Margaret Brennan yesterday.  (I

2  might be missing 1-2 others).  Justin, should we just do a

3  national press call tightly focused on this tomorrow, no?"

4        And then "JM."

5        Did you know Mr. Miller to sign his e-mails "JM," by his

6  initials?

7  **A.**   I would assume that's him, but I don't know.

8  **Q.**   And then it appears on State's Exhibit Number 1 you

9  respond at 4:34 p.m.

10        Do you see that, Mr. Meadows?

11  **A.**   Yes.

12  **Q.**   And can you read for me what your response to Mr. Miller

13  was?

14  **A.**   "Let's have a discussion about this tomorrow."

15  **Q.**   I'm sorry --

16  **A.**   Oh, that's 4:11, I'm sorry.

17  **Q.**   That's fine.

18        About midway through the page.

19  **A.**   "If you were on it, then never mind the meeting, we just

20  need to have someone coordinating the electors for the

21  states."

22  **Q.**   We just need to have someone coordinating the electors

23  for the state?

24  **A.**   Right.

25  **Q.**   Who is the "we" you're referring to, Mr. Meadows?

1  **A.**   My understanding, it would be the campaign would need to

2  have someone coordinating that.

3  **Q.**   And when you're referring to "the campaign" in this

4  e-mail exchange, you used the term "we"; correct?

5  **A.**   Yes.  I mean, that's what I wrote.

6  **Q.**   Okay.  Mr. Meadows, did you have a personal interest in

7  then President Trump winning reelection?

8  **A.**   Wanting him to stay in office?

9  **Q.**   Yes.

10  **A.**   Certainly.

11  **Q.**   You wanted him to win?

12  **A.**   Sure.

13  **Q.**   You worked very hard for him to win?

14  **A.**   Well, not on the campaign.  I worked very hard for the

15  President, again, to be specific.  But, sure, I wanted him to

16  win.

17  **Q.**   You voted for him?

18  **A.**   Yes, I did.

19  **Q.**   In North Carolina?

20  **A.**   Yes, I did.

21  **Q.**   And your position in federal government, of course,

22  depended on Mr. Trump being reelected; correct?

23  **A.**   Yeah.  I can't imagine that I would be Chief of Staff for

24  Joe Biden.

25  **Q.**   That's yes?

1  A.   Yes.

2  Q.   And he didn't call you, did he?

3  A.   Mr. Biden -- President Biden?

4  Q.   Yes.

5  A.   No, I was not on the short list.

6        MS. CROSS:  All right.  Those are all my questions,

7  Mr. Meadows.  Thank you.

8        THE COURT:  Redirect?

9        MR. TERWILLIGER:  Thank you, Your Honor.

10                    REDIRECT EXAMINATION

11 BY MR. TERWILLIGER:

12 Q.   While we're on the question --

13        MR. TERWILLIGER:  Can I have the exhibit, please?

14        MS. CROSS:  There's your copy.

15        MR. TERWILLIGER:  Yeah, I know, but I'd like to have

16 the exhibit.

17        Thank you.

18 BY MR. TERWILLIGER:

19 Q.   So you just testified about this exhibit and the

20 statement here where you say "we."  Were you trying to

21 indicate that "we" meant you and the campaign together?  Who's

22 the "we"?

23 A.   No, sir.  The -- as I've mentioned earlier, I use "we"

24 far too often.  And I've -- it was normally out of deference

25 to other people where you would say we accomplished this and

1  we accomplished that.  It's a habit that's left over from my

2  Congressional days.

3       But, bluntly, on this it -- I took it to mean the Trump

4  campaign specifically.  Not me and the Trump campaign.

5  **Q.**   And if you can say, if you recall, why did you care

6  whether the electors were coordinated?

7  **A.**   So about this time, maybe on this given day, it was

8  mentioned to me that there was litigation going on and that

9  you had to have a provisional or conditional elector.  Should

10 a court or should a legislature rule that you can't just have

11 one set of electors, you had to have a provisional set.  And

12 what I didn't want to happen was for the campaign to prevail

13 in certain areas and then not have this.  It was brought --

14 **Q.**   Why did you not want that to happen?

15 **A.**   Well, because I know I would get yelled at if we had

16 not --

17 **Q.**   By whom?

18 **A.**   By the President of the United States.

19      -- had we not had what I saw more as a procedural

20 provisional issue.  And so I forwarded it on to the campaign

21 team.  And it sounded like they were well on top of it and

22 working that in.

23 **Q.**   The district attorney asked you about the Hatch Act and

24 made some comment, I don't believe it was a question, that

25 maybe it's down the line somebody else will adjudicate your

1  violation of it.  Did you believe you violated the Hatch Act

2  in the January 2nd call?

3  **A.**   Absolutely not.  Just the opposite.

4  **Q.**   Okay.  Let's talk about why.

5      The district attorney's office seems to have made the

6  assumption that if you were involved in something political --

7           THE COURT:  Hold on.  Hold on.  We have an objection.

8           MS. CROSS:  I am going to object to the phrasing of

9  that question, Your Honor, insofar as it asks the witness to

10  speculate on the motivations of the prosecution agency.

11           MR. TERWILLIGER:  I'm not speculating on the

12  motivations.  I'm talking about the factual basis for their

13  questions.

14           THE COURT:  Let's rephrase the questions and leave

15  the district attorney out of it.

16           MS. CROSS:  Thank you.

17           MR. TERWILLIGER:  Okay, Your Honor.

18           THE COURT:  Go ahead.

19  BY MR. TERWILLIGER:

20  **Q.**   When you got on the January 2nd call, and you testified

21  that on that call you were trying -- you looked for an

22  opening, I believe you said, to bring something to closure,

23  what exactly were you trying to bring to closure?

24  **A.**   I felt like that if we could get both groups together

25  where the attorneys were talking to each other, that they

1  would be able to look at the veracity of some of the claims

2  that had been made and make a determination whether they were

3  valid or not valid and hopefully get this off of the

4  President's concern list and as we look to continue on towards

5  January 20th and what ultimately would happen.

6  **Q.**   Why did that matter to you on January 2nd?

7  **A.**   It continued to be a concern for the President that he

8  brought up a number of times.  But there were a number of

9  other things that had to get done in order -- I think I used

10  the term earlier in order to land the plane.  I mean --

11  **Q.**   Let me stop you there, if I may.

12       What plane are you talking about landing?

13  **A.**   Well, the whole transfer of power.  All the final things

14  that have to happen at the end of an administration to be able

15  to make sure that we address those.

16       But it was not just those.  I think I told His Honor

17  earlier, it was executive orders, a number of other duties

18  that had to get done prior to January 20th.  It was a

19  transition that had to take place as well.

20  **Q.**   And what -- how did you view January 6th prior to that

21  date in terms of that process?

22  **A.**   I viewed January 6th as kind of the final day that would

23  allow for any open questions to be finished with certification

24  in Washington, DC.  And --

25  **Q.**   So if you can, can you relate that back to why you were

1  participating on January 2nd?

2  **A.**   Well, you know, again, there were a number of issues that

3  continued to get raised in the White House.  Questions of

4  whether allegations of fraud, of which there were many, had to

5  get raised.

6        But I also had a timeline in terms of getting certain

7  things done.  And those, as long as they were open questions,

8  would not allow us to continue on with the transition.

9  **Q.**   Is it fair to say, then, that you wanted the question

10  closed, it really didn't matter how?

11  **A.**   Well, it didn't matter how.  I think I said that, you

12  know, on the end of the call, whether it's for or against.

13  And that's not the exact words that I used, but certainly

14  whether there was veracity, as I mentioned earlier to the DA

15  counsel, to those claims.  But having open questions continued

16  to be a roadblock for initiating other items.

17  **Q.**   You're talking around things a little bit it seems to me.

18  Initiating what other items?

19  **A.**   We had to do the transfer of power.  We actually had to

20  work with the transition teams.  Those had started actually

21  earlier.  But those -- there were certain things that once you

22  put into process, those would continue on.

23        We had to wind down some of the federal agencies that

24  were there.

25        Staffing issues.

1    Certainly making plans for a new administration to come
2    in.
3    **Q.**   How were these issues obstacles?
4    **A.**   Because they were consuming the President's time and his
5    thought, they continued to do that.  And certainly as an open
6    question, you know, there was a belief certainly in the
7    President's mind that some of these allegations were true and
8    might potentially have a different outcome.
9    **Q.**   How does that relate to your December visit to the Cobb
10   County courthouse?
11   **A.**   Well, it relates completely.  It's exactly in line with
12   that, because what I did was go to the Cobb County convention
13   center to look at the process that they were going through.
14   And in doing so was trying to, again, check that box to say,
15   all right, everything is being done right here, and so if
16   there's allegations of fraud, we need to move on to something
17   else.
18   **Q.**   And when you went there, did you go there -- I believe
19   you were asked did somebody direct you?
20   **A.**   No one directed me to go.
21   **Q.**   You went there as a matter of your own discretion?
22   **A.**   Yes, sir.
23   **Q.**   A couple of times Article II of the Constitution has come
24   up in the discussions.  What is -- is there a responsibility
25   of the President's and thus the Executive Office of the

1  President, that's spelled out in Article II that you're aware

2  of?

3  **A.**   Certainly.  The presidential responsibilities for Article

4  II -- Article I is legislative, I believe --

5  **Q.**   No.  I'm asking you in Article II is there a specific

6  obligation that is placed on the President by Article II of

7  the Constitution that you recall?

8  **A.**   Again, I'm -- I told His Honor I don't know that I'm --

9  I'll get dinged on this one, too, but I don't know that I'm --

10  **Q.**   You're familiar with the phrase "take care that the laws

11  be faithfully executed"?

12  **A.**   Sure.

13          MS. CROSS:  Your Honor, I'm going to object to the

14  leading nature of the question.  This is their own witness.

15          THE COURT:  I'm going to give him a little leeway on

16  this.  This is not a lawyer.  I'll allow him to ask that

17  question.

18          MR. TERWILLIGER:  Thank you, Your Honor.

19          THE WITNESS:  Thank you, Your Honor.

20  BY MR. TERWILLIGER

21  **Q.**   And in that connection, are you aware of whether or not

22  there are federal laws that govern elections, including

23  presidential elections?

24  **A.**   Yes.

25  **Q.**   Can you name some of them?

**A.**   Well, I mean, certainly there's the Electoral Count Act.
There's -- as I mentioned to the counsel earlier, there's
duties and responsibility in terms of cybersecurity that DHS
has as part of that but -- in that federal role.  Those would
be two federal roles.

**Q.**   When you were a member of Congress, do you ever recall
there being any policy issues or legislative -- discussions of
legislation or potential legislation about providing aid to
the states in connection with elections?

**A.**   Yes.  I mean -- and we had hearings on that, I think I
mentioned that earlier, where actually that was part of it.

   But that does bring to mind, you know, you talk about the
legislative part of that, during the COVID relief package, a
big part of that package that we were negotiating there and
one of the stumbling blocks that we had was actually on the
amount of federal money that was going to go to federal
elections and how it was getting deployed.

   And, you know, it didn't come to me until you mentioned
that, but in my conversations with Speaker Pelosi and Leader
Schumer, Secretary Mnuchin and myself, that was part of that.
So there was certainly from an appropriations standpoint real
discussions that took place as it relates to funding.

   But from a legislative standpoint, we had that.  You
know, that would be Article I, but we had those kinds of
discussions and hearings quite a bit.

1  **Q.**   I just want to go back briefly to the January 2nd call.

2  And if I can find it, something else that you said.

3          MR. TERWILLIGER:  Your indulgence, Your Honor.

4          THE COURT:  Yes.

5  BY MR. TERWILLIGER:

6  **Q.**   I believe in response to one of counsel's questions you

7  said you were hoping to find a way.  Could you explain a

8  little bit more about what you mean by that?  Hoping that you

9  could find a way to resolve those issues?

10 **A.**   Well, hoping that -- me personally resolving those was

11 not something that I was going to be able to do personally.  I

12 mean, obviously the President had attorneys, the Secretary of

13 State had attorneys.  But what I was hopeful for is that that

14 conversation would actually result in the attorneys talking to

15 one another and being able to say, listen, you know, this

16 allegation, you can look at this, you can look at X, Y or Z

17 and resolve the issue.

18         MR. TERWILLIGER:  One moment, Your Honor.

19         No further questions.  Thank you, Your Honor.

20         THE COURT:  Thank you, sir.

21         Recross?

22         MS. CROSS:  No, thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Meadows.  You can step

24 down.

25         THE WITNESS:  Thank you, sir.  I appreciate it.

1          THE COURT:  Leave all that right there.  They'll get

2     it.  Thank you.

3          (Witness excused.)

4          THE COURT:  Sir, you can call your next witness.

5          MR. TERWILLIGER:  Your Honor, I'm going to turn

6     things over to Mr. Moran for a moment.

7          THE COURT:  Hi, Mr. Moran.

8          MR. MORAN:  Good afternoon, Your Honor.

9          We don't have any additional witnesses to call at

10    this time.  We do have -- would move the admission of two

11    declarations.

12         THE COURT:  All right.

13         MR. MORAN:  Which I've shared with counsel for the

14    State, and I've marked for identification purposes as Defense

15    Exhibits 3 and 4.  I would be happy to hand those up.

16         May I approach?

17         THE COURT:  Yes, sir.

18         And you-all have seen these?

19         MS. CROSS:  I have, Your Honor.  I do have an

20    objection, though, so I don't consent to their admission.

21         THE COURT:  Okay.  Well, before I look at them --

22    well, I guess I need to look at them and then you can tell me

23    what you're objecting to.

24         Are you objecting to 3 and 4 or one or the other one?

25         MS. CROSS:  I have an objection, Your Honor, to both

1    of them, and they are the same.  These are unsworn,

2    unnotarized, purporting to be declarations of individuals who

3    have not been subject to cross-examination.

4           The information itself is in large part hearsay or

5    unsourced.  So I don't believe these are appropriate

6    consideration for the Court without a notarization or a

7    cross-examination.  So we do object to their admission.

8           MR. TERWILLIGER:  Your Honor, I'm sorry.  I'm sorry

9    to interrupt.  While you-all discuss this, may I be excused

10   for a moment?

11          THE COURT:  Yes.

12          MR. MORAN:  Your Honor, I refer the Court to

13   28 USC 1746, which provides that an unsworn declaration with

14   a declaration under penalty of perjury is sufficient for

15   evidentiary purposes in federal court.

16          As to the question of admissibility, I do think this

17   is a natural question to ask.  Under Rule 1101 of the Rules of

18   Evidence, those rules do not apply to, quote, miscellaneous

19   proceedings such as a preliminary examination in a criminal

20   case.

21          District courts have taken different approaches to

22   this question on an evidentiary hearing called for by

23   Section 1455(b)(5).  As Your Honor is probably aware, these

24   don't happen every day.  They're also not unheard of.

25          We can offer three citations of cases where courts

1  determined that receiving declarations or affidavits on

2  relevant issues were appropriate to be admitted in this

3  context.

4       I would also note that the State has admitted

5  numerous hearsay transcripts in support of their opposition to

6  removal.  And so at a minimum, what's good for the goose is

7  good for the gander.

8       MS. CROSS:  Well, whose gander?  I don't know that

9  I'm going to agree with that.

10      I believe that 902(5) permits the excerpts that the

11  State is relying on are actually publications from government

12  offices that are self-authenticating.  So I don't believe any

13  equivalence there is well taken.

14      The State relies on its objections.  These are

15  unsworn declarations on even an affidavit.  It had asked

16  opposing counsel if they intended to call witnesses.  Perhaps

17  had they informed us of these people, we could have addressed

18  it with a proper what the cross-examination might show.

19      But given the posture that we're in, I think the

20  Court is not under an obligation to accept them.  We encourage

21  that you not accept them.  I don't believe they are evidence

22  worthy, so we stand on our objection.

23      THE COURT:  The Court will allow that and give it

24  whatever weight is due, if any.

25      MR. MORAN:  All right.  Your Honor, I have an

1  objection to the suggestion that the transcripts are

2  different, but given that --

3          THE COURT:  You're ahead of me now, sir.

4          MR. MORAN:  I'll let it sit.  Yeah.  Thank you.

5          THE COURT:  And I note your objection for the record,

6  but, again, the Court will give it whatever weight I think is

7  appropriate at this time.

8          MS. CROSS:  I understand.  Thank you.

9          THE COURT:  Thank you.

10          What else?

11          MR. TERWILLIGER:  No further evidence, Your Honor.

12          THE COURT:  All right.  Defendant rests.

13          Are you ready to proceed presenting evidence?

14          MS. CROSS:  We are, Judge Jones.  Can you give us

15  about five minutes to make sure that the witness is ready to

16  be called?

17          THE COURT:  It's 2:55.  At 3:00 I'm going to walk

18  back in here and hope you have your first witness ready.

19          MS. CROSS:  Appreciate it.  Thank you.

20          THE COURT:  Each one of you-all should have a room on

21  the 17th and 18th floor to keep your witnesses.  I'll give you

22  all a chance to bring them up.  Try to bring up more than one

23  so we can flow them right.  Okay?

24          Start back at 3:00.

25          COURT SECURITY OFFICER:  All rise.

1          (After a recess, the proceedings continued at

2     3:05 p.m. as follows:)

3          THE COURT:  Can we shut that back door and have

4     everybody seated, please.

5          Can I get the Marshals to close the back door.  I

6     need everybody seated.  On a chair or bench.

7          Thank you.

8          Are you ready to call your first witness?

9          MS. CROSS:  Yes, Your Honor.  Thank you.

10          The State of Georgia calls Mr. Kurt Hilbert.

11          THE COURT:  Are you representing Mr. Hilbert?

12          MR. BRICKMAN:  Yes, sir.

13          THE COURT:  Let's do this.  Obviously you're

14     representing him for a reason.  If something's said, you don't

15     want him to answer, do you need to get closer to him or

16     sitting right there is fine?  Do you want to get closer or

17     sitting where you're at is going to be okay?

18          MR. BRICKMAN:  Is there a space there, Judge?

19          THE COURT:  We'll find you one, because if there's a

20     question asked, I'd rather you make your objection here rather

21     than back there.

22          MR. BRICKMAN:  If there is a spot, I'd be happy to

23     take it.

24          THE COURT:  All right.  Come on up.

25          COURTROOM DEPUTY CLERK:  Would you raise your right

1   hand, please.

2                    KURT ROBERT HILBERT

3            Having been duly sworn, testified as follows:

4                          * * * * * *

5            COURTROOM DEPUTY CLERK:  Have a seat.  And if you can

6   please state and spell your name for the record.

7            THE WITNESS:  Sure.  My name is Kurt Robert Hilbert.

8   K-U-R-T.  R-O-B-E-R-T.  Hilbert is H-I-L-B-E-R-T.

9            THE COURT:  Counsel, bear with me one second.

10           There will be questions asked of you by the State's

11   counsel and probably questions asked of you by Mr. Meadow's

12   counsel.  You have your counsel here.  If at any point in time

13   you think you need to talk to your counsel, you ask the judge,

14   I'd like to speak to my counsel, and you turn around and say

15   something.

16           Once you answer the question, the question's been

17   answered.  Okay?  Do you understand?

18           THE WITNESS:  I understand, Your Honor.

19           THE COURT:  And you make your objections.  You've

20   done this before, so you know when to do it, okay?

21           MR. BRICKMAN:  Yes, sir.

22           THE COURT:  All right.  You may proceed.

23           MS. CROSS:  Thank you, Your Honor.

24   DIRECT EXAMINATION

25   BY MS. CROSS:

**Q.**   Mr. Hilbert, can you tell the Court, please, what is your
occupation?  What do you do?

**A.**   I'm an attorney here in the State of Georgia.

**Q.**   Are you licensed in Georgia?

**A.**   I am indeed.

**Q.**   How long have you been licensed in Georgia?

**A.**   Since 2002, a little over 20 years.

**Q.**   Okay.  And without getting into too much detail can you
explain just a little bit about what your practice area is?

**A.**   Sure.  I have basically four buckets.  I do business
corporate, real estate, employment and constitutional
litigation.

**Q.**   And do you own your own firm?  Do you work for a
different firm?  How does that work?

**A.**   I have my own small boutique firm in Roswell, Georgia.

**Q.**   I want to direct your attention, please, Mr. Hilbert, to
the December 2020/January 2021 time period, okay?

**A.**   Okay.

**Q.**   You're still an attorney working in Georgia?

**A.**   Yes, ma'am.

**Q.**   Practice areas as you've just described them for us?

**A.**   Yes, ma'am.

**Q.**   Office still in Roswell?

**A.**   Yes, ma'am.

**Q.**   All right.  December 2020, do you have any acquaintance

1  with the defendant, Mr. Meadows?

2  **A.**   Acquaintance with Mr. Meadows?  No, I didn't have any

3  acquaintance with Mr. Meadows.

4  **Q.**   All right.  Had you ever met him prior to December 2020?

5  **A.**   I don't believe I've ever met Mr. Meadows in person.

6  **Q.**   Okay.  Ever spoken to him on the phone?

7  **A.**   Yes.

8  **Q.**   Prior to December of 2020?

9  **A.**   No.

10  **Q.**   Tell me what, if any, relationship you had with the

11  reelection campaign for, during this time period, then

12  President Trump?

13  **A.**   I'm sorry, could you rephrase?  I didn't --

14  **Q.**   I could.

15     What, if any, relationship did you have with the

16  reelection campaign of Donald Trump in December 2020?

17  **A.**   I represented the campaign in Fulton County litigation.

18  **Q.**   Okay.  The campaign, I described it as the Trump

19  reelection campaign.  Is that how you would describe it?

20  **A.**   Donald J. Trump For President, Inc., which was, I

21  believe, the campaign name at the time.

22  **Q.**   Okay.  All right.  But if I talk about the Trump campaign

23  and you talk about the Trump campaign, can we agree that we're

24  talking about that entity that you just described?

25  **A.**   Yes, ma'am.

1  **Q.**   Okay.  What about in his individual capacity, did you

2  represent Donald J. Trump in his individual capacity?

3  **A.**   I represented Donald J. Trump as Candidate for President.

4  **Q.**   As candidate?

5  **A.**   Yes.

6  **Q.**   All right.  And I'm going to show you --

7       MS. CROSS:  May I approach the witness, Your Honor?

8       THE COURT:  Yes.

9  BY MS. CROSS:

10 **Q.**   -- State's Exhibit Number 2.  And I'm going to ask you to

11 take a look at that and you tell me if you recognize it,

12 please.

13 **A.**   I do recall what this is, yes.

14 **Q.**   Okay.  And upon your review of State's Exhibit Number 2

15 is it a fair and accurate representation of what you believe

16 State's Exhibit Number 2 to be?

17 **A.**   Yes.  This is my entry of appearance for the petitioners

18 in the Fulton County court case that I signed.

19 **Q.**   All right.

20      MS. CROSS:  Your Honor, at this time we'd move

21 State's Exhibit Number 2 into evidence.

22      THE COURT:  Any objections?

23      MR. MORAN:  None, Your Honor.

24      THE COURT:  All right.  It's admitted without

25 objection, State's 2.

1  BY MS. CROSS:

2  **Q.**   All right.  Mr. Hilbert, you answered that last question

3  with the Fulton County litigation, this is your entry of

4  appearance in the Fulton County litigation.  And I want you to

5  take a look at that and we'll see if we can save some time.

6      That was Civil Action 2020CV343355 -- I'm sorry -- 3255;

7  is that correct?

8  **A.**   2020CV343255, yes.

9  **Q.**   Thank you.

10      All right.  And who did you file an entry of appearance

11  on behalf of in that litigation?

12  **A.**   Donald J. Trump in His Capacity as Candidate for

13  President; Donald J. Trump for President, Inc.; and David J.

14  Shaffer in His Capacity as a Registered Voter and Presidential

15  Elector Pledged to Donald Trump for President.

16  **Q.**   And if we are talking about the November 3rd, 2020,

17  election, did you represent these parties in the Fulton County

18  litigation and other litigation?

19  **A.**   Okay.  If you could rephrase the question.  I didn't

20  quite understand.

21  **Q.**   It wasn't a very good question.

22      In the post-election period in November, December 2020,

23  what entities or persons did you represent in any election

24  contest litigation?

25  **A.**   Okay.  So there was one actual election contest that was

1  filed.  That was the Fulton County Superior Court case.  I

2  represented Donald J. Trump in his Capacity as Candidate for

3  President, Donald J. Trump for President, Inc., David J.

4  Shaffer in His Capacity as a Registered Voter and Presidential

5  Elector Pledged to Donald Trump for President as part of the

6  election contest.

7  **Q.**   Okay.  And was Mr. Shaffer at that time also the Chair of

8  the Georgia GOP party?

9  **A.**   Yes, he was.

10  **Q.**   Okay.  I'm sorry, I think I interrupted you.  Was there

11  other litigation that was ongoing?

12  **A.**   Yeah.  So I just want to make sure that the time frame is

13  correct.  I made my entry of appearance December 7th.  So

14  before, in November, I was not doing anything with the

15  campaign or the President or anything like that.

16       There was subsequent litigation as well that I brought in

17  the Federal District Court, that was brought before this

18  court.  Not this particular Court, but the Federal District

19  Court.

20  **Q.**   Okay.  And you represented the same entities in that

21  litigation?

22  **A.**   I believe they were different.  The federal case was just

23  *Donald J. Trump*, I believe, *v. Kemp*, *Brian Kemp*.

24  **Q.**   Okay.

25  **A.**   Governor Kemp.

1    **Q.**    Did you ever represent the federal government in any

2    election-related litigation?

3    **A.**    No, ma'am.

4    **Q.**    Who, if anyone else, was on your litigation team

5    assisting in the representation of Donald J. Trump personally

6    and the Trump campaign?

7    **A.**    Goodness.  Several people.

8          Alex Kaufman was on my team.

9    **Q.**    Who's Alex Kaufman?

10   **A.**    Alex Kaufman is a colleague, a lawyer as well here in

11   Georgia.  At the time he was counsel for the Georgia

12   Republican Party, I believe.  He also was counsel for David

13   Shaffer in some capacity, either corporate or individual, I

14   don't really know.

15         But he's just a friend, a colleague.  And I do a lot of

16   cases with him as co-counsel.

17   **Q.**    I didn't see Mr. Kaufman have an entry of appearance into

18   the litigation that you've described for us this afternoon.

19   Was Mr. Kaufman counsel of record?

20   **A.**    No.  He was never counsel of record.

21   **Q.**    In what capacity, then, did he assist in the litigation

22   efforts?

23   **A.**    He was a consultant, independent contractor, attorney.

24   **Q.**    Okay.  Anyone else on your litigation team?

25   **A.**    Yes.  Christopher Gardner, who is an attorney who came

1  down from Virginia.

2      There were several others as well.  I can try to remember

3  all of them.

4      Patrick Witt as well.  He was not a practicing attorney,

5  but he was a graduate from Harvard Law.

6      In addition to that there was Courtney Kramer.

7      In addition to that there was a team of lawyers from Fox

8  Rothschild that was participating in the cases as well.

9  **Q.**   For the court reporter, that was Fox Rothschild?

10 **A.**   Yes.

11 **Q.**   And was that a firm that Mr. Kaufman was then associated

12 with?

13 **A.**   Correct.  Yes.  At the time, yes.

14     So there was a team of folks there, and I honestly do not

15 recall all of their names.

16     And I think, to the best of my knowledge, that is all of

17 the lawyers that were on my team at the time if I can recall.

18 **Q.**   What about Cleta Mitchell?

19 **A.**   Cleta Mitchell as well, yes.  Yes.  She was also a

20 consultant.  Thank you for reminding me, yes.

21 **Q.**   And what was Ms. Mitchell's role in the litigation that

22 you oversaw?

23 **A.**   She was originally the one who found me to bring -- you

24 know, act as counsel in this case to litigate these matters.

25 So she was a consultant as well, similar to what Alex was

1  doing.

2  Q.   Did you have a relationship with Ms. Mitchell that

3  predated your involvement in this litigation?

4  A.   I did not, no.

5  Q.   Okay.  So it was a cold call from Ms. Mitchell to you?

6  A.   Yes.

7  Q.   Some --

8  A.   Yes.

9  Q.   Not based on a prior relationship?

10  A.   Correct.

11  Q.   Was Ms. Mitchell -- what did you understand

12  Ms. Mitchell's role as a consultant to be?

13  A.   She would give legal advice.  She would render opinions

14  on various documents.  I think she did review a few things

15  throughout the litigation.

16      But, generally speaking, she was a consultant.  If we

17  needed an opinion of -- or a liaison between my office and

18  what was going on in the Office of the President and such, I

19  would usually typically go through her as the liaison to the

20  White House.

21  Q.   Did Ms. Mitchell have a contact or a relationship with

22  someone in the West Wing that made that communication?

23  A.   I wouldn't have personal knowledge of that.  I don't

24  know.  I just knew that she was able to contact who she needed

25  to contact up there.  I didn't know those relationships.

1   **Q.**   Did you know who she was contacting?

2   **A.**   I do know that she had contacted Mark Meadows in certain

3   instances.

4   **Q.**   Do you recall what those incidences were?

5   **A.**   Not offhand.  I mean, there were -- I mean, over a course

6   of a month, I -- this is over two-and-a-half years ago, I

7   couldn't tell you the specifics.

8   **Q.**   Okay.  Well, let me ask it a different way then,

9   Mr. Hilbert.

10       If you as the representative for Donald Trump in his

11   personal capacity and the Trump campaign in the reelection

12   efforts, if you needed to get a message to your client,

13   Mr. Trump, how would you achieve that?

14   **A.**   I would go through Cleta Mitchell.

15   **Q.**   Okay.  Cleta Mitchell.

16       You would say -- and I'm being colloquial, so I'm not

17   ascribing these actual words to you.  But you would say

18   something along the lines of, oh, Cleta, I got to get some

19   clarification on something.  I need to advise President Trump

20   on where I'm going, want to make it okay.  That was

21   information you communicated to Ms. Mitchell?

22   **A.**   To Ms. Mitchell and potentially others, whoever might

23   have been on that e-mail chain.

24   **Q.**   Okay.  And Ms. Mitchell then would, in some form or

25   fashion, you believe, get the message to President Trump,

1  would then get direction in that?

2  **A.**   To my knowledge.  That's a yes.  Yeah.

3  **Q.**   Okay.  All right.  And I'm just wondering, Mr. Hilbert,

4  could you pick up the phone and get President Trump on the

5  line?

6  **A.**   I did not have his personal phone number, no.  No.

7  **Q.**   Okay.  Did you coordinate your representation of

8  Mr. Trump or the Trump campaign with any person at the

9  Department of Justice?

10  **A.**   No, I did not speak with anyone at the Department of

11  Justice.

12  **Q.**   At no time?

13  **A.**   At no time.

14  **Q.**   Did you coordinate your representation of Donald Trump or

15  the Trump campaign with any person in the Office of the White

16  House Counsel?

17  **A.**   I spoke with some White House counsel over the period of

18  that month.

19  **Q.**   Who was it that you spoke with?

20  **A.**   I want to say Eric Herschmann.

21  **Q.**   Did you reach out to Mr. Herschmann or did Mr. Herschmann

22  reach out to you?

23  **A.**   I don't recall if I called him or he called me, but it

24  was in context.  There were several attorneys on the phone at

25  the time.

1  **Q.**   Do you recall the subject matter of the conversation you
2  had with Mr. Herschmann?
3  **A.**   I don't.  It had to do with the federal litigation.
4  **Q.**   The federal litigation that you were spearheading here in
5  Georgia?
6  **A.**   Yes.
7  **Q.**   All right.  I want to direct your attention now to
8  January 2nd, 2021.
9  **A.**   Okay.
10 **Q.**   January 2nd, 2021, do you recall any involvement that
11 you had in a phone conversation between Mr. Trump and then
12 Secretary of State Raffensperger?
13 **A.**   I was on a call.
14 **Q.**   Tell me how you came to get on the call.
15 **A.**   So I was working at my office.  I believe January 2nd was
16 a Saturday.  We were preparing for a hearing that was -- we
17 were thinking was going to be upcoming in front of Judge Cohen
18 here in federal court that next Monday or Tuesday.  I was
19 working on preparing for that hearing, working on briefing and
20 things of that nature.
21      And someone on my legal team -- I was in the conference
22 room of my law firm.  Someone from my team came down the
23 hallway and came into my room.  I believe it was Alex Kaufman
24 who was the person who did that.  Came into my conference room
25 and said, I -- there's going to be a call.

1  **Q.**   Who did you understand the call to be between?

2  **A.**   My understanding was that the call was involving the

3  President.  I don't know how else to put it.

4  **Q.**   Okay.  Your associate or someone comes to you and says

5  there's going to be a call, you know it's going to be the

6  President.  Does the President want to talk to you?

7  **A.**   I have no idea.

8  **Q.**   What do you do?

9  **A.**   Well, I don't know if this gets into attorney/client

10  privilege.

11  **Q.**   I don't want to do that.  None of my questions -- so

12  thank you for flagging it for me.  None of my questions are

13  intended to go in that direction.  So if you let me know that,

14  I'm going to ask a different question.

15  **A.**   Okay.  Okay.

16  **Q.**   All right.  Did you have a phone conversation with anyone

17  between the time that your associate came down the hall saying

18  the President wants to have the call and the time you actually

19  got on the call with Secretary Raffensperger?

20  **A.**   And your question was did I have a call?

21  **Q.**   Yeah.  I want to know if you talked to anybody in between

22  that period.

23  **A.**   Yes, I did.

24  **Q.**   Who did you talk to in between that period?

25  **A.**   I talked to the President.  I talked to Mark Meadows.  I

1   talked to Cleta Mitchell.

2   **Q.**   Anyone other than the four of you on the phone?

3   **A.**   Yes.  My legal team, several members of my legal team

4   were on that call.

5   **Q.**   Mr. Kaufman included?

6   **A.**   I believe he was on the call, yes.

7   **Q.**   Okay.  Were you lead counsel for the litigation efforts

8   here in Georgia on behalf of Mr. Trump and the Trump campaign?

9   **A.**   So I did not file the lawsuit.  I did not draft the

10  lawsuit.  I was brought in to litigate the lawsuit.  When I

11  came in to litigate the lawsuit, I took over as lead counsel

12  to do the litigation aspect of the lawsuit.

13  **Q.**   Okay.  All right.  So from -- I think the date of your

14  entry of appearance was somewhere around December 7th?

15  **A.**   Yes.

16  **Q.**   You did not initiate the lawsuit?  You did not draft the

17  lawsuit.

18  **A.**   That is correct.

19  **Q.**   Okay.  But from December 7th on, if somebody had to get a

20  question answered about the litigation, you were the one who

21  called the shots?

22  **A.**   That is correct.  That was my understanding.

23  **Q.**   Okay.  All right.  Mr. Hilbert, did you initiate the

24  call between then President Trump and Secretary of State

25  Raffensperger?

1  A.   No, I did not.

2  Q.   Did you direct anyone else to initiate the call between

3  then President Trump and Secretary of State Raffensperger?

4  A.   No, I did not.

5  Q.   Was it part of your litigation strategy to have a call

6  between the two litigants, your client, Mr. Trump, and the

7  defendant in the lawsuit, Mr. Raffensperger?

8  A.   I think that gets into mental impressions of counsel and

9  litigation strategy.  I don't know if I can answer that

10  question.

11  Q.   Okay.  I'll ask it another way.

12       Did you make any effort to arrange a direct communication

13  between Mr. Trump and Mr. Raffensperger?

14  A.   I did not.

15  Q.   How long did the conversation between yourself,

16  Mr. Trump, Mr. Meadows and Ms. Mitchell last, and the other

17  members of your team as you've described?

18  A.   From my recollection, it was minutes.

19  Q.   And how long after that conversation did the call take

20  place?  And when I say "the call," I mean the call between

21  Mr. Trump and Secretary of State Raffensperger.

22  A.   It was virtually immediately thereafter.

23  Q.   Okay.

24  A.   Yeah.

25  Q.   All right.  You get notified there's going to be a call,

1  you have a conversation, there's still going to be a call at

2  the end of that conversation, and then you move into the call

3  between the President and Secretary of State?

4  **A.**   That's to the best of my recollection how it happened,

5  yes.

6  **Q.**   Okay.  Prior to this conversation with Mr. Meadows that

7  you let us know you were both on, on that pre-Raffensperger

8  call, was that the first time you had talked to Mr. Meadows?

9  **A.**   To the best of my recollection, yes.

10  **Q.**   Were you on the phone for the entirety of the call

11  between President Trump and Secretary of State Raffensperger

12  to your knowledge?

13  **A.**   So just to clarify, are you asking about the actual call?

14  **Q.**   The actual call.

15  **A.**   I was on for the entirety of the call, yes.

16  **Q.**   And your role and participation in that call was as the

17  attorney for the Trump reelection campaign and Mr. Trump

18  personally; correct?

19  **A.**   And David Shaffer, yes.

20  **Q.**   And David Shaffer, correct, who was another litigant.

21  **A.**   Correct.  Yes.

22  **Q.**   And litigation was ongoing at this time, correct, on

23  January 2nd, 2021?

24  **A.**   Yes.

25  **Q.**   The substance of the call, did you speak?

**A.**   I did speak.

**Q.**   What, if you could describe for us, was -- outside your participation, what was the substance of the call?

**A.**   I don't know if I can testify to the substance of the call because that would be in violation of Rule 408 for purpose of settlement compromise.  I don't believe I can get into the substance of the call.

**Q.**   Okay.  That's your position.  I don't agree with your position that -- but I want to make sure we flesh it out for the record.

Are you testifying, Mr. Hilbert, that you believe the entirety of that conversation was in furtherance of settlement negotiations?

**A.**   Yes.

**Q.**   Okay.  Recognizing that we're not going to agree on that point and there's no reason to litigate it further, did you have any role on the conversation -- did you have any role in that conversation that was not derived from your representation of Mr. Trump personally or the campaign?

**A.**   No, ma'am.

THE COURT:  Can I jump in here, Counsel, for one second.

What made you thought this was for settlement negotiations?  What made you thought this telephone conversation was for settlement negotiations?

1          THE WITNESS:  There were two pending cases, Your

2     Honor, one in federal court and one in state court.  There

3     would be no purpose to have a call with the President and a

4     litigant in the case without having it for purpose of

5     settlement compromise.

6          THE COURT:  Never?

7          THE WITNESS:  Well, at least that's my opinion, Your

8     Honor.

9          THE COURT:  Well, no, that's what I'm asking you.  In

10    your opinion, you never called another party unless it was

11    settlement negotiations?

12         THE WITNESS:  No.  Of course you would have other

13    conversations about other things, but when it deals with

14    issues that are directly related to litigation, and especially

15    when I knew that Ryan Germany, who was general counsel for

16    Secretary of State, was going to be on the call as well,

17    there's no reason to have any phone call other than outside

18    the scope of a Rule 408 protected conversation.

19         THE COURT:  Without saying it was settlement

20    negotiations -- well, you would have to say.

21         THE WITNESS:  Thank you, Your Honor.

22         MS. CROSS:  I'm comfortable not getting into that

23    fight anymore.

24         THE COURT:  Yes.

25    BY MS. CROSS:

**Q.**   Mr. Hilbert, settlement negotiation or not, this was not
a call that you initiated; correct?

**A.**   Correct.

**Q.**   This was not part of your litigation strategy, to have
the two litigants speak to each other; correct?

**A.**   I believe, again, that gets into mental impressions and
litigation strategies of counsel.  I don't think I can testify
to that.

**Q.**   Would you -- as part of your representation of Mr. Trump
personally or the Trump reelection campaign, would you consult
with Mr. Meadows about any step that you were going to take in
that litigation?

**A.**   If I'm understanding what you said, would I have
consulted with Mr. Meadows about steps that I took in the
litigation?

**Q.**   Let me ask you a different question.

     Did you feel the need to consult with Mr. Meadows about
settlement negotiations in your ongoing litigation on behalf
of President Trump or the Trump campaign?

**A.**   No.

**Q.**   Who was -- you referenced Mr. Germany.  Mr. Germany was
the general counsel for the Secretary of State's office;
correct?

**A.**   That's correct.

**Q.**   Mr. Germany was not representing the Secretary of State

1  in the litigation that you had; correct?

2  **A.**   He had hired outside counsel, Chris Anulewicz.

3  **Q.**   And was Mr. Anulewicz on the call?

4  **A.**   He was not.

5  **Q.**   Did you make any effort to get Mr. Anulewicz on the call?

6  **A.**   Mr. Anulewicz was outside litigation counsel.  Ryan

7  Germany was general counsel.  The ethical rules say that as

8  long as there's counsel on the phone, that's all that's

9  required, not a specific type of counsel.

10      So from my perspective, if Mr. Anulewicz needed to be on

11  that call, then Ryan Germany should have reached out to him to

12  bring him into that phone call.

13  **Q.**   That's not quite my question.

14      My question was, did you make any effort to get the

15  counsel of record for the Secretary of State's office in a

16  litigation that you were pursuing, did you make any effort to

17  get counsel of record on the phone call?

18  **A.**   No.  I relied on Ryan Germany.

19  **Q.**   Did at any time you ask Ryan Germany if he was

20  representing the Secretary of State's office for purposes of

21  settlement?

22  **A.**   He stated -- well, I was informed that he was counsel.

23  That's the best I can say.

24  **Q.**   Okay.  Well, that wasn't quite my question.

25      At any time did you confirm with Mr. Germany that he was

1  representing the Secretary of State's office for purposes of

2  the settlement conversation that you thought you were having?

3  **A.**   I believe -- I don't know if I can get into that because

4  it's part of the attorney/client privileged communications and

5  part of that call.

6         THE COURT:  Well, it's going to be up to you whether

7  you want to press the point or not.  If you don't want to

8  press the point, we move on.

9         MS. CROSS:  I'll move on.

10  BY MS. CROSS:

11  **Q.**   Mr. Hilbert, outside the phone conversations that we've

12  talked about, did you ever speak with Mr. Meadows again?

13  **A.**   I don't believe I spoke to Mr. Meadows ever again, no.

14         MS. CROSS:  Thank you.  Those are all the questions I

15  have.

16         THE WITNESS:  Thank you.

17         THE COURT:  Your witness, Mr. Moran.

18         MR. MORAN:  Your Honor, at this time under Rule 26.2

19  we'd move for production of all statements by the witness from

20  the State.

21         MS. CROSS:  The State's position, Your Honor, is 26.2

22  doesn't contemplate discovery in a removal hearing.  It's very

23  specific what Rule 26.2 applies to, trials, sentencings,

24  probation revocations, a series of delineated proceedings of

25  which federal removal is not one of them.  So I don't believe

1  that act applies.

2          MR. MORAN:  It does include preliminary hearings,
3  Your Honor.

4          THE COURT:  Excuse me?

5          MR. MORAN:  It does include preliminary hearings.
6  Under the rule it says, This rule applies at trial, at a
7  suppression hearing under Rule 12, and to the extent specified
8  in the following rules:  Rule 5.1 for preliminary hearings;
9  Rule 32(i)(2) for sentencing hearings; 32.1(e) for hearings to
10 revoke or modify probation; Rule 46(j) for detention hearings;
11 and Rule 8 governing proceedings under 2255.

12          THE COURT:  I don't think this hearing falls under
13 any of those.

14          MR. MORAN:  Well, Your Honor, I also say that --
15 that's fine if that's the Court's ruling.  We asked for these
16 on Wednesday.  We were not provided these statements then
17 either.  They would go to potential impeachment evidence
18 that --

19          THE COURT:  You give me a statute, a case that you're
20 supposed to get them right now, I'll tell them to give them to
21 you right now.  But right now all the things you've stated
22 does not give me reason to order them to turn them over.  So
23 they're not going to be turned over.

24          You may proceed to question this witness.

25 CROSS-EXAMINATION

1  BY MR. MORAN:

2  **Q.**   Good afternoon, Mr. Hilbert.  My name is John Moran.  I'm

3  an attorney with McGuireWoods representing Mr. Meadows.

4  **A.**   Good afternoon.

5  **Q.**   Good to meet you.

6  **A.**   Nice to meet you, too.

7  **Q.**   Before we get into the substance, am I right, have you

8  previously testified in any setting about these matters?

9          MS. CROSS:  I'm going to object to the phrase "about

10  these matters."  If we could define that a little more

11  closely, that would probably address my objection.

12  BY MR. MORAN:

13  **Q.**   Let me start, Mr. Hilbert.

14          Did you testify before the Georgia special purpose grand

15  jury?

16  **A.**   I was subpoenaed to testify before the Georgia special

17  purpose grand jury.  Yes, I did testify.

18  **Q.**   And have you been interviewed by the Fulton County

19  District Attorney's Office or their agents separately from

20  that grand jury testimony?

21  **A.**   No, sir.

22  **Q.**   Have you been interviewed or have you testified in any

23  federal proceeding or federal law enforcement interview in

24  relation to these same matters?

25  **A.**   No, sir.

1   **Q.**   Okay.  Thank you.

2        Mr. Hilbert, am I right that you testified that you

3   participated in the January 2nd call with Secretary of State

4   Raffensperger because you were a lawyer representing President

5   Trump as a candidate, his reelection campaign and David

6   Shaffer; is that right?

7   **A.**   That is correct.

8   **Q.**   And would you agree that Mr. Mark Meadows was not a

9   lawyer for those clients?

10   **A.**   I don't know the status of Mark Meadows, whether he's a

11   lawyer or not.  I don't know.

12   **Q.**   But he was not part of your legal team?

13   **A.**   He was not part of my legal team, no.

14   **Q.**   And on the call is it true that he introduced himself as

15   the Chief of Staff?

16        THE WITNESS:  Your Honor, for the same reason, I

17   don't think I can testify to what the content of the call was.

18        THE COURT:  If you want to press the matter, we'll

19   press it.  If not, we'll move on.

20        MR. MORAN:  I won't press the matter, Your Honor.

21   BY MR. MORAN:

22   **Q.**   In preparation for the call, Mr. Hilbert, did you

23   understand that Mr. Meadows was going to be participating

24   because he was the Chief of Staff?

25   **A.**   That was my understanding, yes.

 1          MR. MORAN:  Thank you, Your Honor.  No further
 2  questions.

 3          THE COURT:  Redirect?

 4          MS. CROSS:  I have nothing, Your Honor.

 5          THE COURT:  Thank you, sir.

 6          Let the record reflect the attorney representing him

 7  for this purpose is Mr. Jeff Brickman.  Thank you.

 8          THE WITNESS:  Thank you, Your Honor.

 9          THE COURT:  May this witness be excused?

10          MS. CROSS:  Yes, Your Honor.

11          MR. MORAN:  Yes, Your Honor.

12          (Witness excused.)

13          MR. BRICKMAN:  Good to see you, Judge.

14          THE COURT:  Good to see you, Mr. Brickman.

15          Call your next witness, please.

16          MS. CROSS:  State of Georgia calls Secretary of State

17  Raffensperger.

18          THE COURT:  All right.

19          Counsel, you're doing a great job.  If you would slow

20  down a little bit on the speaking.  The court reporter can't

21  keep up with you.  If they don't write it down, when I get to

22  read it, it's not there.  Other than that, you're doing fine.

23          MS. CROSS:  I appreciate that.  Thank you.  I'm

24  sorry.

25          THE COURT:  Secretary Raffensperger, right up here.

1    Come on up, sir.

2              How you doing today?

3              THE WITNESS:  Fine, Your Honor.

4              THE COURT:  If you would raise your right hand,

5    Ms. Wright is going to administer the oath to you.

6                            *****

7                       BRAD RAFFENSPERGER

8              having been duly sworn, testified as follows:

9                            *****

10             COURTROOM DEPUTY CLERK:  Thank you.  Have a seat,

11   please.

12   DIRECT EXAMINATION

13   BY MS. CROSS:

14   **Q.**   Good afternoon, Secretary Raffensperger.  How are you?

15   **A.**   Great.

16   **Q.**   Can you spell your name, please, for the court reporter.

17   **A.**   R-A-F-F-E-N-S-P-E-R-G-E-R.

18   **Q.**   And my name is Anna Cross.  We hadn't met before today;

19   is that correct?

20   **A.**   Correct.

21   **Q.**   To the best of your recollection?

22   **A.**   Best of my recollection.

23   **Q.**   And mine, too.  All right.

24             THE COURT:  Hold on one second.

25             Secretary Raffensperger, is the gentleman standing in

1  the back your attorney?

2          THE WITNESS:  Yes, he is.

3          THE COURT:  All right.

4          Sir, would you come have a seat up here.

5          And, again, Secretary Raffensperger, if any one of

6  the lawyers asks you a question that you felt unsure whether

7  you should answer or not, turn to your attorney and he will

8  tell you whether to answer or not.  And then I'll have the

9  final word on whether you should answer or not.

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  All right.

12         MS. CROSS:  Thank you, Your Honor.

13         THE COURT:  Your name, sir?

14         MR. SHARMAN:  Jack Sharman, S-H-A-R-M-A-N.

15         THE COURT:  Jack Sharman, for the record,

16 representing the Secretary of State.

17         MS. CROSS:  Thank you, Your Honor.

18 BY MS. CROSS:

19 **Q.**   Secretary Raffensperger, can you let us know, what's your

20 current employment?

21 **A.**   Secretary of State, State of Georgia.

22 **Q.**   How long have you served as the Secretary of State for

23 the State of Georgia?

24 **A.**   Since January 2019.

25 **Q.**   Can you describe for us in broad terms what the

1  responsibilities of the Secretary of State in Georgia are

2  regarding election administration?

3  **A.**   Chief election official for the State of Georgia.

4  **Q.**   And what does that entail?

5  **A.**   Well, we have elections from time to time in our cycle.

6  And it's going through the process of making sure that the

7  elections -- people follow the law, follow the Constitution,

8  and then we certify the results.

9  **Q.**   Am I correct in summarizing the system that we have in

10 Georgia in that the individual counties actually carry out the

11 elections; is that correct?

12 **A.**   Yes, that's correct.

13 **Q.**   And what, then, is the role of your office after the

14 counties administer -- I'm sorry -- after the counties conduct

15 the elections per the state?

16 **A.**   The counties report the results that occurred in their

17 county.  We then tabulate that for all 159 counties, verify

18 their tabulations.  And then at that point we're in a position

19 that we can certify the results of an election.

20 **Q.**   What role, if any, does the federal government play in

21 the administration of the elections in Georgia?

22 **A.**   None, other than what is spelled out in, you know,

23 federal law, but...

24 **Q.**   Who do you send the certifications to?

25 **A.**   Well, actually, I send them to the governor.  And then

1   the governor would certify them.

2   **Q.**    But as you as the Secretary of State are administering

3   elections and preparing to certify an election, is there

4   anyone in the federal government that you coordinate that

5   action with?

6   **A.**    No.

7   **Q.**    Is there anyone in the federal government that you

8   consult about the appropriateness of certifying any specific

9   election?

10  **A.**    No.

11  **Q.**    Anyone in the executive branch -- that's a slightly

12  different question.

13          Anyone in the executive branch that you consult with in

14  the administration or certification of the election results in

15  Georgia?

16  **A.**    No.

17  **Q.**    What about the President of the United States, does the

18  President of the United States at any given time have any role

19  in the administration of the election activity administration

20  in Georgia?

21  **A.**    Not from my understanding.

22  **Q.**    Does the President of the United States have any role

23  in the certification of the Georgia elections in your

24  understanding as the Secretary of State?

25  **A.**    No.

1  **Q.**   All right.  I want to direct your attention, Secretary

2  Raffensperger, to the November 3rd, 2020, presidential

3  election.

4       Were you aware that after that election that you were

5  sued as part of -- you were sued by the Trump campaign and

6  Donald J. Trump individually?

7  **A.**   Yes.

8  **Q.**   And what was your understanding of that litigation?

9  **A.**   The Trump campaign/the candidate, Donald J. Trump, sued

10 us making several allegations.  They did not agree with the

11 results that were reported.

12 **Q.**   December 4th, 2020, does that date sound familiar as the

13 initiation of that lawsuit?

14 **A.**   I can't recall exactly what date.  I was very familiar

15 that we had lawsuits.

16 **Q.**   More than one?

17 **A.**   Yes.

18 **Q.**   Where are election challenges by a campaign required to

19 be filed in Georgia; do you know?

20 **A.**   Not specifically.

21 **Q.**   All right.  Assume for the purpose of my question that

22 December 4th, 2020, was the initiation of the election contest

23 brought on behalf of Mr. Trump personally and the campaign for

24 his reelection.

25      December 4th, 2020, at that time the election had taken

1    place; correct?

2    A.    Correct.

3    Q.    The election was November 3rd, 2020?

4    A.    Correct.

5    Q.    Okay.  Had there been a hand recount of the presidential

6    ballots?

7    A.    By that time I believe so.

8    Q.    Who ordered that?

9    A.    The hand recount?

10   Q.    Yes.

11   A.    The hand retally I ordered.  And then obviously President

12   Trump, once that election result was certified, then he could

13   ask for a recount.  The retally and recount are two separate

14   functions.  But the hand retally was something that I ordered.

15   Q.    All right.  And if I suggest to you that November 11th,

16   2020, was the date that you ordered that hand recount, does

17   that sound consistent with your memory?

18   A.    Yes, it does.

19   Q.    Certification of the vote in Georgia for the presidential

20   election in 2020, do you recall if that took place on or about

21   November 20th, 2020?

22   A.    Don't remember the specific date but that would sound in

23   that order.

24   Q.    And then you referenced a recount, the Trump campaign

25   requested a recount; is that correct?

**A.**    Correct.

**Q.**    And that recount can be requested after the certification of the vote; correct?

**A.**    Correct.

**Q.**    What was the result of the recount?

**A.**    President Trump still came up short.

**Q.**    All right.  When you say "came up short," does that mean he lost the election?

**A.**    He lost the election in the State of Georgia.

**Q.**    Who won?

**A.**    President -- now President Biden.

**Q.**    We've heard testimony prior to your arrival today, Secretary Raffensperger, that there was a signature audit in Cobb County.  Are you familiar with that?

**A.**    Yes.

**Q.**    Can you explain to me, please, how the signature audit in Cobb County came to be?

**A.**    It was the one area that we had received credible evidence that the signature match audit was not done as part of the absentee ballot verification process.  And so we instituted a verification of the signature matches in Cobb County, taking a selected sample, about 10 percent, of the total absentee ballots.

**Q.**    Were there other allegations of election fraud or wrongdoing that were made associated with the November 3rd,

1  2020, election?

2  **A.**   Yes.

3  **Q.**   Did you investigate those?

4  **A.**   Yes.

5  **Q.**   At the time of the signature audit in Cobb County on or

6  about December 22nd, 2020, were there any other issues related

7  to allegations of election fraud that you considered

8  outstanding?

9  **A.**   It was a process, an ongoing process.  In other words,

10 there were allegations that there were thousands of dead

11 people that voted, and we were in the process of verifying

12 what that was.  We wrapped that up at some point.

13 **Q.**   When you say -- I'm sorry, I don't mean to interrupt you,

14 but when you say you "wrapped that up," did you resolve that?

15 **A.**   We resolved that at the time, up until January 2021, we

16 had found two dead people.

17 **Q.**   Were all of the allegations -- again, I want to put aside

18 for a moment the signature audit in Cobb County.  Were all of

19 the other allegations that you investigated, were they

20 resolved in such a way that you were confident that the

21 results of the election were not in question?

22 **A.**   Yes.

23 **Q.**   Are you certain of that?

24 **A.**   Yes.  Absolutely.

25 **Q.**   Were you certain of that at the time of the

1  December 22nd, 2020, signature audit?

2  **A.**   Yes.

3  **Q.**   Am I understanding your testimony correctly to be that

4  that remained the one potential avenue that couldn't -- that

5  wasn't wrapped up at that time?

6  **A.**   Yes.

7  **Q.**   Broadly speaking, what's involved in a signature audit?

8  Who's involved and what are they -- what's their goal, what's

9  the intent?

10  **A.**   When we did the signature audit in Cobb County, we had

11  one of our POST certified officers, along with two GBI agents,

12  we had approximately ten teams.  And that was really -- the

13  GBI assisted us so we could get through the number of people.

14  It was about 15,000 absentee ballot applications that we had

15  to review.

16  **Q.**   Okay.  And just for clarification for the record you said

17  "POST certified."  Does that mean to you that it's someone

18  with arrest powers after having gone through certification in

19  Georgia law enforcement?

20  **A.**   Correct.

21  **Q.**   And who was that person in your office who had arrest

22  powers who was present at the signature audit in Cobb County?

23  **A.**   Frances Watson.

24  **Q.**   Ms. Watson was the chief investigator at that time --

25  **A.**   Yes.

1  Q.    -- for your office?

2  A.    Yes.

3  Q.    All right.  What role, if any, Secretary Raffensperger,

4  did the federal government have in the signature audit that

5  you were conducting in Cobb County on or about December 22nd,

6  2020?

7  A.    None.

8  Q.    Are you aware that Mr. Mark Meadows, a defendant in this

9  case, was physically present in the Cobb County Civic Center

10 at the time that the audit was ongoing?

11 A.    Yes, I am.

12 Q.    Did you invite him?

13 A.    No.

14 Q.    Did you solicit input from either Mr. Meadows or then

15 President Trump?

16 A.    No.

17 Q.    Were you aware at the time of the signature audit -- I'll

18 take that back.

19      At the time of the signature audit on or about

20 December 22nd, 2020, had you personally ever spoken to the

21 then President, Mr. Trump?

22 A.    No.

23 Q.    Had you personally, by December 22nd, 2020, ever spoken

24 to the Chief of Staff at that time, Mr. Meadows?

25 A.    No.

1  **Q.**    At that time, December 22nd, 2020, are you aware of any

2  effort or any outreach on behalf of Mr. Trump to you related

3  to the allegations of fraud in the November 3rd, 2020,

4  election?

5  **A.**    From President Trump directly?

6  **Q.**    From anyone on his behalf.

7  **A.**    A person purporting to be Mr. Meadows did send me a text

8  in November.

9  **Q.**    In November 2020?

10  **A.**    Yes.

11  **Q.**    What was the content of the text; do you recall?

12  **A.**    To the effect of -- it came from -- it was a text but it

13  said nccongressman@gmail.com.  But it said, Mr. Secretary,

14  this is Mark Meadows, your voicemail is full, give me a call.

15  **Q.**    Did you return that call from Mr. Meadows?

16  **A.**    No.

17  **Q.**    Why didn't you return the call from Mr. Meadows?

18  **A.**    Several reasons.  One, he didn't leave a phone number.

19        Two, I first held elected office in the City of Johns

20  Creek.  And what was told to us in very strong terms is that

21  we never, as city council members, got involved in policing

22  investigations.  This was, in effect, an ongoing investigation

23  with POST certified officers.  And I did not feel it was

24  appropriate for me to weigh in or to have other outside forces

25  weighing in to anything that could look like a conflict of

1    interest.  I didn't see what good could come out of it.

2    **Q.**    I understand.

3    Are you aware of any other outreach, either before the

4    signature audit -- well, let me ask -- let me back up a

5    moment.

6    The signature audit, what were the results of that audit?

7    **A.**    I believe it was two, perhaps four individuals, it was --

8    their signatures were not correct.  One was a spouse signing

9    for another spouse member.  Another one was another similar

10   type situation.

11   But what -- we conclusively proved that there was not

12   fraud.  We sent -- we dispatched our investigators with GBI.

13   And Frances Watson could go into detail on that.  But we went

14   out there and we talked, face-to-face interviews, with these,

15   you know, questionable ones.  It was less than five.

16   **Q.**    Less than five.

17   And in the presidential election ballots that were

18   submitted in the November 2020 election, I'm not going to ask

19   you for a specific number, was the five potentially

20   problematic ballots that you --

21   **A.**    Out of, say, 15,000.  So extrapolate that out to -- the

22   150,000, and extrapolate it out, it would never rise to the

23   level of overturning the results of the race.

24   **Q.**    Too small of a number to have affected the results from

25   Cobb County?

1  **A.**   Right.  We did interview those people and we could get

2  answers on all that.  So, in effect, we reduced it down to

3  just, I believe, two.

4  **Q.**   Are you aware, Secretary of State Raffensperger, or were

5  you aware at the time that there was a December 27th text from

6  Defendant Meadows to an employee of yours related to signature

7  verification in Fulton County?  Were you aware of that text?

8  **A.**   Not that I recall, but perhaps.

9  **Q.**   Did you ever conduct a signature audit in Fulton County

10  related to the November 2020 election?

11  **A.**   Not prior to January.  We never had really any

12  credible -- we had lots of allegations, but none of it ever

13  was credible.

14      We had a fellow that -- named Carter Jones that was there

15  as part of our consent agreement with Fulton County.  And he

16  was verifying that they did -- Fulton County did do signature

17  match.

18  **Q.**   Okay.  So despite the allegation, it was insufficient

19  information for you to pursue a signature audit in Fulton

20  County?

21  **A.**   Correct.

22  **Q.**   All right.  I want to -- are you aware of any other --

23  I'm going to orient you a little bit to January 2nd, 2021.

24  I'm going to ask you some questions about that.

25      But right now, prior to January 2nd, 2021, you talked

1   about the text message from Mr. Meadows in November.  You

2   talked about Mr. Meadows arriving uninvited at the Cobb County

3   signature verification.  What other outreach from either

4   Donald Trump or someone acting on his behalf are you aware of?

5   **A.**   Mr. Meadows sent me another text apparently in December,

6   and he wanted me to give him a call.  And this time he said

7   call the White House switchboard.  And he left a number there.

8   **Q.**   Did you return that call?

9   **A.**   No.

10  **Q.**   Did you ever speak with Mr. Meadows after -- as a result

11  of any of these outreaches?

12  **A.**   No.

13  **Q.**   Are you aware of any other -- you talked about what you

14  received personally.  Are you aware of any other communication

15  or efforts that were made to contact your staff on behalf of

16  either Mr. Meadows or the then President Trump?

17  **A.**   I'm not aware of -- can't recollect.  I know you

18  mentioned he reached out to one of our staff members back in

19  November.  I don't know -- I can't recall something in

20  December.

21  **Q.**   Is it something that you can't recall the details at this

22  time?  Were you aware at the time of other outreach?

23  **A.**   Nothing specific.

24  **Q.**   If there's been testimony that Mr. Meadows had attempted

25  to leave a voice message for you over the period of a week or

1  two before the January 2nd, 2021, call, is that consistent

2  with your recollection as far as the number of times

3  Mr. Meadows reached out to you personally?

4  **A.**  Can you say that again, please.

5  **Q.**  That was a bad one.

6       If there was testimony prior to your arrival today that

7  Mr. Meadows reached out to you personally at least once in

8  the week or two weeks prior to the January 2nd call, is that

9  consistent with your recollection?

10 **A.**  I believe that -- my recollection is that I believe he

11 called the Secretary of State's office and left a voicemail in

12 the general mailbox.  But we were swamped with calls and it

13 just never got picked up.

14 **Q.**  All right.

15      Let me direct your attention then to the call on

16 January 2nd, 2021.  Did you initiate that call?

17 **A.**  No.

18 **Q.**  How did you come to learn that there was a call that your

19 presence was requested on?

20 **A.**  My Deputy Secretary of State reached out to me.

21 **Q.**  Who's that?

22 **A.**  Jordan Fuchs.

23      And she said the White House called, and they want to

24 talk to you.

25 **Q.**  To your understanding did Ms. Fuchs have a

1  relationship -- not a personal relationship.  Did she know

2  anyone or have a contact in the President's office?

3  **A.**    It was Mr. Meadows that reached out to her.

4  **Q.**    And what did you understand the purpose of the outreach

5  to be?

6  **A.**    That the President wanted to talk to me.

7  **Q.**    Were you aware at that time of what the President wanted

8  to talk to you about?

9  **A.**    The election of 2020.

10  **Q.**    Is that the information that was relayed to you, or was

11  that your best guess based on the events that had preceded it?

12  **A.**    I think it went along the lines of, the President wants

13  to talk to you.  He heard you on Cavuto this morning.

14  **Q.**    What's Cavuto?

15  **A.**    Neil Cavuto, Fox News.  I was interviewed by Neil Cavuto.

16  And I don't believe the President cared for my comments.  It

17  was about data points and why he came up short.

18  **Q.**    Did any of the interview that you're describing for us,

19  did that interview at least air on the morning of

20  January 2nd, 2020 [sic]?

21  **A.**    Yes, it did.

22  **Q.**    The information that was relayed to you was that the

23  President had seen it?

24  **A.**    Yes.

25  **Q.**    The President had some things he wanted to talk to you

1    about --

2    **A.**    Yes.

3    **Q.**    -- as a result of that interview?

4    **A.**    Yes.

5    **Q.**    And that was why the outreach was occurring on that day?

6    **A.**    Yes.

7    **Q.**    You had resisted efforts at contact prior to January 2nd,

8    2021, is that correct?

9    **A.**    Correct.

10   **Q.**    Why was it that you decided to accept the call on

11   January 2nd?

12   **A.**    I didn't at first.  I told the deputy, I don't think

13   that's, you know, in our best interest.  I don't have an

14   interest.

15         And so we hung up.  And she called back, and she said

16   that -- and this is my recollection, that she called back

17   then.  And then it was relayed that, no, we needed to have

18   this call.

19         And I said, If we're going to have this call, it can't

20   just be by myself.  We have ongoing litigation from the

21   campaign, that I need to have general counsel on the call with

22   us.

23         So they even said, you know, we have our lawyers on the

24   phone call.

25   **Q.**    Who was your general counsel for the Secretary of State's

1   office in December, January of 2021?

2   **A.**   Ryan Germany.

3   **Q.**   Were you able to get Mr. Germany?

4   **A.**   Yes.

5   **Q.**   Anyone else on your end that was on the call?

6   **A.**   Jordan Fuchs who facilitated the call.

7   **Q.**   The second when -- what was your understanding of who was

8   communicating with Ms. Fuchs in the second contact?  As I'm

9   understanding your testimony -- let me ask a better question.

10      As I'm understanding your testimony, Mr. Meadows reached

11  out to Ms. Fuchs to reach out to you to arrange a call;

12  correct?

13  **A.**   Right.

14  **Q.**   You declined to participate at that time; correct?

15  **A.**   Right.

16  **Q.**   You relayed that to Ms. Fuchs; correct?

17  **A.**   Correct.  I believe she called back to Mark Meadows and

18  said, well, we need to have this call.  So that came back to

19  me.  So we ended up having the call.

20      THE COURT:  Was this call -- do I understand that

21  this call was solely to deal with the 2020 election?

22      THE WITNESS:  Yes, Your Honor.

23      THE COURT:  Was it to deal with anything else, COVID

24  or anything like that?

25      THE WITNESS:  No.  The 2020 election.

1  BY MS. CROSS:

2  **Q.**   The 2020 election that the federal government didn't have

3  a role in certifying; correct?

4  **A.**   Correct.

5  **Q.**   The 2020 election that the federal government didn't have

6  a role in administering; correct?

7  **A.**   Correct.

8  **Q.**   The 2020 election that Mr. Trump personally and the

9  campaign was suing you and your office to challenge; correct?

10 **A.**   Correct.

11 **Q.**   At this point, January 2nd, 2021, the certification in

12 Georgia had taken place; correct?

13 **A.**   Correct.

14 **Q.**   At least two certifications?

15 **A.**   The race gets certified once.

16 **Q.**   How, then, does it work with the recount?

17 **A.**   The results were consistent when we did the 100 percent

18 rescan of the ballots, so there wasn't anything to review.

19 And it had been certified.

20         THE COURT:  Let me interrupt again.

21         Is it my understanding at this point in time Governor

22 Kemp had certified the election?

23         THE WITNESS:  Yes, Your Honor.

24         THE COURT:  So this call on January 2nd, the election

25 was certified by Governor Kemp?

1          THE WITNESS:  Your Honor?

2          THE COURT:  You already got a certification from

3   Governor Kemp on the election?  He had certified?

4          THE WITNESS:  Yes.  Yes, Your Honor.

5          THE COURT:  Once the election is certified by the

6   Governor, can anything change it?

7          THE WITNESS:  We haven't crossed that bridge yet,

8   Your Honor.

9          THE COURT:  Well, I hope you don't bring it to court

10  to me.

11         THE WITNESS:  I wouldn't think so, but I'm not a

12  lawyer, I'm an engineer.

13         THE COURT:  But you're Secretary of State?

14         THE WITNESS:  I am.  I'm not aware of anything that

15  could cause that.

16         THE COURT:  In your history -- this is your second

17  term as Secretary of State?

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  In your term as Secretary of State has it

20  ever occurred before once the governor certifies the election

21  anything changed?

22         THE WITNESS:  No, Your Honor.

23  BY MS. CROSS:

24  **Q.**   There were no recounts pending at this time, January 2nd;

25  correct?

1   **A.**   None to my recollection.

2   **Q.**   Was your job with respect to the certification --

3         THE COURT:  Let me interrupt you again.

4         Would there have been anything to settle at this

5   time, any compromise and settlement that could be done?

6         THE WITNESS:  I don't believe, Your Honor, there was.

7         THE COURT:  Go ahead.  I'm sorry.

8         MS. CROSS:  Your Honor, may I approach the witness?

9         THE COURT:  Yes.

10   BY MS. CROSS:

11   **Q.**   I'm going to approach you, Secretary Raffensperger, with

12   what has been marked as State's Exhibit Number 3.  I want you

13   to take a look at it for me, please, and see if you recognize

14   it?

15   **A.**   It's a recording of the phone call I had with the

16   President and my signature.

17   **Q.**   Okay.

18         Your signature is on the envelope that -- State's Exhibit

19   Number 3 is the actual USB drive.  And you have reviewed that

20   prior to your testimony today; correct?

21   **A.**   Correct.

22   **Q.**   And your signature on that means it is true and accurate

23   to the best of your recollection?

24   **A.**   Yes.

25   **Q.**   State's Exhibit Number 3, is that a full and complete

1  recording of the conversation, at least the portion where you

2  were on the line and Mr. Trump is on the line?

3  **A.**   Yes.

4        MS. CROSS:  Your Honor, at this time we move State's

5  Exhibit Number 3 into evidence.

6        MR. FRANCISCO:  No objection, Your Honor.

7        THE COURT:  Admitted without objection.

8        MS. CROSS:  Thank you.

9  BY MS. CROSS:

10 **Q.**   Secretary of State Raffensperger, in your experience up

11 to this time as Secretary of State, was this outreach from a

12 campaign, was that normal?

13 **A.**   I've seen candidates lose and come up short and have a

14 recount, but outreach to this extent was extraordinary.

15 **Q.**   What about public statements, public statements made by

16 then President Trump or the campaign making allegations of

17 fraud in Georgia, was that something that was typical in your

18 experience of a losing candidate?

19 **A.**   No, it was extraordinary.

20 **Q.**   Had you personally been the target of some of these

21 public statements, Secretary Raffensperger?

22 **A.**   Several.

23 **Q.**   What, if any, consequence did you see as a result of

24 public statements alleging that you personally were involved

25 in fraud?

**A.**    From a personal standpoint, you know, we had multiple
threats, myself, my wife.  We also saw throughout Georgia
election workers being threatened and other situations like
that.  Nationally you saw just tremendous social disruption.
People were spun up.  And so that's why we went through
diligently, thoughtfully and checked out every single
allegation so we could report back to the people of Georgia
and to the campaigns here are what the results were.

**Q.**    As you continued to go throughout the processes of
certification, recounts, signature verification, as you
reported those events and the results of your investigation,
what, if any, effect did you see in the public statements
coming from then President Trump or the Trump campaign?

**A.**    I didn't see any change in tone or behavior.

**Q.**    Who, to your knowledge, was on -- you told us who was
on the phone call from your side, who you arranged to have
present on the call.  Who was on the call from the Trump side
if you knew or as you knew it at the time?

**A.**    I never really knew who all the people were.  I assumed
they were all up in the -- up in the Oval Office.  But he
mentioned Alex, which turned out to be Alex Kaufman.  Kurt,
which turned out to be Hilbert.  I think that's his name.  And
then I knew Mark Meadows was on there.  The President.  And --

**Q.**    How did you know Mr. Meadows was on the phone?

**A.**    Because he started the call.

1        MS. CROSS:  Your Honor, with the permission of the

2   Court, we have excerpts from State's Exhibit Number 3 that we

3   play and then -- with the Court's permission.

4        THE COURT:  Any objections?

5        MR. FRANCISCO:  You're talking about playing audio

6   excerpts?

7        MS. CROSS:  Correct.

8        MR. FRANCISCO:  That's fine.

9        THE COURT:  No objection?

10        MR. FRANCISCO:  No objection.

11        THE COURT:  You may proceed.

12        (Clip Number 1 was published in open court.)

13   BY MS. CROSS:

14   Q.   That excerpt that we heard, we'll call it Clip Number 1,

15   is that consistent with your recollection of the introduction

16   to the call made by Mr. Meadows?

17   A.   Yes.

18   Q.   You didn't hear Mr. Meadows say that anyone from DOJ was

19   involved; correct?

20   A.   Correct.

21   Q.   You didn't hear Mr. Meadows say that anyone from the

22   Office of Legal Counsel was involved; correct?

23   A.   Correct.

24   Q.   Did you understand this call to be between the Trump

25   individually and the Trump campaign in their individual

1  capacities?

2  **A.**    Those were Trump campaign lawyers, so I felt that it was

3  a campaign call.

4  **Q.**    When Mr. Meadows mentioned finding a less litigious path

5  referencing the litigation, what litigation did you understand

6  him to be referring to?

7  **A.**    That somehow we could resolve this.

8  **Q.**    Which lawsuit could you resolve was your understanding?

9  **A.**    I believe that was the Trump v. Kemp versus -- and

10  Raffensperger.

11  **Q.**    The election challenges?

12  **A.**    The election challenge.

13          MS. CROSS:   Can we play Clip Number 2, please.   Thank

14  you.

15          (Clip Number 2 was published in open court.)

16  BY MS. CROSS:

17  **Q.**    Secretary Raffensperger, to your knowledge, at that time

18  when Mr. Meadows was referring to the litigation, and I want

19  to -- we can play it again if you need to hear it, but I

20  heard, We believe that not every vote or fair vote and legal

21  vote was counted, among other things.

22          Do you recall hearing that?

23  **A.**    Yes.

24  **Q.**    Who did you understand Mr. Meadows to be referring to

25  when he said "we"?

1   A.    President Trump and himself and the Trump campaign.

2         MS. CROSS:  Can we play Clip Number 3, please.

3         (Clip Number 3 published in open court.)

4   BY MS. CROSS:

5   Q.    Secretary of State Raffensperger --

6   A.    Uh-huh.

7   Q.    -- did then President Trump win the State of Georgia in

8   the 2020 election campaign by more than half a million votes?

9   A.    No, he did not.

10  Q.    Did then President Trump lose the election in Georgia?

11  A.    He lost the election in the State of Georgia.

12  Q.    That was known to you by January 2nd, 2021?

13  A.    Yes.

14  Q.    The allegations that were specifically made in that clip

15  and throughout the call by then President Trump, you

16  investigated all of them; correct?

17  A.    Correct.

18  Q.    Were you able to substantiate?

19  A.    Yes.

20  Q.    What?

21  A.    Well, they alleged in their lawsuit that 66,000 underaged

22  voters had voted in the State of Georgia.  In Georgia you can

23  register to vote when you're 17-and-a-half.  We had the

24  information day, month, year.  They just had a year.  So it

25  could have looked from their perspective that these were

1    underaged voters.  We verified day, month, year.  And every

2    single voter had turned 18 by election day.

3        They allege in their lawsuit 10,000 dead voters that had

4    voted.  In the conversation I had with President Trump, he

5    said 5,000.  Be that as it may.  We had found at that time

6    [sic].

7        Subsequent to that I spoke to the January 6th committee,

8    I told them to correct the record, we found two more.  So we

9    have four dead people that voted in the State of Georgia.

10       As it related to the number of felons, they alleged in

11   their lawsuit over -- about 2,050.  What we found is no more

12   than 74, total potential of 74 voters that could have still

13   been under felony sentence.  All the others were lawful

14   voters.

15       Then they also talked about non-registers voters.  I

16   think it was 2,423.  There were zero.

17       They talked about out-of-state voters in that range also,

18   in that range of 4,500, something like that.  That is a

19   difficult thing to prove, and we understand that, because it

20   goes to residency.  But we went through that and realized it

21   was less than that number.  And I don't recall exactly what

22   that was.

23       But you add that all up, none of it was sufficient to

24   come to anywhere near that total of 11,779, which would have

25   changed the outcome of the election for the State of Georgia.

1  **Q.**   And were those facts and the results of your

2  investigation that you just described for us, were those

3  things that you tried to convey to then President Trump and

4  Mr. Meadows on that call?

5  **A.**   Yes.  When we got the opportunity to speak, we spoke the

6  truth.

7  **Q.**   Did it appear to you that your words were accepted?

8  **A.**   No.

9        MS. CROSS:  Can we play the final clip, please.

10       (Clip Number 4 was published in open court.)

11  BY MS. CROSS:

12  **Q.**   Secretary Raffensperger, that was a fairly lengthy clip.

13  At the beginning do you recall hearing Mr. Meadows talk, and

14  I'm going to quote to make sure, they were asking for access

15  to data; do you recall?

16  **A.**   Yes, I do.

17  **Q.**   Was a remedy that the campaign litigation was seeking,

18  was that access to the Secretary of State voter data?

19  **A.**   Yes, it was.

20  **Q.**   At that time, January 2nd, 2021, was there any effort

21  that you're aware of by the federal government to get

22  Secretary of State voter data?

23  **A.**   Nothing specific.  In other words, I know that at some

24  point the US Attorney of the Northern District, BJ Pak,

25  resigned and Bobby Christine took over that role.  But I

1 believe that was January 3rd or somewhere in that range.

2        But we had been talking to the FBI and had talked to them

3 about State Farm Arena, I know that -- that infamous tape that

4 was done.  And they had looked at it along with GBI and along

5 with our people.  But nothing specific as related on to this

6 call if that's what your question was.

7 **Q.**    Okay.

8        So when Mr. Meadows references we need access to the data

9 or we want access to the data, who were you understanding

10 wanted access to the data?

11 **A.**    The Trump campaign.

12        MS. CROSS:  Thank you, Secretary Raffensperger.  I

13 have no further questions of you, but I believe the other side

14 may.

15        THE COURT:  Your witness, sir.

16        MR. FRANCISCO:  Thank you.  Good afternoon, Your

17 Honor.

18        To preserve the record we would start by making the

19 same Rule 26.2 request that you previously ruled on and ask

20 that we be given immediate access to those documents as to

21 Mr. Raffensperger.

22        MS. CROSS:  The State's response is the same, Your

23 Honor.  They haven't cited any authority that would entitle

24 them to that information at this time.  That's the State's

25 position.

1          THE COURT:  I'll overrule your objections.  Well, not

2   overrule her objections.  I'll affirm her objections.  I'll

3   note your objections for the record.

4   CROSS-EXAMINATION

5   BY MR. FRANCISCO:

6   **Q.**   Good afternoon, Secretary Raffensperger.

7          I would like to start out by talking a little bit about

8   federal election law.  I assume in your role as Secretary of

9   State you're quite familiar with federal election laws?

10  **A.**   Yes.

11  **Q.**   Are there a number of federal election laws that apply to

12  aspects of election administration that your office conducts?

13  **A.**   Yes.

14  **Q.**   And so when we talk about election fraud, as that term is

15  commonly used, that can refer to both a violation of state law

16  or a violation of federal law when it comes to voting?

17  **A.**   Correct.

18  **Q.**   In the 2020 federal election there were numerous federal

19  executive branch agencies that were involved in the process of

20  Georgia administering its election, is that accurate?

21  **A.**   From the standpoint of -- like for cyber security and

22  resources like that that the federal government brought --

23  made available to the states?

24         What specifically are you asking?

25  **Q.**   I think -- you know, was SISA for cyber security involved

1   in monitoring Georgia's election or being involved with what

2   you were administering?

3   **A.**   They've been involved in that for several years now.

4   **Q.**   That's through the Department of Homeland Security?

5   **A.**   Yes.

6   **Q.**   You mentioned BJ Pak and the US Attorneys.  Were they

7   involved in investigating election fraud?

8   **A.**   Yes.  Post-election November 2020.

9   **Q.**   And then the FBI, you're talking about the federal FBI

10  was also investigating these allegations about the State Farm

11  Arena?

12  **A.**   Yes.

13  **Q.**   So it's actually quite common for the federal government

14  to be involved with -- in post-election matters in Georgia; is

15  that correct?

16  **A.**   If there's a reason for them to be.

17  **Q.**   It's not as if Georgia runs the election and the federal

18  government has no role or -- no role to play whatsoever?

19  **A.**   No.  They have their role per statute.

20  **Q.**   Post-election challenges happen quite commonly when we

21  have elections in this country; is that correct?

22  **A.**   They happen from time to time, particularly in close

23  elections.

24  **Q.**   And when you took office, was there -- were there

25  post-election challenges, this was before 2020, that were

1  pending?

2  **A.**   Stacey Abrams lost the gubernatorial race of 2018 by

3  55,000 votes.  And when I took office, we had multiple

4  lawsuits from Stacey Abrams and her allied groups relating to

5  the 2018 race.

6  **Q.**   And in general terms, those lawsuits challenged the

7  number of votes or alleged voter fraud and various things that

8  they wanted to change the result of the election?

9  **A.**   It was her allegation about voter suppression.  And, you

10  know, that was all entailed.  And so that was litigated.  It

11  took several years.  Four years to be exact.  And we won in

12  court on every single count.

13  **Q.**   I suspect the judge is familiar with at least one of

14  those cases quite well.

15       THE COURT:  Yeah.

16  **Q.**   The timing of those cases, those cases weren't all

17  resolved before that election was certified; is that correct?

18  **A.**   Correct.

19  **Q.**   So candidates -- it's happened before where a major

20  statewide candidate had litigation, was challenging an

21  election in Georgia, and that challenge extended beyond the

22  certification of the results?

23  **A.**   Well, in the case of Stacey Abrams, it's really about the

24  process, you know, was there actually voter suppression where

25  people were removed off voter rolls, things like that.

**Q.**   But it did happen?  There were a number of lawsuits and they --

**A.**   Correct.

**Q.**   -- were resolved by mid-December, whenever certification tends to occur?

I would like to ask a couple questions about the Cobb County signature audit that you-all were doing.  And I know you've previously explained this process in helpful detail.

But as to Mr. Meadows, it's true, isn't it, that he didn't express any objections as far as you're aware to how that audit was being conducted when he visited Cobb County?

**A.**   Correct.

**Q.**   In fact, Mr. Meadows didn't ask for anything be done differently when he visited that audit as far as you were aware?

**A.**   Correct.

**Q.**   And is it fair to say that Mr. Meadows' observation  when he was gathering information in that audit consisted primarily of him looking through a glass panel of a door to observe the process?

**A.**   Correct.

**Q.**   And candidates occasionally will ask to reach out to your office or watch part of the process after election night, to have observers; is that true?

**A.**   Correct.

**Q.**   Mr. Meadows was the Chief of Staff for President Trump in
this time.  Were you -- just generally in the fall of 2020
were you aware that Mr. Meadows was the Chief of Staff?

**A.**   Yes, I was.

**Q.**   And, you know, I think we just heard a clip of the call
that's been discussed at some length.  Mr. Meadows, you
remember, he announced himself as Chief of Staff on that call?

**A.**   Yes.

**Q.**   And you testified in some detail about going back and
forth with Ms. Fuchs -- I probably said her name
incorrectly -- about that, setting up the call.  But when
Mr. Meadows reached out through Ms. Fuchs, you understood that
he was acting on behalf of the President as Chief of Staff?

**A.**   I understood he was acting on behalf of the President.

**Q.**   So as far as you were concerned, before the call started
you knew Mr. Meadows was the Chief of Staff, you knew that he
set up the call on behalf of the President, and you knew that
he announced himself as Chief of Staff early on in the call?

**A.**   Correct.

**Q.**   I would like to ask you some questions about the call
itself and what transpired on that.  I understand it's quite a
long call.  We heard chunks of it, but there's a lot that we
didn't hear.

    And, you know, there was a lot of statements made on the
call by former President Trump.  But Mr. Meadows' speaking

1  roles were quite limited.  In fact, I believe we just listened

2  to virtually all of Mr. Meadows' statements on that call.

3      Do you think it's fair to say that Mr. Meadows was making

4  requests about letting the lawyers get together and resolving

5  things in some fashion, but he wasn't making specific voter

6  fraud allegations?

7  **A.**  Correct.

8  **Q.**  Others on the call certainly may have, but Mr. Meadows

9  was not speaking on those issues?

10 **A.**  Correct.

11 **Q.**  In fact, Mr. Meadows is seeking some sort of agreement is

12 what it sounds like on the call to me.  And when he says he's

13 hopeful there's some sort of agreement that can be reached,

14 where the parties can look at the data, is there anything

15 inappropriate with that request?

16 **A.**  I didn't take it as inappropriate.

17 **Q.**  You didn't think it was inappropriate.  Okay.

18     We talked a little bit about types of election fraud

19 claims in your testimony and whether it would change the

20 results of the election, but I noticed that you said there

21 were two dead voters that were discovered at the time of this

22 call and then two subsequently discovered?

23 **A.**  Uh-huh.

24 **Q.**  Did your office do anything with those discoveries?

25 **A.**  Pardon me?

1   **Q.**   Did your office do anything with those discoveries of

2   dead voters?

3   **A.**   Yes.  They came before the State Election Board, and they

4   were prosecuted.

5   **Q.**   Okay.  So there's a law enforcement function that occurs

6   when you discover voter fraud, even if it's only a couple

7   votes?

8   **A.**   Correct.

9   **Q.**   Even if it doesn't change the outcome of the election?

10  **A.**   Yes.

11  **Q.**   So it's legitimate for the State of Georgia, your office

12  or others, to investigate allegations, credible allegations of

13  voter fraud even after an election may be settled?

14  **A.**   Correct.

15  **Q.**   And to take action?

16  **A.**   Correct.

17  **Q.**   Would it also be appropriate for the federal law

18  enforcement agencies to do likewise?

19  **A.**   That's a federal issue.  I would assume so.

20  **Q.**   But you don't have any reason to believe that the federal

21  government would have less interest in pursuing election fraud

22  after an election than the state government?

23  **A.**   No.  I assume everyone should want fair and honest

24  elections.

25          MR. FRANCISCO:  Pardon me, Your Honor, reviewing my

1  notes.

2        THE COURT:  Take your time.

3  BY MR. FRANCISCO

4  **Q.**   Mr. Meadows' statements on the call, which, again, we

5  just refreshed the whole world's, or at least the people in

6  this courtroom's, memory about what he said.  I just want to

7  clarify that he didn't make any requests that you change vote

8  totals in that call, Mr. Meadows himself?

9  **A.**   Correct.

10  **Q.**   And that's consistent with your memory of this endeavor?

11  **A.**   Correct.

12  **Q.**   To go back to the numbers of dead voter's thing, just

13  real briefly, I know that Mr. Meadows disagreed with your

14  statement that there were two dead voters on the call.  But as

15  we sit here today, it's actually accurate that there were more

16  than two dead voters that you subsequently discovered?

17  **A.**   We found four.  Recently I read in a newspaper that

18  someone thought there was 25, but 25 is a whole lot closer to

19  four.

20        MR. FRANCISCO:  One moment, Your Honor.

21        THE COURT:  Yes, sir.

22        MR. FRANCISCO:  Nothing further, Your Honor.

23        THE COURT:  Redirect?

24        MS. CROSS:  Just one.

25  REDIRECT EXAMINATION

1    BY MS. CROSS:

2    **Q.**    Secretary Raffensperger, you were asked some questions on

3    cross-examination about some of the roles potentially that the

4    federal government might have in investigating allegations of

5    fraud; correct?

6    **A.**    Correct.

7    **Q.**    When the federal government is investigating allegations

8    of fraud, in your experience do they ask you to provide

9    information to a campaign?

10   **A.**    No.

11   **Q.**    When DOJ or another federal agency is investigating

12   allegations of impropriety or fraud in an election, to your

13   experience who do you deliver that information to?

14   **A.**    The actual FBI agents or US Attorney.

15              MS. CROSS:  Thank you.  That's all.

16              THE COURT:  Any recross?

17              MR. FRANCISCO:  Nothing further, Your Honor.

18              THE COURT:  Thank you, Secretary Raffensperger.

19              Is he free to go?

20              MS. CROSS:  Yes, Your Honor.

21              THE COURT:  Excused?

22              MR. FRANCISCO:  Yes.

23              THE COURT:  Thank you.

24              You're released.  Thank you.

25              (Witness excused.)

 1          THE COURT:  Any further witnesses?

 2          MS. CROSS:  No further witnesses from the State, Your

 3   Honor.

 4          THE COURT:  Any rebuttal?

 5          MR. TERWILLIGER:  No, Your Honor.

 6          THE COURT:  We'll do closings.  I'll give you-all

 7   30 minutes each.  It is 4:30.  Let's take a 15-minute break

 8   and we'll start closings at 4:45.  And we'll finish them

 9   today.

10          COURT SECURITY OFFICER:  All rise.

11          (After a recess, the proceedings continued at 4:48

12   p.m. as follows:)

13          THE COURT:  As you-all know, this hearing is being

14   conducted in federal court, which means we're proceeding under

15   federal procedure, which means, defense counsel, you-all carry

16   the burden.  You have 30 minutes.  You can use all your

17   30 minutes, or you can reserve time for rebuttal.  But, as you

18   know, your rebuttal has to be based on the scope of what was

19   said in their closing, so I don't -- I know you guys do this

20   every day, but I have to put it on the record.

21          For the State, your whole 30 minutes has to be used

22   at one time.

23          Last thing, who will be arguing for the defense?

24          MR. TERWILLIGER:  I will, Your Honor.

25          THE COURT:  The clock on the left is your clock.

1          MR. TERWILLIGER:  I probably will reserve maybe five

2    minutes.

3          THE COURT:  However you want to do it.

4          MR. TERWILLIGER:  We'll see.

5          THE COURT:  Okay.

6          MR. TERWILLIGER:  If needed.

7          To start out, Your Honor, not that you need any

8    validation from me in the Court's observations, but Your

9    Honor, of course, correctly laid out this morning what is

10   before the Court in terms of the determinations to be made in

11   connection with removal.

12         I will say, without meaning to be critical at all of

13   our adversaries, that it was hard to tell from what they

14   presented that that was the issue.  It felt a lot more like

15   Mr. Meadows was being tried for the violations the state has

16   alleged.

17         And, of course, it's axiomatic in the case law for

18   removal that even provable existence of the state law

19   violation will not defeat removal because if it was, there

20   wouldn't be removal cases.

21         If the state -- if there's a shooting by a federal

22   officer, however unfortunate that might be, and the state says

23   homicide, and the federal officer says self-defense in the

24   line of duty, the state saying homicide doesn't defeat his and

25   presenting facts concerning why it might be a homicide.  And

1  we've seen that applied in a lot of different circumstances.

2         But I would like to try to go to the heart of what I

3  think is the issue in front of Your Honor.  If, however, you

4  have questions for me, I, of course, would welcome them.

5         THE COURT:  I'll hold my questions to the end so I

6  won't be interrupting you or State's counsel.

7         MR. TERWILLIGER:  All right.  Thank you, Your Honor.

8         So I would really like to discuss two aspects of the

9  three parts of the test you mentioned.

10         The first test you mentioned was is Mr. Meadows a

11  federal officer?  Well, I don't think that's in dispute.

12         The second part is is there a causal connection to --

13  of the alleged violations to his role, in the performance of

14  his role as a federal officer?  And, if so even, is there a

15  colorable federal defense that has been laid out?

16         So I'm going to talk about two aspects of number two.

17         First of all, the evidentiary burden -- and I think

18  there can be no dispute and should be no dispute that the

19  evidentiary burden on us for removal at this point is about

20  the lowest evidentiary burden one can imagine.

21         I will not bore Your Honor with quoting the Eleventh

22  Circuit about the outer perimeter and the extremely low

23  threshold.  We all recognize, I hope, that that's what the

24  burden is and the reason for it because the case law and the

25  underlying statute, the Federal Officer Removal statute, in

1  fact, favor removal.  A tie doesn't go to the state because of

2  the Supremacy Clause.  A tie goes to the federal interest.

3      So that then leaves the second part of the test, the

4  causal connection.  And that burden is also very, very low at

5  this point, requiring only some kind of a relation or

6  connection to the duties.  And I'll talk about this at some

7  greater length, but I'll go to what I think, frankly, Your

8  Honor, is an easy bottom line for you here following an

9  evidentiary hearing.  And that is that Mr. Meadows' testimony,

10  if believed, and there's every -- there's no reason not to

11  find it credible, clearly establishes that causal connection.

12  And I'll take what might be the aspect the State leaned on the

13  hardest; that is, the January 2nd call.

14      Nothing Mr. Raffensperger says informs Your Honor in

15  any way whatsoever about what Mr. Meadows was doing and why at

16  the time.  He has no idea.  He can have his impression.  And I

17  can understand why he would have the impression he had and

18  say, well, I think "we" means Trump and the campaign, and that

19  sort of thing.

20      But Mr. Meadows explained in his testimony to you

21  that, first of all, he overuses the "we" and it's a weakness

22  in his rhetoric.  But more importantly he explained in some

23  detail why he was trying to force that matter to closure.

24      And that's probably the critical -- at least one

25  critical aspect of his testimony.  He was trying to force that

1  to closure because, as he put it, he was trying to land the

2  plane by January 6th, to have this over, have the

3  certification completed and get on with the rest of the

4  transition and a peaceful transfer of power.

5         So let me go back to some of the law, if I can, Your

6  Honor.  The Eleventh Circuit has made clear that as to the

7  connection it only requires an association or some relation to

8  the officer's duty.

9         And the Eleventh Circuit has noted, as I'm sure Your

10  Honor has seen in the cases, and in 2011 when Congress revised

11  the statute, they actually broadened that even further and,

12  thus, making the burden at this stage of the case to show that

13  connection even less.

14         So I would submit to you, Your Honor, that

15  Mr. Meadows clearly meets all three parts of the test that you

16  mentioned.  It clearly -- the things that he did that the

17  state complains of were connected or associated with his job

18  as Chief of Staff.

19         Even the most questionable, unquestionable or

20  universally applicable state laws, according to the Eleventh

21  Circuit in *Denson,* is not sufficient to overcome the principle

22  that states cannot use their law to define the parameters of a

23  federal officer's proper role.

24         And that's exactly what the State is trying to do

25  here.  The State is attempting through the enforcement

1    mechanism of an indictment in a criminal case to define Mr.
2    Meadows' role as the Chief of Staff.

3            Now, they claim that he can't avail himself of
4    this -- really I think this goes as much to immunity and we're
5    beyond the removal question, but I'll address it anyway --
6    that he can't do that because he violated the Hatch Act, and
7    he can't undertake his duties in violation of federal law; or
8    as we put it in our responsive papers, that there's some kind
9    of a, quote, political exception to the scope of his duties as
10   the Chief of Staff to the President or the White House Chief
11   of Staff.  And I think Your Honor can see through that quite
12   easily.

13           One of the reasons we spent as much time as we did in
14   his testimony regarding the political affairs that he gets
15   involved in is for two reasons:

16           One, the State doesn't get to define the parameters
17   of the Hatch Act.  And, frankly, Your Honor, with all due
18   respect, the Court isn't even empowered at this stage to
19   adjudicate, as the State suggested, whether or not there's
20   been a Hatch Act violation.  Certainly for purposes of removal
21   that that's beyond the pale.

22           But the second reason we did it was to help Your
23   Honor understand the true nature of the position.  I would
24   expect that very, very few people who have not worked at the
25   top levels of government -- and I, frankly, include our

1  adversaries in that -- the top levels of the federal

2  government really understand what the workings of the

3  government are like at that level and why something like even

4  the Hatch Act provision they point to would not apply.

5         This just came to me today.  I'll give you an

6  illustration of it.  There was testimony both on direct and

7  cross and maybe in some other parts about Mr. Barr's now

8  infamous visit to the Oval Office.  And he said a couple of

9  things in that visit that are now in the record in that case,

10 including telling the President that the Justice Department

11 had, in fact, investigated allegations of fraud in a couple

12 different places and found them wanting, I'll use that term.

13        And the President, according to the testimony we've

14 heard, pushed back on that, and there was talk of the Attorney

15 General resigning and so forth.  And so the Attorney General

16 was pushing very hard for the outcome of the election to be at

17 that point that Biden won.  Was that the Attorney General

18 using his office to affect an outcome of an election?  At

19 least on a very technical sense, yes, it was, because he's

20 telling the President of the United States the outcome of this

21 election as it stands now is that Joe Biden won, and we need

22 to back up, and he wasn't going to do certain things.

23        But as importantly what that testimony shows, despite

24 the State's contention of trying to minimize, if not

25 eliminate, a federal role in post-election matters, the

1  federal government has a huge role in post-election matters

2  and has a huge role in the administration of elections as we

3  have found out in great detail right up through January 6th

4  when the certification takes place.

5        So what does Mr. Meadows tell the Court the relevance

6  of that is to the exercise of his duties as Chief of Staff and

7  his various touch points along the way here to matters --

8  post-election matters that are political?  There's not one

9  iota of evidence, Your Honor, that he was in any way, shape or

10  form doing anything in his post as the Chief of Staff to try

11  and effectuate a certain result of that election.

12        What he told you, and I submit to you what he told

13  you credibly, was I was trying to bring these things to

14  closure.  I needed to check the box I think was a term he used

15  at one point.  Get this off the plate.  He went to Atlanta --

16  I'm sorry.  He went to the Cobb County Civic Center to observe

17  and did that for the reason that he would be able to report

18  back to the President, anticipating that the President would

19  be fired up about this, that these people are doing a great

20  job and if there's any fraud there, they will find it.

21        We also produced evidence on this record, Your Honor,

22  to show that not just is it within the Chief of Staff's job to

23  do the kinds of things that he did, but that he did those

24  things as part of the function of the Executive Office of the

25  President overall, which is not at all divorced from political

1    matters.

2         When he says he needs to know what's going on, I

3    can't imagine a more simple but elegant explanation of what

4    the Chief of Staff's relationship with the President and the

5    President's own execution of his duties are than the necessity

6    to stay on top of everything, see around the corner and work

7    to manage and advise the President on matters as they arose.

8         The third element of the testimony that I think is

9    important is if -- as so often happens when legal cases sort

10   of come to the fore, particularly in keen public attention,

11   the world thinks the only thing that was going on inside the

12   White House and in Mr. Meadows' world at that time is the

13   President's concern about fraud in the election.

14        As far as he was concerned, as he testified, that was

15   a very small part of what was going on.  It might have been a

16   big part in terms of actually managing the President and the

17   office and trying to get to a peaceful transition, but for him

18   there were a whole lot of other things going on.  And when

19   he's trying to manage the work necessary to get those things

20   done and get them addressed, matters of the most incredible

21   import to the people of the United States, he has to be aware

22   of what's going on and try to get some of these other things

23   off the board as he went along.

24        Turning to the law a little further, Your Honor,

25   courts have been very consistent in how these cases are

1  handled.  I don't think -- I can't recall an Eleventh Circuit

2  case that hasn't -- for removal that the circuit has had on

3  appeal that has not resulted in removal.

4       And the reason for that is very important.  The

5  overarching issue that's really laid before this Court here is

6  no small one.  The overarching issue really is can the

7  District Attorney of Fulton County, Georgia, use the

8  enforcement power of the State to affect what the Chief of

9  Staff of the President of the United States does in his job?

10 Not just this Chief of Staff, he's obviously gone, but the

11 currently Chief of Staff.

12      Going back to this Hatch Act point for a minute.  I

13 think Mr. Meadows mentioned this in his testimony, but I'm

14 sure the Court has seen the newspapers.  The current Press

15 Secretary to the President just got called out on a Hatch Act

16 violation.

17      Think about it for a second with the logical

18 extension of the theory that's being presented here.  If that

19 statement was somehow related to something that some DA

20 somewhere in the country thinks is a state law violation,

21 according to the State here, they could issue a complaint and

22 get an arrest warrant and go arrest the current Press

23 Secretary.

24      The reason for this law is it's seminal in our

25 constitutional system.  It goes back to *McCulloch v. Maryland*

1    when Chief Justice Marshall said we can't have a state taxing

2    a national bank that could tax it out of existence.

3            It continued in the infamous oleo case in Ohio where

4    the state wanted to -- this is *Ohio v. Thompson* in 1899.  The

5    state wanted to sanction a federal officer who was serving

6    oleo margarine in his federal facility, I think it was a home

7    for people, and didn't have a sign up saying "Oleo is Served

8    Here," which was a violation of state law.  And that case was

9    removed all the way to the Supreme Court.

10           In *Johnson v. Maryland*, which involved a postal

11   service driver, the Court said the entire -- recognized the

12   entire absence of power on the part of the state to touch the

13   instrumentalities of the United States.  It's just off limits

14   to state authority.  And that principle is what underlies

15   these removal cases.

16           But I have a case I want to share with Your Honor.

17   And I've tried not to get into quotes.  This case was relied

18   on by the Eleventh Circuit in *Baucham v. Martin*, an Eleventh

19   Circuit decision.  But this is actually a case from the Ninth

20   Circuit.  It's called *Clifton v. Cox*.  It's a Ninth Circuit

21   case.

22           I'll share, if I may, just a little something with

23   you, Your Honor.  One of the reasons I loved being a lawyer

24   when I first went to law school was actually getting into the

25   cases.  And some of the young people that are here with me can

1  tell you I detest the word search method of legal research and

2  string cites.  If I may get a little personal, Judge, you and

3  I are a little closer to each other --

4          THE COURT:  We had to learn how to do it through the

5  books.

6          MR. TERWILLIGER:  That's right.

7          And so one of the things I really enjoyed because

8  this law is so basic and fundamental as a constitutional

9  matter between the state and federal government was looking

10  into this a little bit.

11          And if I may, I would just like to read you from this

12  Clifton decision.

13          The Court said -- this is the Ninth Circuit -- the

14  Court said, It is well settled that a federal official cannot

15  be held personally liable in a civil suit for acts committed

16  in the outer perimeter of his duty.  It's only necessary that

17  the action bear some reasonable relation to those federal

18  duties.

19          But the Court then went on and had a discussion,

20  which I would command to Your Honor's attention, and said

21  that, the Supreme Court, I'm quoting here, in *Bar v. Matteo*

22  gives approval to the task in turn propounded by Judge Learned

23  Hand, an eminent jurist to be sure, as follows:  What is meant

24  by saying that the officer must be acting within his power

25  cannot be more than the occasion must be, such that would have

1   justified the act if he had been using his power for any of

2   the purposes on whose account it was vested.

3          And the Ninth Circuit goes on to say, the Court

4   concludes the fact that the petitioner is not required by

5   law or direction of his superiors to act as he did is not

6   controlling because the same considerations which underlie the

7   recognition of the privilege as to acts done in connection

8   with a mandatory duty apply with equal force to discretionary

9   acts at those levels of government where the concept of duty

10  encompasses the sound exercise of discretionary authority.

11         I think that case, frankly, Your Honor, should be

12  more helpful to you --

13         THE COURT:  What is the citation of that again for my

14  people?

15         MR. TERWILLIGER:  Yes.  Yes.  It's -- let me get the

16  first page.  It's *Clifton v. Cox*.  It's 549 F.2d 722, a 1977

17  decision of the Ninth Circuit.

18         THE COURT:  Thank you.

19         MR. TERWILLIGER:  I think that case should be more

20  helpful to you perhaps than any others because all of these

21  cases in a way are sort of sui generis, but this one is in

22  particular.

23         There's never been a case dealing with the

24  discretionary authority of an official at this level of

25  government.  And what, based on Judge Hand's test, the Ninth

1   Circuit said here is, As that discretion gets wider -- as that

2   discretion gets wider, so does the burden for showing the

3   relationship of the acts complained of to the conduct get

4   lower because we can't have the state interfering with the

5   exercise of that discretion.

6          Now, some people may decide that they disagree with

7   some of the judgments Mr. Meadows said about how to execute

8   his role.  I'll bet if he went to the people that run that

9   advisory office on the Hatch Act, should he have been on the

10  call with Brad Raffensperger, they would have said no.  I

11  don't know that, but I bet they would have.  But even a

12  mistake on his part is not enough to defeat his entitlement

13  to removal, even a mistake as to federal law, unless it was

14  malicious and done willfully.  And I think you heard from the

15  testimony that it wasn't even close to that.

16         Thank you, Your Honor.

17         THE COURT:  Let me ask you one question here.

18         Is there any limitations on what Mr. Meadows could

19  have done -- not just Mr. Meadows.  Is there any limitations

20  on what a Chief of Staff can do if it's not negligence per se?

21         MR. TERWILLIGER:  If it's not --

22         THE COURT:  I mean criminal per se.

23         MR. TERWILLIGER:  Yes.

24         THE COURT:  What?

25         MR. TERWILLIGER:  Well, for example, I don't think

1  for various and sundry reasons it would be criminal per se for

2  him to say, you know, I'm here because I think the policies of

3  the Trump administration were just as good as they possibly

4  could be and were good for the American people, and I hope the

5  American people will recognize that when they go to the polls.

6  That may be a Hatch Act violation.  And that -- the Hatch Act

7  may in that circumstance put a limit on.

8        But if in the exercise of his judgment he didn't

9  think that was a Hatch Act violation, it wasn't malicious and

10  it wasn't willful, that doesn't place a limitation on his role

11  for purposes of removal.  And probably not for immunity

12  either, but we're only here on removal today.

13        THE COURT:  State's counsel through at least three

14  questions emphasized, as I interpreted it, what Mr. Meadows

15  was doing had nothing to do with the operation of the federal

16  government.  What do you have to say to that?

17        They're arguing that the intent of this statute is

18  not being met by what Mr. Meadows was doing.

19        MR. TERWILLIGER:  The intent of what statute?

20        THE COURT:  It's important to understand the statute

21  regarding interference, 14-42.  In other words, the removal

22  aspect of it.  They said you're using -- saying here's a

23  federal official doing their job, and here's a state

24  prosecutor trying to prosecute this federal official for doing

25  their job.

1        From at least three questions asked by the district

2   attorney or assistant district attorney, it's her position --

3   she can speak for herself, of course -- that this does not

4   meet the intent of the statute because it's not interfering

5   with federal operations.

6        MR. TERWILLIGER:  But that's not the test.

7   Interference with federal operations is not the test.  He is

8   federal operations.  He is the alter ego of the one person,

9   the one person under our constitutional system in which the

10  executive branch is embodied, so what he's doing by definition

11  is in that role.

12       Now, if he went out and shot a demonstrator in

13  Lafayette Park and said, Oh, it was part of my role, that

14  would obviously be outside the scope of his duties.  But

15  when -- there's not one thing that is -- that is specified in

16  this indictment that is not at least colorably in the scope of

17  his duties.  And his duties are federal operations.

18       He doesn't have to say, Oh, I'm doing this because

19  of, you know, it's a matter of Justice Department interest, or

20  I'm doing this because there's a cyber security issue with the

21  Department of Homeland Security.  It is enough for purposes of

22  removal, Your Honor, I respectfully submit, that he is doing

23  it because he's the Chief of Staff, like going to the Cobb

24  County counting center there, anticipating that his principal,

25  the President, is going to ask him what are they doing down

1  there?  So he gets ahead of the curve, he goes down there and

2  looks.  And this is in the federal indictment for goodness

3  sake of Donald Trump -- he turns around and says,

4  Mr. President, they're doing a great job and if there's any

5  fraud there, they'll find it.  That is squarely within his

6  duties.

7          Thank you, Your Honor.

8          THE COURT:  Thank you, sir.

9          Counsel, I've been asked to have the attorneys, when

10  you get ready to argue, to state your name so the people in

11  the overflow courtrooms know who is speaking.

12          MR. WAKEFORD:  Good afternoon, Your Honor.

13          THE COURT:  Good afternoon.

14          MR. WAKEFORD:  My name is Donald Wakeford.  I

15  introduced myself at the beginning of this hearing, but we've

16  been here a good while at this point, so...

17          THE COURT:  I remember.  The people on 23rd floor...

18          MR. WAKEFORD:  Well, I appreciate the opportunity to

19  introduce myself again.  And I think -- I think that opposing

20  counsel answered the first question Your Honor asked but

21  perhaps not in the way that he intended, because one of the

22  first -- the first question you asked was is there a limit to

23  the scope of what Mr. Meadows could do as Chief of Staff?

24          And it took a little while, but opposing counsel

25  eventually said he is federal operations.  Mr. Meadows is the

1   embodiment of federal authority and, therefore, there is no
2   boundary and no scope of duties for him.  It is limitless.  It
3   has no horizon, it never ends.

4        So then he proceeds to say they're disclaiming their
5   burden entirely.  They don't really have to show you anything
6   because as the Chief of Staff he can simply come in here and
7   say, of course, I did it, I was the Chief of Staff.
8   Everything I do is federal because I am federal authority and,
9   therefore, what are we even talking about?

10        We didn't hear anything from the witness or from his
11  attorney that indicates there is a limit to the scope of his
12  duties.  And the first question Your Honor has to answer in
13  order to determine whether removal is proper is whether he
14  acted under color of his office.

15        They haven't offered a scope of duties for which Your
16  Honor can use to determine that.  They have simply said that
17  there is no limit to what he can do.

18        Finally, they talked about the purpose of removal.
19  And we say in our brief, very clearly, that there's one
20  particular district court case that sums it up pretty nicely.
21  And it says that federal removal is about protecting federal
22  authority.  And in that case, just like in this one, there is
23  no federal authority to protect.

24        There has not been a citation of a single duty of the
25  President that would authorize Mr. Meadows to participate in

1    that phone call.

2           There is not a single citation, reference or any

3    other kind of connection presented to this Court under Article

4    II or any applicable statute about why Mr. Meadows can text a

5    state official and say, How about if the campaign kicks in

6    some money, could things speed up?

7           There is nothing, and this is especially important,

8    that has been cited to to demonstrate in any kind of way, much

9    less a detailed way, which is actually the burden placed upon

10   the defendant in trying to remove a criminal case, that would

11   demonstrate what federal authority would countenance allow or

12   authorize the Chief of Staff to arrange or attempt to arrange

13   the organization of fake electors throughout the state.  And

14   yet we had an e-mail admitted into the record here today that

15   demonstrated that Mr. Meadows played a role in doing exactly

16   that.

17          He used -- he had to be reminded of the e-mail's

18   existence after saying, I didn't do anything about that.  If

19   there was anything about the organization of that, I just

20   referred it to the campaign.

21          But we understand why that wasn't the case because he

22   doesn't see a distinction that matters between him and the

23   campaign.  We learned from Mr. Meadows that he doesn't even

24   think the word "we" can really be applied in the way that the

25   word "we" is always applied when he uses it.

1          It came up in multiple situations today where

2    Mr. Meadows discussed the word "we," and it never meant what

3    the word "we" actually means.  He said, Well, the campaign but

4    not me and the campaign, as if that is somehow possible.  This

5    happened on the phone call and it happened in the e-mail.

6          It also happened in a different place other than just

7    Mr. Meadows' words where President Trump on the phone call is

8    saying, We just need to do this, we just need to do that.

9    Mark, wouldn't you agree?  And Mr. Meadows is chiming in and

10   agreeing, yes, yes, right.

11         Mr. Meadows came before the Court today unprepared to

12   define the scope of his duties or to define what his burden

13   actually is.  And he has not presented the Court anything,

14   anything that is sufficient to show he was acting within any

15   allowable scope of duties as Chief of Staff.

16         I'll turn first to an important distinction that I

17   think the Court should highlight.

18         THE COURT:  Okay.

19         MR. WAKEFORD:  In their reply brief, and here again

20   at the hearing, the defendant is saying that we are asking

21   this Court to apply some kind of political activity exception

22   to the rules of removal.  It's quite the opposite.

23         They are asking for this Court to find a whole host

24   of exceptions and find that certain aspects of federal law

25   either don't apply to the Chief of Staff, unlike every other

244

executive branch employee, or that in this case they shouldn't apply because -- because of the way he went about them. Whereas the district attorney in the State of Georgia is asking this Court to simply look at the law and apply it.

If you look at what is actually prohibited by federal law -- we're not asking for an exception.  We are not asking for some kind of determination of mandatory and discretionary actions.  We're asking the Court look at prohibited actions, because the Hatch Act and the applicable regulations actually place a hard outer boundary to what the scope of duties can be for any federal official, including the Chief of Staff.  And they say that you cannot use your job title and engage in federal activity -- I mean in political activity.  That is at 5 CFR 734.302.

We know that political activity -- despite the fact in their reply brief that they say we have never defined political or political activity, yes, we did.  We referred specifically to 5 CFR 734.101.  Political activity means an activity directed towards the success or failure of a political party, candidate for partisan political office or partisan political group.  That is not authorized federal activity for any executive branch employee.

And then, finally, of course, we had reference to -- we had reference to -- apologies -- the requirement that no executive branch employee can use his official authority or

1  influence for the purpose of interfering with or affecting the

2  results of an election.

3      Over and over today that is what we have seen.  The

4  reason the State put up evidence was to demonstrate that that

5  was precisely what was happening, at least on that phone call,

6  but also every time Mr. Meadows took actions which were

7  described in the indictment and some which were not because

8  the e-mail is not in the indictment.  We had to bring it

9  before Your Honor today to demonstrate that there were

10 activities that Mr. Meadows was taking which cannot have any

11 application, have any authority under federal law and could

12 only be either an effort to influence or affect the result of

13 an election, or to engage in political activity, meaning to

14 try to support a candidate for political office.  There is no

15 statute or law that he has cited.

16     And in looking at this hard prohibition, we see that

17 the scope is defined for him.  The scope of federal duties

18 ends when you reach political activity.  That is not something

19 that they have addressed.  Instead what they say is that it

20 just doesn't apply because there is no end to the scope.  They

21 just move right past it and just assume the question has

22 already been answered.

23     This is despite the fact that we have him referring

24 to the inclusive "we" to himself and the campaign in

25 multiple -- in multiple settings.  This is despite the fact

1   that we have him offering campaign resources and trying to

2   broker deals on behalf of the campaign.  This is not activity

3   where we are asking for an exception or some kind of novel

4   application of federal law.  We are simply asking for the

5   Court to look to these regulations and laws to show that there

6   was no federal authority under which Mr. Meadows could have

7   been traveling when he took these activities.

8           The first question -- if Your Honor will bear with me

9   for a moment because I want to say it exactly right.

10          The first question that has to be answered, the

11  defendant has to show this Court that the prosecution arises

12  out of the acts done by him under color of federal authority

13  and in enforcement of federal law.  He cannot be categorically

14  proceeding under federal authority if he is engaging in

15  prohibited political activity or seeking to affect the results

16  of an election.  Those two things cannot be true at the same

17  time.

18          And this is one thing that has not been mentioned yet

19  today, which is equally important.  The defendant has not even

20  tried to act like -- has not even tried to explain why he said

21  all of his activity was political activity.

22          As we pointed out in our response, in his motion to

23  dismiss he says, Oh, look, everything in the indictment,

24  everything alleged, everything he did is political activity

25  and tries to connect it to the First Amendment concerns.

1        First Amendment, by the way, the Supreme Court has

2   found that the First Amendment does not bar any application of

3   the Hatch Act, so that question can be set aside.

4        But there is nothing -- there is nothing that

5   indicates how Mr. Meadows could simultaneously be engaging

6   in these activities, concede to this Court that they are

7   political activities and still be acting under color of

8   federal authority and enforcement of federal law.

9        He can't be acting under color of federal authority

10  if he's taking activities which federal law specifically says

11  he cannot take in the scope of his duties.  And he cannot be

12  acting to enforce federal law when he identifies no federal

13  law that applies.

14        We cited in our brief, Your Honor, *Thompson v. Trump*.

15        THE COURT:  Got it.

16        MR. WAKEFORD:  Got it.  Understood.

17        There are a couple of points in that case where the

18  judge in that case said there has been no citation to a role

19  for the President in the administration of -- or in the

20  counting and certification of electoral votes because there is

21  none.

22        The judge in that case also goes on to say there has

23  been no authority cited for how exhorting state-level

24  non-executive branch officials to act a certain way could be

25  applicable -- could be authorized by the Take Care Clause

1   because the President cannot exhort non-executive officials to

2   do anything under the Take Care Clause.

3           But I'm going into specifics.  I am looking for an

4   authority that Mr. Meadows could point to to say that he is

5   enforcing federal law.  And all he can point to is to say, I

6   was doing what the President asked me to do, and I am federal

7   authority.  That's as far as we've gotten.

8           There have been references to FEMA, there have been

9   references to COVID, neither of which was discussed on that

10  call or anywhere else in this case.

11          There's been no demonstration of what role the

12  President would play in the activities in which Mr. Meadows

13  inserted himself.

14          And there's been no indication how Mr. Meadows'

15  participation in a criminal conspiracy seeking to overturn the

16  election can be explained as a necessity of his duties.

17          And I think that's the next thing, is that we sort of

18  zoomed past the first question when opposing counsel was up

19  here and started talking about Mr. Meadows' good faith belief

20  in what he was doing.  He was out there just trying to do what

21  he thought was the right thing to do.  But we understand that

22  there's requirements.

23          First of all, he still has to be acting under the

24  scope of his duties before we even get to the question of a

25  colorable federal defense.  So we have to answer that question

1  first.  But even if we get to it, it still has to be his

2  belief in what he's doing has to be objectively reasonable.

3         Mr. Meadows is familiar with the Hatch Act.  He was a

4  congressman before he was the Chief of Staff.  How can he have

5  an objectively reasonable belief that the activities he took

6  in this case were authorized, were reasonable, were necessary

7  and proper under his duties when the Hatch Act explicitly

8  forbids him from doing them?

9         But we know the answer to that question, we've

10  received it already.  It's because he doesn't think anything

11  he does can be touched by the Hatch Act.  Everything he does

12  is within the scope of his duties despite what anything else

13  may say.

14         The origin of the rule in the Hatch Act actually came

15  from an executive order of Teddy Roosevelt in 1907.  That was

16  where the language first appeared -- pardon me.  That was

17  where the language first appeared that said that federal

18  officers could not use their authority or influence for the

19  purpose of interfering with an election or affecting the

20  result thereof.  That language is 100 and -- I can't do the

21  math, I'm a lawyer.  It was enacted in 1907 and has been with

22  us for over a century.

23         That is what the defendant is coming before Your

24  Honor to say is a non sequitur, a red herring, it shouldn't

25  apply.  And that all that really should happen is you should

1  just look at who he works for, that that answers all

2  questions.

3       Finally, I want to talk about the sound exercise of

4  discretionary authority in light of what we just talked about

5  with regard to an objectively reasonable belief.  Mr. Meadows

6  had to have an objectively reasonable belief that what he was

7  doing was necessary and proper to do his job.

8       In what realm would it be necessary or proper for

9  the Chief of Staff to identify himself as such and then

10  participate in calls directed solely at the success of

11  Mr. Trump as a campaign -- as a candidate for political

12  office, or to offer campaign resources to a state official, or

13  to try to coordinate the activity of fake electors in several

14  states.

15       This is what he is suggesting is the sound exercise

16  of discretionary authority despite the fact that all he had to

17  do was look at the law, something that he asked Your Honor to

18  pay no attention to today.

19       I think in the end the district attorney is not

20  asking to insert itself using the powers -- the prosecuting

21  powers of the State of Georgia into the operations of the

22  federal government.  Once again, Mr. Meadows has it backwards.

23  This case is about removing the improper assertion of

24  authority from people in DC into the State of Georgia, trying

25  to tell federal officials -- I mean state officials how they

1  should conduct their election, how they should determine their

2  election, how they should use their authority and who should

3  win.

4          And this wasn't done in order to enforce a law or

5  seeing that justice was done.  It wasn't done to -- for the

6  marshalling of the common defense or to see that the laws of

7  the executive branch are followed.  It was done so that Donald

8  Trump could be declared the winner of the 2020 election

9  despite the fact that he was not.

10          THE COURT:  I have a few questions for you.

11          MR. WAKEFORD:  Yes, sir.

12          THE COURT:  First of all, are you conceding that

13  Mr. Meadows is a federal officer?

14          MR. WAKEFORD:  At the time of the activities relevant

15  in the indictment he was employed as the Chief of Staff, yes.

16          THE COURT:  He was a federal officer?

17          MR. WAKEFORD:  At the time, yes, sir.

18          THE COURT:  Okay.  In Act 9 of the indictment

19  Mr. Meadows indicated, I think it was on direct, that he did

20  not recall being in the meeting.  This is the meeting of the

21  Pennsylvania people.

22          I'm not saying one way or the other who I believe or

23  disbelieve at this point.  Let's say he was not in that

24  meeting, would it be any type of violation?  In other words,

25  you-all are saying he was in the meeting.  He testified he was

1  not in the meeting.

2          MR. WAKEFORD:  Would it be a violation of state law?

3          THE COURT:  Right.

4          MR. WAKEFORD:  Well, that is a jury question, but we

5  know that under Georgia RICO law proving each and every one of

6  those overt acts is not necessary.  Actually, all that the

7  state has to show to get a conviction -- well, actually, Your

8  Honor, just one overt act, but that Mr. Meadows was associated

9  with that criminal enterprise.

10         What the evidence has shown today by an enormous --

11  what the enormous quantity of evidence has shown today is that

12  he was associated with that enterprise.  He actually doesn't

13  dispute that he was.

14         So to finish up, yes, Your Honor, if that's not

15  proven, it still doesn't negate the state's case or mean that

16  he has a total defense.

17         THE COURT:  You probably have the same answer for the

18  next question.  In Act 19 he says he did not tell Mr. McEntee

19  to write the memo.  Again, I'm not saying what I believe at

20  this point or what I don't believe at this point.  But let's

21  say if he did not tell him to write the memo, where are we at

22  on --

23         MR. WAKEFORD:  Where are we at on where?

24         THE COURT:  Is there a state violation?

25         MR. WAKEFORD:  Once again, we would have to marshal

1  evidence at a trial to show that -- to show that he did

2  participate in ordering Mr. McEntee to do that.

3          THE COURT:  And you still say that all you have to

4  prove is one of the acts?

5          MR. WAKEFORD:  That's correct.  And not even by

6  Mr. Meadows.

7          THE COURT:  Yeah.  By any of the --

8          MR. WAKEFORD:  By any of the co-conspirators in the

9  RICO enterprise, that's correct, Your Honor.

10          THE COURT:  Last question.  Well, maybe the last

11  question.  It depends on how you answer this question.

12          The things relating to it's broad and requires only a

13  connection or an association between the act in question and

14  federal office, this has been said to be a low bar, a broad

15  bar.  Mr. Terwilliger has even gone as far as saying there's

16  no Eleventh Circuit case that's ever said you shouldn't

17  remove.  What do you say?

18          MR. WAKEFORD:  I wonder if there's ever been a case

19  anywhere where the defendant asked for his case to be removed

20  where he admits all of his activity was political and,

21  therefore, cannot possibly fall within the scope of his

22  duties.  That's what Mr. Meadows has done here.  So I agree,

23  this is an exceptional case.

24          THE COURT:  Is it so broad as they indicate,

25  Mr. Meadows and his team is indicating, saying, Judge, this

1  is a low bar and it's so broad there's not even a question

2  here?  They're not saying it quite that way but, you know, in

3  so many words.

4          MR. WAKEFORD:  The case law is out there.  The courts

5  have defined what the bar is.  But there still is a bar to

6  clear.

7          Just taking activity while you are a federal

8  officer -- and there's many cases that say this.  Just being a

9  federal officer while you do the activity in question is not

10 enough.  But that is all Mr. Meadows has given us today.  He

11 is federal authority.  End of inquiry.  But that's not enough.

12         He has to show, to quote the standard again, that he

13 was acting under federal authority and to enforce federal law.

14 He can't be possibly acting under federal authority because he

15 acknowledges that he was taking political activities which are

16 expressly forbidden to a person in his position.

17         THE COURT:  My last question.  Can Mr. Meadows have

18 federal authority if former President Trump didn't have

19 federal authority?

20         MR. WAKEFORD:  I cannot see a scenario where that

21 could be the case.

22         THE COURT:  You've got five minutes left, but if you

23 want to stop -- you know, when Abraham Lincoln gave the

24 Gettysburg Address, it took him less than five minutes.  It

25 took Edward Everett two hours.  Now which one do we remember

1  in history?

2         MR. WAKEFORD:  Well, Your Honor, speaking of high

3  bars, I think you're putting me up against somebody with a

4  pretty tough reputation.

5         THE COURT:  You've done well.  You've done well.

6         MR. WAKEFORD:  I will take the hint, Your Honor, and

7  sit down.  Thank you.

8         THE COURT:  Thank you, sir.

9         MR. WAKEFORD:  Thank you.

10        THE COURT:  How much time do the defendants have

11 left?

12        COURTROOM DEPUTY CLERK: About six and a half.

13        MR. TERWILLIGER:  First of all, on behalf of myself

14 and my colleagues who are here pro hac, we thank you for the

15 privilege of appearing in your court.

16        I want to answer your last question to counsel.  The

17 answer to that is definitely yes, that the President -- the

18 Chief of Staff has a range of authority and -- it's not so

19 much authority, it's role that is quite distinct from the

20 President's.

21        Now, he may take direction from the President.  He

22 may advise the President.  But the President is in a different

23 position, particularly when it comes to election matters

24 because he is running not just as the President but as a

25 candidate as well.  The Chief of Staff is never the candidate.

1  Is never, as he said, in the campaign.  So I think the answer

2  to your question is definitely yes.

3       I hate to put it this way, Your Honor, and I -- but

4  the State's closing argument, their legal points are an

5  invitation to reversible error for you.

6       They want to credit their allegations over Mr.

7  Meadows' testimony as to what his role is.  The cases don't

8  permit that.  It just -- I hate to do this to our friends in

9  the press, and I don't think we've used much Latin all day but

10  I have to.  The State's case really boils down to ipse dixit.

11  It's a classic thing.  They're going to set the standard,

12  which is the Hatch Act in essence, that's what they're telling

13  you, and then say, Oh, so he can't meet the test to have a

14  colorable federal defense because the Hatch Act would prevent

15  it.

16       That's not been adjudicated.  That hasn't even been

17  pled with any -- in any convincing way.  And most importantly

18  that just simply isn't before you.  Maybe that comes up in the

19  context of immunity after removal, but it's not here now.

20       So ipse dixit really does sort of capture it.

21       Your Honor, I have one last thing.  I know Your Honor

22  has worked hard all day today to get us here today.  The State

23  continues to move a pace down the street.  We are entitled to

24  a prompt determination.  Even if the Court rules for removal

25  and puts the immunity question off for a while, we

1  respectfully ask the Court to as soon as it practically can

2  reach this issue so that we know what we're doing from here.

3          THE COURT:  All right.  You bring up a good point,

4  and I would like to address that point.  Thank you, sir.

5          MR. TERWILLIGER:  Thank you, Your Honor.

6          THE COURT:  The Court will try to act as fast as

7  possible.  This is a case that does not have a lot of case law

8  out there for the Court to follow, so the Court's got to give

9  this case thorough consideration.  It's a very important case

10  in a lot of different ways.  And some of the things I may rule

11  on may set precedent for future cases.

12          Therefore, as you indicated, I've indicated two

13  orders that the State case proceeds and Mr. Meadows is subject

14  to the State case.

15          I was informed at lunch today that the district

16  attorney has set -- well, not the district attorney.  The

17  Superior Court Judge McAfee has set a September 6th

18  arraignment.  If I do not issue an order to the district

19  attorney or to Judge McAfee by September 6th removing this

20  case to federal court, Mr. Meadows needs to show up at that

21  arraignment on September 6th.

22          Any questions?

23          MR. WAKEFORD:  No, Your Honor.

24          THE COURT:  And, again, I can't give you-all a time,

25  date when I'm going to issue this ruling.  I'll do it as quick

1    as possible.  But up until that time, thank you all and have a

2    great week.

3              MS. CROSS:  Thank you, Your Honor.

4         (PROCEEDINGS REPORTED WERE CONCLUDED AT 5:41 P.M.)

5                             - - - - -

259

1                          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6         I do hereby certify that the foregoing pages are a true
     and correct transcript of the proceedings taken down by me in
7    the case aforesaid.
          This the 28TH day of August, 2023.

8

9

10
                          /s/Viola S. Zborowski _____
11                        VIOLA S. ZBOROWSKI,
                          RDR, FAPR, CMR, CRR, RPR, CRC
12                        OFFICIAL COURT REPORTER TO
                          THE HONORABLE STEVE C. JONES
13

14
                          /S/PENNY PRITTY COUDRIET _____
15                        PENNY PRITTY COUDRIET,
                          RMR, CRR
16                        OFFICIAL COURT REPORTER TO
                          THE HONORABLE JEAN-PAUL BOULEE
17

18

19

20

21

22

23

24

25

## /

**/S/PENNY** [1] - 259:14
**/S/VIOLA** [1] - 259:10

## 1

**1** [13] - 11:6, 11:10, 141:10, 141:13, 141:14, 141:23, 142:2, 142:7, 144:5, 144:9, 145:8, 209:12, 209:14
**1-2** [1] - 145:2
**10** [2] - 3:1, 192:22
**10,000** [1] - 212:3
**100** [5] - 26:24, 27:17, 31:5, 204:17, 249:20
**11** [1] - 14:20
**11,779** [1] - 212:24
**11,780** [1] - 7:20
**11/20/2020** [1] - 144:2
**1101** [1] - 157:17
**112** [2] - 54:15, 54:20
**11TH** [1] - 191:15
**12** [1] - 182:7
**12:50** [1] - 117:3
**13** [1] - 5:13
**14** [2] - 7:14, 43:7
**14-42** [1] - 238:21
**1455** [1] - 6:8
**1455B(5)** [1] - 157:23
**14TH** [1] - 7:9
**15** [2] - 5:24, 30:8
**15,000** [2] - 194:14, 197:21
**15-MINUTE** [1] - 224:7
**150,000** [1] - 197:22
**159** [1] - 188:17
**16** [1] - 6:8
**16-14-4(C)** [1] - 5:18
**16TH** [1] - 6:3
**17-AND-A-HALF** [1] - 211:23
**1746** [1] - 157:13
**17TH** [1] - 159:21
**18** [1] - 212:2
**1899** [1] - 234:4
**18TH** [1] - 159:21
**19** [5] - 5:14, 49:11, 49:12, 75:2, 252:18
**1907** [2] - 249:15, 249:21
**1977** [1] - 236:16
**1:23-CV-03621-SCJ** [1] - 1:6
**1:23-CV-3621-SCJ** [1] - 4:19
**1ST** [1] - 7:9

## 2

**2** [17] - 42:20, 43:6, 43:20, 68:15, 97:17, 100:25, 101:25, 103:10, 117:2, 117:3, 164:10, 164:14, 164:16, 164:21, 164:25, 210:13, 210:15
**2,050** [1] - 212:11
**2,423** [1] - 212:16
**20** [6] - 14:14, 56:19, 57:7, 57:15, 85:25, 162:7
**2000** [1] - 106:14
**2002** [1] - 162:7
**2011** [1] - 228:10
**2013** [1] - 9:22
**2018** [2] - 217:2, 217:5
**2019** [1] - 187:24
**2020** [62] - 9:25, 11:17, 27:7, 56:19, 57:7, 57:15, 65:18, 68:19, 76:15, 78:4, 78:10, 79:23, 81:2, 85:25, 89:7, 90:8, 91:13, 101:25, 134:5, 140:10, 142:13, 142:15, 142:24, 144:18, 162:25, 163:4, 163:8, 163:16, 165:16, 165:22, 190:2, 190:12, 190:22, 190:25, 191:3, 191:16, 191:20, 191:21, 193:1, 193:6, 194:1, 195:6, 195:20, 195:23, 196:1, 196:3, 196:9, 197:18, 198:10, 201:9, 201:20, 203:21, 203:25, 204:2, 204:5, 204:8, 211:8, 215:18, 216:8, 216:25, 219:2, 251:8
**2020/JANUARY** [1] - 162:17
**2020CV343255** [1] - 165:8
**2020CV343355** [1] - 165:6
**2021** [30] - 10:3, 11:18, 85:25, 97:17, 100:25, 103:10, 106:15, 119:19, 120:10, 120:13, 128:14, 128:20, 131:14, 134:13, 139:24, 140:11, 162:17, 172:8, 172:10, 176:23, 193:15, 198:23, 198:25, 200:1, 200:16, 202:8, 203:1, 204:11, 211:12, 213:20
**2023** [7] - 1:12, 5:13, 6:9, 6:10, 6:13, 43:7, 259:7
**20TH** [5] - 10:2, 57:12, 150:5, 150:18, 191:21
**21** [6] - 43:4, 43:9, 46:18, 56:18, 65:13, 65:18
**21ST** [1] - 67:14
**22** [7] - 47:20, 68:15, 76:14, 78:3, 79:23, 81:2, 87:13
**2255** [1] - 182:11
**22ND** [6] - 193:6, 194:1, 195:5, 195:20, 195:23, 196:1
**23** [2] - 6:13, 89:7
**23RD** [1] - 240:17
**24** [2] - 49:10, 75:2
**24-HOUR** [1] - 12:1
**24/7** [1] - 14:19
**25** [4] - 6:15, 68:19, 222:18
**26.2** [4] - 181:18, 181:21, 181:23, 214:19
**27** [1] - 91:13
**27TH** [2] - 90:8, 198:5
**28** [4] - 1:12, 6:8, 6:9, 157:13
**28TH** [1] - 259:7
**2:55** [1] - 159:17
**2ND** [37] - 105:12, 119:19, 120:7, 120:8, 120:10, 120:13, 123:20, 128:13, 128:20, 128:25, 131:14, 134:13, 139:24, 149:2, 149:20, 150:6, 151:1, 155:1, 172:8, 172:10, 172:15, 176:23, 184:3, 198:23, 198:25, 200:1, 200:8, 200:16, 201:20, 202:7, 202:11, 204:11, 204:24, 205:24,
131:14, 134:13, 139:24, 140:11, 162:7, 172:8, 172:10, 176:23, 193:15, 198:23, 198:25, 200:1, 200:16, 202:8, 203:1, 204:11, 211:12, 213:20

## 3

**3** [10] - 63:18, 156:15, 156:24, 206:12, 206:19, 206:25, 207:5, 209:2, 211:2, 211:3
**30** [8] - 8:8, 14:14, 32:8, 142:18, 224:7, 224:16, 224:17, 224:21
**32(I)(2** [1] - 182:9
**32.1(E** [1] - 182:9
**3255** [1] - 165:6
**35** [1] - 116:14
**3:00** [2] - 159:17, 159:24
**3:05** [1] - 160:2
**3RD** [7] - 32:8, 165:16, 190:2, 191:3, 192:25, 196:3, 214:1

## 4

**4** [3] - 156:15, 156:24, 213:10
**4,500** [1] - 212:18
**40** [1] - 116:14
**404-215-1479** [1] - 1:25
**408** [2] - 177:5, 178:18
**40TH** [1] - 15:2
**41-COUNT** [1] - 5:14
**44** [5] - 51:15, 53:13, 76:5, 76:6, 89:1
**45** [2] - 53:22, 90:1
**46(J** [1] - 182:10
**4:11** [2] - 142:13, 145:16
**4:18** [1] - 144:17
**4:30** [1] - 224:7
**4:34** [1] - 145:9
**4:39** [1] - 142:15
**4:45** [1] - 224:8
**4:48** [1] - 224:11
**4TH** [4] - 67:17, 190:12, 190:22, 190:25

## 5

**5** [5] - 43:25, 44:4, 56:18, 244:14, 244:18
**5,000** [1] - 212:5
**5.1** [1] - 182:8
**50** [5] - 54:14, 54:16, 97:11, 97:13, 97:14
211:12, 213:20, 227:13

## 549 ...
**549** [1] - 236:16
**55** [1] - 2:5
**55,000** [1] - 217:3
**5:41** [1] - 258:4
**5TH** [1] - 67:17

## 6

**6** [7] - 30:9, 30:14, 30:21, 46:19, 50:6, 65:13, 91:15
**60** [3] - 28:11, 31:6, 128:5
**66,000** [1] - 211:21
**6TH** [15] - 25:21, 90:21, 90:24, 94:12, 142:13, 142:15, 144:18, 150:20, 150:22, 212:7, 228:2, 231:3, 257:17, 257:19, 257:21

## 7

**7** [3] - 12:5, 12:23, 14:20
**7-DAY-A-WEEK** [1] - 12:2
**722** [1] - 236:16
**734.101** [1] - 244:18
**734.302** [1] - 244:14
**74** [2] - 212:12
**7:30** [1] - 12:6
**7TH** [3] - 166:13, 174:14, 174:19

## 8

**8** [2] - 12:24, 182:11

## 9

**9** [6] - 2:4, 12:24, 47:20, 48:5, 68:16, 251:18
**902(5** [1] - 158:10
**92** [3] - 51:18, 51:21, 76:5
**93** [4] - 53:12, 53:14, 89:2, 89:4
**96** [4] - 53:23, 54:1, 89:25, 95:24

## A

**A.M** [1] - 3:1
**ABILITY** [2] - 93:7, 139:19
**ABLE** [31] - 29:8, 37:2, 45:2, 49:1, 52:18, 52:19, 63:5, 77:22,

78:14, 81:10, 82:4, 92:1, 92:15, 92:25, 96:20, 96:24, 97:1, 110:1, 111:10, 128:5, 128:8, 134:22, 135:1, 150:1, 150:14, 155:11, 155:15, 169:24, 203:3, 211:18, 231:17

**ABRAHAM**[1] - 254:23

**ABRAMS**[3] - 217:2, 217:4, 217:23

**ABSENCE**[1] - 234:12

**ABSENTEE**[3] - 192:20, 192:23, 194:14

**ABSOLUTELY**[7] - 54:7, 57:5, 118:9, 118:22, 139:14, 149:3, 193:24

**ACCEPT**[4] - 71:4, 158:20, 158:21, 202:10

**ACCEPTED**[2] - 77:14, 213:7

**ACCESS**[12] - 24:10, 35:7, 35:11, 35:14, 95:4, 95:9, 213:14, 213:18, 214:8, 214:9, 214:10, 214:20

**ACCESSIBLE**[1] - 87:9

**ACCOMPANIES**[1] - 87:25

**ACCOMPLISHED**[2] - 147:25, 148:1

**ACCORDING**[3] - 228:20, 230:13, 233:21

**ACCOUNT**[2] - 94:10, 236:2

**ACCOUNTS**[3] - 94:5, 94:18, 94:24

**ACCURATE**[20] - 59:7, 59:19, 59:23, 65:3, 65:7, 72:12, 88:24, 91:19, 96:10, 96:19, 101:8, 110:3, 110:6, 131:18, 136:14, 141:18, 164:15, 206:22, 215:20, 222:15

**ACCURATELY**[1] - 78:2

**ACHIEVE**[1] - 170:13

**ACKNOWLEDGE**[7] - 65:17, 65:18, 68:18,

76:14, 89:6, 90:7, 97:15

**ACKNOWLEDGED**[2] - 88:25, 140:7

**ACKNOWLEDGES**[1] - 254:15

**ACQUAINTANCE**[3] - 162:25, 163:2, 163:3

**ACT**[71] - 5:18, 7:23, 29:2, 30:25, 39:8, 39:14, 40:2, 40:14, 41:14, 42:13, 43:24, 44:4, 46:19, 47:20, 48:5, 49:11, 49:12, 51:21, 53:12, 53:14, 54:1, 54:15, 54:20, 56:18, 65:13, 68:16, 75:2, 76:5, 89:2, 89:25, 95:24, 135:7, 135:13, 135:17, 135:22, 135:23, 136:3, 137:1, 137:14, 137:21, 138:6, 138:9, 138:11, 138:16, 139:18, 140:2, 140:6, 140:10, 148:23, 149:1, 154:1, 229:6, 229:17, 229:20, 230:4, 233:12, 233:15, 237:9, 238:6, 238:9, 244:9, 247:3, 249:3, 249:7, 249:11, 249:14, 251:18, 252:18, 256:12, 256:14

**ACTED**[2] - 53:3, 241:14

**ACTING**[18] - 6:20, 31:7, 85:3, 85:4, 113:2, 114:18, 114:19, 199:4, 219:13, 219:14, 235:24, 243:14, 247:7, 247:9, 247:12, 248:23, 254:13, 254:14

**ACTION**[2] - 4:18, 165:6

**ACTION**[9] - 7:3, 19:22, 33:18, 49:17, 58:18, 77:16, 189:5, 221:15, 235:17

**ACTIONS**[4] - 33:7,

244:8, 245:6

**ACTIVELY**[1] - 39:21

**ACTIVITIES**[13] - 39:23, 47:23, 65:8, 93:22, 245:10, 246:7, 247:6, 247:7, 247:10, 248:12, 249:5, 251:14, 254:15

**ACTIVITY**[36] - 7:25, 44:2, 46:22, 48:4, 48:6, 49:14, 49:16, 51:20, 53:17, 53:18, 53:25, 54:1, 54:19, 54:20, 56:12, 78:3, 189:19, 243:21, 244:13, 244:15, 244:17, 244:18, 244:19, 244:22, 245:13, 245:18, 246:2, 246:15, 246:21, 246:24, 250:13, 253:20, 254:7, 254:9

**ACTS**[9] - 7:14, 56:7, 235:15, 236:7, 236:9, 237:3, 246:12, 252:6, 253:4

**ACTUAL**[7] - 52:11, 165:25, 170:17, 176:13, 176:14, 206:19, 223:14

**ADAM**[1] - 1:15

**ADD**[1] - 212:23

**ADDED**[1] - 110:23

**ADDITION**[7] - 12:22, 13:23, 29:21, 33:6, 62:9, 168:6, 168:7

**ADDITIONAL**[5] - 46:25, 79:11, 134:1, 139:7, 156:9

**ADDRESS**[1] - 254:24

**ADDRESS**[9] - 13:21, 18:1, 18:2, 27:4, 29:23, 150:15, 183:11, 229:5, 257:4

**ADDRESSED**[5] - 21:11, 65:16, 158:17, 232:20, 245:19

**ADDRESSING**[3] - 12:21, 27:18, 35:20

**ADHERED**[1] - 3:25

**ADJUDICATE**[2] - 148:25, 229:19

**ADJUDICATED**[1] - 256:16

**ADMINISTER**[3] - 9:6, 186:5, 188:14

**ADMINISTERING**[4] -

189:2, 204:6, 215:20, 216:2

**ADMINISTRATION**[21] - 28:10, 45:24, 46:2, 46:10, 49:24, 64:20, 69:22, 83:4, 83:25, 85:14, 150:14, 152:1, 188:2, 188:21, 189:14, 189:19, 215:12, 231:2, 238:3, 247:19

**ADMISSIBILITY**[1] - 157:16

**ADMISSION**[4] - 11:6, 156:10, 156:20, 157:7

**ADMIT**[1] - 65:17

**ADMITS**[1] - 253:20

**ADMITTED**[12] - 11:9, 43:10, 43:12, 43:15, 43:19, 142:2, 143:12, 158:2, 158:4, 164:24, 207:7, 242:14

**ADMONISH**[1] - 123:2

**ADVANCE**[2] - 114:19

**ADVANCED**[5] - 59:4, 60:24, 74:12, 109:22, 109:23

**ADVANCING**[7] - 73:25, 81:7, 110:3, 113:19, 113:22, 115:3, 115:18

**ADVERSARIES**[4] - 30:14, 30:19, 225:13, 230:1

**ADVICE**[13] - 19:25, 20:1, 33:20, 41:24, 44:25, 45:2, 45:8, 45:10, 46:14, 81:17, 84:6, 136:17, 169:13

**ADVISE**[9] - 52:13, 63:5, 82:4, 82:7, 92:25, 122:11, 170:19, 232:7, 255:22

**ADVISED**[3] - 82:10, 85:9, 85:12

**ADVISING**[1] - 38:24

**ADVISOR**[1] - 34:3

**ADVISOR**[2] - 24:4, 24:6

**ADVISORY**[1] - 237:9

**ADVOCATE**[1] - 39:16

**ADVOCATING**[3] - 39:17, 112:22, 112:24

**AFFAIRS**[2] - 45:14, 229:14

**AFFECT**[5] - 61:7, 230:18, 233:8, 245:12, 246:15

**AFFECTED**[2] - 88:24, 197:24

**AFFECTING**[2] - 245:1, 249:19

**AFFIDAVIT**[1] - 158:15

**AFFIDAVITS**[1] - 158:1

**AFFIRM**[1] - 215:2

**AFFIRMATIVELY**[1] - 75:16

**AFGHANISTAN**[8] - 20:10, 26:15, 26:17, 28:17, 30:24, 86:15, 86:16, 86:25

**AFORESAID**[1] - 259:7

**AFRICA**[1] - 33:9

**AFTERNOON**[9] - 156:8, 167:18, 183:2, 183:4, 186:14, 214:16, 215:6, 240:12, 240:13

**AG**[1] - 23:23

**AGENCIES**[5] - 81:25, 127:14, 151:23, 215:19, 221:18

**AGENCY**[4] - 83:3, 85:17, 149:10, 223:11

**AGENTS**[3] - 183:19, 194:11, 223:14

**AGO**[2] - 40:8, 170:6

**AGREE**[23] - 63:14, 64:17, 78:8, 78:10, 78:23, 79:1, 113:19, 114:18, 114:22, 114:23, 128:22, 131:5, 132:22, 138:5, 158:9, 163:23, 177:8, 177:15, 184:8, 190:10, 243:9, 253:22

**AGREED**[2] - 79:8, 127:15

**AGREEING**[1] - 243:10

**AGREEMENT**[3] - 198:15, 220:11, 220:13

**AGRICULTURE**[4] - 17:9, 17:11, 17:24,

19:4

**AHEAD** [13] - 62:24, 67:6, 70:20, 86:21, 86:22, 92:5, 95:2, 96:2, 108:6, 149:18, 159:3, 206:7, 240:1

**AID** [4] - 15:22, 24:1, 118:16, 154:8

**AIR** [1] - 33:11

**AIR** [1] - 201:19

**AIRLINE** [2] - 18:6, 21:15

**AL** [1] - 81:4

**ALEX** [10] - 107:16, 109:3, 121:2, 167:8, 167:9, 167:10, 168:25, 172:23, 208:21

**ALEXANDER** [1] - 43:8

**ALLEGATION** [14] - 7:21, 40:15, 52:7, 78:13, 90:2, 129:9, 132:3, 132:13, 134:19, 136:7, 155:16, 198:18, 208:7, 217:9

**ALLEGATIONS** [65] - 35:18, 36:6, 38:4, 38:5, 38:7, 44:21, 56:22, 64:4, 66:8, 77:9, 78:9, 78:11, 79:3, 79:6, 79:12, 80:2, 80:5, 80:21, 108:11, 126:5, 126:11, 127:17, 127:24, 127:25, 128:9, 128:14, 128:16, 128:17, 129:5, 129:12, 129:20, 130:5, 131:4, 131:6, 132:1, 132:7, 133:2, 133:7, 133:13, 133:14, 134:7, 134:18, 151:4, 152:7, 152:16, 190:10, 192:24, 193:7, 193:10, 193:17, 193:19, 196:3, 198:12, 207:16, 211:14, 216:10, 220:6, 221:12, 223:4, 223:7, 223:12, 230:11, 256:6

**ALLEGE** [2] - 7:23, 212:3

**ALLEGED** [11] - 7:14, 7:17, 7:19, 40:2,

56:12, 211:21, 212:10, 217:7, 225:16, 226:13, 246:24

**ALLEGING** [1] - 207:24

**ALLIED** [1] - 217:4

**ALLOCATE** [1] - 27:19

**ALLOCATED** [1] - 15:5

**ALLOW** [10] - 7:24, 35:21, 42:2, 60:8, 96:23, 150:23, 151:8, 153:16, 158:23, 242:11

**ALLOWABLE** [1] - 243:15

**ALLOWED** [2] - 39:14, 39:25

**ALLOWING** [1] - 42:6

**ALLUDED** [1] - 21:14

**ALMOST** [3] - 16:9, 41:6, 135:5

**ALTER** [1] - 239:8

**AMENDMENT** [4] - 7:9, 246:25, 247:1, 247:2

**AMERICA** [2] - 24:12, 61:7, 115:9

**AMERICAN** [11] - 15:24, 23:13, 24:15, 27:24, 34:15, 34:16, 60:23, 93:14, 93:16, 238:4, 238:5

**AMERICANS** [2] - 59:16, 60:17

**AMID** [1] - 87:12

**AMOUNT** [1] - 154:16

**ANDY** [1] - 36:10

**ANNA** [1] - 1:15

**ANNA** [2] - 5:8, 186:18

**ANNIVERSARY** [1] - 15:2

**ANNOUNCED** [2] - 219:7, 219:18

**ANSWER** [46] - 17:6, 48:1, 59:13, 60:1, 60:5, 62:1, 74:21, 83:16, 86:23, 94:14, 96:1, 114:4, 114:12, 114:13, 114:15, 115:14, 115:23, 122:24, 123:2, 123:4, 123:8, 123:10, 127:2, 128:16, 130:15, 130:16, 131:21, 134:12, 137:20, 160:15, 161:16, 175:9, 187:7, 187:8,

187:9, 241:12, 248:25, 249:9, 252:17, 253:11, 255:16, 255:17, 256:1

**ANSWERED** [10] - 62:22, 81:15, 115:22, 115:24, 161:17, 165:2, 174:20, 240:20, 245:22, 246:10

**ANSWERING** [2] - 41:19, 95:19

**ANSWERS** [3] - 121:10, 198:2, 250:1

**ANTICIPATE** [2] - 34:4, 77:19

**ANTICIPATING** [2] - 52:9, 231:18, 239:24

**ANULEWICZ** [5] - 180:2, 180:3, 180:5, 180:6, 180:10

**ANYWAY** [2] - 76:10, 229:5

**AP** [2] - 131:15, 131:21

**APARTMENT** [1] - 12:25

**APOLOGIES** [2] - 61:21, 244:24

**APOLOGIZE** [1] - 143:3

**APPEAL** [1] - 233:3

**APPEAR** [3] - 143:21, 143:22, 213:7

**APPEARANCE** [6] - 164:17, 165:4, 165:10, 166:13, 167:17, 174:14

**APPEARANCES** [1] - 1:13

**APPEARED** [3] - 133:23, 249:16, 249:17

**APPEARING** [1] - 255:15

**APPLICABLE** [4] - 228:20, 242:4, 244:9, 247:25

**APPLICATION** [3] - 245:11, 246:4, 247:2

**APPLICATIONS** [1] - 194:14

**APPLIED** [6] - 135:13, 135:22, 140:7, 226:1, 242:24, 242:25

**APPLIES** [8] - 135:23, 138:17, 138:18, 138:20, 181:23,

182:1, 182:6, 247:13

**APPLY** [16] - 60:22, 136:3, 138:10, 138:20, 138:21, 140:11, 157:18, 215:11, 230:4, 236:8, 243:21, 243:25, 244:2, 244:4, 245:20, 249:25

**APPOINTED** [1] - 10:22

**APPRECIATE** [6] - 131:17, 141:21, 155:25, 159:19, 185:23, 240:18

**APPROACH** [9] - 10:7, 42:17, 42:23, 117:19, 141:7, 156:16, 164:7, 206:8, 206:11

**APPROACHES** [1] - 157:21

**APPROACHING** [1] - 131:24

**APPROPRIATE** [8] - 12:3, 103:17, 118:3, 157:5, 158:2, 159:7, 196:24, 221:17

**APPROPRIATENES S** [1] - 189:8

**APPROPRIATIONS** [1] - 154:21

**APPROVAL** [2] - 24:3, 235:22

**APPROVED** [2] - 23:14, 24:17

**ARABIA** [1] - 55:1

**ARCHIVES** [1] - 94:7

**AREA** [9] - 24:23, 37:25, 52:3, 52:4, 64:20, 76:10, 96:23, 162:9, 192:18

**AREAS** [4] - 84:5, 123:13, 148:13, 162:21

**ARENA** [2] - 214:3, 216:11

**ARGUE** [1] - 240:10

**ARGUING** [2] - 224:23, 238:17

**ARGUMENT** [2] - 8:13, 256:4

**ARGUMENTS** [2] - 8:9, 19:7

**ARISES** [1] - 246:11

**AROSE** [1] - 232:7

**ARRAIGNMENT** [2] - 257:18, 257:21

**ARRANGE** [11] - 89:7,

99:21, 102:14, 102:21, 102:25, 104:7, 110:21, 175:12, 203:11, 242:12

**ARRANGED** [2] - 77:3, 208:16

**ARRANGEMENTS** [1] - 105:22

**ARRANGING** [2] - 7:16, 66:12

**ARREST** [4] - 194:18, 194:21, 233:22

**ARRIVAL** [2] - 192:12, 200:6

**ARRIVE** [1] - 77:3

**ARRIVED** [2] - 76:23, 79:21

**ARRIVING** [1] - 199:2

**ARTICLE** [23] - 84:9, 84:11, 84:12, 84:14, 84:17, 84:18, 84:19, 109:22, 109:24, 110:1, 110:4, 110:5, 111:6, 152:23, 153:1, 153:3, 153:4, 153:5, 153:6, 154:24, 242:3

**ARTICLE** [1] - 85:6

**ASCERTAIN** [1] - 134:22

**ASCRIBING** [1] - 170:17

**ASIDE** [3] - 28:7, 193:17, 247:3

**ASPECT** [4] - 174:12, 227:12, 227:25, 238:22

**ASPECTS** [9] - 27:8, 84:21, 105:16, 110:1, 126:12, 215:12, 226:8, 226:16, 243:24

**ASSEMBLING** [1] - 48:24

**ASSERTION** [1] - 250:23

**ASSESSMENT** [5] - 78:9, 78:11, 78:23, 127:16, 128:23

**ASSIST** [2] - 59:2, 167:21

**ASSISTANCE** [2] - 92:16, 92:20

**ASSISTANT** [4] - 10:22, 13:9, 47:5, 239:2

**ASSISTANTS** [2] - 19:14, 21:4

**ASSISTED** [1] -

194:13
ASSISTING [1] - 167:5
ASSISTS [1] - 91:16
ASSOCIATE [2] -
173:4, 173:17
ASSOCIATED [10] -
69:19, 70:1, 71:15,
143:7, 144:10,
168:11, 192:25,
228:17, 252:8,
252:12
ASSOCIATION [3] -
121:21, 228:7,
253:13
ASSUME [15] - 8:24,
25:15, 42:21, 43:14,
47:17, 59:20, 94:23,
95:5, 109:4, 145:7,
190:21, 215:8,
221:19, 221:23,
245:21
ASSUMED [2] - 131:3,
208:19
ASSUMING [2] - 52:1,
74:1
ASSUMPTION [1] -
149:6
AT [2] - 3:1, 258:4
AT-HOME [1] - 29:5
ATLANTA [5] - 52:2,
52:4, 76:10, 231:15
ATLANTA [2] - 1:2,
1:24
ATMOSPHERICS [1] -
11:20
ATTACHMENT [5] -
143:17, 143:24,
144:4, 144:6, 144:10
ATTEMPT [5] - 77:6,
103:4, 104:23,
120:6, 242:12
ATTEMPTED [5] -
102:9, 102:14,
102:21, 102:25,
199:24
ATTEMPTING [1] -
228:25
ATTEMPTS [6] -
100:17, 100:21,
102:3, 102:5,
104:20, 105:3
ATTEND [4] - 16:5,
20:17, 21:8, 57:19
ATTENDANCE [1] -
37:8
ATTENTION [29] -
28:4, 28:9, 34:23,
43:3, 43:9, 43:24,
45:7, 46:18, 47:20,
49:10, 51:15, 53:12,

53:22, 54:5, 54:14,
68:16, 75:1, 76:4,
83:19, 95:12, 97:15,
119:18, 162:16,
172:7, 190:1,
200:15, 232:10,
235:20, 250:18
ATTORNEY [20] -
5:10, 5:11, 6:12,
7:11, 37:9, 39:3,
78:4, 79:2, 79:9,
79:20, 127:5,
127:16, 128:22,
213:24, 223:14,
230:14, 230:15,
230:17, 233:7
ATTORNEY [33] -
4:12, 8:14, 8:19,
50:25, 56:6, 70:2,
70:3, 78:5, 88:11,
105:20, 111:7,
122:2, 148:23,
149:15, 162:3,
162:19, 167:23,
167:25, 168:4,
176:17, 183:3,
185:6, 187:1, 187:7,
239:2, 241:11,
244:3, 250:19,
257:16, 257:19
ATTORNEY'S [1] -
183:19
ATTORNEY'S [1] -
149:5
ATTORNEY/CLIENT
[3] - 88:12, 173:9,
181:4
ATTORNEYS [50] -
5:25, 6:18, 8:21,
40:16, 71:20, 82:18,
82:20, 82:24, 91:8,
94:14, 94:16, 97:25,
98:3, 98:25, 99:16,
99:22, 99:24, 99:25,
100:4, 107:13,
107:15, 107:16,
107:22, 107:24,
108:15, 108:21,
108:24, 109:3,
109:6, 109:11,
109:14, 109:16,
110:14, 110:15,
120:24, 121:1,
121:14, 122:17,
123:13, 131:12,
132:24, 139:24,
149:25, 155:12,
155:13, 155:14,
171:24, 240:9
ATTORNEYS [1] -

216:6
AUDIENCE [1] - 3:9
AUDIO [1] - 209:5
AUDIT [36] - 76:16,
76:18, 77:7, 77:11,
77:13, 77:16, 79:23,
80:11, 80:14, 81:8,
82:9, 85:4, 127:13,
134:10, 192:13,
192:16, 192:19,
193:5, 193:18,
194:1, 194:7,
194:10, 194:22,
195:4, 195:10,
195:17, 195:19,
197:4, 197:6, 198:9,
198:19, 218:7,
218:11, 218:14,
218:18
AUDITS [1] - 104:1
AUGUST [1] - 1:12
AUGUST [9] - 5:13,
5:24, 6:3, 6:8, 6:9,
6:13, 6:15, 43:7,
259:7
AUL [1] - 1:22
AUL [1] - 4:25
AUTHENTICATING [1]
- 158:12
AUTHORITY [35] -
93:7, 109:22, 128:9,
128:11, 214:23,
234:14, 236:10,
236:24, 241:1,
241:8, 241:22,
241:23, 242:11,
244:25, 245:11,
246:6, 246:12,
246:14, 247:8,
247:9, 247:23,
248:4, 248:7,
249:18, 250:4,
250:16, 250:24,
251:2, 254:11,
254:13, 254:14,
254:18, 254:19,
255:18, 255:19
AUTHORIZATION [2]
- 29:2, 30:25
AUTHORIZATIONS
[2] - 129:4, 132:10
AUTHORIZE [2] -
241:25, 242:12
AUTHORIZED [3] -
244:21, 247:25,
249:6
AVAIL [1] - 229:3
AVAILABLE [5] -
66:17, 92:20, 93:10,
137:11, 215:23

AVENUE [1] - 194:4
AVERTED [1] - 18:5
AVOID [1] - 136:18
AWARE [59] - 15:8,
16:11, 16:12, 16:14,
19:16, 19:23, 20:5,
20:14, 34:12, 35:4,
39:7, 44:23, 45:6,
58:11, 63:24, 66:9,
68:1, 77:19, 81:25,
85:16, 87:20, 89:12,
106:14, 120:9,
124:18, 124:20,
124:23, 130:3,
136:25, 139:17,
139:18, 140:9,
142:25, 143:1,
153:1, 153:21,
157:23, 190:4,
195:8, 195:17,
196:1, 197:3, 198:4,
198:5, 198:7,
198:22, 199:4,
199:13, 199:14,
199:17, 199:22,
201:7, 205:14,
213:21, 218:10,
218:15, 219:3,
232:21
AWARENESS [2] -
34:25, 35:2
AWKWARD [1] -
136:21
AXIOMATIC [1] -
225:17

B

BACKGROUND [1] -
144:25
BACKWARDS [1] -
250:22
BAD [1] - 200:5
BADGERING [1] -
62:22
BALLOT [2] - 192:20,
194:14
BALLOTS [6] - 52:21,
191:6, 192:23,
197:17, 197:20,
204:18
BANK [1] - 234:2
BANKRUPT [1] - 18:7
BAR [1] - 235:21
BAR [6] - 247:2,
253:14, 253:15,
254:1, 254:5
BARR [12] - 37:9,
37:15, 37:16, 38:17,
39:4, 78:5, 79:2,
79:9, 79:10, 79:15,

79:21, 127:6
BARR'S [6] - 78:9,
78:23, 79:16,
127:16, 128:23,
230:7
BARS [1] - 255:3
BASED [9] - 73:1,
75:19, 78:7, 79:17,
95:23, 169:9,
201:11, 224:18,
236:25
BASIC [1] - 235:8
BASIS [8] - 14:10,
14:15, 14:16, 17:18,
32:6, 39:3, 66:18,
149:12
BATHROOM [1] -
24:12
BAUCHAM [1] -
234:18
BEACH [3] - 24:24,
25:1, 40:5
BEAR [3] - 161:9,
235:17, 246:8
BECOME [1] - 35:4
BEEF [2] - 17:13,
17:20
BEFORE [1] - 1:11
BEG [3] - 23:19,
107:10, 123:9
BEGINNING [3] -
109:17, 213:13,
240:15
BEHALF [18] - 91:22,
93:6, 113:2, 122:19,
136:7, 165:11,
174:8, 179:18,
190:23, 196:2,
196:6, 199:4,
199:15, 219:13,
219:14, 219:17,
246:2, 255:13
BEHALF [2] - 1:14,
1:18
BEHAVIOR [1] -
208:14
BEHIND [2] - 5:10,
67:22
BELIEF [10] - 85:5,
90:15, 107:3, 107:4,
152:6, 248:19,
249:2, 249:5, 250:5,
250:6
BELONGS [1] - 3:20
BENCH [1] - 160:6
BERNIE [1] - 69:13
BEST [28] - 14:10,
16:24, 38:15, 48:11,
55:16, 73:21, 81:4,
91:19, 91:20, 94:22,

5

94:23, 101:22,
104:6, 104:12,
104:15, 126:3,
126:16, 132:11,
141:18, 168:16,
176:4, 176:9,
180:23, 186:21,
186:22, 201:11,
202:13, 206:23
**BET** [4] - 131:22,
144:24, 237:8,
237:11
**BETTER** [7] - 9:24,
32:14, 103:8, 109:8,
133:15, 203:9
**BETWEEN** [43] - 7:5,
7:13, 12:5, 12:23,
17:24, 18:21, 21:5,
30:15, 50:16, 66:12,
89:7, 97:17, 98:2,
98:15, 99:1, 112:6,
113:8, 119:19,
120:17, 120:20,
121:7, 136:25,
142:9, 142:13,
142:17, 169:17,
172:11, 173:1,
173:17, 173:21,
173:24, 174:24,
175:2, 175:6,
175:13, 175:15,
175:20, 176:3,
176:11, 209:24,
235:9, 242:22,
253:13
**BEYOND** [8] - 12:14,
60:4, 60:7, 72:16,
133:10, 217:21,
229:5, 229:21
**BIDEN** [11] - 22:14,
29:25, 39:19, 39:21,
134:23, 146:24,
147:3, 192:11,
230:17, 230:21
**BIG** [8] - 11:1, 11:2,
11:3, 23:12, 24:16,
50:15, 154:14,
232:16
**BIGGEST** [1] - 50:8
**BILLIONS** [1] - 24:17
**BIT** [16] - 18:17, 18:20,
25:23, 130:17,
130:18, 135:6,
136:8, 151:17,
154:25, 155:8,
162:9, 185:20,
198:23, 215:7,
220:18, 235:10
**BITTMAN** [1] - 4:25
**BJ** [2] - 213:24, 216:6

**BLOCKS** [1] - 154:15
**BLUNT** [1] - 68:4
**BLUNTLY** [7] - 13:3,
20:23, 21:1, 28:12,
85:9, 139:12, 148:3
**BOARD** [2] - 83:9,
232:23
**BOARD** [1] - 221:3
**BOBBY** [1] - 213:25
**BODY** [1] - 49:25
**BOILS** [1] - 256:10
**BONO** [1] - 105:21
**BOOKS** [1] - 235:5
**BORDERING** [1] -
62:22
**BORE** [1] - 226:21
**BOTTOM** [2] - 144:9,
227:8
**BOULEE** [1] - 259:16
**BOUNDARY** [2] -
241:2, 244:10
**BOUTIQUE** [1] -
162:15
**BOX** [3] - 81:13,
152:14, 231:14
**BRAD** [3] - 5:21, 7:15,
237:10
**BRAD** [2] - 2:10, 186:7
**BRANCH** [10] - 21:14,
189:11, 189:13,
215:19, 239:10,
244:1, 244:22,
244:25, 247:24,
251:7
**BRANCHES** [1] -
34:20
**BREAK** [8] - 55:20,
55:21, 55:23,
116:17, 116:20,
117:3, 224:7
**BREAKING** [1] -
117:14
**BREAKS** [1] - 3:13
**BRENNAN** [1] - 145:1
**BRIAN** [1] - 166:23
**BRICKMAN** [2] -
185:7, 185:14
**BRICKMAN** [5] -
160:12, 160:18,
160:22, 161:21,
185:13
**BRIDGE** [1] - 205:7
**BRIEF** [5] - 6:14,
241:19, 243:19,
244:16, 247:14
**BRIEFING** [3] - 12:7,
32:7, 172:19
**BRIEFINGS** [3] -
22:12, 22:13, 22:14,
30:2, 30:10

**BRIEFLY** [6] - 9:20,
10:20, 51:24, 55:14,
155:1, 222:13
**BRIEFS** [1] - 7:1
**BRING** [20] - 11:3,
18:8, 19:21, 20:24,
38:10, 44:12, 52:10,
63:11, 132:23,
149:22, 149:23,
154:12, 159:22,
168:23, 180:12,
205:9, 231:13,
245:8, 257:3
**BRINGING** [3] - 18:10,
122:10, 130:1
**BRINGS** [1] - 8:2
**BROAD** [9] - 12:17,
13:23, 34:2, 90:25,
187:25, 253:12,
253:14, 253:24,
254:1
**BROADEN** [1] - 110:2
**BROADENED** [1] -
228:11
**BROADER** [1] - 45:5
**BROADLY** [5] - 13:11,
13:12, 39:23, 81:11,
194:7
**BROKER** [1] - 246:2
**BROUGHT** [9] - 39:3,
87:1, 148:13, 150:8,
166:16, 166:17,
174:10, 190:23,
215:22
**BS** [1] - 78:25
**BUCKETS** [1] - 162:10
**BUILDING** [3] - 13:21,
13:25, 45:20
**BULLSHIT** [2] - 38:22,
79:4
**BURDEN** [12] - 6:18,
224:16, 226:17,
226:19, 226:20,
226:24, 227:4,
228:12, 237:2,
241:5, 242:9, 243:12
**BUREAU** [1] - 52:19
**BUSINESS** [2] - 12:16,
162:10
**BUST** [1] - 63:9
**BUT..** [1] - 188:23
**BY** [72] - 9:12, 10:17,
11:13, 18:13, 25:13,
33:13, 41:11, 43:2,
43:23, 51:14, 55:11,
56:5, 57:6, 60:13,
61:15, 62:3, 63:1,
71:2, 72:23, 75:25,
78:22, 83:22, 85:2,
87:6, 88:16, 92:18,

95:10, 95:18, 96:4,
114:3, 114:9,
114:17, 115:11,
115:16, 116:1,
116:11, 117:13,
117:21, 123:7,
126:22, 127:3,
131:23, 135:20,
141:11, 142:5,
143:15, 147:11,
147:18, 149:19,
153:20, 155:5,
161:25, 164:9,
165:1, 178:25,
181:10, 183:1,
183:12, 184:21,
186:13, 187:18,
204:1, 205:23,
206:10, 207:9,
209:13, 210:16,
211:4, 213:11,
215:5, 222:3, 223:1

---

## C

**CABINET** [10] - 12:14,
14:1, 16:17, 19:2,
21:5, 21:23, 48:16,
48:23, 69:2, 69:12
**CALENDAR** [2] -
57:10, 130:19
**CAMPAIGN** [164] -
27:16, 31:19, 31:20,
31:22, 31:25, 32:1,
32:15, 35:1, 35:25,
36:25, 39:21, 57:21,
66:4, 66:8, 69:19,
70:1, 70:4, 71:14,
81:1, 87:17, 88:1,
88:2, 91:16, 91:23,
92:10, 92:17, 92:19,
92:22, 92:24, 93:6,
93:10, 93:17, 95:20,
96:12, 96:14, 97:3,
97:6, 98:6, 100:1,
100:6, 103:20,
103:23, 103:24,
104:1, 104:21,
104:22, 105:24,
106:4, 106:5, 106:7,
107:22, 107:24,
109:12, 109:13,
109:16, 112:20,
113:2, 113:4, 113:5,
113:8, 113:10,
113:14, 113:15,
113:20, 113:22,
113:24, 114:19,
115:3, 115:7, 115:8,
115:9, 115:17,
115:18, 116:3,

116:5, 120:24,
121:1, 122:12,
122:19, 122:21,
122:22, 123:11,
138:23, 139:1,
139:2, 139:3, 139:8,
139:9, 139:10,
139:20, 139:21,
139:22, 139:25,
140:3, 140:14,
140:15, 140:16,
140:21, 141:1,
141:2, 142:23,
143:8, 146:1, 146:3,
146:14, 147:21,
148:4, 148:12,
148:20, 163:11,
163:16, 163:17,
163:18, 163:19,
163:21, 163:22,
163:23, 166:15,
167:6, 170:11,
171:8, 171:15,
174:8, 176:17,
177:19, 179:10,
179:19, 184:5,
190:5, 190:18,
190:23, 191:24,
202:21, 204:9,
207:12, 207:16,
208:13, 209:25,
210:2, 210:3, 211:1,
211:8, 213:17,
214:11, 223:9,
227:18, 242:5,
242:20, 242:23,
243:3, 243:4,
245:24, 246:1,
246:2, 250:11,
250:12, 256:1
**CAMPAIGN'S** [1] -
56:21
**CAMPAIGN-
RELATED** [4] -
93:17, 113:24,
122:12, 140:3
**CAMPAIGN/THE** [1] -
190:9
**CAMPAIGNING** [1] -
113:1
**CAMPAIGNS** [3] -
93:22, 123:17, 208:8
**CANDIDATE** [3] -
164:3, 165:12, 166:2
**CANDIDATE** [12] -
39:17, 40:9, 164:4,
184:5, 190:9,
207:18, 217:20,
244:20, 245:14,
250:11, 255:25

CANDIDATES[3] - 207:13, 217:19, 218:22
CANDIDLY[1] - 12:20
CANDOR[1] - 116:8
CANNOT[12] - 228:22, 235:14, 235:25, 244:12, 245:10, 246:13, 246:16, 247:11, 248:1, 253:21, 254:20
CAPACITIES[1] - 210:1
CAPACITY[14] - 32:19, 33:4, 44:6, 44:13, 59:1, 71:13, 71:18, 100:5, 140:1, 164:1, 164:2, 167:13, 167:21, 170:11
CAPACITY[4] - 165:12, 165:14, 166:2, 166:4
CAPITOL[8] - 15:13, 15:14, 27:2, 28:24, 30:15, 34:22, 83:10, 83:11
CAPTURE[1] - 256:20
CARE[3] - 37:6, 148:5, 153:10
CARE[2] - 247:25, 248:2
CARED[1] - 201:16
CAREFUL[1] - 72:11
CAREFULLY[1] - 71:3
CAROLINA[7] - 9:16, 9:23, 17:11, 17:12, 47:15, 47:16, 146:19
CARRY[2] - 188:10, 224:15
CARTER[1] - 198:14
CASE[67] - 4:11, 4:16, 5:25, 6:7, 6:13, 6:15, 6:16, 8:1, 8:4, 8:22, 42:21, 54:2, 54:22, 92:17, 117:23, 157:20, 164:18, 166:1, 166:22, 168:24, 178:4, 182:19, 195:9, 217:23, 225:17, 226:24, 228:12, 229:1, 230:9, 233:2, 234:3, 234:8, 234:16, 234:17, 234:19, 234:21, 236:11, 236:19, 236:23, 241:20,

241:22, 242:10, 242:21, 244:1, 247:17, 247:18, 247:22, 248:10, 249:6, 250:23, 252:15, 253:16, 253:18, 253:19, 253:23, 254:4, 254:21, 256:10, 257:7, 257:9, 257:13, 257:14, 257:20, 259:7
CASES[17] - 157:25, 167:16, 168:8, 178:1, 217:14, 217:16, 225:20, 228:10, 232:9, 232:25, 234:15, 234:25, 236:21, 254:8, 256:7, 257:11
CASUAL[2] - 7:12, 7:25
CATCH[1] - 12:20
CATCH-UP[1] - 12:20
CATEGORICALLY[1] - 246:13
CAUGHT[1] - 12:8
CAUSAL[4] - 7:4, 226:12, 227:4, 227:11
CAUTIOUS[2] - 40:23, 51:6
CAUTIOUSLY[1] - 3:16
CAVUTO[4] - 201:13, 201:14, 201:15
CENTER[3] - 89:17, 152:13, 239:24
CENTER[9] - 76:15, 77:2, 79:22, 80:10, 81:7, 89:17, 127:12, 195:9, 231:16
CENTRALIZED[1] - 119:2
CENTURY[1] - 249:22
CEREMONIAL[1] - 11:2
CERTAIN[19] - 15:6, 73:6, 73:7, 73:9, 73:18, 73:19, 88:7, 123:24, 128:17, 148:13, 151:6, 151:21, 170:2, 193:23, 193:25, 230:22, 231:11, 243:24, 247:24
CERTAINLY[69] - 14:13, 16:17, 19:10, 20:19, 20:21, 21:18, 23:13, 25:18, 26:20,

27:13, 28:3, 31:4, 32:2, 35:2, 36:5, 36:21, 39:24, 44:6, 44:25, 45:3, 45:9, 45:20, 46:9, 46:24, 49:8, 50:12, 51:23, 54:3, 59:6, 59:7, 59:18, 61:8, 63:12, 64:18, 65:7, 67:19, 67:23, 68:11, 70:6, 74:11, 91:11, 92:24, 96:11, 96:19, 98:8, 99:15, 105:14, 106:7, 107:4, 110:2, 110:17, 113:10, 113:15, 123:11, 123:15, 128:8, 128:16, 137:10, 139:16, 146:10, 151:13, 152:1, 152:5, 152:6, 153:3, 154:1, 154:21, 220:8, 229:20
CERTAINTY[2] - 67:16, 90:14
CERTIFICATION[24] - 64:15, 64:21, 83:4, 83:6, 85:17, 129:14, 130:12, 130:14, 130:20, 150:23, 189:14, 189:23, 191:19, 192:2, 194:18, 204:11, 205:2, 206:2, 208:10, 217:22, 218:4, 228:3, 231:4, 247:20
CERTIFICATIONS[2] - 188:24, 204:14
CERTIFIED[13] - 120:11, 120:12, 191:12, 194:11, 194:17, 196:23, 204:15, 204:19, 204:22, 204:25, 205:3, 205:5, 217:17
CERTIFIES[1] - 205:20
CERTIFY[6] - 64:24, 188:8, 188:19, 189:1, 189:3, 259:6
CERTIFYING[2] - 189:8, 204:3
CFR[2] - 244:14, 244:18
CHAFF[1] - 36:20
CHAIN[1] - 170:23
CHAIR[1] - 160:6
CHAIR[1] - 166:7
CHAIRMAN[1] - 30:16

CHALLENGE[5] - 57:22, 66:5, 204:9, 210:12, 217:21
CHALLENGED[1] - 217:6
CHALLENGES[6] - 34:25, 35:17, 190:18, 210:11, 216:20, 216:25
CHALLENGING[4] - 13:3, 35:9, 36:3, 217:20
CHANCE[1] - 159:22
CHANGE[6] - 205:6, 208:14, 217:8, 220:19, 221:9, 222:7
CHANGED[2] - 205:21, 212:25
CHARACTERIZE[1] - 52:15
CHARGE[2] - 14:4, 31:22
CHARGED[4] - 5:16, 5:17, 5:19, 65:17
CHARGES[1] - 6:22
CHAT[2] - 65:22, 66:21, 67:11
CHECK[4] - 27:24, 144:15, 152:14, 231:14
CHECKED[2] - 81:14, 208:6
CHECKING[1] - 81:13
CHESEBRO[1] - 143:25
CHICKEN[1] - 17:13
CHIEF[3] - 13:8, 188:3, 194:24
CHIEF[151] - 7:3, 7:13, 10:1, 10:4, 10:22, 11:15, 11:16, 11:21, 13:7, 13:8, 13:10, 14:18, 14:21, 15:20, 19:12, 19:14, 21:4, 22:4, 22:13, 27:8, 30:3, 30:7, 39:13, 40:21, 44:3, 44:7, 44:13, 44:24, 44:25, 45:13, 46:23, 46:24, 47:23, 47:25, 48:6, 48:14, 48:18, 48:25, 49:9, 49:16, 49:17, 49:18, 51:22, 51:23, 53:19, 53:20, 54:2, 54:4, 54:9, 54:21, 54:23, 58:7, 62:8, 63:7, 63:10, 66:11, 66:16, 68:8, 74:9, 85:8, 85:13, 85:21, 87:25, 88:7,

88:8, 91:21, 93:21, 100:15, 100:19, 109:18, 110:11, 110:18, 110:20, 111:4, 111:7, 111:15, 111:19, 111:21, 111:25, 112:11, 112:19, 112:25, 113:3, 113:5, 113:17, 113:20, 114:20, 115:7, 115:19, 116:4, 116:6, 118:2, 118:24, 123:12, 124:16, 126:7, 129:17, 132:8, 133:8, 135:12, 135:22, 137:9, 137:25, 138:5, 138:8, 138:10, 138:15, 138:16, 138:18, 139:6, 140:4, 140:5, 140:11, 141:2, 141:4, 146:23, 184:15, 184:24, 195:24, 219:1, 219:3, 219:7, 219:13, 219:16, 219:18, 228:18, 229:2, 229:10, 231:6, 231:10, 231:22, 232:4, 233:8, 233:10, 233:11, 234:1, 237:20, 239:23, 240:23, 241:6, 241:7, 242:12, 243:15, 243:25, 244:11, 249:4, 250:9, 251:15, 255:18, 255:25
CHIEFS[1] - 30:17
CHILDREN[4] - 52:3, 52:11, 76:12
CHILLING[1] - 40:25
CHIMING[1] - 243:9
CHRIS[1] - 180:2
CHRISTINE[1] - 213:25
CHRISTMAS[3] - 52:3, 52:10, 98:12
CHRISTOPHER[1] - 167:25
CHUCK[1] - 145:1
CHUNKS[1] - 219:22
CHYRON[1] - 40:21
CHÉ[1] - 43:8
CIA[1] - 12:7
CIPOLLONE[2] -

51:1, 82:23
**CIRCUIT** [1] - 233:2
**CIRCUIT** [14] - 226:22, 228:6, 228:9, 228:21, 233:1, 234:18, 234:19, 234:20, 235:13, 236:3, 236:17, 237:1, 253:16
**CIRCUMSTANCE** [3] - 112:15, 112:16, 238:7
**CIRCUMSTANCES** [3] - 40:4, 51:25, 226:1
**CITATION** [4] - 236:13, 241:24, 242:2, 247:18
**CITATIONS** [1] - 157:25
**CITED** [5] - 214:23, 242:8, 245:15, 247:14, 247:23
**CITES** [1] - 235:2
**CITIZENS** [1] - 15:24
**CITY** [1] - 196:19
**CITY** [1] - 196:21
**CIVIC** [9] - 76:15, 77:2, 79:22, 80:10, 81:7, 89:17, 127:12, 195:9, 231:16
**CIVIL** [2] - 4:18, 165:6
**CIVIL** [2] - 15:4, 235:15
**CLAIM** [1] - 229:3
**CLAIMS** [4] - 129:2, 150:1, 151:15, 220:19
**CLARIFICATION** [2] - 170:19, 194:16
**CLARIFY** [4] - 54:6, 75:21, 176:13, 222:7
**CLASSIC** [1] - 256:11
**CLASSIFIED** [4] - 15:16, 15:19, 30:4
**CLAUSE** [2] - 7:6, 7:8
**CLAUSE** [3] - 227:2, 247:25, 248:2
**CLEAR** [18] - 21:13, 26:18, 36:17, 58:17, 70:24, 71:23, 91:24, 95:1, 108:2, 108:20, 108:23, 110:12, 110:25, 113:8, 131:15, 144:23, 228:6, 254:6
**CLEARLY** [6] - 112:22, 144:16, 227:11, 228:15, 228:16, 241:19
**CLERK** [1] - 43:8

**CLERK** [5] - 4:17, 160:25, 161:5, 186:10, 255:12
**CLETA** [11] - 105:13, 105:14, 105:20, 105:22, 168:18, 168:19, 170:14, 170:15, 170:18, 174:1
**CLIENT** [2] - 170:12, 175:6
**CLIENTS** [1] - 184:9
**CLIFTON** [3] - 234:20, 235:12, 236:16
**CLIP** [7] - 209:12, 209:14, 210:13, 210:15, 211:2, 211:3, 213:10
**CLIP** [4] - 211:14, 213:9, 213:12, 219:5
**CLOCK** [3] - 14:19, 224:25
**CLOSE** [12] - 8:8, 19:21, 20:25, 22:10, 44:12, 49:25, 122:15, 122:18, 133:1, 160:5, 216:22, 237:15
**CLOSED** [2] - 96:23, 151:10
**CLOSELY** [1] - 183:11
**CLOSER** [4] - 160:15, 160:16, 222:18, 235:3
**CLOSING** [3] - 8:9, 224:19, 256:4
**CLOSINGS** [2] - 224:6, 224:8
**CLOSURE** [5] - 149:22, 149:23, 227:23, 228:1, 231:14
**CMR** [2] - 1:23, 259:11
**CO** [2] - 167:16, 253:8
**CO-CONSPIRATORS** [1] - 253:8
**CO-COUNSEL** [1] - 167:16
**COBB** [38] - 7:21, 52:5, 52:11, 76:15, 77:1, 77:9, 77:24, 79:22, 80:10, 81:7, 82:8, 85:4, 87:14, 89:16, 90:13, 96:17, 96:20, 96:21, 127:11, 129:6, 130:23, 152:9, 152:12, 192:14, 192:17, 192:21,

193:5, 193:18, 194:10, 194:22, 195:5, 195:9, 197:25, 199:2, 218:6, 218:11, 231:16, 239:23
**COHEN** [1] - 172:17
**COLD** [1] - 169:5
**COLLEAGUE** [2] - 167:10, 167:15
**COLLEAGUES** [3] - 4:24, 5:7, 255:14
**COLLEGE** [1] - 84:21
**COLLOQUIAL** [2] - 58:18, 170:16
**COLOR** [6] - 6:23, 47:11, 241:14, 246:12, 247:7, 247:9
**COLORABLE** [3] - 226:15, 248:25, 256:14
**COLORABLY** [1] - 239:16
**COLORFUL** [1] - 78:24
**COMFORTABLE** [2] - 133:2, 178:22
**COMING** [15] - 7:21, 8:10, 8:15, 12:10, 14:6, 20:6, 24:13, 24:16, 29:3, 30:19, 36:11, 74:22, 107:23, 208:13, 249:23
**COMMAND** [1] - 235:20
**COMMANDER** [1] - 74:8
**COMMENCED** [1] - 117:5
**COMMENT** [3] - 40:11, 40:19, 148:24
**COMMENTARY** [1] - 123:3
**COMMENTING** [1] - 136:23
**COMMENTS** [2] - 39:5, 201:16
**COMMISSION** [5] - 10:21, 10:25, 13:6, 13:10, 90:24
**COMMISSIONED** [1] - 10:5
**COMMITTED** [1] - 235:15
**COMMITTEE** [5] - 25:22, 90:21, 94:12, 142:22, 212:7
**COMMITTING** [1] - 57:14

**COMMON** [5] - 44:9, 49:17, 98:2, 216:13, 251:6
**COMMONLY** [4] - 22:23, 25:1, 215:15, 216:20
**COMMUNICATED** [4] - 25:15, 27:3, 90:12, 170:21
**COMMUNICATING** [3] - 23:12, 113:14, 203:8
**COMMUNICATION** [8] - 22:11, 24:14, 24:20, 68:6, 68:7, 169:22, 175:12, 199:14
**COMMUNICATIONS** [13] - 21:25, 22:1, 22:3, 22:5, 22:9, 22:21, 23:17, 23:20, 25:14, 36:2, 53:9, 181:4
**COMPENSATED** [2] - 107:24, 107:25
**COMPLAINED** [1] - 237:3
**COMPLAINS** [1] - 228:17
**COMPLAINT** [1] - 233:21
**COMPLETE** [3] - 21:13, 141:18, 206:25
**COMPLETED** [1] - 228:3
**COMPLETELY** [2] - 139:14, 152:15
**COMPLEX** [3] - 15:10, 19:11, 37:25
**COMPONENT** [3] - 27:13, 28:2, 113:18
**COMPROMISE** [6] - 97:25, 108:16, 108:17, 177:6, 178:5, 206:5
**CONCEDE** [3] - 135:12, 135:14, 247:6
**CONCEDED** [2] - 135:16, 135:17
**CONCEDING** [1] - 251:12
**CONCENTRATE** [1] - 4:5
**CONCEPT** [3] - 36:18, 36:19, 236:9
**CONCERN** [7] - 52:6, 77:11, 107:6, 137:13, 150:4,

150:7, 232:13
**CONCERNED** [7] - 18:6, 31:12, 63:23, 64:18, 82:3, 219:15, 232:14
**CONCERNING** [3] - 36:2, 38:5, 225:25
**CONCERNS** [6] - 20:3, 33:3, 52:7, 107:12, 132:1, 246:25
**CONCLUDED** [1] - 258:4
**CONCLUDES** [1] - 236:4
**CONCLUSION** [8] - 79:25, 80:1, 80:2, 80:7, 80:8, 127:15, 127:18, 129:11
**CONCLUSIONS** [1] - 82:8
**CONCLUSIVELY** [1] - 197:11
**CONDITIONAL** [1] - 148:9
**CONDUCT** [9] - 5:22, 44:1, 46:20, 47:22, 65:17, 188:14, 198:9, 237:3, 251:1
**CONDUCTED** [4] - 80:14, 127:13, 218:11, 224:14
**CONDUCTING** [1] - 195:5
**CONDUCTS** [1] - 215:12
**CONFERENCE** [3] - 110:21, 172:21, 172:24
**CONFIDENCE** [1] - 29:8
**CONFIDENT** [2] - 133:23, 193:20
**CONFIRM** [1] - 180:25
**CONFLICT** [1] - 196:25
**CONFRONTATION** [1] - 52:25
**CONGRESS** [18] - 9:23, 15:13, 21:14, 23:14, 24:20, 34:17, 40:12, 45:22, 46:2, 46:12, 46:15, 47:18, 50:6, 83:12, 96:9, 122:3, 154:6, 228:10
**CONGRESSIONAL** [1] - 148:2
**CONGRESSIONAL** [3] - 40:10, 46:4, 46:5
**CONGRESSMAN** [1] -

249:4
**CONJURE** [1] - 72:10
**CONNECT** [1] -
246:25
**CONNECTED** [2] -
144:10, 228:17
**CONNECTION** [26] -
7:5, 7:12, 7:25,
15:18, 44:2, 46:22,
47:23, 48:6, 51:21,
53:19, 54:21, 65:5,
102:9, 153:21,
154:9, 225:11,
226:12, 227:4,
227:6, 227:11,
228:7, 228:13,
236:7, 242:3, 253:13
**CONNECTIONS** [2] -
65:2, 102:25
**CONS** [1] - 19:6
**CONSENT** [2] -
156:20, 198:15
**CONSEQUENCE** [1] -
207:23
**CONSIDER** [5] -
49:23, 98:11,
111:20, 112:10,
115:19
**CONSIDERATION** [2]
- 157:6, 257:9
**CONSIDERATIONS**
[2] - 87:2, 236:6
**CONSIDERED** [1] -
193:7
**CONSIDERING** [1] -
27:12
**CONSISTED** [1] -
218:18
**CONSISTENT** [11] -
90:17, 91:17, 132:3,
135:15, 191:17,
200:1, 200:9,
204:17, 209:15,
222:10, 232:25
**CONSPIRACY** [1] -
248:15
**CONSPIRATORS** [1] -
253:8
**CONSTITUENCY** [1] -
24:21
**CONSTITUTES** [1] -
13:14
**CONSTITUTING** [1] -
5:22
**CONSTITUTION** [6] -
84:9, 84:11, 111:6,
152:23, 153:7, 188:7
**CONSTITUTIONAL** [4]
- 162:11, 233:25,
235:8, 239:9

**CONSTRAINT** [1] -
97:10
**CONSTRAINTS** [1] -
92:14
**CONSULT** [4] -
179:10, 179:17,
189:8, 189:13
**CONSULTANT** [5] -
167:23, 168:20,
168:25, 169:12,
169:16
**CONSULTED** [1] -
179:14
**CONSUMED** [1] -
139:15
**CONSUMING** [2] -
45:6, 152:4
**CONT'D** [1] - 117:13
**CONTACT** [16] - 46:9,
47:7, 66:12, 89:15,
89:18, 89:19, 99:8,
120:1, 169:21,
169:24, 169:25,
199:15, 201:2,
202:7, 203:8
**CONTACTED** [1] -
170:2
**CONTACTING** [1] -
170:1
**CONTACTS** [1] - 83:1
**CONTEMPLATE** [1] -
181:22
**CONTENT** [6] - 41:24,
90:17, 91:4, 99:5,
184:17, 196:11
**CONTENTION** [1] -
230:24
**CONTEST** [4] -
165:24, 165:25,
166:6, 190:22
**CONTESTED** [2] -
140:20, 141:3
**CONTESTING** [2] -
63:20, 68:23
**CONTEXT** [4] - 47:8,
158:3, 171:24,
256:19
**CONTINUE** [8] -
38:10, 79:12, 79:14,
80:5, 96:25, 150:4,
151:8, 151:22
**CONTINUED** [12] -
9:24, 28:19, 33:12,
129:20, 150:7,
151:3, 151:15,
152:5, 160:1, 208:9,
224:11, 234:3
**CONTINUES** [2] -
61:10, 256:23
**CONTINUING** [2] -

79:19, 80:4
**CONTRACTOR** [1] -
167:23
**CONTRADICTION** [1]
- 109:10
**CONTROL** [1] - 18:22
**CONTROLLING** [1] -
236:6
**CONVENTION** [1] -
152:12
**CONVERSATION** [34]
- 31:17, 42:10,
90:14, 99:5, 99:20,
105:13, 106:17,
106:20, 106:21,
106:22, 109:23,
120:16, 120:19,
121:6, 121:11,
128:13, 131:24,
155:14, 172:1,
172:11, 173:16,
175:15, 175:19,
176:1, 176:2, 176:6,
177:12, 177:17,
177:18, 177:25,
178:18, 181:2,
207:1, 212:4
**CONVERSATIONS**
[13] - 17:24, 30:18,
31:8, 96:16, 102:22,
105:14, 105:15,
105:18, 106:3,
123:23, 154:19,
178:13, 181:11
**CONVEY** [1] - 213:3
**CONVICTION** [1] -
252:7
**CONVINCED** [1] -
133:20
**CONVINCING** [1] -
256:17
**COOL** [1] - 3:3
**COOPERATION** [1] -
119:3
**COORDINATE** [5] -
141:4, 171:7,
171:14, 189:4,
250:13
**COORDINATED** [1] -
148:6
**COORDINATING** [6] -
118:23, 140:19,
141:3, 145:20,
145:22, 146:2
**COORDINATION** [1] -
119:14
**COPIED** [1] - 19:9
**COPY** [2] - 94:7,
147:14
**CORE** [1] - 13:24

**CORNER** [3] - 19:13,
24:6, 232:6
**CORPORATE** [2] -
162:11, 167:13
**CORRECT** [187] -
55:15, 57:22, 60:19,
63:14, 63:16, 63:19,
63:21, 64:6, 64:10,
64:16, 64:23, 66:9,
69:9, 69:19, 69:22,
70:1, 70:6, 70:8,
70:11, 71:11, 71:12,
71:16, 71:17, 72:2,
76:12, 76:13, 76:17,
76:19, 80:12, 80:13,
80:15, 85:24, 86:1,
86:2, 86:11, 86:13,
86:17, 87:10, 88:19,
88:22, 90:4, 93:11,
95:25, 98:22, 99:3,
101:3, 102:1, 102:2,
102:3, 102:4, 102:7,
103:10, 103:20,
106:15, 106:16,
107:20, 107:21,
113:9, 118:4, 118:7,
118:9, 118:11,
118:20, 118:24,
119:3, 119:7,
119:25, 120:3,
120:5, 120:7,
120:11, 120:14,
120:15, 124:2,
124:5, 124:7,
125:17, 125:20,
125:23, 125:24,
126:18, 127:16,
134:10, 135:13,
136:1, 136:4, 136:9,
137:2, 138:7,
138:17, 138:25,
139:8, 140:12,
140:13, 140:14,
140:17, 140:18,
142:10, 142:15,
142:16, 142:19,
142:20, 143:5,
143:8, 144:12,
146:4, 146:22,
165:7, 166:13,
168:13, 169:10,
174:18, 174:22,
176:18, 176:20,
176:21, 176:22,
179:2, 179:3, 179:5,
179:23, 179:24,
180:1, 184:7,
186:19, 186:20,
188:9, 188:11,
188:12, 191:1,
191:2, 191:4,

191:25, 192:1,
192:3, 192:4,
194:20, 197:8,
198:21, 202:8,
202:9, 203:12,
203:14, 203:16,
203:17, 204:3,
204:4, 204:6, 204:7,
204:9, 204:10,
204:12, 204:13,
205:25, 206:20,
206:21, 209:7,
209:19, 209:20,
209:22, 209:23,
211:16, 211:17,
212:8, 215:17,
216:15, 216:21,
217:17, 217:18,
218:3, 218:12,
218:16, 218:21,
218:25, 219:19,
220:7, 220:10,
221:8, 221:14,
221:16, 222:9,
222:11, 223:5,
223:6, 253:5, 253:9,
259:6
**CORRECTLY** [4] -
75:6, 144:22, 194:3,
225:9
**COUDRIET** [2] -
259:14, 259:15
**COUDRIET** [1] - 117:4
**COUNCIL** [1] - 196:21
**COUNSEL** [2] - 125:5,
171:16, 177:21,
209:22
**COUNSEL** [51] - 5:8,
41:4, 41:13, 41:25,
42:4, 42:9, 45:2,
123:2, 136:17,
151:15, 154:2,
156:13, 158:16,
161:9, 161:11,
161:12, 161:13,
161:14, 167:11,
167:12, 167:16,
167:19, 167:20,
168:24, 171:17,
174:7, 174:11,
175:8, 178:15,
179:7, 179:22,
180:2, 180:6, 180:7,
180:8, 180:9,
180:15, 180:17,
180:22, 185:19,
202:21, 202:25,
224:15, 226:6,
238:13, 240:9,
240:20, 240:24,

248:18, 255:16
**COUNSEL'S** [5] -
42:12, 51:2, 82:22,
82:25, 155:6
**COUNSEL'S** [5] -
124:20, 136:20,
137:7, 137:10,
137:22
**COUNT** [3] - 7:22,
52:12, 217:12
**COUNT** [4] - 5:16,
5:17, 5:18, 154:1
**COUNTED** [1] -
210:21
**COUNTENANCE** [1] -
242:11
**COUNTIES** [6] -
131:2, 188:10,
188:14, 188:16,
188:17
**COUNTING** [4] -
52:22, 52:23,
239:24, 247:20
**COUNTRY** [7] - 14:2,
15:24, 27:19, 33:9,
33:12, 216:21,
233:20
**COUNTS** [1] - 59:17
**COUNTY** [3] - 80:11,
96:22, 188:17
**COUNTY** [68] - 5:14,
6:1, 6:12, 6:14, 7:21,
8:1, 43:8, 52:5, 52:6,
52:11, 76:15, 77:2,
77:10, 77:24, 79:22,
80:10, 81:7, 82:8,
85:4, 87:14, 89:16,
90:13, 96:17, 96:20,
96:22, 103:13,
103:17, 107:5,
108:8, 127:12,
129:4, 129:6, 129:7,
129:19, 130:23,
132:5, 134:20,
152:10, 152:12,
163:17, 164:18,
165:3, 165:4,
165:17, 166:1,
183:18, 192:14,
192:17, 192:22,
193:5, 193:18,
194:10, 194:22,
195:5, 195:9,
197:25, 198:7,
198:9, 198:15,
198:16, 198:20,
199:2, 218:7,
218:11, 231:16,
233:7, 239:24
**COUNTY'S** [2] - 91:14,

132:9
**COUPLE** [12] - 3:5,
16:2, 26:9, 30:22,
33:15, 45:15,
152:23, 218:6,
221:6, 230:8,
230:11, 247:17
**COURSE** [18] - 5:1,
14:8, 64:14, 66:7,
87:7, 88:17, 120:9,
133:3, 144:3,
146:21, 170:5,
178:12, 225:9,
225:17, 226:4,
239:3, 241:7, 244:23
**COURT** [74] - 4:17,
5:25, 6:1, 6:2, 6:3,
6:5, 6:8, 6:14, 6:17,
6:19, 7:17, 7:18, 8:1,
8:3, 9:14, 10:20,
11:19, 13:14, 16:8,
22:2, 25:23, 26:11,
33:13, 40:4, 43:8,
44:1, 47:11, 50:20,
51:6, 51:24, 67:16,
90:5, 117:4, 157:6,
157:12, 158:20,
158:23, 159:6,
162:1, 166:1,
166:17, 166:18,
166:19, 209:2,
225:10, 229:18,
231:5, 233:5,
233:14, 234:9,
234:11, 235:13,
235:14, 235:19,
235:21, 236:3,
242:3, 243:11,
243:13, 243:17,
243:21, 243:23,
244:4, 244:8, 246:5,
246:11, 247:1,
247:6, 256:24,
257:1, 257:6, 257:8,
257:17
**COURT** [25] - 58:16,
61:22, 62:2, 67:7,
89:22, 148:10,
157:15, 164:18,
166:18, 168:9,
172:18, 178:2,
185:20, 186:16,
205:9, 209:12,
210:15, 211:3,
213:10, 217:12,
224:14, 241:20,
255:15, 257:20
**COURT** [231] - 1:1,
1:23, 1:24, 3:1, 3:2,
4:21, 5:3, 5:5, 5:12,

8:14, 8:19, 8:25, 9:4,
10:9, 10:13, 10:16,
11:7, 11:9, 17:6,
22:25, 23:2, 23:15,
23:17, 23:20, 25:6,
25:8, 32:21, 32:23,
41:3, 41:9, 41:22,
42:2, 42:7, 42:14,
42:18, 42:23, 43:1,
43:10, 43:12, 43:15,
43:19, 50:10, 50:15,
51:9, 51:12, 55:5,
55:8, 55:21, 55:25,
56:3, 57:3, 59:11,
59:14, 59:25, 60:4,
60:7, 60:10, 61:6,
61:25, 62:23, 70:20,
72:20, 75:23, 78:16,
78:18, 78:20, 83:18,
84:8, 84:14, 84:16,
84:19, 84:23, 84:25,
86:23, 88:12, 92:5,
95:2, 95:16, 96:3,
114:2, 114:11,
114:15, 115:1,
115:15, 115:24,
116:9, 116:13,
116:16, 116:24,
117:6, 117:10,
117:20, 122:25,
123:4, 126:20,
126:24, 127:1,
131:21, 135:16,
141:8, 141:24,
142:2, 143:13,
147:8, 149:7,
149:14, 149:18,
153:15, 155:4,
155:20, 155:23,
156:1, 156:4, 156:7,
156:12, 156:17,
156:21, 157:11,
158:23, 159:3,
159:5, 159:9,
159:12, 159:17,
159:20, 159:25,
160:3, 160:11,
160:13, 160:19,
160:24, 161:9,
161:19, 161:22,
164:8, 164:22,
164:24, 177:21,
178:6, 178:9,
178:19, 178:24,
181:6, 181:17,
182:4, 182:12,
182:19, 184:18,
185:3, 185:5, 185:9,
185:14, 185:18,
185:25, 186:4,
186:24, 187:3,

187:11, 187:13,
187:15, 203:20,
203:23, 204:20,
204:24, 205:2,
205:5, 205:9,
205:13, 205:16,
205:19, 206:3,
206:7, 206:9, 207:7,
209:4, 209:9,
209:11, 214:15,
215:1, 217:15,
222:2, 222:21,
222:23, 223:16,
223:18, 223:21,
223:23, 224:1,
224:4, 224:6,
224:10, 224:13,
224:25, 225:3,
225:5, 226:5, 235:4,
236:13, 236:18,
237:17, 237:22,
237:24, 238:13,
238:20, 240:8,
240:13, 240:17,
243:18, 247:15,
251:10, 251:12,
251:16, 251:18,
252:3, 252:17,
252:24, 253:3,
253:7, 253:10,
253:24, 254:17,
254:22, 255:5,
255:8, 255:10,
257:3, 257:6,
257:24, 259:3,
259:12, 259:16
**COURT'S** [5] - 55:19,
182:15, 209:3,
225:8, 257:8
**COURTEOUS** [4] -
4:1, 26:4, 26:5,
74:23
**COURTHOUSE** [1] -
152:10
**COURTNEY** [1] -
168:6
**COURTROOM** [4] -
160:25, 161:5,
186:10, 255:12
**COURTROOM** [6] -
3:6, 3:17, 3:19, 3:20,
3:24, 4:4
**COURTROOM'S** [1] -
222:6
**COURTROOMS** [1] -
240:11
**COURTS** [4] - 157:21,
157:25, 232:25,
254:4
**COVID** [29] - 13:3,

15:13, 17:13, 18:5,
23:7, 28:21, 29:6,
29:12, 30:25, 48:19,
48:20, 48:22, 49:3,
67:17, 69:8, 73:10,
74:8, 74:13, 86:11,
86:13, 87:9, 118:20,
118:24, 125:16,
125:20, 154:13,
203:23, 248:9
**COX** [2] - 234:20,
236:16
**CRC** [2] - 1:23, 259:11
**CREATED** [1] - 35:16
**CREDIBILITY** [2] -
50:20, 134:20
**CREDIBLE** [5] -
192:18, 198:12,
198:13, 221:12,
227:11
**CREDIBLY** [1] -
231:13
**CREDIT** [2] - 96:8,
256:6
**CREEK** [1] - 196:20
**CRIMINAL** [8] - 6:22,
157:19, 229:1,
237:22, 238:1,
242:10, 248:15,
252:9
**CRISES** [1] - 18:5
**CRISIS** [1] - 17:12
**CRITICAL** [4] - 82:4,
225:12, 227:24,
227:25
**CRITICALLY** [1] - 34:3
**CROSS** [2] - 5:9,
186:18
**CROSS** [137] - 1:15,
2:5, 2:8, 2:11, 10:11,
10:15, 11:8, 41:16,
41:24, 42:5, 43:18,
55:9, 55:10, 55:11,
56:1, 56:4, 56:5,
57:5, 57:6, 60:3,
60:12, 60:13, 61:15,
62:3, 62:25, 63:1,
71:2, 72:22, 72:23,
75:24, 75:25, 78:22,
83:21, 83:22, 85:1,
85:2, 87:6, 88:14,
88:16, 92:18, 95:10,
95:17, 95:18, 96:4,
114:3, 114:9,
114:14, 114:17,
115:11, 115:13,
115:16, 115:23,
116:1, 116:11,
116:14, 117:9,
117:13, 117:19,

117:21, 123:6, 123:7, 126:21, 126:22, 127:2, 127:3, 131:23, 135:19, 135:20, 141:7, 141:9, 141:11, 141:22, 142:4, 142:5, 143:11, 143:14, 143:15, 147:6, 147:14, 149:8, 149:16, 153:13, 155:22, 156:19, 156:25, 158:8, 159:8, 159:14, 159:19, 160:9, 161:23, 161:25, 164:7, 164:9, 164:20, 165:1, 178:22, 178:25, 181:9, 181:10, 181:14, 181:21, 182:25, 183:9, 185:4, 185:10, 185:16, 185:23, 186:13, 187:12, 187:17, 187:18, 204:1, 205:23, 206:8, 206:10, 207:4, 207:8, 207:9, 209:1, 209:7, 209:13, 210:13, 210:16, 211:2, 211:4, 213:9, 213:11, 214:12, 214:22, 215:4, 222:24, 223:1, 223:15, 223:20, 224:2, 258:3

CROSS [9] - 36:15, 55:22, 95:14, 116:13, 157:3, 157:7, 158:18, 223:3, 230:7

CROSS-EXAMINATION [3] - 55:10, 182:25, 215:4

CROSS-EXAMINATION [5] - 55:22, 157:3, 157:7, 158:18, 223:3

CROSS-EXAMINATION.......... [1] - 2:5

CROSS-EXAMINATION.......... 183 [1] - 2:8

CROSS-EXAMINATION.......

................215 [1] - 2:11

CROSSED [1] - 205:7

CRR [4] - 1:23, 117:4, 259:11, 259:15

CURRENT [3] - 187:20, 233:14, 233:22

CURVE [1] - 240:1

CUSHMAN [1] - 51:2

CUT [1] - 60:8

CYBER [4] - 84:6, 215:21, 215:25, 239:20

CYBERSECURITY [1] - 154:3

CYCLE [1] - 188:5

## D

D'ANYA [1] - 1:16

DA [2] - 151:14, 233:19

DAILY [6] - 12:7, 14:10, 14:15, 15:23, 22:12, 30:6

DATA [8] - 201:17, 213:15, 213:18, 213:22, 214:8, 214:9, 214:10, 220:14

DATE [20] - 38:12, 57:13, 57:14, 58:20, 67:14, 68:21, 68:22, 79:13, 79:17, 81:3, 142:14, 144:1, 144:3, 150:21, 174:13, 190:12, 190:14, 191:16, 191:22, 257:25

DAUGHTER'S [1] - 15:3

DAVID [6] - 165:13, 166:3, 167:12, 176:19, 176:20, 184:5

DAYS [6] - 15:6, 28:11, 30:8, 31:6, 128:5, 148:2

DAYSHA [1] - 5:11

DAYSHA [1] - 1:16

DC [2] - 150:24, 250:24

DEAD [9] - 193:10, 193:16, 212:3, 212:9, 220:21, 221:2, 222:12, 222:14, 222:16

DEADLINE [1] - 143:25

DEAL [10] - 23:24, 35:18, 36:9, 46:1, 49:22, 110:11, 110:12, 128:2, 203:21, 203:23

DEALING [7] - 7:21, 8:21, 31:2, 33:10, 46:17, 128:4, 236:23

DEALS [3] - 84:14, 178:13, 246:2

DEALT [7] - 11:22, 16:18, 20:4, 36:22, 46:5, 78:14, 99:14, 111:2, 128:4

DECEMBER [47] - 36:8, 38:16, 76:14, 78:3, 79:23, 81:1, 81:5, 87:13, 89:6, 90:8, 91:13, 106:14, 120:12, 130:17, 130:18, 130:21, 140:10, 142:13, 142:15, 142:24, 144:18, 152:9, 162:17, 162:25, 163:4, 163:8, 163:16, 165:22, 166:13, 174:14, 174:19, 190:12, 190:22, 190:25, 193:6, 194:1, 195:5, 195:20, 195:23, 196:1, 198:5, 199:5, 199:20, 203:1, 218:4

DECIDE [1] - 237:6

DECIDED [2] - 6:6, 202:10

DECISION [6] - 26:18, 26:22, 27:12, 234:19, 235:12, 236:17

DECLARATION [2] - 157:13, 157:14

DECLARATIONS [4] - 156:11, 157:2, 158:1, 158:15

DECLARED [1] - 251:8

DECLINED [1] - 203:14

DECORUM [1] - 3:25

DEEM [2] - 42:3, 93:23

DEEPER [1] - 35:2

DEFAULT [1] - 96:7

DEFEAT [3] - 225:19, 225:24, 237:12

DEFENDANT [2] - 1:9, 1:18

DEFENDANT [9] - 163:1, 175:7, 195:8,

242:10, 243:20, 246:11, 246:19, 249:23, 253:19

DEFENDANT [2] - 159:12, 198:6

DEFENDANTS [1] - 255:10

DEFENSE [14] - 6:25, 7:8, 7:10, 20:5, 20:6, 43:6, 224:15, 224:23, 225:23, 226:15, 248:25, 251:6, 252:16, 256:14

DEFENSE [7] - 29:2, 30:24, 42:20, 43:6, 43:20, 68:15, 156:14

DEFENSES [1] - 7:7

DEFERENCE [1] - 147:24

DEFERENTIAL [1] - 53:4

DEFINE [6] - 183:10, 228:22, 229:1, 229:16, 243:12

DEFINED [3] - 244:16, 245:17, 254:5

DEFINING [1] - 106:1

DEFINITELY [2] - 255:17, 256:2

DEFINITION [2] - 135:17, 239:10

DEFINITIVE [1] - 93:2

DEGREE [2] - 46:21, 135:24

DELAYING [1] - 50:5

DELEGATION [3] - 48:15, 69:9, 72:2

DELINEATED [1] - 181:24

DELIVER [1] - 223:13

DEMAND [2] - 19:17, 27:15

DEMANDS [1] - 33:6

DEMOCRAT [1] - 24:22

DEMONSTRATE [4] - 242:8, 242:11, 245:4, 245:9

DEMONSTRATED [1] - 242:15

DEMONSTRATION [1] - 248:11

DEMONSTRATOR [1] - 239:12

DENIED [1] - 6:5

DENOMINATED [2] - 43:24, 46:19

DENSON [1] - 228:21

DEPARTMENT [12] -

59:23, 64:18, 82:2, 84:4, 124:23, 125:1, 171:9, 171:10, 216:4, 230:10, 239:19, 239:21

DEPENDED [1] - 146:22

DEPLOYED [1] - 154:17

DEPUTY [3] - 22:9, 31:14, 202:12

DEPUTY [5] - 5:10, 5:11, 19:14, 21:4, 200:20

DEPUTY [5] - 4:17, 160:25, 161:5, 186:10, 255:12

DERIVED [1] - 177:18

DESCRIBE [4] - 9:20, 163:19, 177:2, 187:25

DESCRIBED [23] - 44:1, 46:21, 47:22, 48:5, 49:14, 51:21, 53:18, 54:1, 54:20, 57:15, 66:13, 75:10, 81:21, 82:12, 88:1, 119:12, 162:21, 163:18, 163:24, 167:18, 175:17, 213:2, 245:7

DESCRIBING [2] - 85:20, 201:18

DESCRIPTION [2] - 13:13, 16:2

DESIGNEE [1] - 15:21

DESIRED [1] - 107:13

DESK [1] - 44:17

DESPITE [8] - 198:18, 230:23, 244:15, 245:23, 245:25, 249:12, 250:16, 251:9

DETAIL [8] - 22:23, 77:3, 162:8, 197:13, 218:8, 219:9, 227:23, 231:3

DETAILED [1] - 242:9

DETAILS [3] - 105:17, 122:5, 199:21

DETENTION [1] - 182:10

DETERMINATION [5] - 80:23, 135:1, 150:2, 244:7, 256:24

DETERMINATIONS [1] - 225:10

DETERMINE [4] - 132:13, 241:13, 241:16, 251:1

**DETERMINED** [2] - 6:4, 158:1

**DETEST** [1] - 235:1

**DHS** [1] - 154:3

**DIFFERENCE** [1] - 50:16

**DIFFERENCES** [1] - 138:19

**DIFFERENT** [28] - 13:5, 20:7, 20:12, 29:17, 34:18, 45:16, 56:16, 83:23, 98:13, 103:8, 112:7, 118:4, 126:12, 129:22, 152:8, 157:21, 159:2, 162:14, 166:22, 170:8, 173:14, 179:16, 189:12, 226:1, 230:12, 243:6, 255:22, 257:10

**DIFFERENTIATION** [1] - 113:8

**DIFFERENTLY** [2] - 91:3, 218:14

**DIFFICULT** [3] - 11:4, 16:13, 212:19

**DILIGENTLY** [1] - 208:6

**DINGED** [5] - 40:1, 136:8, 136:11, 136:14, 153:9

**DINING** [2] - 37:24, 37:25

**DINNER** [1] - 121:25

**DIRECT** [6] - 2:4, 2:8, 2:11, 9:11, 161:24, 186:12

**DIRECT** [32] - 27:24, 28:4, 31:4, 35:7, 43:3, 43:9, 49:10, 54:14, 62:7, 65:16, 68:16, 69:6, 75:4, 76:4, 78:6, 86:4, 88:25, 92:19, 93:24, 95:12, 97:15, 119:18, 152:19, 162:16, 172:7, 175:2, 175:12, 190:1, 200:15, 230:6, 251:19

**DIRECTED** [5] - 77:15, 77:18, 152:20, 244:19, 250:10

**DIRECTING** [8] - 34:23, 43:24, 46:18, 47:20, 51:15, 53:12, 53:22, 54:5

**DIRECTION** [21] - 32:12, 70:13, 70:15,

70:22, 71:4, 102:22, 103:1, 104:6, 110:12, 110:17, 111:13, 111:20, 111:24, 112:9, 112:17, 128:9, 171:1, 173:13, 236:5, 255:21

**DIRECTIONS** [1] - 20:7

**DIRECTLY** [9] - 31:2, 35:21, 100:7, 108:1, 109:12, 123:23, 128:1, 178:14, 196:5

**DIRECTOR** [2] - 22:9, 22:10

**DISAGREE** [3] - 62:23, 128:22, 237:6

**DISAGREED** [2] - 79:9, 222:13

**DISASTER** [2] - 118:16, 119:8

**DISBELIEVE** [1] - 251:23

**DISCERN** [1] - 73:6

**DISCLAIMING** [1] - 241:4

**DISCOVER** [1] - 221:6

**DISCOVERED** [3] - 220:21, 220:22, 222:16

**DISCOVERIES** [2] - 220:24, 221:1

**DISCOVERY** [1] - 181:22

**DISCRETION** [5] - 18:18, 152:21, 237:1, 237:2, 237:5

**DISCRETIONARY** [7] - 33:18, 236:8, 236:10, 236:24, 244:7, 250:4, 250:16

**DISCUSS** [5] - 116:19, 116:21, 116:25, 157:9, 226:8

**DISCUSSED** [5] - 111:19, 113:11, 219:6, 243:2, 248:9

**DISCUSSING** [4] - 38:10, 39:2, 64:5, 88:10

**DISCUSSION** [6] - 72:5, 88:13, 133:19, 144:12, 145:14, 235:19

**DISCUSSIONS** [6] - 16:19, 72:7, 152:24, 154:7, 154:22, 154:25

**DISINGENUOUS** [1] -

113:18

**DISMISS** [1] - 246:23

**DISPATCHED** [1] - 197:12

**DISPERSED** [1] - 14:1

**DISPERSING** [1] - 119:6

**DISPOSED** [1] - 78:14

**DISPUTE** [5] - 65:25, 68:7, 72:24, 73:1, 226:11, 226:18, 252:13

**DISPUTES** [1] - 7:12

**DISRUPTING** [1] - 50:5

**DISRUPTION** [1] - 208:4

**DISTANCE** [1] - 49:6

**DISTINCT** [1] - 255:19

**DISTINCTION** [6] - 18:17, 18:20, 136:25, 138:13, 242:22, 243:16

**DISTINGUISH** [1] - 94:4

**DISTRICT** [12] - 148:23, 149:5, 149:15, 157:21, 239:1, 239:2, 241:20, 244:3, 250:19, 257:15, 257:16, 257:18

**DISTRICT** [6] - 1:1, 1:1, 1:11, 1:24, 259:3, 259:4

**DISTRICT** [14] - 5:10, 5:11, 6:2, 6:12, 6:17, 7:11, 9:23, 166:17, 166:18, 183:19, 213:24, 233:7

**DIVISION** [1] - 1:2

**DIVORCED** [1] - 231:25

**DIXIT** [2] - 256:10, 256:20

**DO-OUTS** [2] - 58:11, 58:17

**DOCKET** [1] - 1:5

**DOCTOR** [1] - 111:5

**DOCTORS** [1] - 18:10

**DOCUMENT** [2] - 10:18, 142:6

**DOCUMENTS** [4] - 94:11, 94:17, 169:14, 214:20

**DOJ** [7] - 36:24, 59:24, 80:6, 82:2, 106:11, 209:18, 223:11

**DOLLARS** [3] - 24:17, 93:14, 93:16

**DOMAIN** [2] - 143:4, 143:7

**DOMINATE** [1] - 23:8

**DON'T..** [1] - 137:4

**DONALD** [24] - 5:6, 7:3, 7:19, 10:23, 163:16, 163:20, 164:2, 164:3, 165:12, 165:13, 165:15, 166:2, 166:3, 166:5, 166:23, 167:5, 170:10, 171:14, 190:6, 190:9, 199:4, 240:3, 240:14, 251:7

**DONALD** [1] - 1:16

**DONALDTRUMP. COM** [1] - 143:5

**DONE** [39] - 11:25, 12:9, 22:13, 22:15, 28:15, 28:25, 29:3, 29:13, 29:15, 52:17, 52:24, 70:23, 70:25, 77:12, 77:23, 128:7, 129:8, 135:5, 150:9, 150:18, 151:7, 152:15, 161:20, 192:19, 206:5, 214:4, 218:13, 232:20, 236:7, 237:14, 237:19, 246:12, 251:4, 251:5, 251:7, 253:22, 255:5

**DOOR** [5] - 28:21, 69:12, 160:3, 160:5, 218:19

**DOS** [1] - 12:9

**DOUBT** [5] - 34:6, 79:16, 83:10, 115:5, 141:20

**DOWN** [34] - 8:17, 12:10, 12:11, 14:6, 17:1, 21:9, 24:7, 48:14, 48:23, 49:3, 62:2, 67:17, 73:9, 74:7, 86:15, 116:18, 122:13, 123:18, 140:9, 148:25, 151:23, 155:24, 168:1, 172:22, 173:17, 185:20, 185:21, 198:2, 239:25, 240:1, 255:7, 256:10, 256:23, 259:6

**DOZEN** [1] - 14:14

**DRAFT** [2] - 174:9, 174:16

**DRAFTS** [1] - 29:20

**DRAIN** [1] - 92:13

**DRAWING** [1] - 129:11

**DRIVE** [2] - 12:25, 206:19

**DRIVER** [1] - 234:11

**DRUG** [2] - 18:10, 115:4

**DUE** [2] - 158:24, 229:17

**DULY** [3] - 9:9, 161:3, 186:8

**DURATION** [1] - 124:12

**DURING** [18] - 14:11, 14:13, 18:5, 45:24, 46:6, 67:18, 72:24, 79:18, 118:24, 132:2, 133:3, 133:19, 135:25, 137:8, 139:20, 143:8, 154:13, 163:11

**DUTIES** [32] - 7:4, 27:18, 35:23, 87:12, 111:25, 112:18, 129:17, 150:17, 154:3, 227:6, 229:7, 229:9, 231:6, 232:5, 235:18, 239:14, 239:17, 240:6, 241:2, 241:12, 241:15, 243:12, 243:15, 244:10, 245:17, 247:11, 248:16, 248:24, 249:7, 249:12, 253:22

**DUTY** [7] - 110:18, 225:24, 228:8, 235:16, 236:8, 236:9, 241:24

## E

**E-MAIL** [24] - 13:21, 27:3, 27:4, 27:5, 27:6, 93:25, 94:1, 94:5, 94:7, 94:9, 94:10, 95:3, 141:17, 142:9, 143:2, 143:4, 143:18, 143:20, 144:11, 146:4, 170:23, 242:14, 243:5, 245:8

**E-MAIL'S** [1] - 242:17

**E-MAILS** [5] - 95:5, 95:8, 142:12, 142:17, 145:5

**EAR** [3] - 17:3, 35:6, 37:3

**EARLY** [8] - 38:16,

41:6, 46:16, 72:1,
122:14, 130:17,
130:18, 219:18
**EASIER** [3] - 61:23,
67:7, 128:11
**EASILY** [1] - 229:12
**EASY** [2] - 66:3, 227:8
**EDWARD** [1] - 254:25
**EFFECT** [5] - 41:1,
196:12, 196:22,
198:2, 208:12
**EFFECTS** [1] - 40:15
**EFFECTUATE** [1] -
231:11
**EFFORT** [7] - 175:12,
180:5, 180:14,
180:16, 196:2,
213:20, 245:12
**EFFORTS** [7] - 141:3,
141:5, 167:22,
170:12, 174:7,
199:15, 202:7
**EGO** [1] - 239:8
**EIGHT** [2] - 5:16, 5:19
**EISENHOWER** [3] -
13:21, 13:25, 45:20
**EITHER** [22] - 8:4,
13:20, 18:18, 18:19,
19:25, 26:11, 35:24,
45:19, 45:20, 89:18,
102:12, 128:22,
167:13, 182:17,
195:14, 197:3,
199:3, 199:16,
238:12, 243:25,
245:12
**ELECT** [1] - 29:25
**ELECTED** [4] - 12:15,
21:23, 46:6, 196:19
**ELECTION** [2] - 28:5,
221:3
**ELECTION** [144] -
25:24, 27:7, 27:15,
28:7, 32:7, 34:24,
34:25, 35:12, 36:3,
37:10, 37:15, 38:3,
38:4, 38:7, 38:18,
56:22, 57:22, 58:3,
59:8, 59:18, 63:13,
63:17, 63:20, 63:23,
64:9, 64:21, 65:7,
66:4, 66:9, 78:10,
80:3, 82:3, 83:4,
85:21, 86:5, 88:18,
88:22, 88:24,
105:17, 110:6,
120:10, 121:16,
121:17, 121:18,
122:15, 123:17,
127:8, 133:21,

134:5, 139:20,
165:17, 165:22,
165:23, 165:25,
166:6, 167:2, 188:2,
188:3, 188:19,
189:3, 189:9,
189:14, 189:19,
190:3, 190:4,
190:18, 190:22,
190:25, 191:3,
191:12, 191:20,
192:8, 192:9,
192:24, 193:1,
193:7, 193:21,
196:4, 197:17,
197:18, 198:10,
201:9, 203:21,
203:25, 204:2,
204:5, 204:8,
204:22, 204:24,
205:3, 205:5,
205:20, 208:3,
210:11, 210:12,
211:8, 211:10,
211:11, 212:2,
212:25, 215:8,
215:9, 215:11,
215:12, 215:14,
215:18, 215:20,
216:1, 216:7, 216:8,
216:14, 216:17,
216:20, 216:25,
217:8, 217:17,
217:21, 218:23,
220:18, 220:20,
221:9, 221:13,
221:21, 221:22,
223:12, 230:16,
230:18, 230:21,
230:25, 231:1,
231:8, 231:11,
232:13, 245:2,
245:13, 246:16,
248:16, 249:19,
251:1, 251:2, 251:8,
255:23
**ELECTION-
RELATED** [1] - 167:2
**ELECTIONS** [33] -
59:19, 59:22, 60:18,
62:12, 63:4, 64:15,
82:1, 83:9, 84:1,
84:2, 84:10, 84:20,
85:15, 85:17, 110:3,
110:10, 153:22,
153:23, 154:9,
154:17, 188:5,
188:7, 188:11,
188:15, 188:21,
189:3, 189:23,
216:21, 216:23,

221:24, 231:2
**ELECTOR** [2] -
165:15, 166:5
**ELECTOR** [1] - 148:9
**ELECTORAL** [2] -
84:20, 154:1
**ELECTORAL** [1] -
247:20
**ELECTORS** [7] -
140:20, 145:20,
145:22, 148:6,
148:11, 242:13,
250:13
**ELECTORS'S** [1] -
140:24
**ELEGANT** [1] - 232:3
**ELEMENT** [1] - 232:8
**ELEVATED** [1] - 24:20
**ELEVENTH** [9] - 9:23,
226:21, 228:6,
228:9, 228:20,
233:1, 234:18,
253:16
**ELIMINATE** [2] -
35:11, 230:25
**ELLIS** [3] - 70:17,
71:10
**ELMO** [1] - 9:1
**ELSEWHERE** [1] -
31:3
**EMBODIED** [1] -
239:10
**EMBODIMENT** [1] -
241:1
**EMERGENCY** [2] -
119:7, 137:21
**EMILY** [1] - 4:25
**EMILY** [1] - 1:21
**EMINENT** [1] - 235:23
**EMPHASIZED** [1] -
238:14
**EMPLOYED** [1] -
251:15
**EMPLOYEE** [14] -
70:6, 71:11, 106:9,
106:10, 106:13,
113:9, 135:25,
136:3, 138:21,
139:19, 198:6,
244:1, 244:22,
244:25
**EMPLOYEES** [5] -
71:24, 74:15,
113:11, 135:24,
138:20
**EMPLOYMENT** [5] -
56:13, 69:18,
142:25, 162:11,
187:20
**EMPOWERED** [1] -

229:18
**ENACTED** [1] - 249:21
**ENCOMPASSES** [1] -
236:10
**ENCOURAGE** [1] -
158:20
**END** [13] - 11:17, 40:7,
42:9, 69:22, 132:16,
150:14, 151:12,
176:2, 203:5, 226:5,
245:20, 250:19,
254:11
**ENDEAVOR** [1] -
222:10
**ENDED** [9] - 14:25,
16:12, 17:19, 17:25,
119:21, 121:5,
124:1, 124:7, 203:19
**ENDING** [1] - 124:4
**ENDS** [2] - 241:3,
245:18
**ENERGY** [1] - 19:5
**ENERGY** [1] - 89:17
**ENFORCE** [3] -
247:12, 251:4,
254:13
**ENFORCEMENT** [8] -
183:23, 194:19,
221:5, 221:18,
228:25, 233:8,
246:13, 247:8
**ENFORCING** [1] -
248:5
**ENGAGE** [3] - 5:22,
244:12, 245:13
**ENGAGED** [9] - 43:25,
46:20, 47:21, 48:4,
49:14, 51:20, 53:17,
53:25, 54:19
**ENGAGING** [3] -
26:15, 246:14, 247:5
**ENGINEER** [1] -
205:12
**ENGLERT** [1] - 1:20
**ENGLERT** [1] - 5:1
**ENJOYED** [1] - 235:7
**ENORMOUS** [2] -
252:10, 252:11
**ENTAIL** [1] - 188:4
**ENTAILED** [1] -
217:10
**ENTERED** [1] - 6:8
**ENTERPRISE** [3] -
252:9, 252:12, 253:9
**ENTIRE** [6] - 3:7, 3:8,
3:10, 124:12,
234:11, 234:12
**ENTIRELY** [1] - 241:5
**ENTIRETY** [5] - 124:9,
124:12, 176:10,

176:15, 177:12
**ENTITIES** [4] - 80:17,
80:19, 165:23,
166:20
**ENTITLE** [1] - 214:23
**ENTITLED** [3] - 14:22,
15:6, 256:23
**ENTITLEMENT** [1] -
237:12
**ENTITY** [2] - 92:13,
163:24
**ENTRY** [6] - 164:17,
165:3, 165:10,
166:13, 167:17,
174:14
**ENVELOPE** [1] -
206:18
**EOP** [3] - 13:20,
13:21, 45:18
**EQUAL** [3] - 34:20,
236:8
**EQUALLY** [1] - 246:19
**EQUIVALENCE** [1] -
158:13
**ERB** [1] - 1:21
**ERIC** [2] - 51:1,
171:20
**ERROR** [1] - 256:5
**ESCORT** [1] - 73:11
**ESPECIALLY** [2] -
178:14, 242:7
**ESQ** [12] - 1:15, 1:15,
1:16, 1:16, 1:17,
1:17, 1:19, 1:20,
1:20, 1:21, 1:21,
1:22
**ESSENCE** [1] - 256:12
**ESTABLISHES** [1] -
227:11
**ESTABLISHMENT** [1]
- 21:17
**ESTATE** [1] - 162:11
**ET** [1] - 81:4
**ETHICAL** [1] - 180:7
**ETHICS** [3] - 40:16,
136:17
**EVENING** [2] - 44:8,
58:24
**EVENT** [2] - 41:4,
76:21
**EVENTS** [2] - 201:11,
208:11
**EVENTUALLY** [1] -
240:25
**EVERETT** [1] - 254:25
**EVERYWHERE** [1] -
26:3
**EVIDENCE** [22] - 7:18,
8:6, 8:7, 8:8, 8:13,
11:11, 43:21, 79:24,

141:23, 158:21, 159:11, 159:13, 164:21, 182:17, 192:19, 207:5, 231:9, 231:21, 245:4, 252:10, 252:11, 253:1

**EVIDENCE** [1] - 157:18

**EVIDENTIARY** [8] - 6:6, 6:9, 157:15, 157:22, 226:17, 226:19, 226:20, 227:9

**EVIDENTIARY** [1] - 1:10

**EX** [1] - 69:16

**EX-NEW** [1] - 69:16

**EXACT** [3] - 105:22, 151:13, 217:11

**EXACTLY** [12] - 92:7, 98:7, 100:14, 114:24, 132:7, 149:23, 152:11, 190:14, 212:21, 228:24, 242:15, 246:9

**EXAMINATION** [10] - 55:22, 75:5, 78:6, 86:4, 93:25, 157:3, 157:7, 157:19, 158:18, 223:3

**EXAMINATION** [8] - 9:11, 55:10, 147:10, 161:24, 182:25, 186:12, 215:4, 222:25

**EXAMINATION.......... ............** [1] - 2:4

**EXAMINATION......... .............** [1] - 2:5

**EXAMINATION.......... ...............183** [1] - 2:8

**EXAMINATION.......... ...............215** [1] - 2:11

**EXAMINATION.......... ...............161** [1] - 2:8

**EXAMINATION.......... ...............186** [1] - 2:11

**EXAMINATION.......... ............147** [1] - 2:5

**EXAMINATION.......... ...............222** [1] - 2:12

**EXAMPLE** [14] - 25:21, 26:7, 31:18, 109:2, 112:2, 112:12, 112:13, 112:14, 113:24, 113:25, 119:12,

119:16, 139:23, 237:25

**EXAMPLES** [3] - 28:16, 118:13, 118:21

**EXCEPTION** [4] - 229:9, 243:21, 244:6, 246:3

**EXCEPTIONAL** [1] - 253:23

**EXCEPTIONS** [1] - 243:24

**EXCERPT** [1] - 209:14

**EXCERPTS** [3] - 158:10, 209:2, 209:6

**EXCHANGE** [2] - 142:9, 146:4

**EXCLUSION** [1] - 82:24

**EXCUSE** [7] - 17:5, 23:15, 29:4, 67:6, 70:19, 102:15, 182:4

**EXCUSED** [6] - 156:3, 157:9, 185:9, 185:12, 223:21, 223:25

**EXECUTE** [1] - 237:7

**EXECUTED** [1] - 153:11

**EXECUTION** [2] - 39:13, 232:5

**EXECUTIVE** [25] - 13:20, 16:19, 16:20, 19:14, 21:4, 21:14, 27:12, 29:14, 29:16, 47:5, 62:13, 81:11, 81:24, 150:17, 189:11, 189:13, 215:19, 239:10, 244:1, 244:22, 244:25, 247:24, 248:1, 249:15, 251:7

**EXECUTIVE** [8] - 13:15, 13:16, 14:4, 45:13, 45:18, 49:21, 152:25, 231:24

**EXECUTIVES** [2] - 18:6, 21:15

**EXERCISE** [6] - 231:6, 236:10, 237:5, 238:8, 250:3, 250:15

**EXHIBIT** [21] - 11:6, 11:10, 42:20, 43:6, 43:20, 141:9, 141:12, 141:14, 141:23, 144:5, 144:9, 145:8, 164:10, 164:14, 164:16, 164:21, 206:12, 206:18,

206:25, 207:5, 209:2

**EXHIBIT** [9] - 10:7, 10:10, 43:4, 117:15, 143:2, 143:24, 147:13, 147:16, 147:19

**EXHIBITS** [1] - 156:15

**EXHORT** [1] - 248:1

**EXHORTING** [1] - 247:23

**EXISTENCE** [3] - 225:18, 234:2, 242:18

**EXPECT** [2] - 47:16, 229:24

**EXPECTED** [1] - 85:13

**EXPEDITE** [1] - 97:8

**EXPEDITED** [3] - 31:6, 95:21, 96:11

**EXPERIENCE** [6] - 101:12, 112:16, 207:10, 207:18, 223:8, 223:13

**EXPERIENCED** [1] - 117:1

**EXPERT** [1] - 114:8

**EXPLAIN** [8] - 13:14, 31:19, 51:24, 104:5, 155:7, 162:9, 192:16, 246:20

**EXPLAINED** [4] - 218:8, 227:20, 227:22, 248:16

**EXPLANATION** [1] - 232:3

**EXPLICITLY** [1] - 249:7

**EXPRESS** [1] - 218:10

**EXPRESSED** [1] - 127:6

**EXPRESSING** [1] - 107:12

**EXPRESSION** [1] - 34:6

**EXPRESSLY** [1] - 254:16

**EXTENDED** [1] - 217:21

**EXTENSION** [1] - 233:18

**EXTENT** [14] - 43:25, 46:20, 47:21, 48:4, 49:14, 51:20, 53:17, 53:25, 54:19, 56:12, 108:3, 108:25, 182:7, 207:14

**EXTRAORDINARY** [2] - 207:14, 207:19

**EXTRAPOLATE** [2] - 197:21, 197:22

**EXTREMELY** [3] - 40:23, 136:21, 226:22

# F

**F-U-C-H-S** [1] - 89:23

**F.2D** [1] - 236:16

**FACE** [2] - 197:14

**FACE-TO-FACE** [1] - 197:14

**FACILITATE** [3] - 97:8, 99:10, 110:18

**FACILITATED** [1] - 203:6

**FACILITATING** [1] - 119:3

**FACILITY** [1] - 234:6

**FACING** [1] - 6:22

**FACT** [23] - 35:11, 53:5, 56:19, 57:18, 79:4, 87:7, 88:21, 94:21, 109:5, 133:21, 136:6, 143:4, 218:13, 220:1, 220:11, 227:1, 230:11, 236:4, 244:15, 245:23, 245:25, 250:16, 251:9

**FACT-FINDING** [1] - 53:5

**FACTS** [2] - 213:1, 225:25

**FACTUAL** [1] - 149:12

**FAILURE** [1] - 244:19

**FAIR** [16] - 59:7, 59:18, 64:12, 82:3, 84:23, 84:25, 86:10, 110:3, 132:14, 135:19, 151:9, 164:15, 210:20, 218:17, 220:3, 221:23

**FAIRLY** [2] - 126:13, 213:12

**FAITH** [1] - 248:19

**FAITHFULLY** [1] - 153:11

**FAKE** [2] - 242:13, 250:13

**FALL** [2] - 219:2, 253:21

**FALLS** [1] - 182:12

**FAMILIAR** [11] - 41:18, 42:22, 66:6, 75:18, 153:10, 190:12, 190:14, 192:14, 215:9, 217:13, 249:3

**FANI** [2] - 6:11, 7:12

**FAPR** [2] - 1:23, 259:11

**FAR** [8] - 147:24, 200:2, 218:10, 218:14, 219:15, 232:14, 248:7, 253:15

**FARM** [2] - 214:3, 216:10

**FASHION** [2] - 170:25, 220:5

**FAST** [1] - 257:6

**FAVOR** [1] - 227:1

**FBI** [4] - 214:2, 216:9, 223:14

**FDA** [1] - 23:9

**FEC** [2] - 122:6, 122:7

**FEDERAL** [197] - 5:22, 6:25, 7:2, 13:11, 21:17, 24:1, 31:3, 39:7, 45:16, 58:1, 59:4, 59:6, 59:20, 59:21, 59:22, 60:21, 60:23, 61:7, 61:10, 61:13, 61:18, 62:5, 62:18, 62:19, 64:14, 64:22, 65:1, 65:2, 65:4, 65:5, 68:8, 69:18, 70:6, 71:11, 71:15, 71:24, 73:24, 74:6, 74:9, 74:13, 74:17, 81:6, 81:19, 81:23, 81:25, 83:3, 83:7, 83:8, 83:9, 83:12, 83:25, 84:2, 84:3, 84:7, 85:8, 85:16, 86:13, 93:7, 93:10, 93:12, 94:8, 106:9, 106:10, 106:13, 110:8, 110:9, 113:9, 113:11, 115:5, 115:6, 116:6, 118:16, 118:23, 119:2, 119:6, 125:19, 135:24, 135:25, 136:3, 138:20, 138:21, 139:19, 142:24, 146:21, 151:23, 153:22, 154:4, 154:5, 154:16, 157:15, 166:22, 167:1, 172:3, 172:4, 172:18, 178:2, 181:25, 183:23, 188:20, 188:23, 189:4, 189:7, 195:4, 204:2, 204:5, 213:21, 215:8,

215:9, 215:11, 215:16, 215:18, 215:22, 216:9, 216:13, 216:17, 221:17, 221:19, 221:20, 223:4, 223:7, 223:11, 224:14, 224:15, 225:21, 225:23, 226:11, 226:14, 226:15, 227:2, 228:23, 229:7, 230:1, 230:25, 231:1, 234:5, 234:6, 235:9, 235:14, 235:17, 237:13, 238:15, 238:23, 238:24, 239:5, 239:7, 239:8, 239:17, 240:2, 240:25, 241:1, 241:8, 241:21, 241:23, 242:11, 243:24, 244:5, 244:11, 244:13, 244:21, 245:11, 245:17, 246:4, 246:6, 246:12, 246:13, 246:14, 247:8, 247:9, 247:10, 247:12, 248:5, 248:6, 248:25, 249:17, 250:22, 250:25, 251:13, 251:16, 253:14, 254:7, 254:9, 254:11, 254:13, 254:14, 254:18, 254:19, 256:14, 257:20
**FEDERAL** [3] - 166:17, 166:18, 226:25
**FELLOW** [1] - 198:14
**FELONS** [1] - 212:10
**FELONY** [1] - 212:13
**FELT** [18] - 17:1, 24:11, 29:7, 35:18, 36:23, 52:9, 52:24, 53:5, 77:23, 96:17, 103:16, 122:17, 132:3, 134:6, 149:24, 187:6, 210:2, 225:14
**FEMA** [10] - 23:24, 24:3, 118:16, 119:5, 119:6, 119:10, 119:14, 125:21, 125:22, 248:8
**FEW** [5] - 55:18,

55:20, 169:14, 229:24, 251:10
**FIGHT** [1] - 178:23
**FIGURE** [1] - 129:2
**FIGURES** [1] - 31:3
**FIGURING** [1] - 136:21
**FILE** [2] - 165:10, 174:9
**FILED** [6] - 5:25, 6:12, 6:14, 43:7, 166:1, 190:19
**FINAL** [6] - 29:1, 142:14, 150:13, 150:22, 187:9, 213:9
**FINALLY** [3] - 241:18, 244:23, 250:3
**FINANCIAL** [7] - 91:21, 91:25, 92:13, 92:14, 92:16, 93:4, 97:10
**FINANCIALLY** [1] - 91:16
**FINDINGS** [1] - 82:12
**FINE** [13] - 40:11, 42:14, 55:24, 55:25, 56:1, 74:21, 88:15, 145:17, 160:16, 182:15, 185:22, 186:3, 209:8
**FINISH** [14] - 3:12, 13:1, 59:10, 59:12, 59:14, 61:20, 86:23, 96:3, 122:24, 123:2, 123:4, 128:5, 224:8, 252:14
**FINISHED** [3] - 123:8, 123:10, 150:23
**FIRED** [1] - 231:19
**FIRM** [5] - 162:13, 162:14, 162:15, 168:11, 172:22
**FIRST** [3] - 246:25, 247:1, 247:2
**FIRST** [38] - 11:14, 18:24, 27:10, 43:4, 48:1, 75:3, 99:1, 99:7, 100:25, 126:8, 138:14, 143:17, 143:18, 144:8, 159:18, 160:8, 176:8, 196:19, 202:12, 226:10, 226:17, 227:21, 234:24, 236:16, 240:20, 240:22, 241:12, 243:16, 246:8, 246:10, 248:18, 248:23, 249:1, 249:16,

249:17, 251:12, 255:13
**FIRST-IN-TIME** [1] - 143:18
**FIVE** [7] - 159:15, 197:15, 197:16, 197:19, 225:1, 254:22, 254:24
**FLAGGING** [1] - 173:12
**FLAVOR** [1] - 26:11
**FLESH** [1] - 177:9
**FLOOR** [1] - 159:21
**FLOOR..** [1] - 240:17
**FLOW** [1] - 159:23
**FLOWED** [1] - 12:19
**FLOWS** [1] - 98:10
**FLYING** [1] - 18:7
**FOCUS** [2] - 61:10, 87:9
**FOCUSED** [2] - 29:13, 145:3
**FOLKS** [1] - 168:14
**FOLLOW** [7] - 26:21, 36:25, 61:4, 144:21, 188:7, 257:8
**FOLLOWED** [5] - 3:25, 8:6, 8:7, 74:10, 251:7
**FOLLOWING** [5] - 32:11, 61:4, 61:5, 182:8, 227:8
**FOLLOWS** [6] - 9:9, 160:2, 161:3, 186:8, 224:12, 235:23
**FOR** [1] - 1:1
**FORBIDDEN** [1] - 254:16
**FORBIDS** [1] - 249:8
**FORCE** [1] - 33:11
**FORCE** [3] - 227:23, 227:25, 236:8
**FORCES** [1] - 196:24
**FORE** [1] - 232:10
**FOREGOING** [1] - 259:6
**FORGET** [1] - 73:14
**FORM** [4] - 56:24, 72:18, 170:24, 231:10
**FORMAL** [1] - 14:17
**FORMALLY** [1] - 13:7
**FORMER** [4] - 50:1, 126:4, 219:25, 254:18
**FORMS** [3] - 22:6, 22:7, 111:1
**FORTH** [4] - 90:20, 112:5, 219:10, 230:15

**FORTUNATELY** [1] - 18:4
**FORWARDED** [1] - 148:20
**FOUR** [10] - 9:25, 19:1, 20:12, 162:10, 174:2, 197:7, 212:9, 217:11, 222:17, 222:19
**FOX** [3] - 168:7, 168:9, 201:15
**FRAME** [1] - 166:12
**FRAMED** [1] - 11:2
**FRANCES** [1] - 54:9, 194:23, 197:13
**FRANCIS** [1] - 4:25
**FRANCIS** [2] - 1:16, 1:22
**FRANCISCO** [1] - 4:24
**FRANCISCO** [13] - 1:21, 207:6, 209:5, 209:8, 209:10, 214:16, 215:5, 221:25, 222:3, 222:20, 222:22, 223:17, 223:22
**FRANK** [1] - 138:19
**FRANKLY** [6] - 25:24, 115:7, 227:7, 229:17, 229:25, 236:11
**FRAUD** [49] - 38:7, 44:21, 56:22, 64:4, 64:20, 65:8, 66:8, 77:9, 77:25, 78:1, 78:9, 79:3, 79:12, 79:18, 80:3, 80:5, 80:21, 105:17, 108:9, 108:11, 108:13, 126:5, 126:11, 126:12, 127:7, 134:7, 151:4, 152:16, 192:24, 193:7, 196:3, 197:12, 207:17, 207:25, 215:14, 216:7, 217:7, 220:6, 220:18, 221:6, 221:13, 221:21, 223:5, 223:8, 223:12, 230:11, 231:20, 232:13, 240:5
**FRAUDULENT** [2] - 64:19, 126:13
**FREE** [4] - 59:17, 65:7, 82:3, 223:19
**FREQUENTLY** [1] - 133:9
**FRIEND** [1] - 167:15

**FRIENDS** [2] - 121:24, 256:8
**FRONT** [16] - 7:18, 24:23, 44:17, 56:8, 57:10, 65:11, 68:14, 75:2, 76:5, 76:7, 117:15, 117:16, 117:22, 142:7, 172:17, 226:3
**FUCHS** [23] - 77:5, 89:18, 89:19, 89:22, 90:4, 90:10, 90:16, 90:20, 91:13, 91:18, 95:20, 96:16, 97:9, 99:14, 200:22, 200:25, 203:6, 203:8, 203:11, 203:16, 219:10, 219:12
**FUCHS'** [1] - 90:11
**FULFILL** [1] - 15:18
**FULL** [6] - 9:13, 66:23, 67:1, 123:4, 196:14, 206:25
**FULLY** [3] - 11:24, 11:25, 134:22
**FULTON** [33] - 5:13, 6:1, 6:12, 6:14, 8:1, 43:8, 52:5, 77:10, 91:14, 96:22, 103:13, 103:16, 107:5, 108:8, 129:4, 129:7, 129:18, 132:5, 132:9, 134:20, 163:17, 164:18, 165:3, 165:4, 165:17, 166:1, 183:18, 198:7, 198:9, 198:15, 198:16, 198:19, 233:7
**FUNCTION** [3] - 13:11, 221:5, 231:24
**FUNCTIONS** [3] - 22:20, 113:9, 191:14
**FUNDAMENTAL** [1] - 235:8
**FUNDING** [1] - 154:22
**FUNDS** [7] - 92:20, 92:22, 93:7, 93:10, 97:7, 119:7, 125:22
**FURTHERANCE** [2] - 85:5, 177:12
**FUTURE** [5] - 63:5, 81:11, 81:23, 136:19, 257:11
**FUZZY** [1] - 48:12

# G

**GANDER** [2] - 158:7,

158:8
**GARDNER** [1] - 167:25
**GATEKEEPER** [2] - 35:9, 45:3
**GATHERING** [1] - 218:18
**GBI** [9] - 52:19, 77:5, 77:23, 80:18, 82:13, 194:11, 194:13, 197:12, 214:4
**GENERAL** [20] - 30:7, 30:16, 37:9, 37:15, 37:16, 38:17, 39:4, 78:5, 78:8, 78:23, 79:2, 79:9, 79:20, 127:6, 127:16, 128:23, 230:15, 230:17
**GENERAL** [17] - 11:15, 11:22, 16:3, 34:24, 35:2, 60:17, 64:20, 81:20, 82:22, 86:8, 178:15, 179:22, 180:7, 200:12, 202:21, 202:25, 217:6
**GENERALLY** [8] - 12:22, 19:23, 39:1, 39:8, 110:13, 137:18, 169:16, 219:2
**GENERIS** [1] - 236:21
**GENTLEMAN** [2] - 53:3, 186:25
**GEORGE** [1] - 4:22
**GEORGE** [1] - 1:19
**GEORGIA** [83] - 4:7, 4:18, 5:8, 5:21, 6:2, 6:11, 6:17, 7:11, 52:19, 80:15, 80:21, 81:1, 81:4, 83:5, 84:1, 85:18, 88:19, 88:22, 91:22, 93:11, 96:23, 97:7, 104:2, 105:16, 120:10, 122:14, 126:6, 129:14, 130:4, 130:7, 133:21, 134:5, 134:17, 134:24, 160:10, 162:3, 162:4, 162:6, 162:15, 162:19, 166:8, 167:11, 172:5, 174:8, 183:14, 183:16, 185:16, 187:21, 187:23, 188:1, 188:3, 188:10, 188:21, 189:15,

189:20, 189:23, 190:19, 191:19, 192:9, 194:19, 204:12, 207:17, 208:2, 208:7, 211:7, 211:10, 211:11, 211:22, 212:9, 212:25, 215:20, 216:14, 216:17, 217:21, 221:11, 233:7, 244:3, 250:21, 250:24, 252:5
**GEORGIA** [4] - 1:1, 1:4, 1:24, 259:4
**GEORGIA'S** [2] - 5:18, 216:1
**GERMANY** [1] - 99:17, 124:13, 178:15, 179:21, 179:25, 180:7, 180:11, 180:18, 180:19, 180:25, 203:2, 203:3
**GETTYSBURG** [1] - 254:24
**GIULIANI** [9] - 57:18, 58:24, 68:25, 69:17, 69:25, 70:7, 70:25, 71:4
**GIVEN** [14] - 14:7, 14:21, 15:1, 15:5, 18:23, 20:9, 112:17, 118:13, 148:7, 158:19, 159:2, 189:18, 214:20, 254:10
**GLASS** [1] - 218:19
**GLOVE** [1] - 52:20
**GMAIL** [1] - 94:10
**GOAL** [11] - 96:18, 103:20, 103:25, 113:24, 114:19, 115:3, 115:4, 115:17, 115:18, 194:8
**GOALS** [1] - 116:3
**GOODNESS** [2] - 167:7, 240:2
**GOOSE** [1] - 158:6
**GOP** [1] - 166:8
**GOVERN** [1] - 153:22
**GOVERNED** [3] - 138:6, 138:8, 138:9
**GOVERNING** [1] - 182:11
**GOVERNMENT** [39] - 21:16, 31:3, 34:20, 58:1, 59:22, 64:14, 64:22, 71:15, 77:14,

92:13, 92:14, 118:23, 119:6, 146:21, 158:11, 167:1, 188:20, 189:4, 189:7, 195:4, 204:2, 204:5, 213:21, 215:22, 216:13, 216:18, 221:21, 221:22, 223:4, 223:7, 229:25, 230:2, 230:3, 231:1, 235:9, 236:9, 236:25, 238:16, 250:22
**GOVERNMENT'S** [1] - 11:10
**GOVERNOR** [8] - 21:21, 21:22, 166:25, 204:21, 204:25, 205:3, 205:6
**GOVERNOR** [3] - 188:25, 189:1, 205:20
**GOVERNORS** [2] - 23:21, 23:22
**GRACE** [1] - 139:13
**GRADUATE** [1] - 168:5
**GRAND** [4] - 5:13, 183:14, 183:17, 183:20
**GREAT** [10] - 15:24, 82:13, 82:14, 132:21, 185:19, 186:15, 231:3, 231:19, 240:4, 258:2
**GREATER** [2] - 52:4, 227:7
**GREEN** [1] - 1:15
**GRIFFITH** [1] - 36:10
**GROUND** [1] - 98:2
**GROUP** [10] - 13:19, 17:19, 40:14, 57:11, 68:19, 68:23, 72:5, 88:7, 108:1, 244:21
**GROUPS** [4] - 41:7, 78:15, 149:24, 217:4
**GUBERNATORIAL** [1] - 217:2
**GUESS** [11] - 11:3, 15:4, 78:25, 81:4, 95:23, 142:1, 156:22, 201:11
**GUIDING** [1] - 138:12
**GUY** [1] - 69:16
**GUYS** [1] - 224:19

# H

**H-I-L-B-E-R-T** [1] - 161:8

**HABIT** [1] - 148:1
**HAC** [1] - 255:14
**HALF** [4] - 106:6, 170:6, 211:8, 255:12
**HALL** [2] - 48:14, 173:17
**HALLWAY** [2] - 19:12, 172:23
**HALT** [1] - 28:22
**HAND** [10] - 10:13, 52:20, 156:15, 161:1, 186:4, 191:5, 191:9, 191:11, 191:14, 191:16
**HAND** [1] - 235:23
**HAND'S** [1] - 236:25
**HANDLE** [3] - 26:2, 36:16, 98:4
**HANDLED** [2] - 78:14, 233:1
**HANDLING** [1] - 26:1
**HAPPY** [3] - 88:14, 156:15, 160:22
**HARD** [7] - 146:13, 146:14, 225:13, 230:16, 244:10, 245:16, 256:22
**HARDEST** [1] - 227:13
**HARVARD** [1] - 168:5
**HATCH** [44] - 7:23, 39:8, 39:14, 40:2, 40:14, 41:14, 42:13, 135:7, 135:13, 135:17, 135:22, 135:23, 136:3, 137:1, 137:14, 137:21, 138:6, 138:9, 138:11, 138:16, 139:18, 140:2, 140:6, 140:10, 148:23, 149:1, 229:6, 229:17, 229:20, 230:4, 233:12, 233:15, 237:9, 238:6, 238:9, 244:9, 247:3, 249:3, 249:7, 249:11, 249:14, 256:12, 256:14
**HATE** [2] - 256:3, 256:8
**HEAD** [3] - 49:22, 50:2, 66:1
**HEADLINE** [1] - 41:8
**HEADLINES** [1] - 38:9
**HEAR** [9] - 3:21, 4:7, 21:6, 126:20, 209:18, 209:21, 210:19, 219:23, 241:10

**HEARD** [14] - 34:6, 99:1, 127:25, 128:1, 132:9, 133:9, 192:12, 201:13, 209:14, 210:20, 219:5, 219:22, 230:14, 237:14
**HEARING** [18] - 6:6, 6:9, 26:25, 52:14, 61:16, 73:18, 157:22, 172:16, 172:19, 181:22, 182:7, 182:12, 210:22, 213:13, 224:13, 227:9, 240:15, 243:20
**HEARINGS** [10] - 83:10, 83:11, 154:10, 154:25, 182:2, 182:5, 182:8, 182:9, 182:10
**HEARSAY** [4] - 41:16, 42:1, 157:4, 158:5
**HEART** [1] - 226:2
**HELD** [4] - 3:1, 6:6, 196:19, 235:15
**HELP** [6] - 33:21, 34:15, 55:2, 73:11, 110:18, 229:22
**HELPFUL** [3] - 218:8, 236:12, 236:20
**HELPS** [2] - 47:11, 63:8
**HEREBY** [1] - 259:6
**HERRING** [1] - 249:24
**HERSCHMANN** [6] - 82:23, 125:7, 171:20, 171:21, 172:2
**HERSELF** [1] - 239:3
**HHS** [2] - 23:11, 31:14
**HI** [1] - 156:7
**HIGH** [1] - 255:2
**HIGHEST** [1] - 21:20
**HIGHLIGHT** [1] - 243:17
**HIGHLY** [1] - 121:13
**HILBERT** [3] - 2:7, 132:18, 161:2
**HILBERT** [26] - 107:19, 108:21, 109:3, 121:5, 124:4, 132:18, 132:19, 132:20, 160:10, 160:11, 161:7, 161:8, 162:1, 162:16, 165:2, 170:9, 171:3, 174:23, 177:11, 179:1, 181:11,

183:2, 183:13, 184:2, 184:22, 208:22
**HILBERT** [1] - 109:6
**HILBRIN** [1] - 132:17
**HILL** [7] - 15:13, 15:14, 27:2, 28:24, 34:22, 83:10, 83:11
**HIMSELF** [10] - 96:12, 184:14, 211:1, 219:7, 219:18, 222:8, 229:3, 245:24, 248:13, 250:9
**HINT** [1] - 255:6
**HIRED** [1] - 180:2
**HISTORY** [2] - 205:16, 255:1
**HIT** [1] - 13:4
**HITTING** [1] - 36:14
**HOLD** [19] - 41:22, 59:11, 61:25, 83:18, 114:2, 114:11, 122:25, 149:7, 186:24, 226:5
**HOLD** [1] - 122:25
**HOLE** [1] - 36:13
**HOLIDAY** [1] - 76:11
**HOME** [6] - 17:7, 29:5, 29:10, 29:11, 67:18, 234:6
**HOMELAND** [5] - 59:23, 82:2, 84:4, 216:4, 239:21
**HOMICIDE** [3] - 225:23, 225:24, 225:25
**HONEST** [2] - 51:6, 221:23
**HONESTLY** [3] - 18:3, 41:8, 168:14
**HONOR** [171] - 4:20, 5:4, 5:6, 8:12, 8:16, 8:23, 9:2, 9:3, 10:8, 10:11, 10:15, 11:5, 11:8, 16:8, 17:5, 20:1, 21:2, 22:17, 25:10, 32:25, 35:6, 41:6, 41:16, 42:5, 42:16, 42:17, 42:25, 43:11, 43:22, 47:2, 48:10, 51:1, 51:11, 52:2, 55:4, 55:6, 55:9, 55:24, 56:2, 56:25, 59:12, 60:12, 62:21, 75:19, 83:20, 85:1, 87:5, 92:8, 95:15, 110:25, 114:6, 115:21, 117:9, 117:19,

126:21, 130:19, 135:15, 141:7, 141:22, 141:25, 142:1, 143:11, 147:9, 149:9, 149:17, 150:16, 153:8, 153:13, 153:18, 153:19, 155:3, 155:18, 155:19, 155:22, 156:5, 156:8, 156:19, 156:25, 157:8, 157:12, 157:23, 158:25, 159:11, 160:9, 161:18, 161:23, 164:7, 164:20, 164:23, 178:2, 178:8, 178:21, 181:18, 181:21, 182:3, 182:14, 184:16, 184:20, 185:1, 185:4, 185:8, 185:10, 185:11, 186:3, 187:10, 187:12, 187:17, 203:22, 204:23, 205:1, 205:4, 205:8, 205:18, 205:22, 206:6, 206:8, 207:4, 207:6, 209:1, 214:17, 214:23, 221:25, 222:20, 222:22, 223:17, 223:20, 224:3, 224:5, 224:24, 225:7, 225:9, 226:3, 226:7, 226:21, 227:8, 227:14, 228:6, 228:10, 228:14, 229:11, 229:17, 229:23, 231:9, 231:21, 232:24, 234:16, 234:23, 236:11, 237:16, 239:22, 240:7, 240:12, 240:20, 241:12, 241:16, 245:9, 246:8, 247:14, 249:24, 250:17, 252:8, 252:14, 253:9, 255:2, 255:6, 256:3, 256:21, 257:5, 257:23, 258:3
**HONOR'S** [2] - 109:24, 235:20
**HONORABLE** [4] - 1:11, 1:23, 259:12, 259:16
**HOPE** [6] - 3:3, 117:6,

159:18, 205:9, 226:23, 238:4
**HOPEFUL** [2] - 155:13, 220:13
**HOPEFULLY** [4] - 110:14, 132:22, 132:24, 150:3
**HOPING** [4] - 107:7, 155:7, 155:8, 155:10
**HORIZON** [1] - 241:3
**HOSPITAL** [2] - 24:19
**HOSPITALS** [1] - 31:13
**HOST** [1] - 243:23
**HOSTAGE** [1] - 33:9
**HOUR** [1] - 126:17
**HOURS** [4] - 11:21, 14:17, 15:6, 254:25
**HOUSE** [2] - 46:7, 88:11
**HOUSE** [47] - 11:20, 15:9, 22:15, 22:22, 24:23, 24:25, 25:4, 25:22, 27:5, 41:12, 41:25, 42:11, 45:1, 45:21, 46:11, 47:2, 47:4, 51:2, 66:18, 68:20, 74:10, 74:15, 82:22, 82:25, 94:9, 95:3, 95:5, 95:8, 99:15, 105:2, 105:7, 105:10, 105:11, 124:20, 125:5, 136:20, 137:6, 137:10, 137:22, 151:3, 169:20, 171:16, 171:17, 199:7, 200:23, 229:10, 232:12
**HOUSED** [2] - 45:17, 45:19
**HUGE** [2] - 231:1, 231:2
**HUM** [1] - 71:6
**HUNDREDS** [1] - 14:15
**HUNG** [1] - 202:15
**HURTING** [2] - 28:1, 28:2
**HYPOTHETICAL** [1] - 114:7

# I

**IDEA** [7] - 8:4, 11:19, 29:18, 98:22, 99:20, 173:7, 227:16
**IDENTIFICATION** [1] - 156:14
**IDENTIFIED** [2] -

67:11, 109:17
**IDENTIFIES** [1] - 247:12
**IDENTIFY** [3] - 30:18, 43:4, 250:9
**IGNORE** [1] - 139:14
**II** [19] - 84:9, 84:11, 84:13, 84:14, 84:17, 84:19, 109:22, 109:24, 110:1, 110:4, 110:5, 111:6, 152:23, 153:1, 153:4, 153:5, 153:6, 242:4
**III** [3] - 1:19, 84:18, 110:6
**ILLUSTRATION** [1] - 230:6
**IMAGINE** [4] - 16:13, 146:23, 226:20, 232:3
**IMMEDIATE** [1] - 214:20
**IMMEDIATELY** [2] - 41:6, 175:22
**IMMUNITY** [4] - 229:4, 238:11, 256:19, 256:25
**IMPEACHMENT** [1] - 182:17
**IMPLEMENTED** [1] - 116:5
**IMPLICATION** [1] - 34:11
**IMPLICATIONS** [2] - 28:23, 34:13
**IMPORT** [1] - 232:21
**IMPORTANT** [14] - 3:18, 3:21, 3:24, 4:6, 34:3, 87:3, 232:9, 233:4, 238:20, 242:7, 243:16, 246:19, 257:9
**IMPORTANTLY** [3] - 227:22, 230:23, 256:17
**IMPRESSION** [2] - 227:16, 227:17
**IMPRESSIONS** [2] - 175:8, 179:6
**IMPRESSIVE** [1] - 96:17
**IMPROPER** [1] - 250:23
**IMPROPRIETY** [1] - 223:12
**IN** [1] - 3:1
**IN-HOUSE** [1] - 88:11
**IN-PERSON** [1] - 25:17

**INAPPROPRIATE** [4] - 93:23, 220:15, 220:16, 220:17
**INAUGURATION** [1] - 28:5
**INC** [3] - 163:20, 165:13, 166:3
**INCIDENCES** [1] - 170:4
**INCLUDE** [4] - 94:13, 182:2, 182:5, 229:25
**INCLUDED** [2] - 84:4, 174:5
**INCLUDING** [4] - 33:19, 153:22, 230:10, 244:11
**INCLUSIVE** [1] - 245:24
**INCOMING** [4] - 26:3, 26:12, 36:11, 94:8
**INCORRECTLY** [1] - 219:11
**INCREASE** [1] - 26:17
**INCREDIBLE** [1] - 232:20
**INDEED** [3] - 77:20, 91:12, 162:5
**INDEPENDENT** [1] - 167:23
**INDICATE** [8] - 53:2, 77:2, 87:2, 97:9, 101:4, 109:10, 147:21, 253:24
**INDICATED** [9] - 7:1, 7:6, 7:9, 92:9, 101:25, 130:25, 251:19, 257:12
**INDICATES** [3] - 13:6, 241:11, 247:5
**INDICATING** [2] - 16:25, 253:25
**INDICATION** [1] - 248:14
**INDICTMENT** [31] - 5:14, 5:16, 7:14, 42:21, 43:7, 43:25, 46:19, 47:21, 49:10, 50:8, 51:15, 51:21, 53:12, 56:7, 56:8, 56:18, 65:10, 68:14, 75:2, 75:14, 76:5, 77:2, 117:15, 229:1, 239:16, 240:2, 245:7, 245:8, 246:23, 251:15, 251:18
**INDIVIDUAL** [9] - 17:17, 25:18, 72:8, 108:20, 164:1, 164:2, 167:13,

188:10, 209:25
**INDIVIDUALLY** [2] - 190:6, 209:25
**INDIVIDUALS** [18] - 4:5, 5:14, 5:15, 26:25, 27:21, 31:8, 31:9, 46:10, 47:1, 48:25, 49:7, 49:18, 54:25, 67:11, 73:10, 113:11, 157:2, 197:7
**INDULGENCE** [2] - 42:24, 155:3
**INDUSTRY** [2] - 17:25, 18:11
**INFAMOUS** [3] - 214:3, 230:8, 234:3
**INFLUENCE** [3] - 245:1, 245:12, 249:18
**INFORM** [1] - 81:10
**INFORMAL** [2] - 17:23
**INFORMATION** [22] - 23:3, 30:5, 64:2, 66:13, 79:24, 80:23, 89:15, 103:18, 127:20, 128:22, 132:12, 134:13, 157:4, 170:21, 198:19, 201:10, 201:22, 211:24, 214:24, 218:18, 223:9, 223:13
**INFORMED** [9] - 45:2, 52:12, 73:9, 81:10, 85:9, 101:1, 158:17, 180:22, 257:15
**INFORMS** [1] - 227:14
**INFRINGE** [1] - 50:19
**INITIALS** [1] - 145:6
**INITIATE** [6] - 119:24, 121:7, 174:16, 174:23, 175:2, 200:16
**INITIATED** [5] - 97:20, 98:22, 99:20, 132:12, 179:2
**INITIATING** [2] - 151:16, 151:18
**INITIATION** [3] - 98:5, 190:13, 190:22
**INITIATIVE** [1] - 77:6
**INPUT** [2] - 104:23, 195:14
**INQUIRE** [1] - 92:19
**INQUIRY** [1] - 254:11
**INSERT** [1] - 250:20
**INSERTED** [1] - 248:13
**INSIDE** [2] - 35:24, 232:11

**INSIGHTFUL** [1] - 25:7
**INSOFAR** [2] - 69:8, 149:9
**INSTANCES** [1] - 170:3
**INSTEAD** [4] - 16:23, 52:13, 96:13, 245:19
**INSTITUTED** [1] - 192:21
**INSTRUCTIONS** [1] - 4:15
**INSTRUMENTALITIES** [1] - 234:13
**INSUFFICIENT** [2] - 132:12, 198:18
**INTENDED** [3] - 158:16, 173:13, 240:21
**INTENT** [4] - 194:9, 238:17, 238:19, 239:4
**INTERACT** [4] - 24:7, 32:2, 32:3, 32:5
**INTERACTING** [3] - 113:4, 113:15, 123:11
**INTERACTION** [5] - 23:12, 24:2, 75:13, 84:5, 140:3
**INTERACTIONS** [4] - 31:21, 46:16, 82:21, 118:15
**INTERCONNECTION** [1] - 83:13
**INTEREST** [24] - 60:18, 61:18, 62:6, 62:19, 63:13, 64:9, 64:11, 64:13, 68:9, 73:24, 81:23, 88:18, 113:20, 113:23, 114:20, 115:18, 146:6, 197:1, 202:13, 202:14, 221:21, 227:2, 239:19
**INTERESTED** [3] - 64:10, 88:23, 101:9
**INTERESTING** [2] - 63:11, 82:6
**INTERESTS** [4] - 62:18, 81:6, 81:19, 81:20
**INTERFERENCE** [2] - 238:21, 239:7
**INTERFERING** [4] - 237:4, 239:4, 245:1, 249:19
**INTERPRETATION** [1] - 111:12

**INTERPRETED** [1] - 238:14
**INTERRUPT** [5] - 25:8, 157:9, 193:13, 204:20, 206:3
**INTERRUPTED** [1] - 166:10
**INTERRUPTING** [3] - 23:15, 52:10, 226:6
**INTERSECT** [1] - 27:20
**INTERSECTED** [1] - 27:9
**INTERSECTION** [1] - 27:20
**INTERVIEW** [10] - 40:5, 40:7, 40:9, 40:17, 41:14, 183:23, 198:1, 201:18, 201:19, 202:3
**INTERVIEWED** [3] - 183:18, 183:22, 201:15
**INTERVIEWS** [2] - 41:1, 197:14
**INTIMATELY** [2] - 22:19, 29:4
**INTRODUCE** [6] - 4:13, 109:5, 109:11, 124:17, 240:19
**INTRODUCED** [8] - 48:24, 69:10, 109:2, 126:7, 126:8, 184:14, 240:15
**INTRODUCTION** [1] - 209:15
**INTRODUCTIONS** [1] - 58:10
**INVALID** [1] - 80:22
**INVESTED** [1] - 88:21
**INVESTIGATE** [2] - 193:3, 221:12
**INVESTIGATED** [6] - 80:6, 134:2, 134:22, 193:19, 211:16, 230:11
**INVESTIGATING** [5] - 216:7, 216:10, 223:4, 222:7, 223:11
**INVESTIGATION** [1] - 52:20
**INVESTIGATION** [12] - 79:7, 79:12, 127:18, 127:22, 130:4, 130:8, 131:3, 132:4, 133:4, 196:22, 208:11, 213:2
**INVESTIGATIONS** [4] - 79:14, 79:19,

128:25, 196:22
**INVESTIGATOR** [1] - 194:24
**INVESTIGATOR** [1] - 54:9
**INVESTIGATORS** [2] - 52:19, 197:12
**INVITATION** [1] - 256:5
**INVITE** [1] - 195:12
**INVITED** [2] - 16:8, 76:21
**INVOLVE** [1] - 103:4
**INVOLVED** [39] - 3:23, 7:24, 21:25, 22:1, 22:19, 29:5, 39:24, 44:15, 45:14, 62:18, 62:19, 83:3, 100:5, 103:2, 105:24, 106:2, 106:3, 106:7, 108:24, 109:1, 109:14, 110:13, 120:24, 123:24, 149:6, 194:7, 194:8, 196:21, 207:24, 209:19, 209:22, 215:19, 215:25, 216:1, 216:3, 216:7, 216:14, 229:15, 234:10
**INVOLVEMENT** [6] - 31:1, 31:4, 69:1, 73:23, 169:3, 172:10
**INVOLVES** [1] - 110:10
**INVOLVING** [1] - 173:2
**IOTA** [1] - 231:9
**IPSE** [2] - 256:10, 256:20
**IRREGULARITIES** [1] - 38:8, 38:18
**ISSUE** [29] - 19:2, 23:7, 28:12, 28:13, 30:13, 37:6, 85:10, 87:3, 93:4, 93:5, 98:4, 98:9, 122:12, 129:3, 130:13, 132:24, 140:25, 148:20, 155:17, 221:19, 225:14, 226:3, 233:5, 233:6, 233:21, 239:20, 257:2, 257:18, 257:25
**ISSUES** [27] - 16:19, 21:10, 23:25, 30:23, 35:17, 35:20, 38:8, 38:11, 63:5, 85:10, 93:17, 96:25,

123:17, 128:3, 128:4, 128:8, 151:2, 151:25, 152:3, 154:7, 155:9, 158:2, 178:14, 193:6, 220:9
**ITEM** [1] - 19:22
**ITEMS** [4] - 58:18, 151:16, 151:18
**ITSELF** [3] - 157:4, 219:21, 250:20
**IV** [1] - 1:16

## J

**JACK** [2] - 187:14, 187:15
**JAN** [1] - 91:15
**JANUARY** [70] - 9:22, 10:2, 11:17, 11:18, 25:21, 28:6, 30:9, 30:14, 30:21, 50:6, 85:25, 90:21, 90:24, 94:12, 97:17, 100:25, 101:25, 103:10, 105:12, 106:14, 119:19, 120:7, 120:8, 120:10, 120:13, 123:20, 128:13, 128:20, 128:25, 131:14, 134:13, 139:24, 140:10, 140:11, 149:2, 149:20, 150:5, 150:6, 150:18, 150:20, 150:22, 151:1, 155:1, 172:8, 172:10, 172:15, 176:23, 184:3, 187:24, 193:15, 198:11, 198:23, 198:25, 200:1, 200:8, 200:16, 201:20, 202:7, 202:11, 203:1, 204:11, 204:24, 205:24, 211:12, 212:7, 213:20, 214:1, 227:13, 228:2, 231:3
**JASON** [3] - 142:10, 142:21, 142:22
**JEAN** [1] - 259:16
**JEAN-PAUL** [1] - 259:16
**JEFF** [1] - 185:7
**JERSEY** [1] - 21:22
**JM** [2] - 145:4, 145:5
**JOB** [35] - 7:13, 7:24, 11:25, 12:2, 14:24, 15:9, 16:3, 16:11,

21:25, 27:8, 31:1,
34:12, 52:24, 53:6,
77:24, 82:13, 82:14,
111:9, 111:10,
115:7, 116:6, 128:2,
134:10, 185:19,
206:2, 228:17,
231:20, 231:22,
233:9, 238:23,
238:25, 240:4,
244:12, 250:7
**JOBS** [4] - 4:2, 7:5,
35:8, 60:10
**JOE** [2] - 146:24,
230:21
**JOG** [2] - 73:3, 76:2
**JOHN** [2] - 1:17, 1:20
**JOHN** [2] - 4:24, 183:2
**JOHNNY** [1] - 51:7
**JOHNS** [1] - 196:19
**JOHNSON** [1] -
234:10
**JOINED** [1] - 5:8
**JOINT** [1] - 30:17
**JOINT** [1] - 50:5
**JONES** [2] - 159:14,
198:14
**JONES** [3] - 1:11,
1:23, 259:12
**JONES'** [1] - 118:14
**JORDAN** [4] - 89:19,
90:16, 200:22, 203:6
**JOSEPH** [1] - 5:1
**JOSEPH** [1] - 1:20
**JUDGE** [4] - 161:13,
217:13, 247:18,
247:22
**JUDGE** [1] - 1:11
**JUDGE** [13] - 8:20,
8:21, 118:14,
159:14, 160:18,
172:17, 185:13,
235:2, 235:22,
236:25, 253:25,
257:17, 257:19
**JUDGES** [2] - 3:20,
97:25
**JUDGMENT** [1] -
238:8
**JUDGMENTS** [1] -
237:7
**JUMP** [1] - 177:21
**JURIST** [1] - 235:23
**JURY** [5] - 5:13,
183:15, 183:17,
183:20, 252:4
**JUSTICE** [1] - 251:5
**JUSTICE** [8] - 64:18,
124:23, 125:1,
171:9, 171:11,

230:10, 234:1,
239:19
**JUSTIFICATION** [1] -
108:10
**JUSTIFIED** [1] - 236:1
**JUSTIN** [2] - 144:25,
145:2

## K

**K-U-R-T** [1] - 161:8
**KAUFMAN** [15] -
107:17, 108:21,
109:3, 109:6, 121:5,
124:7, 167:8, 167:9,
167:10, 167:17,
167:19, 168:11,
172:23, 174:5,
208:21
**KEEN** [1] - 232:10
**KEEP** [11] - 15:5, 49:5,
49:6, 52:12, 60:15,
84:6, 85:9, 107:23,
121:1, 159:21,
185:21
**KEEPING** [1] - 93:3
**KELLEY** [1] - 1:21
**KELLEY** [1] - 5:1
**KEMP** [7] - 166:23,
166:25, 204:22,
204:25, 205:3, 210:9
**KEPT** [7] - 24:13, 81:9,
91:10, 129:16,
129:18, 130:1
**KERIK** [2] - 69:13,
69:18
**KERIK** [1] - 69:15
**KICKS** [1] - 242:5
**KIDS** [1] - 15:1
**KIND** [30] - 12:2, 12:3,
19:12, 22:2, 22:3,
23:17, 29:10, 40:6,
44:11, 47:17, 50:25,
51:7, 52:25, 56:11,
58:17, 80:9, 103:7,
108:16, 109:18,
119:20, 128:9,
136:8, 150:22,
227:5, 229:8, 242:3,
242:8, 243:21,
244:7, 246:3
**KINDS** [8] - 16:4,
20:20, 26:3, 28:14,
93:22, 111:1,
154:24, 231:23
**KING** [1] - 54:25
**KIRK** [2] - 107:17,
109:3
**KLAIN** [1] - 30:3
**KNOW..** [1] - 101:19

**KNOWING** [3] - 34:16,
47:13, 67:21
**KNOWLEDGE** [23] -
69:20, 87:16, 91:19,
91:20, 94:22, 94:23,
97:6, 97:9, 98:18,
103:25, 106:2,
108:13, 125:6,
125:8, 125:14,
129:7, 129:15,
168:16, 169:23,
171:2, 176:12,
208:15, 210:17
**KNOWN** [4] - 15:20,
39:8, 121:22, 211:12
**KNOWS** [5] - 3:19,
25:16, 25:20, 41:21,
50:20
**KRAMER** [1] - 168:6
**KURT** [2] - 2:7, 161:2
**KURT** [4] - 121:2,
160:10, 161:7,
208:21

## L

**LACK** [1] - 32:14
**LAFAYETTE** [1] -
239:13
**LAID** [3] - 225:9,
226:15, 233:5
**LAND** [4] - 128:2,
132:23, 150:10,
228:1
**LANDING** [1] - 150:12
**LANGUAGE** [3] -
249:16, 249:17,
249:20
**LARGE** [2] - 27:20,
157:4
**LARGELY** [1] - 27:25
**LAST** [12] - 28:11,
28:20, 30:8, 99:23,
165:2, 175:16,
224:23, 253:10,
254:17, 255:16,
256:21
**LATE** [1] - 44:8
**LATIN** [1] - 256:9
**LAW** [1] - 168:5
**LAW** [45] - 34:19,
61:1, 172:22,
183:23, 188:7,
188:23, 194:19,
215:8, 215:15,
215:16, 221:5,
221:17, 225:17,
225:18, 226:24,
228:5, 228:22,
229:7, 232:24,
233:20, 233:24,

234:8, 234:24,
235:8, 236:5,
237:13, 243:24,
244:4, 244:6,
245:11, 245:15,
246:4, 246:13,
247:8, 247:10,
247:12, 247:13,
248:5, 250:17,
251:4, 252:2, 252:5,
254:4, 254:13, 257:7
**LAWFUL** [1] - 212:13
**LAWS** [7] - 153:10,
153:22, 215:9,
215:11, 228:20,
246:5, 251:6
**LAWSUIT** [16] - 63:24,
109:1, 109:15,
174:9, 174:10,
174:11, 174:12,
174:16, 174:17,
175:7, 190:13,
210:8, 211:21,
212:3, 212:11
**LAWSUITS** [4] -
190:15, 217:4,
217:6, 218:1
**LAWYER** [11] - 39:10,
60:10, 86:3, 153:16,
167:10, 184:4,
184:9, 184:11,
205:12, 234:23,
249:21
**LAWYERLY** [1] -
56:11
**LAWYERS** [12] - 3:21,
4:2, 51:2, 98:6,
116:21, 117:1,
168:7, 168:17,
187:6, 202:23,
210:2, 220:4
**LEAD** [3] - 4:12,
174:7, 174:11
**LEADER** [1] - 154:19
**LEADER** [2] - 65:21,
66:21
**LEADERS** [3] - 12:16,
17:25, 18:11
**LEADING** [2] - 44:19,
153:14
**LEANED** [1] - 227:12
**LEARN** [4] - 98:14,
100:9, 200:18, 235:4
**LEARNED** [1] - 235:22
**LEARNED** [3] - 79:23,
109:25, 242:23
**LEARNING** [1] - 99:7
**LEAST** [16] - 66:5,
101:15, 101:16,
120:6, 129:1,

132:22, 178:7,
200:7, 201:19,
204:14, 207:1,
217:13, 222:5,
227:24, 230:19,
238:13, 239:1,
239:16, 245:5
**LEAVE** [11] - 3:13,
14:21, 15:5, 21:12,
26:6, 37:4, 102:6,
149:14, 156:1,
196:18, 199:25
**LEAVES** [1] - 227:3
**LEAVING** [1] - 28:7
**LEE** [1] - 1:21
**LEEWAY** [1] - 153:15
**LEFT** [11] - 4:25, 9:25,
31:6, 100:22,
110:13, 148:1,
199:7, 200:11,
224:25, 254:22,
255:11
**LEGAL** [1] - 209:22
**LEGAL** [12] - 35:20,
35:25, 169:13,
172:21, 174:3,
184:12, 184:13,
210:20, 232:9,
235:1, 256:4
**LEGISLATE** [1] -
115:10
**LEGISLATION** [9] -
46:17, 56:21, 62:11,
63:6, 81:11, 81:24,
110:9, 154:8
**LEGISLATIVE** [5] -
57:11, 153:4, 154:7,
154:13, 154:23
**LEGISLATORS** [6] -
23:23, 44:16, 64:6,
68:12, 68:19, 68:24
**LEGISLATURE** [3] -
65:22, 66:22, 67:12
**LEGISLATURE** [4] -
44:22, 57:8, 68:24,
148:10
**LEGITIMATE** [3] -
36:14, 36:19, 221:11
**LENGTH** [2] - 219:6,
227:7
**LENGTHY** [2] -
126:14, 213:12
**LESS** [16] - 14:11,
14:13, 16:20, 41:1,
98:4, 107:8, 107:9,
107:11, 197:15,
197:16, 210:4,
212:21, 221:21,
228:13, 242:9,
254:24

**LETTING** [1] - 220:4
**LEVEL** [5] - 116:6, 197:23, 230:3, 236:24, 247:23
**LEVELS** [4] - 26:17, 229:25, 230:1, 236:9
**LEVEN** [1] - 145:1
**LIABLE** [1] - 235:15
**LIAISON** [4] - 46:4, 46:5, 169:17, 169:19
**LICENSED** [2] - 162:4, 162:6
**LIFE** [1] - 9:18
**LIGHT** [2] - 138:12, 250:4
**LIKEWISE** [1] - 221:18
**LIMIT** [7] - 35:11, 35:13, 35:21, 238:7, 240:22, 241:11, 241:17
**LIMITATION** [1] - 238:10
**LIMITATIONS** [2] - 237:18, 237:19
**LIMITED** [1] - 220:1
**LIMITLESS** [1] - 241:2
**LIMITS** [1] - 234:13
**LINCOLN** [1] - 254:23
**LINE** [12] - 25:8, 30:20, 113:10, 124:15, 140:9, 148:25, 152:11, 171:5, 207:2, 225:24, 227:8
**LINES** [2] - 170:18, 201:12
**LIST** [2] - 147:5, 150:4
**LISTEN** [3] - 58:12, 111:2, 155:15
**LISTENED** [1] - 220:1
**LITIGANT** [2] - 176:20, 178:4
**LITIGANTS** [2] - 175:6, 179:5
**LITIGATE** [4] - 168:24, 174:10, 174:11, 177:16
**LITIGATED** [1] - 217:10
**LITIGATION** [65] - 58:1, 63:25, 66:6, 81:1, 81:4, 99:22, 99:24, 100:2, 103:11, 105:24, 106:4, 106:5, 106:6, 106:7, 110:7, 110:10, 110:13, 110:22, 120:25, 121:17, 122:7, 148:8, 162:12,

163:17, 165:3, 165:4, 165:11, 165:18, 165:24, 166:11, 166:16, 166:21, 167:2, 167:4, 167:18, 167:21, 167:24, 168:21, 169:3, 169:15, 172:3, 172:4, 174:7, 174:12, 174:20, 175:5, 175:9, 176:22, 178:14, 179:4, 179:7, 179:12, 179:15, 179:18, 180:1, 180:6, 180:16, 190:8, 202:20, 210:5, 210:18, 213:17, 217:20
**LITIGIOUS** [5] - 98:4, 107:8, 107:9, 107:11, 210:4
**LIVE** [2] - 9:15, 52:4
**LIVES** [1] - 13:5
**LOCAL** [2] - 21:16, 84:3
**LOGICAL** [1] - 233:17
**LOGISTIC** [1] - 3:5
**LOGISTICS** [2] - 33:3, 34:4
**LOOK** [30] - 36:24, 51:16, 53:13, 68:15, 76:25, 89:2, 90:1, 141:13, 142:6, 143:23, 144:8, 150:1, 150:4, 152:13, 155:16, 156:21, 156:22, 164:11, 165:5, 196:25, 206:13, 220:14, 244:4, 244:5, 244:8, 246:5, 246:23, 250:1, 250:17
**LOOKED** [8] - 52:22, 77:14, 122:14, 133:10, 134:7, 149:21, 211:25, 214:4
**LOOKING** [15] - 24:1, 24:10, 24:21, 59:15, 81:12, 91:20, 93:1, 96:1, 130:22, 138:14, 143:23, 218:19, 235:9, 245:16, 248:3
**LOOKS** [6] - 10:21, 10:23, 117:7, 142:9, 142:17, 240:2

**LOOP** [2] - 104:21, 104:23
**LOOPING** [1] - 104:22
**LOSE** [2] - 207:13, 211:10
**LOSING** [1] - 207:18
**LOST** [5] - 64:10, 192:8, 192:9, 211:11, 217:2
**LOVE** [2] - 131:21, 139:10
**LOVED** [1] - 234:23
**LOW** [4] - 226:22, 227:4, 253:14, 254:1
**LOWER** [1] - 237:4
**LOWERING** [1] - 115:4
**LOWEST** [1] - 226:20
**LUNCH** [8] - 3:12, 116:17, 117:3, 117:6, 117:7, 117:14, 119:21, 257:15

# M

**MA'AM** [41] - 56:10, 56:15, 57:17, 58:15, 65:12, 68:17, 76:3, 76:6, 76:8, 76:18, 76:20, 85:23, 86:2, 86:7, 86:9, 86:12, 86:14, 87:11, 87:15, 89:5, 89:9, 89:24, 97:19, 111:22, 117:17, 117:20, 119:22, 125:18, 131:10, 135:8, 136:5, 142:11, 143:9, 143:22, 144:20, 162:20, 162:22, 162:24, 163:25, 167:3, 177:20
**MAIL** [24] - 13:21, 27:3, 27:4, 27:5, 27:6, 93:25, 94:1, 94:5, 94:7, 94:9, 94:10, 95:3, 141:17, 142:9, 143:2, 143:4, 143:18, 143:20, 144:11, 146:4, 170:23, 242:14, 243:5, 245:8
**MAIL'S** [1] - 242:17
**MAILBOX** [1] - 200:12
**MAILS** [5] - 95:5, 95:8, 142:12, 142:17, 145:5
**MAINTAIN** [1] - 34:24
**MAJOR** [1] - 217:19

**MAJORITY** [3] - 14:12, 46:7, 126:10
**MALICIOUS** [2] - 237:14, 238:9
**MAN** [1] - 49:25
**MANAGE** [4] - 12:17, 61:9, 232:7, 232:19
**MANAGEMENT** [4] - 59:2, 61:17, 62:4, 81:19
**MANAGER** [1] - 61:12
**MANAGING** [1] - 232:16
**MANDATORY** [2] - 236:8, 244:7
**MANNER** [3] - 77:4, 98:4, 105:21
**MANPOWER** [1] - 93:5
**MARCH** [3] - 9:25, 11:17, 85:25
**MARGARET** [1] - 145:1
**MARGARINE** [1] - 234:6
**MARIA** [1] - 145:1
**MARK** [14] - 5:15, 9:3, 9:15, 16:25, 17:12, 170:2, 173:25, 184:8, 184:10, 195:8, 196:14, 203:17, 208:23, 243:9
**MARK** [3] - 4:18
**MARK** [3] - 1:8, 2:3, 9:8
**MARKED** [6] - 11:10, 42:20, 43:20, 141:9, 156:14, 206:12
**MARSHAL** [1] - 252:25
**MARSHALL** [1] - 234:1
**MARSHALLING** [1] - 251:6
**MARSHALS** [1] - 160:5
**MARSHALS** [1] - 4:4
**MARTIN** [1] - 234:18
**MARYLAND** [2] - 233:25, 234:10
**MATCH** [2] - 192:19, 198:17
**MATCHES** [1] - 192:21
**MATCHING** [1] - 132:13
**MATH** [1] - 249:21
**MATTEO** [1] - 235:21
**MATTER** [18] - 3:18,

14:9, 38:6, 39:15, 57:1, 64:3, 118:17, 122:4, 150:6, 151:10, 151:11, 152:21, 172:1, 184:18, 184:20, 227:23, 235:9, 239:19
**MATTERS** [25] - 3:5, 6:19, 27:9, 28:7, 28:9, 33:14, 82:23, 110:13, 122:7, 122:8, 122:9, 168:24, 183:8, 183:10, 183:24, 216:14, 230:25, 231:1, 231:7, 231:8, 232:1, 232:7, 232:20, 242:22, 255:23
**MATTHEW** [1] - 1:20
**MC** [1] - 1:16
**MCAFEE** [2] - 257:17, 257:19
**MCCULLOCH** [1] - 233:25
**MCENTEE** [1] - 75:8
**MCENTEE** [10] - 49:20, 49:22, 50:4, 50:22, 51:7, 75:5, 75:7, 75:9, 252:18, 253:2
**MCGUIRE** [1] - 4:22
**MCGUIREWOODS** [1] - 183:3
**MEADOW'S** [1] - 161:11
**MEADOWS** [3] - 1:8, 2:3, 9:8
**MEADOWS** [174] - 4:6, 4:18, 4:23, 5:2, 5:15, 5:17, 5:24, 6:15, 6:18, 7:1, 7:21, 8:7, 8:11, 9:3, 9:4, 9:5, 9:15, 9:17, 10:14, 10:18, 11:14, 16:3, 17:1, 41:7, 42:2, 42:20, 43:3, 47:21, 55:12, 56:6, 56:19, 57:7, 60:14, 65:11, 68:18, 74:20, 78:3, 78:16, 83:16, 85:20, 87:16, 88:17, 89:1, 91:12, 93:24, 95:13, 95:19, 101:10, 109:21, 111:12, 113:19, 114:18, 116:12, 116:18, 116:19, 117:10, 117:14, 118:1,

123:8, 125:16, 126:23, 127:4, 135:5, 135:21, 138:22, 140:19, 141:12, 143:16, 145:10, 145:25, 146:6, 147:7, 155:23, 163:1, 163:2, 163:3, 163:5, 170:2, 173:25, 175:16, 176:6, 176:8, 179:11, 179:14, 179:17, 181:12, 181:13, 183:3, 184:8, 184:10, 184:23, 195:8, 195:14, 195:24, 196:7, 196:14, 196:15, 196:17, 198:6, 199:1, 199:2, 199:5, 199:10, 199:16, 199:24, 200:3, 200:7, 201:3, 203:10, 203:17, 208:23, 208:24, 209:16, 209:18, 209:21, 210:4, 210:18, 210:24, 213:4, 213:13, 214:8, 218:9, 218:13, 219:1, 219:3, 219:6, 219:12, 219:16, 220:3, 220:8, 220:11, 222:8, 222:13, 225:15, 226:10, 227:15, 227:20, 228:15, 231:5, 233:13, 237:7, 237:18, 237:19, 238:14, 238:18, 240:23, 240:25, 241:25, 242:4, 242:15, 242:23, 243:2, 243:9, 243:11, 245:6, 245:10, 246:6, 247:5, 248:4, 248:12, 249:3, 250:5, 250:22, 251:13, 251:19, 252:8, 253:6, 253:22, 253:25, 254:10, 254:17, 257:13, 257:20

**MEADOWS'** [12] - 7:24, 218:17, 219:25, 220:2, 222:4, 227:9, 229:2, 232:12, 243:7,

248:14, 248:19, 256:7

**MEAN** [77] - 11:1, 14:10, 14:15, 14:19, 15:11, 15:19, 18:20, 24:12, 25:16, 26:2, 27:11, 28:1, 28:17, 31:6, 31:23, 34:9, 34:14, 34:17, 36:4, 36:17, 37:14, 40:7, 41:6, 47:12, 59:21, 61:1, 63:22, 64:18, 70:19, 70:22, 70:24, 73:2, 73:14, 74:23, 87:3, 87:21, 93:14, 94:21, 95:23, 97:25, 98:23, 99:6, 99:7, 100:22, 102:16, 110:2, 111:2, 112:12, 124:17, 125:21, 129:13, 131:18, 137:10, 137:18, 137:19, 138:9, 139:14, 139:15, 139:23, 146:5, 148:3, 150:10, 154:1, 154:10, 155:8, 155:12, 170:5, 175:20, 192:7, 193:13, 194:17, 237:22, 244:13, 250:25, 252:15

**MEAN..** [2] - 99:9, 141:20

**MEANING** [4] - 122:1, 139:22, 225:12, 245:13

**MEANS** [9] - 25:15, 34:10, 124:1, 206:22, 224:14, 224:15, 227:18, 243:3, 244:18

**MEANT** [3] - 147:21, 235:23, 243:2

**MECHANISM** [1] - 229:1

**MEDIA** [1] - 3:7

**MEET** [15] - 15:12, 21:16, 32:9, 44:9, 46:11, 48:21, 49:1, 56:19, 57:7, 58:10, 68:20, 183:5, 183:6, 239:4, 256:13

**MEETING** [88] - 12:14, 12:15, 12:16, 16:9, 16:15, 16:21, 18:5, 18:19, 18:23, 20:1, 20:2, 20:13, 20:24, 21:7, 21:13, 21:22,

33:17, 37:9, 37:11, 37:13, 37:16, 37:19, 38:1, 38:2, 38:12, 38:23, 38:25, 39:6, 44:7, 44:12, 44:14, 44:20, 44:24, 48:10, 48:12, 48:13, 49:5, 49:8, 57:11, 57:15, 58:8, 58:19, 58:22, 58:25, 59:3, 59:5, 60:24, 61:2, 61:6, 62:7, 62:16, 62:20, 64:3, 64:4, 66:12, 69:3, 69:8, 72:2, 72:8, 72:12, 72:17, 72:25, 73:8, 73:20, 73:22, 73:23, 74:1, 74:17, 78:4, 79:2, 79:15, 79:18, 79:20, 92:6, 98:11, 108:14, 126:6, 127:5, 145:19, 251:20, 251:24, 251:25, 252:1

**MEETINGS** [23] - 12:18, 16:3, 16:4, 16:7, 16:16, 16:17, 18:14, 19:9, 19:18, 19:24, 20:17, 20:20, 21:12, 22:2, 25:17, 25:18, 32:10, 36:5, 37:14, 44:10, 49:9, 63:7, 63:9

**MEETS** [2] - 7:2, 228:15

**MEMBER** [12] - 9:22, 40:11, 45:22, 46:2, 46:15, 47:14, 47:18, 83:12, 102:10, 122:3, 154:6, 197:9

**MEMBERS** [14] - 12:14, 14:1, 15:12, 16:17, 19:2, 21:13, 24:20, 56:20, 57:8, 77:5, 174:3, 175:17, 196:21, 199:18

**MEMO** [8] - 50:25, 51:8, 75:10, 143:25, 144:1, 144:4, 252:19, 252:21

**MEMORANDUM** [1] - 50:4

**MEMORY** [5] - 73:4, 76:2, 191:17, 222:6, 222:10

**MEMOS** [1] - 49:19

**MENTAL** [2] - 175:8, 179:6

**MENTION** [1] - 36:18

**MENTIONED** [40] -

13:6, 13:13, 14:6, 15:13, 16:2, 21:13, 23:23, 25:14, 28:17, 30:23, 32:13, 33:14, 36:18, 37:21, 44:8, 48:16, 69:13, 72:6, 81:22, 82:21, 85:8, 86:11, 93:24, 108:21, 118:6, 147:23, 148:8, 151:14, 154:2, 154:11, 154:18, 199:18, 208:21, 210:4, 216:6, 226:9, 226:10, 228:16, 233:13, 246:18

**MERIT** [1] - 132:14

**MERITS** [4] - 26:4, 36:23, 37:7, 38:21

**MESS** [1] - 42:13

**MESSAGE** [11] - 25:4, 25:18, 90:3, 90:4, 90:8, 91:17, 100:23, 170:12, 170:25, 199:1, 199:25

**MESSAGES** [10] - 25:16, 25:19, 25:21, 25:24, 26:19, 36:4, 90:19, 91:5, 91:7, 102:6

**MET** [14] - 18:8, 21:18, 37:9, 55:14, 55:15, 56:23, 56:25, 57:4, 77:4, 118:8, 163:4, 163:5, 186:18, 238:18

**METED** [1] - 52:8

**METHOD** [1] - 235:1

**METING** [1] - 129:1

**MICHAEL** [3] - 4:24, 47:5

**MICHAEL** [1] - 1:21

**MICHIGAN** [15] - 44:21, 56:20, 57:8, 57:11, 57:22, 58:2, 63:13, 63:21, 64:5, 64:6, 64:9, 64:15, 64:21, 72:8, 83:2

**MID** [1] - 218:4

**MID-DECEMBER** [1] - 218:4

**MIDDLE** [3] - 130:21, 137:18, 137:22

**MIDWAY** [1] - 145:18

**MIGHT** [25] - 12:21, 14:7, 15:16, 16:5, 16:6, 19:1, 20:11, 27:9, 33:23, 36:12, 58:18, 58:20, 67:22, 70:25, 78:25, 106:1,

145:2, 152:8, 158:18, 170:22, 223:4, 225:22, 225:25, 227:12, 232:15

**MILITARY** [2] - 15:22, 16:18

**MILLER** [14] - 141:17, 142:10, 142:18, 142:21, 142:22, 142:24, 143:3, 144:11, 144:17, 144:24, 145:5, 145:12

**MILLER'S** [1] - 143:4

**MILLEY** [2] - 30:7, 30:16

**MILLION** [2] - 20:7, 211:8

**MIND** [11] - 17:4, 31:18, 112:14, 117:18, 118:22, 135:4, 145:19, 152:7, 154:12

**MINE** [4] - 24:7, 51:4, 93:20, 186:23

**MINIMIZE** [1] - 230:24

**MINIMUM** [1] - 158:6

**MINUTE** [5] - 18:14, 55:19, 58:14, 116:14, 233:12

**MINUTE'S** [1] - 12:13

**MINUTES** [15] - 8:6, 8:8, 55:20, 116:15, 142:18, 144:17, 159:15, 175:18, 224:7, 224:16, 224:17, 224:21, 225:2, 254:22, 254:24

**MISCELLANEOUS** [1] - 157:18

**MISSED** [2] - 99:23, 104:9

**MISSING** [1] - 145:2

**MISTAKE** [2] - 237:12, 237:13

**MITCHELL** [37] - 105:13, 105:14, 105:19, 105:20, 105:22, 105:23, 106:9, 106:21, 106:22, 107:2, 107:16, 108:22, 121:11, 121:13, 121:16, 121:18, 121:21, 121:23, 122:11, 122:13, 123:15, 123:22, 124:1, 126:7,

168:18, 168:19,
169:2, 169:5,
169:11, 169:21,
170:14, 170:15,
170:21, 170:22,
170:24, 174:1,
175:16
**MITCHELL** [1] -
106:18
**MITCHELL'S** [3] -
123:19, 168:21,
169:12
**MNUCHIN** [3] - 29:3,
29:4, 154:20
**MODE** [1] - 53:5
**MODIFY** [1] - 182:10
**MOMENT** [12] - 4:10,
28:8, 51:16, 55:4,
141:25, 155:18,
156:6, 157:10,
193:18, 197:5,
222:20, 246:9
**MONDAY** [1] - 1:12
**MONDAY** [1] - 172:18
**MONEY** [4] - 31:12,
31:15, 154:16, 242:6
**MONITORING** [1] -
216:1
**MONTANA** [1] -
123:16
**MONTH** [5] - 14:8,
170:6, 171:18,
211:24, 212:1
**MONTHLY** [1] - 14:16
**MONTHS** [3] - 11:18,
85:22, 106:24
**MORAN** [5] - 4:24,
156:6, 156:7,
181:17, 183:2
**MORAN** [17] - 1:20,
156:8, 156:13,
157:12, 158:25,
159:4, 164:23,
181:18, 182:2,
182:5, 182:14,
183:1, 183:12,
184:20, 184:21,
185:1, 185:11
**MORNING** [19] - 3:2,
4:20, 4:21, 4:23, 5:3,
5:6, 5:12, 9:5, 12:6,
30:15, 55:12, 55:13,
55:14, 68:5, 113:12,
118:1, 201:13,
201:19, 225:9
**MOST** [18] - 13:8,
18:8, 20:1, 30:17,
44:16, 44:20, 45:16,
46:15, 47:2, 50:25,
82:21, 86:7, 132:9,

133:9, 137:25,
228:19, 232:20,
256:17
**MOSTLY** [1] - 126:5
**MOTION** [3] - 5:25,
6:4, 246:22
**MOTIVATIONS** [2] -
149:10, 149:12
**MOVE** [17] - 11:5,
19:18, 42:15, 88:14,
95:16, 141:22,
152:16, 156:10,
164:20, 176:2,
181:8, 181:9,
181:19, 184:19,
207:4, 245:21,
256:23
**MOVING** [2] - 43:10,
43:12
**MR** [135] - 4:20, 4:22,
5:4, 5:6, 8:12, 8:16,
8:23, 9:2, 9:12, 10:7,
10:12, 10:17, 11:5,
11:12, 11:13, 18:13,
25:10, 25:13, 33:13,
41:11, 41:20, 41:23,
42:6, 42:17, 42:19,
42:24, 43:2, 43:11,
43:14, 43:17, 43:22,
43:23, 51:10, 51:13,
51:14, 55:4, 55:6,
56:2, 56:24, 59:12,
62:21, 72:18, 83:19,
114:6, 115:21,
122:24, 123:1,
135:14, 141:25,
147:9, 147:11,
147:13, 147:15,
147:18, 149:11,
149:17, 149:19,
153:18, 153:20,
155:3, 155:5,
155:18, 156:5,
156:8, 156:13,
157:8, 157:12,
158:25, 159:4,
159:11, 160:12,
160:18, 160:22,
161:21, 164:23,
181:18, 182:2,
182:5, 182:14,
183:1, 183:12,
184:20, 184:21,
185:1, 185:11,
187:14, 207:6,
209:5, 209:8,
209:10, 214:16,
215:5, 221:25,
222:3, 222:20,
222:22, 223:17,

223:22, 224:5,
224:24, 225:1,
225:4, 225:6, 226:7,
235:6, 236:15,
236:19, 237:21,
237:23, 237:25,
238:19, 239:6,
240:12, 240:14,
240:18, 243:19,
247:16, 251:11,
251:14, 251:17,
252:2, 252:4,
252:23, 252:25,
253:5, 253:8,
253:18, 254:4,
254:20, 255:2,
255:6, 255:9,
255:13, 257:5,
257:23
**MS** [130] - 10:11,
10:15, 11:8, 41:16,
41:24, 42:5, 43:18,
55:9, 55:11, 56:1,
56:4, 56:5, 57:5,
57:6, 60:3, 60:12,
60:13, 61:15, 62:3,
62:25, 63:1, 71:2,
72:22, 72:23, 75:24,
75:25, 78:22, 83:21,
83:22, 85:1, 85:2,
87:6, 88:14, 88:16,
92:18, 95:10, 95:17,
95:18, 96:4, 114:3,
114:9, 114:14,
114:17, 115:11,
115:13, 115:16,
115:23, 116:1,
116:11, 116:14,
117:9, 117:13,
117:19, 117:21,
123:6, 123:7,
126:21, 126:22,
127:2, 127:3,
131:23, 135:19,
135:20, 141:7,
141:9, 141:11,
141:22, 142:4,
142:5, 143:11,
143:14, 143:15,
147:6, 147:14,
149:8, 149:16,
153:13, 155:22,
156:19, 156:25,
158:8, 159:8,
159:14, 159:19,
160:9, 161:23,
161:25, 164:7,
164:9, 164:20,
165:1, 178:22,
178:25, 181:9,
181:10, 181:14,

181:21, 183:9,
185:4, 185:10,
185:16, 185:23,
186:13, 187:12,
187:17, 187:18,
204:1, 205:23,
206:8, 206:10,
207:4, 207:8, 207:9,
209:1, 209:7,
209:13, 210:13,
210:16, 211:2,
211:4, 213:9,
213:11, 214:12,
214:22, 222:24,
223:1, 223:15,
223:20, 224:2, 258:3
**MULTIPLE** [8] - 14:11,
14:14, 56:25, 208:1,
217:3, 243:1, 245:25
**MUNDANE** [1] - 32:10
**MUST** [2] - 235:24,
235:25
**MYAPOLOGIES** [1] -
83:20
**MYOPIC** [3] - 87:3,
87:8, 87:9
**MYOPICALLY** [1] -
29:13

# N

**NAME** [16] - 9:13,
69:24, 143:4, 143:7,
153:25, 161:6,
161:7, 163:21,
183:2, 186:16,
186:18, 187:13,
208:22, 219:10,
240:10, 240:14
**NAMED** [1] - 198:14
**NAMES** [2] - 126:9,
168:15
**NARROW** [1] - 83:24
**NATHAN** [1] - 5:9
**NATHAN** [1] - 1:17
**NATIONAL** [9] - 16:18,
28:19, 30:1, 30:9,
30:23, 33:25, 55:3,
145:3, 234:2
**NATIONAL** [4] - 24:4,
24:6, 29:2, 30:24
**NATIONALLY** [1] -
208:4
**NATURAL** [1] - 157:17
**NATURE** [7] - 33:24,
33:25, 46:3, 153:14,
172:20, 229:23
**NCCONGRESSMAN**
**@GMAIL.COM** [1] -
196:13
**NEAR** [1] - 212:24

**NECESSARILY** [3] -
67:22, 136:23,
138:12
**NECESSARY** [11] -
62:7, 68:7, 110:19,
111:21, 118:14,
232:19, 235:16,
249:6, 250:7, 250:8,
252:6
**NECESSITY** [2] -
232:5, 248:16
**NEED** [35] - 3:25, 4:9,
6:6, 17:14, 19:5,
25:11, 27:1, 33:19,
44:23, 55:20, 55:21,
55:23, 91:11, 95:16,
117:23, 122:5,
145:20, 145:22,
146:1, 152:16,
156:22, 160:6,
160:15, 161:13,
170:19, 179:17,
202:21, 203:18,
210:19, 214:8,
225:7, 230:21, 243:8
**NEEDED** [16] - 34:5,
79:6, 79:12, 122:17,
132:4, 134:1, 134:7,
134:21, 169:17,
169:24, 170:12,
180:10, 202:17,
225:6, 231:14
**NEEDING** [1] - 33:15
**NEEDS** [2] - 232:2,
257:20
**NEFARIOUS** [1] - 65:8
**NEGATE** [1] - 252:15
**NEGATIVELY** [1] -
27:25
**NEGLIGENCE** [1] -
237:20
**NEGOTIATING** [2] -
15:15, 154:14
**NEGOTIATION** [1] -
179:1
**NEGOTIATIONS** [6] -
177:13, 177:24,
177:25, 178:11,
178:20, 179:18
**NEIL** [2] - 201:15
**NEVER** [19] - 15:24,
31:25, 121:25,
145:19, 167:20,
178:6, 178:10,
196:21, 197:22,
198:11, 200:13,
208:19, 236:23,
241:3, 243:2,
244:16, 255:25,
256:1

**NEW** [5] - 21:21, 21:22, 31:13, 69:16, 118:6
**NEW** [3] - 79:24, 87:8, 152:1
**NEWER** [1] - 46:15
**NEWS** [1] - 201:15
**NEWSPAPER** [1] - 222:17
**NEWSPAPERS** [1] - 233:14
**NEXT** [11] - 16:24, 53:22, 89:25, 115:15, 123:5, 144:16, 156:4, 172:18, 185:15, 248:17, 252:18
**NEXUS** [5] - 59:20, 59:21, 65:5, 115:5, 115:6
**NEY** [1] - 1:15
**NICE** [2] - 3:3, 183:6
**NICELY** [1] - 241:20
**NIGHT** [3] - 137:18, 137:23, 218:23
**NINTH** [6] - 234:19, 234:20, 235:13, 236:3, 236:17, 236:25
**NO** [1] - 1:5
**NOBODY** [1] - 18:7
**NON** [4] - 212:15, 247:24, 248:1, 249:24
**NON-EXECUTIVE** [2] - 247:24, 248:1
**NON-REGISTERS** [1] - 212:15
**NONE** [9] - 164:23, 173:11, 173:12, 188:22, 195:7, 198:12, 206:1, 212:23, 247:21
**NOON** [1] - 11:18
**NORMAL** [4] - 30:9, 58:10, 207:12
**NORMALLY** [4] - 12:5, 13:4, 111:4, 147:24
**NORTH** [6] - 9:23, 17:10, 17:11, 47:14, 47:16, 146:19
**NORTHERN** [4] - 6:2, 6:17, 33:9, 213:24
**NORTHERN** [2] - 1:1, 259:4
**NOTARIZATION** [1] - 157:6
**NOTE** [3] - 158:4, 159:5, 215:3
**NOTED** [1] - 228:9

**NOTES** [1] - 222:1
**NOTHING** [12] - 61:11, 185:4, 199:23, 213:23, 214:5, 222:22, 223:17, 227:14, 238:15, 242:7, 247:4
**NOTICE** [1] - 12:13
**NOTICED** [1] - 220:20
**NOTIFIED** [2] - 3:22, 175:25
**NOVEL** [1] - 246:3
**NOVEMBER** [9] - 28:5, 32:8, 36:8, 56:19, 57:7, 57:12, 57:15, 63:18, 65:18, 67:14, 67:17, 68:18, 165:16, 165:22, 166:14, 190:2, 191:3, 191:15, 191:21, 192:25, 196:3, 196:8, 196:9, 197:18, 198:10, 199:1, 199:19, 216:8
**NUANCES** [1] - 24:3
**NUMBER** [24] - 141:10, 141:13, 141:14, 141:23, 142:7, 144:5, 144:9, 145:8, 164:10, 164:14, 164:16, 164:21, 206:12, 206:19, 206:25, 207:5, 209:2, 209:12, 209:14, 210:13, 210:15, 211:2, 211:3, 213:10
**NUMBER** [51] - 15:6, 15:14, 22:19, 23:24, 24:11, 26:16, 29:17, 30:23, 31:7, 31:14, 32:11, 32:17, 35:7, 35:16, 36:6, 38:8, 47:9, 52:18, 65:20, 66:15, 79:6, 89:21, 90:11, 100:13, 111:3, 122:17, 126:5, 127:24, 129:5, 129:20, 133:7, 134:18, 136:22, 150:8, 150:17, 151:2, 171:6, 194:13, 196:18, 197:19, 197:24, 199:7, 200:2, 212:10, 212:21, 215:11, 217:7, 218:1, 226:16
**NUMBERS** [7] - 46:25, 47:10, 47:19, 66:17,

68:11, 68:13, 222:12
**NUMEROUS** [2] - 158:5, 215:18

## O

**O'CLOCK** [2] - 12:24, 117:2
**OATH** [5] - 5:20, 5:23, 9:6, 117:11, 186:5
**OBAMA** [3] - 45:24, 46:10, 46:13
**OBJECT** [10] - 41:16, 42:1, 56:24, 62:21, 114:6, 115:13, 149:8, 153:13, 157:7, 183:9
**OBJECTING** [2] - 156:23, 156:24
**OBJECTION** [25] - 11:6, 11:8, 11:9, 41:18, 43:18, 43:19, 72:18, 114:12, 115:21, 115:25, 135:14, 142:2, 149:7, 156:20, 156:25, 158:22, 159:1, 159:5, 160:20, 164:25, 183:11, 207:6, 207:7, 209:9, 209:10
**OBJECTIONS** [11] - 11:7, 141:24, 158:14, 161:19, 164:22, 209:4, 215:1, 215:2, 215:3, 218:10
**OBJECTIVELY** [4] - 249:2, 249:5, 250:5, 250:6
**OBJECTIVES** [2] - 116:4, 116:5
**OBLIGATION** [2] - 153:6, 158:20
**OBSERVATION** [1] - 218:17
**OBSERVATIONS** [3] - 53:9, 82:7, 225:8
**OBSERVE** [10] - 52:15, 53:5, 77:7, 77:16, 79:22, 80:10, 85:3, 127:12, 218:19, 231:16
**OBSERVED** [4] - 52:13, 52:16, 96:17, 98:11
**OBSERVER** [6] - 16:10, 18:17, 18:21, 18:25, 19:18, 20:2
**OBSERVERS** [1] - 218:24

**OBSERVING** [2] - 76:16, 81:7
**OBSTACLES** [1] - 152:3
**OBTAINING** [1] - 66:12
**OBVIOUSLY** [11] - 15:23, 18:7, 22:8, 27:7, 74:6, 124:4, 155:12, 160:13, 191:11, 233:10, 239:14
**OCCASION** [2] - 47:10, 235:25
**OCCASIONALLY** [1] - 218:22
**OCCUPATION** [1] - 162:2
**OCCUPIED** [1] - 28:8
**OCCUPYING** [1] - 86:17
**OCCUR** [1] - 218:5
**OCCURRED** [4] - 37:20, 126:6, 188:16, 205:20
**OCCURRING** [2] - 44:15, 202:5
**OCCURS** [1] - 221:5
**OF** [6] - 1:1, 1:4, 1:10, 1:14, 1:18, 259:4
**OFFENSE** [2] - 5:23, 20:5
**OFFER** [6] - 39:4, 91:22, 91:25, 93:7, 157:25, 250:12
**OFFERED** [1] - 241:15
**OFFERING** [1] - 246:1
**OFFHAND** [1] - 170:5
**OFFICE** [5] - 5:23, 6:23, 12:5, 14:12, 19:13, 22:10, 24:6, 41:12, 42:12, 48:14, 48:18, 48:22, 51:3, 53:6, 54:3, 80:15, 82:14, 82:22, 82:25, 91:22, 93:11, 96:15, 97:7, 98:3, 98:12, 107:14, 124:17, 127:14, 130:4, 130:22, 134:9, 146:8, 149:5, 162:23, 169:17, 172:15, 179:22, 180:15, 180:20, 181:1, 188:13, 194:21, 195:1, 196:19, 200:11, 201:2, 203:1, 204:9, 215:12, 216:24, 217:3, 218:23,

220:24, 221:1, 221:11, 230:18, 232:17, 237:9, 241:14, 244:20, 245:14, 250:12, 253:14
**OFFICE** [28] - 13:15, 13:16, 14:4, 19:11, 37:10, 37:23, 44:10, 45:13, 45:18, 48:17, 49:21, 56:21, 57:9, 72:13, 124:21, 125:4, 136:20, 137:7, 137:10, 137:22, 152:25, 169:18, 171:15, 183:19, 208:20, 209:22, 230:8, 231:24
**OFFICER** [2] - 159:25, 224:10
**OFFICER** [1] - 226:25
**OFFICER** [16] - 5:20, 5:22, 6:20, 6:21, 7:2, 10:5, 225:22, 225:23, 226:11, 226:14, 234:5, 235:24, 251:13, 251:16, 254:8, 254:9
**OFFICER'S** [2] - 228:8, 228:23
**OFFICERS** [4] - 46:1, 194:11, 196:23, 249:18
**OFFICES** [2] - 45:12, 158:12
**OFFICIAL** [3] - 1:23, 259:12, 259:16
**OFFICIAL** [28] - 13:10, 14:3, 23:21, 27:18, 32:19, 33:4, 33:7, 35:22, 39:17, 39:22, 44:13, 46:6, 58:7, 59:1, 66:11, 93:25, 129:14, 129:17, 139:2, 188:3, 235:14, 236:24, 238:23, 238:24, 242:5, 244:11, 244:25, 250:12
**OFFICIALS** [25] - 12:15, 21:14, 21:16, 21:19, 21:21, 21:23, 21:24, 23:13, 23:18, 24:2, 24:10, 54:25, 84:3, 113:14, 113:15, 118:3, 118:8, 118:15, 118:17, 119:13, 247:24, 248:1,

250:25
**OFTEN** [7] - 14:6, 15:11, 20:1, 49:19, 62:10, 147:24, 232:9
**OFTENTIMES** [12] - 12:12, 16:21, 18:25, 20:19, 21:18, 23:5, 32:4, 32:9, 37:1, 51:3, 68:12, 94:6
**OHIO** [2] - 234:3, 234:4
**OLD** [1] - 40:10
**OLEO** [2] - 234:3, 234:6
**OLEO** [1] - 234:7
**ON** [2] - 1:14, 1:18
**ONCE** [12] - 4:11, 12:11, 99:19, 151:21, 161:16, 191:12, 200:7, 204:15, 205:5, 205:20, 250:22, 252:25
**ONE** [3] - 5:16, 5:17, 33:11
**ONE** [131] - 4:3, 5:12, 5:15, 6:20, 7:8, 14:25, 15:3, 17:4, 17:9, 17:23, 18:3, 18:4, 20:2, 20:10, 22:10, 24:3, 24:16, 26:15, 27:23, 28:18, 29:7, 29:20, 31:18, 33:8, 33:20, 34:20, 35:8, 36:5, 37:1, 40:16, 41:6, 44:11, 45:12, 49:25, 50:17, 50:21, 51:2, 54:6, 57:2, 57:3, 58:23, 60:22, 61:25, 65:1, 69:21, 72:10, 80:24, 83:6, 86:18, 86:19, 88:9, 89:18, 90:15, 95:15, 96:23, 102:8, 112:3, 114:11, 115:9, 118:6, 118:10, 118:19, 118:20, 125:7, 133:8, 139:7, 141:25, 142:14, 144:16, 148:11, 152:20, 153:9, 154:15, 155:6, 155:15, 155:18, 156:24, 159:20, 159:22, 160:19, 161:9, 165:25, 168:23, 174:20, 177:21, 178:2, 181:25, 186:24,

187:5, 190:16, 192:18, 194:4, 194:11, 196:18, 197:8, 197:9, 199:18, 200:5, 217:13, 222:20, 222:24, 224:22, 226:20, 227:24, 229:13, 229:16, 231:8, 231:15, 233:6, 234:23, 235:7, 236:21, 237:17, 239:8, 239:9, 239:15, 240:21, 241:19, 241:22, 246:18, 251:22, 252:5, 252:8, 253:4, 254:25, 256:21
**ONE-ON-ONE** [2] - 20:2, 36:5
**ONES** [2] - 24:16, 197:15
**ONGOING** [22] - 58:2, 64:1, 66:6, 77:7, 77:17, 79:14, 80:11, 81:1, 81:8, 100:2, 127:18, 127:22, 128:25, 129:1, 131:3, 166:11, 176:22, 179:18, 193:9, 195:10, 196:22, 202:20
**OPEN** [1] - 3:1
**OPEN** [12] - 97:1, 130:4, 130:8, 135:4, 150:23, 151:7, 151:15, 152:5, 209:12, 210:15, 211:3, 213:10
**OPENING** [6] - 8:5, 8:6, 132:16, 132:20, 132:21, 149:22
**OPERATION** [2] - 52:16, 238:15
**OPERATIONS** [10] - 13:11, 16:18, 59:21, 61:7, 239:5, 239:7, 239:8, 239:17, 240:25, 250:21
**OPERATOR** [2] - 36:12, 37:5
**OPINE** [2] - 74:17, 84:24
**OPINING** [1] - 37:6
**OPINION** [14] - 52:17, 79:5, 79:8, 79:11, 79:13, 80:20, 114:8, 134:14, 134:21, 137:3, 138:19,

169:17, 178:7, 178:10
**OPINIONS** [1] - 169:13
**OPPONENTS** [1] - 42:21
**OPPORTUNITY** [3] - 133:1, 213:5, 240:18
**OPPOSING** [4] - 158:16, 240:19, 240:24, 248:18
**OPPOSITE** [3] - 13:22, 149:3, 243:22
**OPPOSITION** [1] - 158:5
**OPTION** [1] - 62:9
**ORDER** [12] - 6:8, 29:16, 91:15, 134:22, 150:9, 150:10, 182:22, 191:23, 241:13, 249:15, 251:4, 257:18
**ORDERED** [4] - 191:8, 191:11, 191:14, 191:16
**ORDERING** [1] - 253:2
**ORDERLY** [1] - 3:15
**ORDERS** [9] - 16:20, 27:12, 29:14, 62:13, 81:11, 81:24, 150:17, 257:13
**ORGANIZATION** [2] - 242:13, 242:19
**ORIENT** [3] - 130:17, 130:18, 198:23
**ORIGIN** [1] - 249:14
**ORIGINAL** [1] - 10:25
**ORIGINALLY** [2] - 29:9, 168:23
**OTHER..** [1] - 40:22
**OTHERS** [1] - 145:2
**OTHERWISE** [3] - 20:17, 53:3, 55:14
**OUGHT** [1] - 26:16
**OUT-OF-STATE** [1] - 212:17
**OUTCOME** [9] - 63:13, 88:19, 88:22, 152:8, 212:25, 221:9, 230:16, 230:18, 230:20
**OUTCOMES** [1] - 88:24
**OUTER** [5] - 21:2, 21:3, 21:6, 37:23, 47:6
**OUTER** [3] - 226:22, 235:16, 244:10
**OUTREACH** [12] -

54:3, 118:17, 119:13, 122:19, 196:2, 197:3, 199:3, 199:22, 201:4, 202:5, 207:11, 207:14
**OUTREACHES** [1] - 199:11
**OUTS** [2] - 58:11, 58:17
**OUTSIDE** [30] - 15:9, 19:11, 19:13, 21:3, 21:15, 21:16, 35:24, 36:1, 60:22, 64:20, 74:13, 81:19, 106:1, 111:14, 111:18, 111:24, 112:10, 112:18, 112:21, 112:24, 113:2, 113:20, 114:20, 177:2, 178:17, 180:2, 180:6, 181:11, 196:24, 239:14
**OUTSTANDING** [8] - 77:24, 129:3, 129:6, 129:9, 129:10, 129:13, 130:13, 193:8
**OVAL** [18] - 19:11, 21:2, 21:3, 21:6, 37:10, 37:23, 37:24, 44:10, 44:18, 47:6, 48:16, 56:21, 57:9, 72:13, 208:20, 230:8
**OVAL** [1] - 12:12
**OVERALL** [1] - 231:25
**OVERARCHING** [2] - 233:5, 233:6
**OVERCOME** [1] - 228:21
**OVERFLOW** [1] - 240:11
**OVERRULE** [3] - 115:25, 215:1, 215:2
**OVERRULED** [1] - 62:24
**OVERSAW** [1] - 168:22
**OVERSEE** [1] - 13:11
**OVERSEEING** [1] - 64:15
**OVERT** [2] - 252:6, 252:8
**OVERTIME** [1] - 92:12
**OVERTURN** [1] - 248:15
**OVERTURNING** [1] - 197:23
**OVERUSES** [1] -

227:21
**OVERVIEW** [1] - 22:3
**OWN** [9] - 24:21, 32:1, 139:11, 152:21, 153:14, 162:13, 162:15, 232:5

**P**

**P.M** [8] - 117:3, 142:13, 142:15, 144:17, 145:9, 160:2, 224:12
**P.M** [1] - 258:4
**PA** [1] - 65:21
**PACE** [1] - 256:23
**PACKAGE** [3] - 28:21, 154:13, 154:14
**PACKAGES** [1] - 23:14
**PAGE** [1] - 2:2
**PAGE** [30] - 43:3, 43:9, 46:18, 47:20, 49:10, 51:15, 53:13, 53:22, 54:14, 54:16, 56:17, 65:13, 68:15, 75:1, 76:5, 76:6, 89:1, 89:25, 90:1, 97:11, 97:12, 142:6, 143:11, 143:16, 144:8, 144:9, 145:18, 236:16
**PAGES** [2] - 142:8, 259:6
**PAID** [1] - 31:25
**PAK** [2] - 213:24, 216:6
**PALE** [1] - 229:21
**PANDEMIC** [3] - 86:13, 118:24, 125:20
**PANEL** [1] - 218:19
**PAPER** [1] - 76:25
**PAPERS** [1] - 229:8
**PARAMETERS** [2] - 228:22, 229:16
**PARAMOUNT** [1] - 28:13
**PARDON** [8] - 23:19, 43:11, 69:21, 107:10, 123:9, 220:25, 221:25, 249:16
**PARDONS** [1] - 29:14
**PARK** [1] - 239:13
**PART** [74] - 7:4, 9:24, 12:21, 16:10, 18:24, 19:17, 20:15, 21:25, 33:18, 34:12, 35:22, 37:24, 38:24, 45:17,

45:18, 45:24, 50:22, 58:10, 59:1, 61:12, 62:15, 63:6, 69:9, 72:4, 72:6, 74:5, 74:16, 74:18, 77:16, 82:5, 83:11, 91:14, 99:23, 110:10, 110:23, 111:9, 113:15, 113:16, 115:9, 116:6, 119:13, 130:21, 138:6, 138:14, 139:15, 142:23, 154:4, 154:11, 154:13, 154:14, 154:20, 157:4, 166:5, 175:5, 179:4, 179:9, 181:4, 181:5, 184:12, 184:13, 190:5, 192:19, 198:15, 218:23, 226:12, 227:3, 231:24, 232:15, 232:16, 234:12, 237:12, 239:13
**PARTICIPANT**[3] - 18:16, 18:21, 44:19
**PARTICIPATE**[11] - 72:16, 73:21, 110:20, 125:2, 125:5, 139:19, 139:21, 203:14, 241:25, 250:10, 253:2
**PARTICIPATED**[4] - 56:12, 69:8, 73:19, 184:3
**PARTICIPATING**[4] - 139:23, 151:1, 168:8, 184:23
**PARTICIPATION**[8] - 60:24, 62:20, 73:25, 99:22, 125:12, 176:16, 177:3, 248:15
**PARTICULAR**[50] - 7:15, 14:25, 16:15, 19:1, 19:2, 20:13, 23:7, 23:8, 26:14, 31:11, 38:9, 39:17, 44:7, 47:7, 47:13, 47:14, 48:8, 48:10, 48:20, 48:24, 50:2, 52:1, 53:8, 58:23, 63:8, 63:25, 66:24, 67:14, 67:20, 72:10, 78:12, 79:5, 80:6, 80:21, 85:10, 90:15, 91:25, 92:10, 92:13, 92:15, 96:20,

119:16, 132:24, 132:25, 134:2, 144:3, 166:18, 236:22, 241:20
**PARTICULARLY**[8] - 25:24, 39:12, 44:10, 44:15, 107:6, 216:22, 232:10, 255:23
**PARTIES**[3] - 21:15, 165:17, 220:14
**PARTISAN**[2] - 244:20, 244:21
**PARTS**[5] - 45:20, 46:7, 226:9, 228:15, 230:7
**PARTY**[4] - 8:5, 166:8, 178:10, 244:20
**PARTY**[1] - 167:12
**PAST**[2] - 245:21, 248:18
**PAT**[1] - 51:1
**PATH**[1] - 210:4
**PATRICK**[1] - 168:4
**PATROL**[1] - 73:16
**PAUL**[1] - 259:16
**PAY**[3] - 92:11, 93:22, 250:18
**PAYING**[2] - 93:16, 95:21
**PEACEFUL**[5] - 29:22, 96:24, 128:6, 228:4, 232:17
**PEBBLE**[3] - 24:24, 25:1, 40:5
**PEBBLES**[1] - 24:24
**PELOSI**[1] - 154:19
**PENALTY**[1] - 157:14
**PENDING**[5] - 57:22, 103:11, 178:1, 205:24, 217:1
**PENNSYLVANIA**[10] - 47:18, 48:13, 65:20, 65:21, 66:8, 66:22, 67:12, 68:19, 68:24, 251:21
**PENNY**[1] - 117:4
**PENNY**[1] - 259:15
**PEOPLE**[70] - 13:17, 13:19, 13:24, 13:25, 16:22, 17:16, 17:19, 19:20, 22:17, 23:13, 24:15, 26:16, 26:24, 27:24, 28:1, 29:8, 31:15, 31:21, 34:15, 34:17, 35:7, 35:24, 36:1, 36:2, 46:11, 48:19, 48:22, 49:23, 52:14, 70:4, 72:9,

88:8, 93:19, 109:19, 111:5, 121:5, 124:18, 131:21, 140:3, 147:25, 158:17, 167:7, 188:7, 193:11, 193:16, 194:13, 198:1, 208:5, 208:7, 208:19, 212:9, 214:5, 217:25, 222:5, 229:24, 231:19, 232:21, 234:7, 234:25, 236:14, 237:6, 237:8, 238:4, 238:5, 240:10, 240:17, 250:24, 251:21
**PEOPLE'S**[1] - 13:5
**PER**[5] - 188:15, 216:19, 237:20, 237:22, 238:1
**PERCENT**[5] - 26:24, 27:17, 31:5, 192:22, 204:17
**PERFORM**[1] - 111:10
**PERFORMANCE**[1] - 226:13
**PERHAPS**[10] - 14:10, 83:16, 126:19, 126:25, 136:25, 158:16, 197:7, 198:8, 236:20, 240:21
**PERIMETER**[2] - 226:22, 235:16
**PERIOD**[22] - 25:24, 28:4, 31:19, 34:24, 35:12, 36:7, 37:10, 85:20, 86:5, 92:7, 101:18, 101:24, 139:20, 142:18, 143:8, 162:17, 163:11, 165:22, 171:17, 173:22, 173:24, 199:25
**PERIODS**[1] - 9:21
**PERJURY**[1] - 157:14
**PERMISSION**[4] - 55:19, 143:12, 209:1, 209:3
**PERMIT**[1] - 256:8
**PERMITS**[1] - 158:10
**PERMITTED**[2] - 137:1, 140:4
**PERRY**[2] - 47:17, 65:19
**PERSON**[17] - 4:4, 6:20, 23:2, 25:17, 47:7, 52:13, 58:24,

93:3, 163:5, 171:8, 171:15, 172:24, 194:21, 196:7, 239:8, 239:9, 254:16
**PERSONAL**[23] - 27:5, 63:13, 64:8, 64:11, 64:13, 70:2, 71:18, 76:10, 79:7, 79:11, 88:18, 93:25, 94:6, 111:2, 121:24, 139:25, 146:6, 169:23, 170:11, 171:6, 201:1, 208:1, 235:2
**PERSONALLY**[28] - 22:21, 23:4, 55:2, 71:14, 88:21, 94:9, 100:1, 102:7, 102:8, 109:15, 130:24, 135:2, 155:10, 155:11, 167:5, 176:18, 177:19, 179:10, 190:23, 195:20, 195:23, 199:14, 200:3, 200:7, 204:8, 207:20, 207:24, 235:15
**PERSONNEL**[6] - 49:22, 50:2, 50:23, 50:24, 136:17, 140:4
**PERSONS**[1] - 165:23
**PERSPECTIVE**[5] - 129:3, 129:10, 129:12, 180:10, 211:25
**PETITIONER**[1] - 236:4
**PETITIONERS**[1] - 164:17
**PHASE**[1] - 121:17
**PHONE**[73] - 12:25, 13:1, 24:11, 24:13, 26:20, 30:12, 36:4, 46:25, 47:9, 54:24, 57:19, 66:14, 68:11, 68:13, 89:21, 90:11, 90:22, 91:4, 99:6, 99:12, 99:17, 99:18, 100:5, 100:15, 102:9, 102:21, 106:18, 106:23, 107:7, 108:15, 109:23, 110:16, 120:19, 120:21, 120:23, 123:19, 123:20, 124:9, 124:11, 124:14, 125:2, 125:5,

125:12, 125:15, 126:10, 128:13, 132:15, 132:16, 133:3, 134:14, 163:6, 171:4, 171:6, 171:24, 172:11, 173:16, 174:2, 176:10, 178:17, 180:8, 180:12, 180:17, 181:11, 196:18, 202:24, 206:15, 208:16, 208:24, 242:1, 243:5, 243:7, 245:5
**PHONETIC**[1] - 132:17
**PHOTOCOPY**[1] - 10:21
**PHRASE**[3] - 71:3, 153:10, 183:9
**PHRASED**[1] - 41:17
**PHRASING**[2] - 91:24, 149:8
**PHYSICALLY**[1] - 195:9
**PHYSICIAN**[1] - 111:3
**PICK**[3] - 8:20, 23:7, 171:4
**PICKED**[1] - 200:13
**PICKING**[2] - 8:17, 69:5
**PICTURE**[1] - 24:25
**PIECES**[1] - 66:6
**PLACE**[18] - 22:20, 29:24, 33:7, 53:1, 74:11, 74:14, 108:10, 109:18, 150:19, 154:22, 175:20, 191:1, 191:20, 204:12, 231:4, 238:10, 243:6, 244:10
**PLACED**[5] - 97:23, 108:22, 109:21, 153:6, 242:9
**PLACES**[1] - 230:12
**PLAINTIFF**[2] - 1:5, 1:14
**PLANE**[5] - 128:2, 132:23, 150:10, 150:12, 228:2
**PLANNING**[1] - 21:8
**PLANS**[1] - 152:1
**PLASTERED**[1] - 24:12
**PLATE**[3] - 19:6, 139:7, 231:15
**PLAUSIBLE**[1] - 6:25
**PLAY**[9] - 20:5, 188:20, 209:3,

210:13, 210:19, 211:2, 213:9, 216:18, 248:12
**PLAYED** [1] - 242:15
**PLAYING** [1] - 209:5
**PLED** [1] - 256:17
**PLEDGED** [2] - 165:15, 166:5
**PLUG** [1] - 36:12
**PODIUM** [2] - 8:24, 9:1
**POINT** [47] - 23:8, 24:5, 24:14, 29:25, 38:9, 41:2, 48:20, 48:24, 50:2, 63:11, 63:17, 66:24, 78:12, 79:5, 79:11, 80:6, 81:5, 94:10, 128:18, 128:21, 131:18, 133:1, 134:2, 140:24, 161:12, 177:16, 181:7, 181:8, 188:18, 193:12, 204:11, 204:21, 213:24, 226:19, 227:5, 230:4, 230:17, 231:15, 233:12, 240:16, 248:4, 248:5, 251:23, 252:20, 257:3, 257:4
**POINTED** [1] - 246:22
**POINTS** [4] - 201:17, 231:7, 247:17, 256:4
**POLICE** [1] - 69:16
**POLICIES** [6] - 18:10, 27:11, 34:21, 59:16, 61:11, 238:2
**POLICING** [1] - 196:21
**POLICY** [16] - 16:19, 26:14, 33:24, 34:6, 34:11, 49:22, 50:3, 59:4, 59:7, 59:8, 60:22, 60:23, 62:6, 81:6, 154:7
**POLITE** [1] - 67:8
**POLITICAL** [41] - 7:24, 27:9, 27:13, 28:2, 28:22, 31:2, 33:14, 33:24, 34:11, 34:13, 40:25, 45:8, 45:10, 45:14, 46:1, 46:3, 113:18, 149:6, 229:9, 229:14, 231:8, 231:25, 243:21, 244:13, 244:15, 244:17, 244:18, 244:20, 244:21, 245:13, 245:14, 245:18, 246:15, 246:21,

246:24, 247:7, 250:11, 253:20, 254:15
**POLITICALLY** [2] - 27:22, 33:19
**POLITICS** [2] - 34:7, 34:21
**POLLS** [1] - 238:5
**POMPEO** [3] - 10:24, 30:7, 30:16
**POOL** [1] - 25:3
**POP** [1] - 20:22
**PORK** [1] - 17:13
**PORTION** [7] - 72:1, 72:16, 72:25, 77:7, 79:22, 127:12, 207:1
**POSED** [1] - 92:23
**POSITION** [19] - 9:24, 9:25, 10:1, 10:2, 10:4, 15:17, 19:1, 38:18, 41:13, 146:21, 177:8, 177:9, 181:21, 188:18, 214:25, 229:23, 239:2, 254:16, 255:23
**POSITIONS** [2] - 9:18, 9:20
**POSITIVE** [3] - 28:23, 48:19, 49:3
**POSITIVELY** [2] - 27:25
**POSSESSION** [1] - 91:5
**POSSIBLE** [8] - 3:16, 4:1, 4:2, 72:16, 72:19, 243:4, 257:7, 258:1
**POSSIBLY** [3] - 238:3, 253:21, 254:14
**POST** [3] - 194:11, 194:17, 196:23
**POST** [19] - 25:24, 26:10, 34:24, 35:12, 37:10, 37:15, 85:21, 86:5, 121:17, 139:20, 165:22, 216:8, 216:14, 216:20, 216:25, 230:25, 231:1, 231:8, 231:10
**POST-2020** [1] - 121:18
**POST-ELECTION** [16] - 25:24, 34:24, 35:12, 37:10, 37:15, 85:21, 121:17, 139:20, 165:22, 216:8, 216:14, 216:20, 216:25,

230:25, 231:1, 231:8
**POSTAL** [1] - 234:10
**POSTURE** [1] - 158:19
**POTENTIAL** [16] - 36:2, 44:21, 62:13, 64:4, 81:11, 81:23, 81:24, 86:16, 99:1, 136:7, 137:13, 154:8, 182:17, 194:4, 212:12
**POTENTIALLY** [9] - 62:18, 64:9, 95:21, 112:1, 119:13, 152:8, 170:22, 197:19, 223:3
**POTUS** [1] - 65:22
**POULTRY** [1] - 17:20
**POWER** [11] - 29:22, 85:6, 96:25, 128:6, 150:13, 151:19, 228:4, 233:8, 234:12, 235:24, 236:1
**POWERS** [4] - 194:18, 194:22, 250:20, 250:21
**PRACTICAL** [1] - 87:10
**PRACTICALLY** [1] - 257:1
**PRACTICE** [2] - 162:9, 162:21
**PRACTICING** [1] - 168:4
**PRE** [2] - 26:10, 176:7
**PRE-RAFFENSPERGER** [1] - 176:7
**PRECEDED** [1] - 201:11
**PRECEDENT** [1] - 257:11
**PRECISE** [1] - 101:20
**PRECISELY** [1] - 245:5
**PREDATED** [1] - 169:3
**PREGNANCY** [1] - 29:11
**PRELIMINARY** [4] - 157:19, 182:2, 182:5, 182:8
**PREPAID** [1] - 14:25
**PREPARATION** [2] - 131:9, 184:22
**PREPARED** [2] - 11:24, 12:1
**PREPARING** [3] - 172:16, 172:19, 189:3

**PRESCRIPTION** [2] - 18:10, 115:4
**PRESENCE** [3] - 62:7, 123:19, 200:19
**PRESENT** [7] - 8:13, 59:5, 72:24, 73:8, 194:22, 195:9, 208:17
**PRESENTED** [4] - 225:14, 233:18, 242:3, 243:13
**PRESENTING** [2] - 159:13, 225:25
**PRESERVE** [1] - 214:18
**PRESIDENT** [3] - 133:18, 192:11, 240:4
**PRESIDENT** [296] - 7:3, 7:19, 10:1, 10:22, 12:10, 12:11, 12:21, 12:23, 13:9, 13:15, 13:16, 14:3, 14:4, 14:6, 14:8, 14:24, 15:12, 15:21, 16:9, 16:17, 16:22, 16:23, 16:25, 17:2, 17:15, 19:9, 19:19, 19:25, 20:8, 20:17, 22:14, 24:10, 26:17, 26:21, 29:15, 29:18, 29:25, 32:4, 32:9, 32:14, 32:15, 33:1, 33:2, 33:11, 33:20, 34:4, 34:18, 35:1, 35:6, 35:10, 35:12, 35:25, 37:10, 38:9, 38:18, 38:25, 39:1, 39:2, 39:19, 39:21, 44:19, 45:1, 45:3, 45:8, 45:10, 45:13, 45:18, 46:13, 46:25, 47:4, 47:9, 47:12, 48:21, 49:2, 49:6, 49:21, 50:1, 52:9, 52:13, 53:10, 53:21, 54:24, 56:20, 57:8, 58:10, 58:20, 61:9, 62:10, 63:5, 63:12, 63:20, 64:5, 64:8, 66:15, 66:21, 67:5, 67:11, 68:10, 69:21, 71:18, 74:7, 74:14, 75:11, 77:10, 77:12, 77:15, 77:21, 78:5, 79:2, 79:21, 81:9, 81:10, 81:16, 82:1, 82:11, 82:15, 84:9, 84:20, 85:6, 85:7, 87:25, 88:18, 88:23,

89:8, 89:12, 92:25, 93:18, 93:19, 93:21, 96:12, 97:17, 98:8, 98:15, 98:16, 98:19, 98:23, 99:2, 99:3, 99:7, 99:16, 99:19, 100:1, 100:7, 100:17, 100:23, 101:1, 101:4, 101:25, 102:23, 103:2, 103:15, 104:5, 104:15, 105:5, 105:21, 106:4, 106:19, 107:6, 107:12, 108:1, 108:8, 109:4, 109:7, 109:12, 110:11, 110:16, 110:24, 111:8, 111:10, 111:14, 111:20, 111:23, 112:6, 112:9, 112:17, 112:22, 119:19, 119:24, 120:17, 120:24, 121:7, 122:11, 123:14, 123:23, 124:11, 126:4, 126:11, 127:25, 128:12, 129:12, 129:17, 130:2, 130:5, 131:4, 131:25, 133:3, 133:19, 134:4, 134:16, 134:23, 139:25, 140:15, 146:7, 146:15, 147:3, 148:18, 150:7, 153:1, 153:6, 155:12, 163:12, 163:20, 164:3, 165:13, 165:15, 166:3, 166:5, 166:15, 169:18, 170:19, 170:25, 171:4, 173:3, 173:6, 173:18, 173:25, 174:24, 175:3, 176:3, 176:11, 178:3, 179:19, 184:4, 189:17, 189:18, 189:22, 191:11, 192:6, 192:11, 195:15, 195:21, 196:5, 199:16, 201:6, 201:7, 201:12, 201:16, 201:23, 201:25, 206:16, 207:16, 208:13, 208:23, 211:1,

211:7, 211:10, 211:15, 212:4, 213:3, 219:1, 219:13, 219:14, 219:17, 219:25, 229:10, 230:10, 230:13, 230:20, 231:18, 231:25, 232:4, 232:7, 232:16, 233:9, 233:15, 239:25, 241:25, 243:7, 247:19, 248:1, 248:6, 248:12, 254:18, 255:17, 255:21, 255:22, 255:24

**PRESIDENT'S** [26] - 19:16, 19:17, 27:16, 31:20, 32:11, 35:6, 37:3, 44:17, 45:6, 49:24, 61:17, 62:4, 81:20, 106:6, 110:21, 111:2, 129:3, 139:16, 150:4, 152:4, 152:7, 152:25, 201:2, 232:5, 232:13, 255:20

**PRESIDENTIAL** [21] - 12:7, 15:18, 22:12, 58:2, 64:21, 66:9, 78:10, 80:3, 84:1, 84:2, 104:1, 127:7, 133:21, 134:5, 153:3, 153:23, 190:2, 191:5, 191:19, 197:17

**PRESIDENTIAL** [2] - 165:14, 166:4

**PRESS** [2] - 233:14, 233:22

**PRESS** [9] - 22:8, 39:20, 145:3, 181:7, 181:8, 184:18, 184:19, 184:20, 256:9

**PRESUME** [1] - 27:3

**PRETTY** [11] - 8:3, 15:20, 21:19, 26:18, 47:3, 47:9, 66:18, 88:21, 113:8, 241:20, 255:4

**PREVAIL** [1] - 148:12

**PREVENT** [1] - 256:14

**PREVIOUS** [6] - 17:10, 100:15, 100:17, 102:21, 102:25, 104:20

**PREVIOUSLY** [7] -

47:24, 68:25, 100:16, 136:9, 183:8, 214:19, 218:8

**PRICES** [1] - 115:4

**PRIMARILY** [2] - 31:5, 218:18

**PRIMARY** [2] - 83:1, 89:19

**PRINCIPAL** [13] - 16:10, 16:15, 18:21, 18:24, 18:25, 19:8, 20:3, 20:20, 31:7, 32:16, 44:9, 110:4, 239:24

**PRINCIPALS** [2] - 29:19, 31:10

**PRINCIPLE** [2] - 228:21, 234:14

**PRIORITIES** [1] - 27:23

**PRIORITIZE** [1] - 33:21

**PRIORITY** [2] - 13:5, 28:9

**PRITTY** [2] - 259:14, 259:15

**PRIVATE** [3] - 19:25, 110:7, 110:21

**PRIVILEGE** [4] - 91:9, 173:10, 236:7, 255:15

**PRIVILEGED** [1] - 181:4

**PRO** [2] - 105:21, 255:14

**PROBABLE** [1] - 121:13

**PROBATION** [2] - 181:24, 182:10

**PROBLEM** [3] - 3:14, 4:8, 115:9

**PROBLEMATIC** [1] - 197:20

**PROCEDURAL** [1] - 148:19

**PROCEDURE** [8] - 8:10, 8:15, 77:12, 77:13, 83:2, 92:21, 103:2, 224:15

**PROCEED** [9] - 3:15, 8:22, 10:16, 51:12, 142:3, 159:13, 161:22, 182:24, 209:11

**PROCEEDING** [3] - 183:23, 224:14, 246:14

**PROCEEDINGS** [7] - 117:5, 157:19, 160:1, 181:24,

182:11, 224:11, 259:6

**PROCEEDINGS** [2] - 1:10, 258:4

**PROCEEDS** [2] - 241:4, 257:13

**PROCESS** [21] - 29:16, 29:19, 52:8, 52:12, 52:22, 76:18, 76:19, 129:14, 150:21, 151:22, 152:13, 188:6, 192:20, 193:9, 193:11, 215:19, 217:24, 218:8, 218:20, 218:23

**PROCESSES** [2] - 29:17, 208:9

**PRODUCED** [3] - 94:11, 94:17, 231:21

**PRODUCTION** [1] - 181:19

**PROFESSIONAL** [6] - 9:17, 17:18, 52:16, 52:24, 121:15, 122:1

**PROFILE** [1] - 21:20

**PROGRAMS** [1] - 30:25

**PROGRESS** [2] - 23:10, 23:11

**PROHIBITED** [4] - 137:1, 244:5, 244:8, 246:15

**PROHIBITION** [1] - 135:13, 245:16

**PROHIBITIONS** [1] - 138:6

**PROMPT** [1] - 256:24

**PROMPTED** [1] - 39:5

**PRONOUNCING** [1] - 75:6

**PROPER** [14] - 49:6, 52:17, 62:8, 68:7, 78:15, 81:17, 110:20, 111:21, 158:18, 228:23, 241:13, 249:7, 250:7, 250:8

**PROPOUNDED** [1] - 235:22

**PROS** [1] - 19:6

**PROSECUTE** [1] - 238:24

**PROSECUTED** [1] - 221:4

**PROSECUTING** [1] - 250:20

**PROSECUTION** [2] - 149:10, 246:11

**PROSECUTOR** [3] -

5:9, 5:10, 238:24

**PROTECT** [2] - 74:14, 241:23

**PROTECTED** [1] - 178:18

**PROTECTING** [2] - 74:6, 241:21

**PROTEIN** [1] - 17:13

**PROTOCOL** [2] - 26:1, 74:13

**PROTOCOLS** [3] - 74:10, 74:11

**PROVABLE** [1] - 225:18

**PROVE** [2] - 212:19, 253:4

**PROVED** [1] - 197:11

**PROVEN** [2] - 127:7, 252:15

**PROVIDE** [2] - 91:4, 223:8

**PROVIDED** [5] - 79:24, 89:16, 90:21, 91:7, 182:16

**PROVIDES** [1] - 157:13

**PROVIDING** [1] - 154:8

**PROVING** [1] - 252:5

**PROVISION** [1] - 230:4

**PROVISIONAL** [3] - 148:9, 148:11, 148:20

**PUBLIC** [16] - 3:19, 3:20, 3:21, 4:1, 5:20, 5:22, 5:23, 9:18, 33:22, 39:5, 207:15, 207:21, 207:24, 208:12, 232:10

**PUBLICATIONS** [1] - 158:11

**PUBLICLY** [1] - 37:8

**PUBLISH** [1] - 143:12

**PUBLISHED** [4] - 209:12, 210:15, 211:3, 213:10

**PURPORTING** [2] - 157:2, 196:7

**PURPORTS** [1] - 144:6

**PURPOSE** [18] - 93:8, 97:23, 103:9, 103:12, 103:14, 109:5, 110:8, 177:6, 178:3, 178:4, 183:14, 183:17, 185:7, 190:21, 201:4, 241:18, 245:1, 249:19

**PURPOSES** [11] - 76:15, 91:11, 103:10, 156:14, 157:15, 180:20, 181:1, 229:20, 236:2, 238:11, 239:21

**PURSUE** [1] - 198:19

**PURSUING** [2] - 180:16, 221:21

**PUSHBACK** [1] - 34:16

**PUSHED** [1] - 230:14

**PUSHING** [2] - 28:24, 230:16

**PUT** [15] - 4:3, 74:11, 81:5, 87:23, 98:9, 117:22, 151:22, 173:3, 193:17, 224:20, 228:1, 229:8, 238:7, 245:4, 256:3

**PUTS** [2] - 7:17, 256:25

**PUTTING** [3] - 8:17, 17:19, 255:3

---

**Q**

**QUANTIFY** [1] - 14:7

**QUANTITY** [1] - 252:11

**QUESTION'S** [1] - 161:16

**QUESTIONABLE** [2] - 197:15, 228:19

**QUESTIONING** [3] - 25:9, 119:21, 127:5

**QUESTIONS** [62] - 8:10, 8:16, 11:14, 18:19, 33:23, 51:10, 55:7, 55:18, 56:7, 56:14, 56:25, 61:20, 75:3, 76:1, 77:19, 83:15, 83:16, 86:4, 86:6, 87:4, 91:9, 95:19, 113:12, 114:4, 114:7, 116:22, 118:14, 127:9, 134:25, 135:7, 135:9, 136:22, 147:6, 149:13, 149:14, 150:23, 151:3, 151:7, 151:15, 155:6, 155:19, 161:10, 161:11, 173:11, 173:12, 181:14, 185:2, 198:24, 214:13, 218:6, 219:20,

223:2, 226:4, 226:5, 238:14, 239:1, 250:2, 251:10, 257:22
**QUICK** [2] - 20:22, 257:25
**QUICKLY** [4] - 17:19, 74:20, 93:2, 96:1
**QUIET** [1] - 8:17
**QUITE** [16] - 4:1, 115:7, 154:25, 165:20, 180:13, 180:24, 215:9, 216:13, 216:20, 217:14, 219:21, 220:1, 229:11, 243:22, 254:2, 255:19
**QUOTE** [8] - 13:13, 54:11, 95:23, 157:18, 213:14, 229:9, 254:12
**QUOTES** [1] - 234:17
**QUOTING** [3] - 78:24, 226:21, 235:21

# R

**R-A-F-F-E-N-S-P-E-R -G-E-R** [1] - 186:17
**R-O-B-E-R-T** [1] - 161:8
**RACE** [4] - 197:23, 204:15, 217:2, 217:5
**RAFFENSPERGER** [56] - 5:21, 7:16, 97:18, 98:16, 98:20, 99:2, 99:8, 99:17, 99:21, 100:18, 101:2, 101:5, 102:1, 103:1, 104:8, 104:14, 106:19, 119:20, 119:25, 120:18, 131:25, 133:20, 172:12, 173:19, 174:25, 175:3, 175:7, 175:13, 175:21, 176:7, 176:11, 184:4, 185:17, 185:25, 186:14, 186:25, 187:5, 187:19, 190:2, 192:13, 195:3, 198:4, 206:11, 207:10, 207:21, 210:10, 210:17, 211:5, 213:12, 214:12, 214:21, 215:6, 223:2, 223:18, 227:14,

237:10
**RAFFENSPERGER** [2] - 2:10, 186:7
**RAISE** [4] - 6:24, 35:17, 160:25, 186:4
**RAISED** [12] - 6:24, 30:13, 66:8, 131:4, 131:6, 132:1, 132:6, 133:13, 136:7, 140:25, 151:3, 151:5
**RAISING** [1] - 130:6
**RALLIES** [1] - 32:15
**RALLY** [1] - 33:5
**RAMP** [1] - 27:1
**RAMPED** [1] - 28:25
**RANDALL** [2] - 4:18, 9:15
**RANDALL** [3] - 1:8, 2:3, 9:8
**RANGE** [4] - 212:17, 212:18, 214:1, 255:18
**RATHER** [2] - 160:20
**RDR** [2] - 1:23, 259:11
**REACH** [29] - 23:9, 23:10, 53:21, 79:24, 80:1, 80:2, 98:25, 99:19, 99:21, 99:23, 100:11, 100:14, 100:17, 100:18, 102:6, 103:3, 103:4, 118:3, 125:1, 125:4, 134:14, 171:21, 171:22, 203:11, 218:22, 245:18, 257:2
**REACHED** [12] - 80:7, 80:8, 105:8, 180:11, 199:18, 200:3, 200:7, 200:20, 201:3, 203:10, 219:12, 220:13
**REACHING** [7] - 46:5, 54:9, 54:10, 96:14, 123:12, 123:15, 125:11
**READ** [12] - 53:2, 75:14, 76:25, 91:14, 101:6, 114:24, 131:19, 144:21, 145:12, 185:22, 222:17, 235:11
**READILY** [1] - 66:17
**READING** [3] - 41:8, 52:14, 144:22
**READY** [9] - 3:4, 117:7, 117:9, 159:13, 159:15, 159:18, 160:8, 240:10

**REAL** [7] - 28:20, 31:12, 134:8, 143:25, 154:21, 162:11, 222:13
**REALIZED** [1] - 212:20
**REALLY** [24] - 11:24, 13:4, 20:4, 28:2, 40:25, 92:16, 134:3, 151:10, 167:14, 194:12, 198:11, 208:19, 217:23, 226:8, 229:4, 230:2, 233:5, 233:6, 235:7, 241:5, 242:24, 249:25, 256:10, 256:20
**REALM** [1] - 250:8
**REALTIME** [2] - 30:17, 33:10
**REASON** [24] - 33:17, 33:23, 50:21, 65:25, 77:24, 79:15, 92:2, 117:23, 125:13, 141:20, 160:14, 177:16, 178:17, 182:22, 184:16, 216:16, 221:20, 226:24, 227:10, 229:22, 231:17, 233:4, 233:24, 245:4
**REASONABLE** [6] - 235:17, 249:2, 249:5, 249:6, 250:5, 250:6
**REASONING** [1] - 67:22
**REASONS** [7] - 76:11, 118:4, 196:18, 229:13, 229:15, 234:23, 238:1
**REAUTHORIZATION** [1] - 30:24
**REBUTTAL** [3] - 224:4, 224:17, 224:18
**RECEIVE** [1] - 36:1
**RECEIVED** [10] - 11:10, 43:20, 69:21, 77:10, 90:24, 94:12, 142:13, 192:18, 199:14, 249:10
**RECEIVING** [2] - 25:23, 158:1
**RECENTLY** [3] - 35:3, 39:20, 222:17
**RECESS** [2] - 160:1, 224:11
**RECOGNITION** [1] - 236:7

**RECOGNIZE** [8] - 10:18, 88:17, 141:14, 141:16, 164:11, 206:13, 226:23, 238:5
**RECOGNIZED** [1] - 234:11
**RECOGNIZING** [1] - 177:15
**RECOLLECT** [3] - 104:6, 104:15, 199:17
**RECOLLECTION** [38] - 38:17, 48:11, 50:9, 55:16, 69:1, 69:7, 72:1, 72:15, 73:1, 73:21, 89:20, 90:3, 90:6, 90:9, 90:18, 101:22, 103:8, 125:9, 125:10, 125:11, 126:3, 126:16, 126:18, 132:11, 133:18, 141:19, 175:18, 176:4, 176:9, 186:21, 186:22, 200:2, 200:9, 200:10, 202:16, 206:1, 206:23, 209:15
**RECOMMENDATION S** [5] - 26:9, 26:13, 50:23, 62:11, 62:12
**RECOMMENDED** [2] - 30:20, 53:20
**RECORD** [24] - 18:15, 43:5, 43:16, 58:17, 94:8, 135:15, 144:23, 159:5, 161:6, 167:19, 167:20, 177:10, 180:15, 180:17, 185:6, 187:15, 194:16, 212:8, 214:18, 215:3, 224:20, 230:9, 231:21, 242:14
**RECORDING** [2] - 206:15, 207:1
**RECORDS** [3] - 90:22, 91:4, 107:14
**RECOUNT** [14] - 92:9, 129:14, 191:5, 191:9, 191:13, 191:16, 191:24, 191:25, 192:2, 192:5, 204:16, 207:14
**RECOUNTED** [1] - 53:10

**RECOUNTS** [2] - 205:24, 208:10
**RECROSS** [2] - 155:21, 223:16
**RED** [1] - 249:24
**REDACTED** [1] - 143:2
**REDIRECT** [3] - 147:8, 185:3, 222:23
**REDIRECT** [4] - 2:5, 2:12, 147:10, 222:25
**REDUCED** [1] - 198:2
**REELECT** [1] - 142:22
**REELECTED** [1] - 146:22
**REELECTION** [13] - 31:20, 63:16, 63:18, 140:16, 146:7, 163:11, 163:16, 163:19, 170:11, 176:17, 179:10, 184:5, 190:24
**REFER** [6] - 22:23, 24:23, 29:10, 117:23, 157:12, 215:15
**REFERENCE** [3] - 242:2, 244:23, 244:24
**REFERENCED** [7] - 99:25, 118:10, 118:16, 119:5, 136:18, 179:21, 191:24
**REFERENCES** [3] - 214:8, 248:8, 248:9
**REFERENCING** [1] - 210:5
**REFERRED** [6] - 25:1, 86:15, 96:6, 140:25, 242:20, 244:17
**REFERRING** [7] - 119:15, 145:25, 146:3, 210:6, 210:18, 210:24, 245:23
**REFLECT** [2] - 18:15, 185:6
**REFRESHED** [1] - 222:5
**REGARD** [2] - 39:12, 250:5
**REGARDING** [4] - 56:21, 188:2, 229:14, 238:21
**REGARDLESS** [2] - 26:4, 36:23
**REGISTER** [1] - 211:23
**REGISTERED** [2] -

165:14, 166:4
**REGISTERS** [1] -
212:15
**REGULAR** [5] - 30:6,
32:6, 39:3, 47:10,
66:18
**REGULARLY** [2] -
21:20, 66:16
**REGULATIONS** [2] -
244:9, 246:5
**REIMBURSE** [1] -
87:17
**REIMBURSED** [3] -
88:2, 88:10, 93:20
**REIMBURSEMENT** [1]
- 87:24
**REIMBURSING** [1] -
87:20
**REITERATE** [2] -
77:12, 128:24
**RELATE** [2] - 150:25,
152:9
**RELATED** [19] - 44:3,
51:22, 54:21, 58:2,
93:17, 113:22,
113:24, 122:12,
129:5, 140:3, 167:2,
178:14, 193:6,
196:2, 198:6,
198:10, 212:10,
214:5, 233:19
**RELATES** [5] -
105:16, 107:1,
134:19, 152:11,
154:22
**RELATING** [3] - 6:22,
217:4, 253:12
**RELATION** [5] - 31:20,
183:24, 227:5,
228:7, 235:17
**RELATIONSHIP** [16] -
17:10, 50:1, 70:3,
121:15, 121:16,
122:2, 123:16,
163:10, 163:15,
169:2, 169:9,
169:21, 201:1,
232:4, 237:3
**RELATIONSHIPS** [1] -
169:25
**RELAY** [1] - 53:9
**RELAYED** [6] - 69:8,
103:18, 201:10,
201:22, 202:17,
203:16
**RELAYING** [1] - 64:5
**RELEASED** [2] -
125:23, 223:24
**RELEVANCE** [1] -
231:5

**RELEVANT** [2] -
158:2, 251:14
**RELIED** [2] - 180:18,
234:17
**RELIEF** [9] - 15:15,
23:14, 24:17, 24:18,
28:21, 29:1, 30:25,
118:16, 154:13
**RELIES** [1] - 158:14
**RELY** [1] - 62:6
**RELYING** [2] - 65:6,
158:11
**REMAIN** [5] - 6:13,
6:15, 6:16, 8:1, 9:5
**REMAINDER** [2] -
73:8, 73:19
**REMAINED** [2] - 10:2,
194:4
**REMAND** [1] - 6:5
**REMEDY** [1] - 213:17
**REMEMBER** [19] -
17:9, 31:12, 33:8,
46:8, 50:10, 50:13,
50:23, 72:9, 74:16,
77:21, 91:2, 101:9,
106:25, 107:1,
168:2, 191:22,
219:7, 240:17,
254:25
**REMEMBERING** [1] -
50:16
**REMIND** [1] - 117:10
**REMINDED** [2] -
36:10, 242:17
**REMINDING** [1] -
168:20
**REMOVAL** [1] -
226:25
**REMOVAL** [25] -
158:6, 181:22,
181:25, 225:11,
225:18, 225:19,
225:20, 226:19,
227:1, 229:5,
229:20, 233:2,
233:3, 234:15,
237:13, 238:11,
238:12, 238:21,
239:22, 241:13,
241:18, 241:21,
243:22, 256:19,
256:24
**REMOVE** [5] - 4:4,
5:25, 7:20, 242:10,
253:17
**REMOVED** [3] -
217:25, 234:9,
253:19
**REMOVING** [2] -
250:23, 257:19

**RENDER** [1] - 169:13
**REPEAT** [4] - 20:16,
78:20, 104:10
**REPEATEDLY** [1] -
130:6
**REPHRASE** [7] -
72:20, 83:24, 104:9,
135:19, 149:14,
163:13, 165:19
**REPLACE** [1] - 40:10
**REPLY** [3] - 6:14,
243:19, 244:16
**REPORT** [9] - 41:3,
70:22, 78:1, 85:11,
97:3, 131:15,
188:16, 208:7,
231:17
**REPORTED** [7] - 18:4,
37:8, 82:11, 82:15,
106:24, 190:11,
208:11
**REPORTED** [1] -
258:4
**REPORTER** [3] - 1:23,
259:12, 259:16
**REPORTER** [1] -
117:4
**REPORTER** [8] -
58:16, 61:22, 62:2,
67:7, 89:22, 168:9,
185:20, 186:16
**REPORTERS** [6] -
25:1, 25:3, 25:4,
136:22, 136:25,
137:3
**REPORTING** [1] -
117:5
**REPORTS** [3] - 53:2,
101:6, 101:7
**REPRESENT** [9] - 5:7,
9:23, 9:24, 109:3,
109:7, 164:2,
165:17, 165:23,
167:1
**REPRESENTATION**
[8] - 108:3, 122:4,
164:15, 167:5,
171:7, 171:14,
177:19, 179:9
**REPRESENTATIONS**
[1] - 133:12
**REPRESENTATIVE**
[1] - 65:19
**REPRESENTATIVE**
[1] - 170:10
**REPRESENTATIVES**
[1] - 25:22
**REPRESENTED** [10] -
7:11, 105:20, 108:4,
109:13, 122:2,

139:25, 163:17,
164:3, 166:2, 166:20
**REPRESENTING** [9] -
160:11, 160:14,
179:25, 180:20,
181:1, 183:3, 184:4,
185:6, 187:16
**REPRIMAND** [1] - 6:4
**REPUBLICAN** [2] -
24:22, 167:12
**REPUBLICANS** [1] -
46:7
**REPUTATION** [1] -
255:4
**REQUEST** [7] - 58:20,
66:14, 93:11, 104:6,
123:19, 214:19,
220:15
**REQUESTED** [6] -
7:19, 106:18,
125:23, 191:25,
192:2, 200:19
**REQUESTING** [1] -
5:21
**REQUESTS** [2] -
220:4, 222:7
**REQUIRE** [2] - 61:11,
133:4
**REQUIRED** [8] - 31:1,
31:5, 39:14, 58:12,
88:8, 180:9, 190:18,
236:4
**REQUIREMENT** [2] -
15:17, 244:24
**REQUIREMENTS** [2] -
7:2, 248:22
**REQUIRES** [3] - 88:6,
228:7, 253:12
**REQUIRING** [1] -
227:5
**REREAD** [1] - 131:8
**REREADING** [2] -
131:7, 132:6
**RESCAN** [1] - 204:18
**RESEARCH** [1] -
235:1
**RESERVE** [2] -
224:17, 225:1
**RESIDE** [1] - 9:14
**RESIDENCE** [3] -
12:10, 12:11, 12:23
**RESIDENCY** [1] -
212:20
**RESIGN** [2] - 37:17,
37:21
**RESIGNATION** [1] -
39:4
**RESIGNED** [2] - 10:1,
213:25
**RESIGNING** [1] -

230:15
**RESISTED** [1] - 202:7
**RESOLUTION** [1] -
19:7
**RESOLVE** [7] -
107:11, 140:9,
155:9, 155:17,
193:14, 210:7, 210:8
**RESOLVED** [7] - 98:9,
129:15, 134:25,
193:15, 193:20,
217:17, 218:4
**RESOLVING** [4] -
107:8, 107:9,
155:10, 220:4
**RESOURCE** [2] - 93:4,
137:6, 137:7
**RESOURCES** [4] -
92:23, 215:22,
246:1, 250:12
**RESPECT** [3] -
106:14, 206:2,
229:18
**RESPECTFULLY** [2] -
239:22, 257:1
**RESPOND** [1] - 145:9
**RESPONDS** [1] -
144:24
**RESPONSE** [20] -
6:13, 26:4, 26:5,
41:25, 64:1, 86:13,
91:6, 97:3, 116:3,
118:13, 118:23,
119:7, 119:14,
125:19, 144:16,
144:21, 145:12,
155:6, 214:22,
246:22
**RESPONSIBILITIES**
[7] - 87:13, 111:15,
111:25, 112:18,
114:21, 153:3, 188:1
**RESPONSIBILITY** [6]
- 12:17, 110:5,
110:6, 139:8,
152:24, 154:3
**RESPONSIBLE** [1] -
31:11
**RESPONSIVE** [5] -
60:1, 78:18, 94:11,
94:17, 229:8
**RESPONSIVENESS**
[1] - 115:13
**REST** [3] - 49:8, 73:22,
228:3
**RESTRICTIONS** [1] -
139:18
**RESTS** [1] - 159:12
**RESULT** [15] - 41:3,
42:8, 42:9, 119:7,

120:10, 155:14,
191:12, 192:5,
199:10, 202:3,
207:23, 217:8,
231:11, 245:12,
249:20
**RESULTED** [2] - 42:3,
233:3
**RESULTS** [26] - 35:1,
36:3, 63:21, 63:23,
69:9, 77:13, 83:4,
91:15, 122:15,
188:8, 188:16,
188:19, 189:14,
190:11, 193:21,
197:6, 197:23,
197:24, 204:17,
208:8, 208:11,
213:1, 217:22,
220:20, 245:2,
246:15
**RESUMES** [1] - 49:23
**RETALLY** [3] - 191:11,
191:13, 191:14
**RETURN** [3] - 196:15,
196:17, 199:8
**RETURNED** [5] - 5:14,
102:12, 102:15,
102:16, 102:19
**RETURNING** [1] - 13:1
**REVERSED** [1] -
64:10
**REVERSIBLE** [1] -
256:5
**REVIEW** [7] - 29:25,
95:21, 97:8, 164:14,
169:14, 194:15,
204:18
**REVIEWED** [4] - 6:3,
131:14, 131:15,
206:19
**REVIEWING** [1] -
221:25
**REVISED** [1] - 228:10
**REVOCATIONS** [1] -
181:24
**REVOKE** [1] - 182:10
**RHETORIC** [2] -
115:8, 227:22
**RHYME** [1] - 33:22
**RICO** [3] - 5:18, 252:5,
253:9
**RIGHTFULLY** [1] -
24:22
**RISE** [3] - 159:25,
197:22, 224:10
**RISK** [1] - 13:5
**RMR** [2] - 117:4,
259:15
**ROADBLOCK** [1] -

151:16
**ROBERT** [2] - 4:25,
161:7
**ROBERT** [2] - 2:7,
161:2
**ROBUST** [2] - 67:1,
139:6
**ROLE** [127] - 11:15,
14:17, 22:3, 31:19,
39:13, 44:3, 46:23,
46:24, 47:23, 48:6,
49:16, 49:18, 49:20,
51:22, 51:23, 53:19,
53:20, 54:2, 54:4,
54:21, 54:23, 58:7,
61:14, 62:8, 63:7,
63:10, 64:14, 64:17,
64:22, 64:25, 65:1,
66:11, 68:8, 74:6,
74:9, 74:13, 74:17,
82:5, 83:7, 83:8,
83:9, 83:25, 84:2,
84:3, 84:7, 84:9,
84:16, 84:19, 85:8,
85:13, 85:16, 88:9,
106:1, 106:13,
108:25, 110:10,
110:20, 111:21,
112:11, 112:25,
113:3, 113:5, 113:9,
113:16, 113:17,
113:20, 115:20,
116:4, 118:2, 119:2,
119:6, 122:10,
122:21, 122:22,
122:23, 123:12,
138:5, 138:8,
138:15, 138:16,
138:17, 138:23,
139:1, 139:2, 139:3,
139:6, 140:5,
140:11, 140:14,
140:16, 140:19,
140:23, 141:2,
154:4, 168:21,
169:12, 176:16,
177:17, 188:13,
188:20, 189:18,
189:22, 195:3,
204:3, 204:6,
213:25, 215:8,
216:18, 216:19,
226:13, 226:14,
228:23, 229:2,
230:25, 231:1,
231:2, 237:8,
238:10, 239:11,
239:13, 242:15,
247:18, 248:11,
255:19, 256:7

**ROLES** [8] - 45:16,
108:20, 108:23,
109:8, 116:5, 154:5,
220:1, 223:3
**ROLLS** [1] - 217:25
**ROLODEX** [1] - 47:3
**ROOM** [1] - 18:9
**ROOM** [11] - 21:5,
37:24, 37:25, 48:23,
52:23, 69:2, 69:12,
159:20, 172:22,
172:23, 172:24
**ROOMS** [1] - 48:16
**ROOSEVELT** [2] -
18:9, 249:15
**ROSWELL** [2] -
162:15, 162:23
**ROTHSCHILD** [2] -
168:8, 168:9
**ROUND** [1] - 45:3
**ROUTE** [1] - 36:13
**ROUTING** [1] - 36:18
**RPR** [3] - 1:23, 117:4,
259:11
**RUDY** [1] - 57:18
**RULE** [6] - 114:11,
148:10, 182:6,
249:14, 257:10
**RULE** [11] - 157:17,
177:5, 178:18,
181:18, 181:23,
182:7, 182:8, 182:9,
182:10, 182:11,
214:19
**RULED** [1] - 214:19
**RULES** [1] - 157:17
**RULES** [6] - 116:25,
157:18, 180:7,
182:8, 243:22,
256:24
**RULING** [2] - 182:15,
257:25
**RUN** [2] - 137:15,
237:8
**RUNNING** [5] - 31:22,
33:11, 63:16, 63:18,
255:24
**RUNS** [1] - 216:17
**RYAN** [6] - 178:15,
180:6, 180:11,
180:18, 180:19,
203:2

**S**

**S-H-A-R-M-A-N** [1] -
187:14
**SAFE** [4] - 49:6, 60:18,
63:4, 111:10
**SAFER** [1] - 62:12

**SAKE** [1] - 240:3
**SAMPLE** [1] - 192:22
**SANCTION** [1] - 234:5
**SAT** [1] - 47:6
**SATISFACTION** [1] -
127:6
**SATURDAY** [1] -
172:16
**SAUDI** [1] - 55:1
**SAVE** [2] - 8:13, 165:5
**SAW** [6] - 110:10,
132:16, 132:20,
148:19, 208:2, 208:4
**SCENARIO** [1] -
254:20
**SCHEDULE** [10] -
12:3, 13:4, 14:22,
19:10, 19:16, 19:17,
19:20, 20:16, 62:5,
139:16
**SCHEDULER** [3] -
19:10, 19:14, 19:15
**SCHEDULINGS** [1] -
32:5
**SCHOOL** [1] - 234:24
**SCHUMER** [3] - 31:12,
31:17, 154:20
**SCOPE** [34] - 45:5,
56:13, 60:4, 60:7,
90:23, 106:2, 108:2,
111:14, 111:19,
111:24, 112:10,
112:18, 112:24,
114:20, 115:19,
178:18, 224:18,
229:9, 239:14,
239:16, 240:23,
241:2, 241:11,
241:15, 243:12,
243:15, 244:10,
245:17, 245:20,
247:11, 248:24,
249:12, 253:21
**SCOTT** [1] - 65:19
**SCREECHING** [1] -
28:22
**SE** [3] - 237:20,
237:22, 238:1
**SEARCH** [1] - 235:1
**SEAT** [1] - 3:6, 3:7,
3:8, 3:9, 3:14, 3:16,
3:17, 40:10, 161:5,
186:10, 187:4
**SEATED** [3] - 3:2,
160:4, 160:6
**SECOND** [18] - 3:18,
20:15, 42:24, 50:22,
95:15, 114:11,
143:11, 143:16,
161:9, 177:22,

186:24, 203:7,
203:8, 205:16,
226:12, 227:3,
229:22, 233:17
**SECRET** [1] - 77:3
**SECRETARIES** [2] -
23:23, 83:8
**SECRETARY** [103] -
5:21, 7:15, 7:20,
10:24, 17:9, 17:11,
17:24, 19:4, 19:5,
29:4, 30:6, 30:16,
53:6, 54:3, 80:14,
82:13, 91:22, 92:20,
93:11, 96:14, 97:7,
97:18, 98:3, 98:12,
98:15, 98:20, 99:2,
99:8, 99:20, 100:18,
101:2, 101:5, 102:1,
103:1, 104:7,
104:14, 105:8,
106:19, 107:14,
119:20, 119:25,
120:18, 127:14,
130:3, 130:7,
130:22, 131:25,
133:4, 133:20,
134:9, 154:20,
155:12, 172:12,
173:19, 174:24,
175:3, 175:21,
176:3, 176:11,
178:16, 179:22,
179:25, 180:15,
180:20, 181:1,
184:3, 185:16,
185:25, 186:14,
186:25, 187:5,
187:16, 187:21,
187:22, 188:1,
189:2, 189:24,
190:1, 192:13,
195:3, 198:4,
200:11, 200:20,
202:25, 205:13,
205:17, 205:19,
206:11, 207:10,
207:11, 207:21,
210:17, 211:5,
213:12, 213:18,
213:22, 214:12,
215:6, 215:8, 223:2,
223:18, 233:15,
233:23
**SECRETARY** [12] -
22:8, 29:20, 31:14,
39:20, 100:14,
100:24, 102:7,
102:8, 120:1,
124:13, 187:19,
196:13

**SECRETARY'S** [1] - 96:18

**SECTION** [1] - 157:23

**SECURE** [6] - 29:24, 30:20, 60:18, 63:4, 77:4, 111:10

**SECURER** [1] - 62:13

**SECURITY** [7] - 24:4, 24:6, 59:23, 82:2, 84:4, 216:4, 239:21

**SECURITY** [12] - 12:7, 16:18, 28:19, 30:1, 30:9, 30:23, 33:25, 55:3, 74:8, 215:21, 215:25, 239:20

**SECURITY** [2] - 159:25, 224:10

**SEE** [40] - 5:5, 10:13, 10:14, 13:17, 14:7, 16:22, 16:24, 20:22, 20:23, 24:25, 30:14, 47:12, 52:11, 52:18, 52:19, 54:8, 60:15, 65:14, 73:4, 83:24, 96:5, 140:5, 141:13, 145:10, 165:5, 167:17, 185:13, 185:14, 197:1, 206:13, 207:23, 208:12, 208:14, 225:4, 229:11, 232:6, 242:22, 245:16, 251:6, 254:20

**SEEING** [8] - 16:23, 16:25, 52:21, 64:9, 73:5, 92:23, 142:16, 251:5

**SEEK** [1] - 136:16

**SEEKING** [5] - 46:14, 213:17, 220:11, 246:15, 248:15

**SEEM** [3] - 48:12, 89:20, 142:12

**SELECTED** [1] - 192:22

**SELF** [2] - 158:12, 225:23

**SELF-AUTHENTICATING** [1] - 158:12

**SELF-DEFENSE** [1] - 225:23

**SEMINAL** [1] - 233:24

**SENATE** [1] - 46:8

**SENATOR** [2] - 31:12, 31:17

**SEND** [9] - 27:23, 65:20, 65:23, 91:12, 94:7, 188:24,

188:25, 196:7

**SENIOR** [2] - 14:3, 34:3

**SENSE** [4] - 24:4, 24:5, 110:2, 230:19

**SENT** [13] - 65:19, 66:20, 90:3, 90:4, 90:8, 91:13, 91:17, 95:20, 96:13, 142:12, 143:20, 197:12, 199:5

**SENTENCE** [1] - 212:13

**SENTENCING** [1] - 182:9

**SENTENCINGS** [1] - 181:23

**SEPARATE** [2] - 94:4, 191:13

**SEPARATELY** [1] - 183:19

**SEPARATING** [1] - 36:19

**SEPTEMBER** [3] - 257:17, 257:19, 257:21

**SEQUITUR** [1] - 249:24

**SERIES** [5] - 39:7, 56:6, 56:14, 142:17, 181:24

**SERVANTS** [1] - 15:4

**SERVE** [1] - 11:16

**SERVED** [1] - 234:7

**SERVED** [4] - 11:17, 123:13, 135:21, 187:22

**SERVICE** [2] - 9:18, 234:11

**SERVICE** [1] - 77:3

**SERVING** [3] - 68:10, 110:24, 234:5

**SESSION** [1] - 50:5

**SET** [24] - 12:18, 13:5, 19:6, 20:16, 30:15, 30:20, 54:24, 55:2, 97:21, 97:23, 99:14, 99:15, 104:25, 109:19, 126:6, 148:11, 219:17, 247:3, 256:11, 257:11, 257:16, 257:17

**SETTING** [12] - 6:9, 17:22, 19:10, 22:19, 30:12, 32:10, 49:23, 108:15, 109:20, 110:16, 183:8, 219:11

**SETTINGS** [1] -

245:25

**SETTLE** [3] - 98:1, 108:17, 206:4

**SETTLED** [2] - 221:13, 235:14

**SETTLEMENT** [16] - 103:10, 110:7, 110:21, 110:23, 177:6, 177:12, 177:23, 177:25, 178:5, 178:11, 178:19, 179:1, 179:18, 180:21, 181:2, 206:5

**SEVEN** [1] - 144:17

**SEVERAL** [14] - 37:14, 90:19, 105:3, 131:6, 167:7, 168:2, 171:24, 174:3, 190:10, 196:18, 207:22, 216:3, 217:11, 250:13

**SHAFFER** [7] - 165:14, 166:4, 166:7, 167:13, 176:19, 176:20, 184:6

**SHAKING** [1] - 66:1

**SHAPE** [1] - 231:9

**SHARE** [3] - 131:25, 234:16, 234:22

**SHARED** [3] - 82:18, 91:10, 156:13

**SHARING** [1] - 17:5

**SHARMAN** [1] - 187:14

**SHARMAN** [2] - 187:14, 187:15

**SHARPEN** [1] - 18:17

**SHEET** [1] - 15:5

**SHOOTING** [1] - 225:21

**SHORT** [6] - 55:22, 147:5, 192:6, 192:7, 201:17, 207:13

**SHORTLY** [1] - 40:13

**SHOT** [1] - 239:12

**SHOTS** [1] - 174:21

**SHOW** [17] - 19:6, 42:19, 108:10, 141:12, 158:18, 164:6, 228:12, 231:22, 241:5, 243:14, 246:5, 246:11, 252:7, 253:1, 254:12, 257:20

**SHOWING** [2] - 6:19, 237:2

**SHOWN** [2] - 252:10,

252:11

**SHOWS** [1] - 230:23

**SHUT** [1] - 160:3

**SIC** [1] - 201:20

**SIC]** [1] - 212:6

**SIDE** [7] - 4:12, 8:8, 69:12, 124:14, 208:16, 208:17, 214:13

**SIDES** [1] - 122:18

**SIGN** [2] - 145:5, 234:7

**SIGNATURE** [56] - 52:6, 76:16, 76:18, 77:7, 77:16, 79:23, 80:11, 81:8, 82:8, 85:4, 91:15, 95:21, 96:19, 96:21, 98:2, 103:12, 103:15, 103:16, 104:1, 107:5, 108:8, 108:9, 127:12, 129:4, 129:19, 130:23, 132:5, 132:9, 132:13, 133:9, 134:10, 192:13, 192:16, 192:19, 192:21, 193:5, 193:18, 194:1, 194:7, 194:10, 194:22, 195:4, 195:17, 195:19, 197:4, 197:6, 198:6, 198:9, 198:16, 198:19, 199:3, 206:16, 206:18, 206:22, 208:10, 218:7

**SIGNATURES** [3] - 131:1, 134:20, 197:8

**SIGNED** [3] - 10:23, 164:18

**SIGNING** [2] - 34:19, 197:8

**SIMILAR** [4] - 22:17, 47:17, 168:25, 197:9

**SIMPLE** [2] - 32:4, 232:3

**SIMPLEST** [1] - 32:5

**SIMPLY** [5] - 241:6, 241:16, 244:4, 246:4, 256:18

**SIMULTANEOUSLY** [1] - 247:5

**SINGLE** [5] - 208:6, 212:2, 217:12, 241:24, 242:2

**SISA** [1] - 215:25

**SIT** [11] - 3:13, 22:10, 67:4, 68:1, 69:7,

75:17, 80:25, 116:18, 159:4, 222:15, 255:7

**SITTING** [6] - 3:8, 3:9, 72:9, 138:11, 160:16, 160:17

**SITUATION** [2] - 4:3, 197:10

**SITUATIONS** [2] - 208:3, 243:1

**SIX** [1] - 255:12

**SIZE** [1] - 10:25

**SKATE** [1] - 33:22

**SLIGHTLY** [4] - 56:16, 98:13, 126:16, 189:11

**SLOW** [1] - 185:19

**SMALL** [4] - 162:15, 197:24, 232:15, 233:6

**SO..** [5] - 69:20, 101:11, 108:19, 131:16, 240:16

**SOCIAL** [1] - 208:4

**SOLELY** [6] - 113:19, 113:22, 114:19, 115:17, 203:21, 250:10

**SOLICIT** [1] - 195:14

**SOLICITATION** [1] - 5:19

**SOLICITING** [1] - 5:20

**SOMEONE** [20] - 20:23, 47:12, 69:25, 70:18, 71:10, 96:14, 136:20, 137:14, 137:21, 140:8, 145:20, 145:22, 146:2, 169:22, 172:21, 172:22, 173:4, 194:17, 199:4, 222:18

**SOMETHING'S** [1] - 160:14

**SOMETIME** [4] - 38:16, 57:12, 120:13, 130:21

**SOMETIMES** [8] - 17:6, 18:15, 18:16, 21:7, 47:7, 58:21, 73:14

**SOMEWHERE** [3] - 174:14, 214:1, 233:20

**SOON** [1] - 257:1

**SORRY** [38] - 22:24, 25:6, 25:8, 41:23, 42:16, 48:2, 51:17, 51:18, 59:10, 60:6, 60:16, 66:2, 67:6,

67:8, 69:15, 71:9,
86:22, 89:3, 89:19,
95:14, 96:2, 100:18,
104:9, 121:17,
123:1, 129:24,
145:15, 145:16,
157:8, 163:13,
165:6, 166:10,
185:24, 188:14,
193:13, 206:7,
231:16
**SORT** [9] - 14:23,
97:8, 220:11,
220:13, 227:19,
232:9, 236:21,
248:17, 256:20
**SORTS** [2] - 11:22,
14:25
**SOUND** [8] - 75:18,
107:19, 190:12,
191:17, 191:22,
236:10, 250:3,
250:15
**SOUNDED** [1] -
148:21
**SOUNDS** [4] - 57:12,
107:20, 139:6,
220:12
**SOUTH** [1] - 9:15
**SPACE** [1] - 160:18
**SPEAKER** [1] - 154:19
**SPEAKER** [2] - 65:21,
66:21
**SPEAKING** [11] - 39:1,
59:6, 93:5, 136:18,
169:16, 185:20,
194:7, 219:25,
220:9, 240:11, 255:2
**SPEAKS** [1] - 93:17
**SPEARHEADING** [1] -
172:4
**SPECIAL** [7] - 5:9,
41:4, 42:3, 42:8,
183:14, 183:16
**SPECIFIC** [26] - 16:4,
16:8, 38:5, 56:7,
68:22, 69:4, 71:25,
72:21, 81:3, 85:5,
90:9, 106:20,
106:22, 107:1,
132:1, 146:15,
153:5, 180:9,
181:23, 189:8,
191:22, 197:19,
199:23, 213:23,
214:5, 220:5
**SPECIFICALLY** [18] -
28:4, 33:8, 33:14,
34:23, 42:4, 68:6,
72:4, 109:25,

120:22, 121:12,
121:22, 128:17,
148:4, 190:20,
211:14, 215:24,
244:18, 247:10
**SPECIFICITY** [1] -
69:23
**SPECIFICS** [6] -
18:12, 87:4, 104:18,
104:19, 170:7, 248:3
**SPECIFIED** [2] -
182:7, 239:15
**SPECULATE** [10] -
61:13, 61:16, 67:24,
71:21, 71:22, 74:18,
95:7, 112:13, 149:10
**SPECULATING** [1] -
149:11
**SPECULATION** [1] -
52:14
**SPEED** [3] - 91:14,
92:1, 242:6
**SPELL** [2] - 161:6,
186:16
**SPELLED** [3] - 89:22,
153:1, 188:22
**SPEND** [1] - 19:19
**SPENT** [2] - 51:3,
229:13
**SPIRIT** [1] - 130:19
**SPOKEN** [3] - 163:6,
195:20, 195:23
**SPOT** [1] - 160:22
**SPOUSE** [2] - 197:8,
197:9
**SPUN** [1] - 208:5
**SQUARELY** [1] -
240:5
**STACEY** [3] - 217:2,
217:4, 217:23
**STACKS** [1] - 52:21
**STAFF** [142] - 7:3,
7:13, 10:1, 10:4,
10:22, 11:15, 11:16,
11:21, 13:7, 13:9,
13:10, 14:18, 14:21,
15:20, 19:12, 19:14,
21:4, 22:4, 22:13,
27:9, 30:3, 30:7,
39:13, 40:21, 44:3,
44:7, 44:13, 44:24,
44:25, 45:13, 46:23,
46:24, 47:23, 47:25,
48:6, 48:14, 48:18,
48:25, 49:9, 49:16,
49:18, 51:22, 51:23,
53:19, 53:20, 54:2,
54:4, 54:21, 54:23,
58:7, 62:8, 63:10,
66:11, 66:16, 68:8,

85:8, 85:13, 85:21,
87:25, 88:7, 88:8,
91:21, 93:21,
100:15, 100:19,
109:18, 110:11,
110:18, 110:20,
111:4, 111:7,
111:15, 111:19,
111:21, 111:25,
112:11, 112:19,
112:25, 113:3,
113:6, 113:17,
113:21, 115:8,
116:4, 116:7, 118:2,
118:25, 123:12,
126:7, 129:17,
132:8, 133:8,
135:12, 135:22,
137:9, 138:1, 138:5,
138:8, 138:10,
138:15, 138:16,
138:18, 139:6,
140:4, 140:5,
140:12, 141:2,
141:4, 146:23,
184:15, 184:24,
195:24, 219:1,
219:3, 219:7,
219:13, 219:16,
219:18, 228:18,
229:2, 229:10,
229:11, 231:6,
231:10, 233:9,
233:10, 233:11,
237:20, 239:23,
240:23, 241:6,
241:7, 242:12,
243:15, 243:25,
244:11, 249:4,
250:9, 251:15,
255:18, 255:25
**STAFF** [10] - 12:16,
12:17, 13:13, 13:23,
29:20, 33:2, 46:11,
102:9, 199:15,
199:18
**STAFF'S** [6] - 63:7,
114:20, 115:20,
124:17, 231:22,
232:4
**STAFFING** [1] -
151:25
**STAGE** [3] - 112:20,
228:12, 229:18
**STAND** [3] - 4:12, 9:3,
158:22
**STANDARD** [2] -
254:12, 256:11
**STANDING** [2] - 9:6,
186:25

**STANDPOINT** [11] -
28:24, 33:2, 34:11,
39:24, 59:18, 61:8,
122:20, 154:21,
154:23, 208:1,
215:21
**STANDS** [1] - 230:21
**START** [13] - 3:4,
24:18, 29:18, 29:23,
40:24, 117:2,
143:16, 159:24,
183:13, 214:18,
215:7, 224:8, 225:7
**STARTED** [7] - 17:23,
22:15, 129:8,
151:20, 208:25,
219:15, 248:19
**STARTS** [1] - 107:17
**STARVE** [1] - 17:16
**STATE** [106] - 4:7,
4:18, 5:8, 5:21, 6:11,
7:11, 7:15, 7:20, 8:7,
8:15, 10:14, 10:24,
56:20, 57:8, 57:11,
96:22, 97:18, 98:15,
98:20, 99:2, 99:8,
99:21, 100:18,
101:2, 101:5, 102:1,
103:1, 104:7,
104:14, 106:19,
119:20, 119:25,
120:18, 130:4,
130:7, 131:25,
133:5, 133:20,
134:4, 134:23,
155:13, 156:14,
158:4, 158:11,
158:14, 160:10,
162:3, 172:12,
174:24, 175:3,
175:21, 176:3,
176:11, 178:16,
179:25, 181:20,
184:3, 185:16,
187:16, 187:21,
187:22, 187:23,
188:1, 188:3, 189:2,
189:24, 192:9,
198:4, 200:20,
205:13, 205:17,
205:19, 207:10,
207:11, 211:5,
211:7, 211:11,
211:22, 212:9,
212:25, 213:18,
213:22, 214:3,
215:9, 216:10,
221:3, 221:11,
224:2, 224:21,
227:12, 228:24,

228:25, 229:16,
229:19, 233:8,
233:21, 244:3,
245:4, 250:21,
250:24, 256:22,
257:13, 257:14
**STATE** [67] - 9:13,
12:15, 21:16, 21:18,
21:20, 23:13, 23:18,
23:21, 23:22, 24:2,
24:10, 44:16, 47:13,
47:14, 54:24, 64:25,
65:1, 68:11, 68:23,
83:8, 84:3, 84:10,
84:20, 92:10, 118:3,
118:8, 118:15,
118:17, 119:3,
119:13, 131:2,
145:23, 161:6,
178:2, 188:15,
212:17, 215:15,
221:22, 225:15,
225:18, 225:21,
225:22, 225:24,
227:1, 228:17,
228:20, 233:20,
234:1, 234:4, 234:5,
234:8, 234:12,
234:14, 235:9,
237:4, 238:23,
240:10, 242:5,
242:13, 247:23,
250:12, 250:25,
252:2, 252:7, 252:24
**STATE** [1] - 1:4
**STATE'S** [47] - 53:6,
54:3, 80:15, 82:14,
91:22, 92:21, 93:11,
96:15, 97:7, 98:3,
98:12, 107:14,
127:14, 130:22,
134:9, 141:9,
141:12, 141:14,
141:23, 142:2,
142:7, 144:5, 144:9,
145:8, 161:10,
164:10, 164:14,
164:16, 164:21,
164:25, 179:22,
180:15, 180:20,
181:1, 181:21,
200:11, 202:25,
206:12, 206:18,
207:4, 209:2,
214:22, 214:24,
226:6, 230:24,
256:4, 256:10
**STATE'S** [3] - 206:25,
238:13, 252:15
**STATE-BY-STATE** [2]

- 64:25, 65:1
**STATE-LEVEL** [1] - 247:23
**STATEMENT** [4] - 8:6, 147:20, 222:14, 233:19
**STATEMENTS** [11] - 8:5, 181:19, 182:16, 207:15, 207:21, 207:24, 208:12, 219:24, 220:2, 222:4
**STATES** [4] - 1:1, 1:11, 1:24, 259:3
**STATES** [9] - 118:6, 118:10, 140:20, 141:3, 145:21, 154:9, 215:23, 228:22, 250:14
**STATES** [29] - 6:1, 6:12, 6:16, 6:21, 10:5, 12:8, 33:21, 34:18, 38:25, 62:10, 65:19, 66:15, 68:10, 74:7, 92:25, 98:8, 107:6, 110:17, 110:24, 112:23, 129:18, 148:18, 189:17, 189:18, 189:22, 230:20, 232:21, 233:9, 234:13
**STATEWIDE** [1] - 217:20
**STATING** [1] - 75:16
**STATUS** [2] - 184:10
**STATUTE** [13] - 39:7, 135:23, 182:19, 216:19, 226:25, 228:11, 238:17, 238:19, 238:20, 239:4, 242:4, 245:15
**STATUTES** [1] - 39:8
**STAY** [4] - 8:17, 12:22, 146:8, 232:6
**STEP** [2] - 155:23, 179:11
**STEPS** [1] - 179:14
**STEVE** [3] - 1:11, 1:23, 259:12
**STICKING** [1] - 18:14
**STILL** [32] - 26:25, 28:18, 30:2, 33:6, 56:8, 65:10, 79:16, 85:12, 89:1, 108:14, 111:9, 117:10, 117:15, 128:25, 129:1, 129:5, 129:9, 129:10, 129:13, 130:13, 130:22, 162:19, 162:23,

176:1, 192:6, 212:12, 247:7, 248:23, 249:1, 252:15, 253:3, 254:5
**STOP** [6] - 50:15, 55:23, 58:13, 116:16, 150:11, 254:23
**STOPPED** [1] - 52:23
**STRATEGIES** [1] - 179:7
**STRATEGY** [4] - 50:5, 175:5, 175:9, 179:4
**STREET** [1] - 256:23
**STRING** [1] - 235:2
**STRONG** [1] - 196:20
**STRUCTURE** [2] - 32:1, 70:5
**STUFF** [1] - 36:14
**STUMBLING** [1] - 154:15
**STYLE** [1] - 20:8
**SUBJECT** [11] - 26:20, 38:6, 57:1, 64:2, 64:3, 118:17, 122:4, 144:25, 157:3, 172:1, 257:13
**SUBJECTS** [1] - 40:18
**SUBMIT** [3] - 228:14, 231:12, 239:22
**SUBMITTED** [1] - 197:18
**SUBPOENA** [4] - 90:24, 91:6, 94:12, 95:5
**SUBPOENAED** [3] - 90:22, 90:23, 183:16
**SUBSEQUENT** [2] - 166:16, 212:7
**SUBSEQUENTLY** [2] - 220:22, 222:16
**SUBSTANCE** [8] - 82:15, 126:2, 144:4, 176:25, 177:3, 177:4, 177:7, 183:7
**SUBSTANTIATE** [1] - 211:18
**SUCCESS** [2] - 244:19, 250:10
**SUDDEN** [2] - 21:8, 40:18
**SUED** [3] - 190:5, 190:9
**SUFFICIENT** [6] - 79:24, 128:21, 157:14, 212:23, 228:21, 243:14
**SUGGEST** [4] - 98:16, 109:4, 113:17, 191:15

**SUGGESTED** [1] - 229:19
**SUGGESTING** [4] - 83:13, 83:15, 98:19, 250:15
**SUGGESTION** [3] - 98:14, 132:20, 159:1
**SUI** [1] - 236:21
**SUING** [1] - 204:9
**SUIT** [1] - 235:15
**SUM** [1] - 82:14
**SUMMARIZE** [1] - 126:2
**SUMMARIZING** [1] - 188:9
**SUMMARY** [1] - 6:5
**SUMS** [1] - 241:20
**SUNDRY** [1] - 238:1
**SUNSET** [1] - 9:15
**SUPERIOR** [6] - 6:1, 6:14, 8:1, 43:8, 166:1, 257:17
**SUPERIORS** [1] - 236:5
**SUPERVISED** [1] - 32:1
**SUPERVISION** [2] - 70:10, 71:11
**SUPERVISOR** [1] - 71:5
**SUPPORT** [3] - 27:1, 158:5, 245:14
**SUPPORTING** [2] - 35:25, 85:7
**SUPPOSED** [4] - 40:17, 40:19, 111:7, 182:20
**SUPPRESSION** [3] - 182:7, 217:9, 217:24
**SUPREMACY** [2] - 7:6, 7:8
**SUPREMACY** [1] - 227:2
**SUPREME** [3] - 234:9, 235:21, 247:1
**SURPRISE** [3] - 50:8, 50:21, 75:15
**SURPRISED** [2] - 87:23, 87:24
**SURPRISING** [1] - 95:8
**SUSPECT** [4] - 137:20, 137:23, 217:13
**SWAMPED** [1] - 200:12
**SWINE** [1] - 17:20
**SWITCHBOARD** [9] - 47:2, 47:4, 55:3, 66:18, 99:16, 105:2,

105:10, 105:11, 199:7
**SWORN** [4] - 9:9, 9:22, 161:3, 186:8
**SYSTEM** [4] - 9:1, 188:9, 233:25, 239:9

## T

**TABLE** [4] - 5:8, 96:23, 97:2, 132:24
**TABULATE** [1] - 188:17
**TABULATIONS** [1] - 188:18
**TAPE** [1] - 214:3
**TARGET** [1] - 207:20
**TARGETED** [1] - 60:15
**TASK** [2] - 16:13, 235:22
**TAX** [1] - 234:2
**TAXING** [1] - 234:1
**TAXPAYER** [2] - 93:14, 93:16
**TEAM** [21] - 27:16, 35:19, 35:20, 35:25, 55:3, 148:21, 167:4, 167:8, 167:24, 168:7, 168:14, 168:17, 172:21, 172:22, 174:3, 175:17, 184:12, 184:13, 253:25
**TEAMS** [2] - 151:20, 194:12
**TECHNICAL** [1] - 230:19
**TEDDY** [1] - 249:15
**TELEPHONE** [6] - 25:14, 25:17, 30:6, 89:7, 177:24
**TEN** [4] - 8:6, 11:18, 85:22, 194:12
**TENDS** [1] - 218:5
**TENURE** [1] - 137:8
**TERM** [13] - 32:14, 38:22, 58:18, 78:24, 96:7, 96:9, 146:4, 150:10, 205:17, 205:19, 215:14, 230:12, 231:14
**TERMS** [42] - 9:25, 17:20, 22:11, 22:21, 22:22, 23:9, 23:11, 25:19, 26:14, 31:2, 31:10, 47:13, 50:24, 54:8, 63:23, 72:13, 82:1, 83:7, 83:9, 84:5, 92:22, 93:14,

94:8, 96:10, 96:11, 98:2, 105:17, 112:22, 118:8, 123:11, 127:18, 139:13, 150:21, 151:6, 154:3, 187:25, 196:20, 217:6, 225:10, 232:16
**TERWILLIGER** [4] - 4:22, 113:13, 135:10, 253:15
**TERWILLIGER** [79] - 1:19, 4:20, 4:22, 5:4, 8:12, 8:23, 9:2, 9:12, 10:7, 10:12, 10:17, 11:5, 11:12, 11:13, 18:13, 25:10, 25:13, 33:13, 41:11, 41:20, 41:23, 42:6, 42:17, 42:19, 42:24, 43:2, 43:11, 43:14, 43:17, 43:22, 43:23, 51:10, 51:13, 51:14, 55:4, 55:6, 56:2, 56:24, 59:12, 62:21, 72:18, 114:6, 115:21, 122:24, 123:1, 135:14, 141:25, 147:9, 147:11, 147:13, 147:15, 147:18, 149:11, 149:17, 149:19, 153:18, 153:20, 155:3, 155:5, 155:18, 156:5, 157:8, 159:11, 224:5, 224:24, 225:1, 225:4, 225:6, 226:7, 235:6, 236:15, 236:19, 237:21, 237:23, 237:25, 238:19, 239:6, 255:13, 257:5
**TEST** [10] - 29:11, 49:3, 226:9, 226:10, 227:3, 228:15, 236:25, 239:6, 239:7, 256:13
**TESTIFIED** [15] - 9:9, 69:1, 82:12, 108:24, 138:23, 147:19, 149:20, 161:3, 183:8, 183:22, 184:2, 186:8, 219:9, 232:14, 251:25
**TESTIFY** [8] - 42:2, 43:13, 177:4, 179:7, 183:14, 183:16, 183:17, 184:17

**TESTIFYING** [1] - 177:11

**TESTIMONY** [48] - 62:6, 62:17, 64:3, 65:16, 67:4, 67:10, 68:5, 69:6, 73:7, 73:22, 75:4, 76:9, 81:22, 82:15, 89:1, 94:2, 97:16, 98:5, 102:6, 103:11, 110:19, 110:23, 116:19, 116:21, 116:25, 119:23, 129:13, 131:8, 183:20, 192:12, 194:3, 199:24, 200:6, 203:9, 203:10, 206:20, 220:19, 227:9, 227:20, 227:25, 229:14, 230:6, 230:13, 230:23, 232:8, 233:13, 237:15, 256:7

**TESTING** [1] - 48:20

**TESTS** [2] - 29:5, 87:9

**TEXAS** [2] - 21:22, 118:11

**TEXT** [29] - 25:16, 25:18, 25:19, 25:20, 25:23, 26:19, 36:4, 65:19, 65:23, 66:13, 66:20, 90:2, 90:4, 90:8, 90:17, 90:19, 91:5, 91:7, 91:13, 96:13, 97:4, 196:7, 196:11, 196:12, 198:5, 198:7, 199:1, 199:5, 242:4

**TEXTS** [2] - 90:23, 95:20

**THE** [294] - 1:1, 1:4, 1:11, 1:14, 1:18, 1:23, 3:2, 4:17, 4:21, 5:3, 5:5, 5:12, 8:14, 8:19, 8:25, 9:4, 10:9, 10:13, 10:16, 11:7, 11:9, 17:6, 17:8, 22:25, 23:1, 23:2, 23:5, 23:15, 23:16, 23:17, 23:19, 23:20, 23:22, 25:6, 25:7, 25:8, 32:21, 32:22, 32:23, 32:25, 41:3, 41:5, 41:9, 41:10, 41:22, 42:2, 42:7, 42:11, 42:14, 42:16, 42:18, 42:23, 43:1, 43:10, 43:12, 43:15, 43:19, 50:10, 50:12,

50:15, 50:18, 51:9, 51:12, 55:5, 55:8, 55:21, 55:24, 55:25, 56:3, 57:3, 59:11, 59:14, 59:15, 59:25, 60:4, 60:6, 60:7, 60:9, 60:10, 60:11, 61:6, 61:8, 61:25, 62:23, 70:20, 70:21, 72:20, 75:23, 78:16, 78:17, 78:18, 78:19, 78:20, 83:18, 84:8, 84:11, 84:14, 84:15, 84:16, 84:17, 84:19, 84:22, 84:23, 84:24, 84:25, 86:23, 86:24, 88:12, 92:5, 92:6, 95:2, 95:3, 95:16, 96:3, 114:2, 114:11, 114:15, 115:1, 115:2, 115:15, 115:24, 116:9, 116:10, 116:13, 116:16, 116:23, 116:24, 117:6, 117:10, 117:12, 117:20, 122:25, 123:4, 126:20, 126:24, 126:25, 127:1, 131:21, 131:22, 135:16, 141:8, 141:24, 142:2, 143:13, 147:8, 149:7, 149:14, 149:18, 153:15, 153:19, 155:4, 155:20, 155:23, 155:25, 156:1, 156:4, 156:7, 156:12, 156:17, 156:21, 157:11, 158:23, 159:3, 159:5, 159:9, 159:12, 159:17, 159:20, 160:3, 160:11, 160:13, 160:19, 160:24, 161:7, 161:9, 161:18, 161:19, 161:22, 164:8, 164:22, 164:24, 177:21, 178:1, 178:6, 178:7, 178:9, 178:12, 178:19, 178:21, 178:24, 181:6, 181:16, 181:17, 182:4, 182:12, 182:19, 184:16, 184:18, 185:3, 185:5, 185:8, 185:9, 185:14,

185:18, 185:25, 186:3, 186:4, 186:24, 187:2, 187:3, 187:10, 187:11, 187:13, 187:15, 203:20, 203:22, 203:23, 203:25, 204:20, 204:23, 204:24, 205:1, 205:2, 205:4, 205:5, 205:7, 205:9, 205:11, 205:13, 205:14, 205:16, 205:18, 205:19, 205:22, 206:3, 206:6, 206:7, 206:9, 207:7, 209:4, 209:9, 209:11, 214:15, 215:1, 217:15, 222:2, 222:21, 222:23, 223:16, 223:18, 223:21, 223:23, 224:1, 224:4, 224:6, 224:13, 224:25, 225:3, 225:5, 226:5, 235:4, 236:13, 236:18, 237:17, 237:22, 237:24, 238:13, 238:20, 240:8, 240:13, 240:17, 243:18, 247:15, 251:10, 251:12, 251:16, 251:18, 252:3, 252:17, 252:24, 253:3, 253:7, 253:10, 253:24, 254:17, 254:22, 255:5, 255:8, 255:10, 257:3, 257:6, 257:24, 259:12, 259:16

**THEMSELVES** [1] - 4:13

**THEORY** [1] - 233:18

**THEREAFTER** [1] - 175:22

**THEREFORE** [6] - 7:25, 241:1, 241:9, 253:21, 257:12

**THEREIN** [4] - 44:1, 47:22, 49:15, 53:18

**THEREOF** [1] - 249:20

**THEY'VE** [2] - 54:10, 216:3

**THINKING** [1] - 172:17

**THINKS** [5] - 8:3, 19:4, 19:5, 232:11, 233:20

**THIRD** [3] - 120:6,

120:8, 232:8

**THOMPSON** [2] - 234:4, 247:14

**THOROUGH** [1] - 257:9

**THOUGHTFULLY** [1] - 208:6

**THOUSANDS** [2] - 14:16, 193:10

**THREATENED** [1] - 208:3

**THREATS** [8] - 12:8, 15:23, 15:25, 28:19, 30:1, 84:6, 208:2

**THREE** [19] - 6:19, 6:24, 7:2, 7:7, 19:1, 20:12, 34:19, 40:8, 48:19, 48:22, 49:1, 73:12, 100:4, 107:16, 157:25, 226:9, 228:15, 238:13, 239:1

**THRESHOLD** [1] - 226:23

**THROUGHOUT** [6] - 14:1, 169:15, 208:2, 208:9, 211:15, 242:13

**TIE** [2] - 227:1, 227:2

**TIGHTLY** [1] - 145:3

**TIMELINE** [2] - 78:7, 151:6

**TIMING** [1] - 217:16

**TITLE** [3] - 13:7, 39:22, 244:12

**TO** [3] - 1:23, 259:12, 259:16

**TO-DO** [2] - 12:21, 58:18

**TO-DOS** [1] - 12:9

**TODAY** [35] - 3:4, 4:14, 6:9, 8:2, 28:12, 75:20, 85:12, 91:11, 102:6, 107:4, 111:19, 131:9, 135:6, 186:2, 186:18, 192:12, 200:6, 206:20, 222:15, 224:9, 230:5, 238:12, 242:14, 243:1, 243:11, 245:3, 245:9, 246:19, 250:18, 252:10, 252:11, 254:10, 256:22, 257:15

**TODD** [1] - 145:1

**TOGETHER** [9] - 17:19, 17:21, 98:10, 121:25, 132:16,

132:25, 147:21, 149:24, 220:4

**TOMORROW** [3] - 144:12, 145:3, 145:14

**TONE** [1] - 208:14

**TOOK** [20] - 14:24, 41:13, 77:6, 108:10, 132:21, 148:3, 154:22, 174:11, 179:14, 191:20, 213:25, 216:24, 217:3, 217:11, 240:24, 245:6, 246:7, 249:5, 254:24, 254:25

**TOP** [6] - 28:13, 142:14, 148:21, 229:25, 230:1, 232:6

**TOPIC** [5] - 20:9, 20:10, 40:6, 86:8, 136:23

**TOPICS** [3] - 20:12, 21:19, 49:19

**TOTAL** [4] - 192:23, 212:12, 212:24, 252:16

**TOTALLY** [2] - 40:6, 130:20

**TOTALS** [1] - 222:8

**TOUCH** [2] - 231:7, 234:12

**TOUCHED** [1] - 249:11

**TOUGH** [1] - 255:4

**TOWARDS** [4] - 69:22, 96:24, 150:4, 244:19

**TRAIL** [1] - 115:7

**TRANSCRIPT** [1] - 1:10

**TRANSCRIPT** [3] - 131:7, 131:8, 259:6

**TRANSCRIPTS** [2] - 158:5, 159:1

**TRANSFER** [6] - 29:22, 97:6, 128:6, 150:13, 151:19, 228:4

**TRANSITION** [7] - 29:22, 96:24, 150:19, 151:8, 151:20, 228:4, 232:17

**TRANSPARENT** [1] - 130:20

**TRANSPIRED** [2] - 123:21, 219:21

**TRASH** [2] - 73:14, 73:16

**TRAVEL** [14] - 15:11,

15:12, 15:18, 15:21,
16:1, 32:13, 32:14,
32:18, 76:15, 87:17,
88:1, 93:19, 93:21
**TRAVELING** [4] -
33:1, 33:10, 93:18,
246:7
**TRAVELS** [1] - 15:22
**TREMENDOUS** [1] -
208:4
**TRIAL** [2] - 182:6,
253:1
**TRIALS** [1] - 181:23
**TRIED** [10] - 26:3,
35:2, 48:25, 100:13,
103:3, 213:3,
225:15, 234:17,
246:20
**TRIES** [2] - 59:22,
246:25
**TRIP** [3] - 52:11,
127:11, 134:12
**TRIPS** [1] - 15:14
**TROOP** [1] - 26:17
**TROUBLE** [1] - 32:22
**TROXLER** [2] - 17:25,
23:24
**TRUE** [12] - 25:20,
91:1, 109:7, 128:10,
152:7, 184:14,
206:22, 218:9,
218:24, 229:23,
246:16, 259:6
**TRULY** [1] - 53:4
**TRUMP** [161] - 7:4,
7:19, 10:2, 10:23,
35:10, 39:19, 56:20,
56:21, 57:8, 57:21,
63:12, 63:20, 64:5,
64:8, 66:4, 66:7,
66:21, 67:5, 67:11,
69:22, 71:14, 75:11,
77:15, 77:21, 78:5,
79:3, 79:21, 81:1,
82:12, 82:16, 88:18,
89:8, 89:12, 91:16,
91:23, 97:17, 98:15,
98:23, 99:2, 99:3,
99:7, 100:1, 100:7,
101:4, 102:23,
103:2, 103:25,
104:5, 106:4,
106:19, 107:12,
111:14, 119:19,
120:17, 121:7,
124:11, 130:5,
131:5, 133:3,
133:18, 133:19,
134:4, 134:16,
134:23, 139:25,

140:20, 142:22,
143:8, 146:7,
146:22, 148:3,
148:4, 163:12,
163:16, 163:18,
163:20, 163:22,
163:23, 164:2,
164:3, 165:12,
165:13, 165:15,
166:2, 166:3, 166:5,
166:23, 167:5,
167:6, 170:10,
170:11, 170:13,
170:19, 170:25,
171:4, 171:8,
171:14, 171:15,
172:11, 174:8,
174:24, 175:3,
175:6, 175:13,
175:16, 175:21,
176:11, 176:17,
177:19, 179:9,
179:10, 179:19,
184:5, 190:5, 190:6,
190:9, 190:23,
191:12, 191:24,
192:6, 195:15,
195:21, 196:2,
196:5, 199:4,
199:16, 204:8,
207:2, 207:16,
208:13, 208:17,
209:24, 209:25,
210:2, 210:9, 211:1,
211:7, 211:10,
211:15, 212:4,
213:3, 214:11,
219:1, 219:25,
227:18, 238:3,
240:3, 243:7,
247:14, 250:11,
251:8, 254:18
**TRUMP'S** [2] - 70:1,
87:16
**TRUMP'S** [6] - 71:18,
104:15, 120:24,
129:12, 132:1,
140:15
**TRUSTED** [1] - 17:17
**TRUTH** [2] - 114:16,
213:6
**TRUTHFUL** [1] - 51:6
**TRY** [30] - 3:15, 12:5,
12:8, 16:7, 16:12,
19:6, 19:18, 24:15,
32:20, 35:11, 35:13,
36:13, 37:4, 37:5,
44:12, 59:2, 81:16,
97:24, 98:1, 104:20,
110:11, 128:2,

159:22, 168:2,
226:2, 231:10,
232:22, 245:14,
250:13, 257:6
**TRYING** [80] - 8:20,
12:16, 12:18, 12:20,
13:1, 15:4, 16:14,
16:22, 17:20, 18:1,
18:12, 19:20, 20:4,
20:13, 26:11, 27:17,
27:19, 28:20, 29:1,
29:5, 29:13, 30:10,
33:8, 33:22, 35:8,
35:21, 36:15, 45:3,
45:5, 49:4, 58:11,
59:19, 61:4, 61:9,
63:3, 69:11, 73:6,
74:10, 74:18, 74:22,
77:19, 78:13, 81:9,
81:12, 87:4, 93:3,
95:7, 96:8, 103:12,
104:25, 106:24,
106:25, 110:2,
112:3, 118:21,
127:23, 129:1,
129:11, 130:20,
134:12, 134:15,
137:3, 147:20,
149:21, 149:23,
152:14, 227:23,
227:25, 228:1,
228:24, 230:24,
231:13, 232:17,
232:19, 238:24,
242:10, 246:1,
248:20, 250:24
**TUESDAY** [1] - 172:18
**TURN** [9] - 56:17,
75:1, 89:25, 156:5,
161:14, 182:22,
187:7, 235:22,
243:16
**TURNED** [4] - 182:23,
208:21, 208:22,
212:2
**TURNING** [2] - 21:25,
232:24
**TURNS** [1] - 240:3
**TV** [2] - 13:18, 136:22
**TWENTY** [2] - 5:16,
5:19
**TWENTY-EIGHT** [2] -
5:16, 5:19
**TWICE** [2] - 101:15,
101:16
**TWO** [43] - 6:22,
18:19, 21:3, 40:15,
45:15, 50:22, 82:25,
94:4, 101:19,
101:24, 120:7,

121:14, 126:8,
142:6, 142:8, 154:5,
156:10, 170:6,
175:6, 178:1, 179:5,
191:13, 193:16,
194:11, 196:19,
197:7, 198:3, 200:1,
200:8, 204:14,
212:8, 220:21,
220:22, 222:14,
222:16, 226:8,
226:16, 229:15,
246:16, 254:25,
257:12
**TWO-AND-A-HALF** [1]
- 170:6
**TWO-PAGE** [1] -
142:6
**TYPE** [4] - 23:20,
180:9, 197:10,
251:24
**TYPES** [3] - 16:16,
23:22, 220:18
**TYPICAL** [2] - 118:17,
207:17
**TYPICALLY** [3] -
47:12, 119:10,
169:19

## U

**U.S.C** [1] - 6:8
**ULTIMATELY** [3] -
29:20, 30:3, 150:5
**UM-HUM** [1] - 71:6
**UNCOMMON** [3] -
47:24, 54:23, 55:1
**UNDER** [38] - 5:18,
6:7, 6:20, 6:23, 7:23,
39:20, 45:13, 70:10,
71:11, 84:9, 87:4,
111:12, 117:11,
157:14, 157:17,
158:20, 181:18,
182:6, 182:7,
182:11, 182:12,
212:13, 224:14,
239:9, 241:14,
242:3, 245:11,
246:6, 246:12,
246:14, 247:7,
247:9, 248:2,
248:23, 249:7,
252:5, 254:13,
254:14
**UNDERAGED** [2] -
211:21, 212:1
**UNDERLIE** [1] - 236:6
**UNDERLIES** [1] -
234:14
**UNDERLYING** [1] -

226:25
**UNDERSTOOD** [11] -
69:6, 75:4, 76:9,
81:18, 95:11, 97:16,
121:10, 123:25,
219:12, 219:14,
247:16
**UNDERTAKE** [7] -
47:22, 48:5, 49:16,
53:18, 54:1, 54:20,
229:7
**UNDERTAKEN** [1] -
49:15
**UNDERTOOK** [2] -
44:2, 46:22
**UNDUE** [1] - 96:8
**UNFORTUNATE** [1] -
225:22
**UNFOUNDED** [4] -
79:3, 128:15,
128:18, 128:19
**UNHEARD** [1] -
157:24
**UNINVITED** [1] - 199:2
**UNIQUE** [1] - 93:20
**UNITED** [29] - 6:1,
6:12, 6:16, 6:21,
10:5, 12:8, 33:20,
34:18, 38:25, 62:10,
65:19, 66:15, 68:10,
74:7, 92:25, 98:8,
107:6, 110:17,
110:24, 112:23,
129:18, 148:18,
189:17, 189:18,
189:22, 230:20,
232:21, 233:9,
234:13
**UNITED** [4] - 1:1, 1:11,
1:24, 259:3
**UNIVERSALLY** [1] -
228:20
**UNLAWFULLY** [1] -
5:20
**UNLESS** [3] - 11:6,
178:10, 237:13
**UNLIKE** [1] - 243:25
**UNNOTARIZED** [1] -
157:2
**UNOFFICIAL** [1] -
139:3
**UNPLEASANTNESS**
[1] - 52:25
**UNPREPARED** [1] -
243:11
**UNQUESTIONABLE**
[1] - 228:19
**UNQUOTE** [1] - 13:14
**UNRELATED** [1] -
40:6

**UNSOURCED** [1] - 157:5
**UNSURE** [1] - 187:6
**UNSWORN** [3] - 157:1, 157:13, 158:15
**UNUSUAL** [1] - 68:4
**UP** [132] - 4:12, 6:9, 8:17, 8:20, 9:4, 12:9, 12:18, 12:20, 12:23, 13:1, 14:25, 15:13, 15:14, 16:12, 17:19, 17:22, 17:25, 19:10, 19:21, 20:18, 20:19, 20:24, 22:16, 25:21, 26:21, 26:24, 27:1, 28:25, 29:3, 29:21, 30:12, 30:15, 30:20, 32:10, 32:11, 33:23, 34:1, 36:20, 36:25, 38:10, 39:3, 39:20, 42:13, 44:11, 44:20, 45:4, 49:23, 52:10, 52:21, 54:24, 55:2, 58:25, 59:2, 62:11, 62:14, 63:5, 63:11, 69:24, 72:10, 77:20, 77:21, 77:22, 91:14, 92:2, 92:16, 97:21, 97:23, 99:14, 99:15, 104:25, 108:15, 109:20, 110:16, 112:12, 112:20, 121:5, 124:1, 124:4, 124:7, 126:6, 128:5, 130:1, 134:12, 137:19, 144:16, 150:8, 152:24, 156:15, 159:22, 160:24, 169:25, 171:4, 181:6, 185:21, 185:25, 186:1, 187:4, 192:6, 192:7, 193:12, 193:14, 193:15, 194:5, 197:4, 200:13, 201:17, 202:15, 203:19, 207:10, 207:13, 208:5, 208:20, 212:23, 219:11, 219:17, 230:22, 231:3, 231:19, 234:7, 241:20, 242:6, 243:1, 245:4, 248:18, 252:14, 255:3, 256:18, 257:3, 257:20, 258:1
**UPCOMING** [1] - 172:17

**UPDATE** [1] - 31:17
**UPDATES** [1] - 22:22
**US** [3] - 213:24, 216:6, 223:14
**USB** [1] - 206:19
**USC** [1] - 157:13
**USEFUL** [1] - 27:10
**USES** [1] - 242:25

# V

**VACANCIES** [1] - 49:23
**VACATION** [3] - 14:22, 14:25, 15:1
**VAGUE** [1] - 89:20
**VALID** [3] - 80:22, 150:3
**VALIDATION** [1] - 225:8
**VARIED** [1] - 131:5
**VARIETY** [9] - 13:25, 16:7, 18:11, 21:19, 24:9, 46:25, 49:19, 85:10, 105:16
**VARIOUS** [7] - 118:3, 119:13, 140:20, 169:14, 217:7, 231:7, 238:1
**VAST** [1] - 126:10
**VERACITY** [7] - 77:13, 129:2, 133:11, 133:13, 141:20, 150:1, 151:14
**VERIFICATION** [16] - 52:6, 91:15, 96:19, 103:13, 103:16, 127:13, 129:7, 129:19, 132:5, 133:9, 192:20, 192:21, 198:7, 199:3, 208:10
**VERIFICATIONS** [7] - 96:11, 96:21, 98:2, 107:5, 108:8, 108:10, 130:23
**VERIFIED** [1] - 212:1
**VERIFY** [3] - 131:1, 131:2, 188:17
**VERIFYING** [2] - 193:11, 198:16
**VERSED** [1] - 84:12
**VERSION** [1] - 56:16
**VERSUS** [2] - 18:24, 210:9
**VESTED** [1] - 236:2
**VETTED** [1] - 78:15
**VETTING** [1] - 29:15
**VIEW** [1] - 150:20
**VIEWED** [4] - 27:25,

34:15, 34:22, 150:22
**VIOLA** [2] - 1:23, 259:11
**VIOLA_ZBOROWSKI @GAND. USCOURTS.GOV** [1] - 1:25
**VIOLATED** [6] - 40:14, 41:7, 41:13, 42:12, 149:1, 229:6
**VIOLATING** [1] - 32:20
**VIOLATION** [22] - 5:17, 5:19, 5:23, 40:2, 136:7, 140:6, 140:8, 149:1, 177:5, 215:15, 215:16, 225:19, 229:7, 229:20, 233:16, 233:20, 234:8, 238:6, 238:9, 251:24, 252:2, 252:24
**VIOLATIONS** [4] - 136:19, 137:14, 225:15, 226:13
**VIRGINIA** [1] - 168:1
**VIRTUALLY** [2] - 175:22, 220:2
**VISIT** [4] - 82:8, 152:9, 230:8, 230:9
**VISITED** [2] - 218:11, 218:14
**VISITING** [3] - 52:3, 76:11, 90:13
**VISUAL** [2] - 69:11, 72:7
**VITALLY** [3] - 3:18, 4:6
**VOICE** [1] - 199:25
**VOICEMAIL** [2] - 196:14, 200:11
**VOLUME** [1] - 36:7
**VOLUNTEER** [2] - 122:14
**VOTE** [11] - 7:22, 39:18, 59:17, 130:12, 191:19, 192:3, 210:20, 210:21, 211:23, 222:7
**VOTED** [5] - 146:17, 193:11, 211:22, 212:4, 212:9
**VOTER** [2] - 165:14, 166:4
**VOTER** [10] - 212:2, 213:18, 213:22, 217:7, 217:9, 217:24, 217:25, 220:5, 221:6, 221:13

**VOTER'S** [1] - 222:12
**VOTERS** [12] - 126:13, 211:22, 212:1, 212:3, 212:12, 212:14, 212:15, 212:17, 220:21, 221:2, 222:14, 222:16
**VOTES** [7] - 7:20, 84:6, 211:8, 217:3, 217:7, 221:7, 247:20
**VOTING** [1] - 215:16
**VS** [1] - 1:7

# W

**WADE** [1] - 5:9
**WADE** [1] - 1:17
**WAIT** [1] - 61:18
**WAKE** [1] - 137:19
**WAKEFORD** [2] - 5:7, 240:14
**WAKEFORD** [26] - 1:16, 5:6, 8:16, 83:19, 95:14, 240:12, 240:14, 240:18, 243:19, 247:16, 251:11, 251:14, 251:17, 252:2, 252:4, 252:23, 252:25, 253:5, 253:8, 253:18, 254:4, 254:20, 255:2, 255:6, 255:9, 257:23
**WALK** [1] - 159:17
**WALL** [2] - 11:2, 24:12
**WANTS** [3] - 65:22, 173:18, 201:12
**WARRANT** [1] - 233:22
**WASHINGTON** [1] - 150:24
**WATCH** [2] - 7:22, 218:23
**WATSON** [17] - 53:21, 54:9, 54:10, 54:12, 77:5, 77:23, 89:7, 89:13, 89:15, 90:3, 90:12, 90:13, 90:15, 130:25, 194:23, 194:24, 197:13
**WAYS** [4] - 29:12, 52:17, 93:1, 257:10
**WAYSIDE** [1] - 37:4
**WEAKER** [1] - 30:14
**WEAKNESS** [1] - 227:21
**WEDDING** [2] - 15:2, 15:3

**WEDNESDAY** [1] - 182:16
**WEEK** [7] - 14:8, 101:19, 101:24, 120:7, 199:25, 200:8, 258:2
**WEEKEND** [2] - 3:3, 15:3
**WEEKENDS** [3] - 14:11, 14:13
**WEEKS** [1] - 200:8
**WEIGH** [3] - 29:19, 91:8, 196:24
**WEIGHING** [1] - 196:25
**WEIGHT** [2] - 158:24, 159:6
**WELCOME** [2] - 20:20, 226:4
**WELL-ADVISED** [1] - 85:9
**WELL-INFORMED** [2] - 52:12, 85:9
**WELL-KNOWN** [1] - 15:20
**WELL-VERSED** [1] - 84:12
**WERE** [1] - 258:4
**WEST** [8] - 13:12, 13:17, 13:18, 13:24, 15:10, 19:11, 45:19, 169:22
**WEST** [2] - 13:22
**WHATNOT** [1] - 31:1
**WHATSOEVER** [3] - 4:8, 216:18, 227:15
**WHEAT** [1] - 36:19
**WHEREAS** [1] - 244:3
**WHITE** [46] - 11:20, 15:9, 22:15, 22:22, 24:23, 24:25, 25:4, 27:5, 41:12, 41:25, 42:11, 45:1, 45:21, 46:11, 47:2, 47:4, 51:2, 66:17, 68:20, 74:10, 74:15, 82:22, 82:24, 94:9, 95:3, 95:5, 95:8, 99:15, 105:2, 105:7, 105:10, 105:11, 124:20, 125:4, 136:20, 137:6, 137:10, 137:22, 151:3, 169:20, 171:15, 171:17, 199:7, 200:23, 229:10, 232:12
**WHOLE** [11] - 20:6, 41:1, 53:4, 87:1, 104:17, 150:13,

222:5, 222:18, 224:21, 232:18, 243:23
**WIDE** [1] - 47:3
**WIDELY** [1] - 106:24
**WIDER** [2] - 237:1, 237:2
**WIDESPREAD** [6] - 78:9, 79:3, 79:18, 80:2, 80:21, 127:7
**WIFE** [2] - 73:13, 208:2
**WILLFUL** [1] - 238:10
**WILLFULLY** [1] - 237:14
**WILLING** [1] - 92:11
**WILLIS** [2] - 6:11, 7:12
**WIN** [5] - 146:11, 146:13, 146:16, 211:7, 251:3
**WIND** [2] - 45:4, 151:23
**WING** [8] - 13:12, 13:17, 13:18, 13:24, 15:10, 19:11, 45:19, 169:22
**WINNER** [1] - 251:8
**WINNING** [1] - 146:7
**WIRES** [1] - 36:15
**WISCONSIN** [2] - 92:8, 92:17
**WISE** [3] - 8:14, 8:19, 8:21
**WISHED** [4] - 99:8, 101:1, 101:5, 102:1
**WISHES** [1] - 8:5
**WITHDRAW** [1] - 126:21
**WITHDRAWAL** [6] - 20:10, 26:15, 28:17, 30:23, 86:16, 86:25
**WITNESS** [23] - 41:17, 41:19, 55:8, 59:25, 117:19, 141:7, 149:9, 153:14, 156:3, 156:4, 159:15, 159:18, 160:8, 164:7, 181:17, 181:19, 182:24, 185:9, 185:15, 206:8, 214:15, 223:25, 241:10
**WITNESS** [63] - 17:8, 23:1, 23:5, 23:16, 23:19, 23:22, 25:7, 32:22, 32:25, 41:5, 41:10, 42:11, 42:16, 50:12, 50:18, 55:24, 59:15, 60:6, 60:9,

60:11, 61:8, 70:21, 78:17, 78:19, 84:11, 84:15, 84:17, 84:22, 84:24, 86:24, 92:6, 95:3, 115:2, 116:10, 116:23, 117:12, 126:25, 131:22, 153:19, 155:25, 161:7, 161:18, 178:1, 178:7, 178:12, 178:21, 181:16, 184:16, 185:8, 186:3, 187:2, 187:10, 203:22, 203:25, 204:23, 205:1, 205:4, 205:7, 205:11, 205:14, 205:18, 205:22, 206:6
**WITNESS** [1] - 185:12
**WITNESSED** [1] - 130:23
**WITNESSES** [1] - 2:2
**WITNESSES** [5] - 156:9, 158:16, 159:21, 224:1, 224:2
**WITT** [1] - 168:4
**WON** [9] - 133:21, 134:4, 134:16, 134:17, 134:23, 192:10, 217:11, 230:17, 230:21
**WONDER** [1] - 253:18
**WONDERFUL** [1] - 134:10
**WONDERING** [10] - 60:21, 60:23, 62:19, 65:4, 96:6, 104:12, 108:2, 121:6, 129:10, 171:3
**WOODS** [1] - 4:23
**WOOTEN** [1] - 1:17
**WOOTEN** [1] - 5:11
**WORD** [11] - 79:16, 87:8, 96:2, 96:10, 106:5, 187:9, 235:1, 242:24, 242:25, 243:2, 243:3
**WORDS** [11] - 104:13, 104:16, 151:13, 170:17, 193:9, 213:7, 213:23, 238:21, 243:7, 251:24, 254:3
**WORKERS** [1] - 208:3
**WORKINGS** [1] - 230:2
**WORKS** [1] - 250:1
**WORLD** [2] - 232:11, 232:12

**WORLD'S** [1] - 222:5
**WORSE** [1] - 17:7
**WORTHY** [1] - 158:22
**WOUND** [1] - 25:21
**WRAP** [5] - 19:21, 20:24, 44:11, 58:25, 59:2
**WRAP-UP** [5] - 19:21, 20:24, 44:11, 58:25, 59:2
**WRAPPED** [4] - 44:20, 193:12, 193:14, 194:5
**WRIGHT** [4] - 4:10, 4:16, 9:6, 186:5
**WRITE** [5] - 62:2, 122:22, 185:21, 252:19, 252:21
**WRITING** [2] - 144:13, 144:14
**WRONGDOING** [1] - 192:25
**WROTE** [2] - 86:15, 146:5

## Y

**YEAR** [7] - 6:3, 15:5, 27:7, 27:15, 211:24, 212:1
**YEARS** [8] - 40:8, 73:12, 121:22, 121:23, 162:7, 170:6, 216:3, 217:11
**YELLED** [1] - 148:15
**YESTERDAY** [1] - 145:1
**YORK** [4] - 21:21, 31:13, 69:16, 118:6
**YOU-ALL** [18] - 3:2, 3:6, 3:25, 4:14, 5:5, 5:12, 10:9, 108:16, 117:2, 156:18, 157:9, 159:20, 218:7, 224:6, 224:13, 224:15, 251:25, 257:24
**YOUNG** [1] - 5:11
**YOUNG** [1] - 234:25
**YOUNG** [1] - 1:16
**YOURSELF** [1] - 175:15

## Z

**ZBOROWSKI** [1] - 259:10
**ZBOROWSKI** [2] - 1:23, 259:11
**ZERO** [2] - 50:9, 212:16

**ZOOMED** [1] - 248:18